## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA

SUKENIA MARSHALL,            )
                                       )
                 Plaintiff,      )
                                       )     Civil Action No. 2:06CV973-ID
       v.                     )
                                       )
GLOVIS ALABAMA, LLC,      )
                                       )
               Defendant.    )
_____)

## DEFENDANT GLOVIS ALABAMA, LLC'S MOTION FOR SUMMARY JUDGMENT, AND IN THE ALTERNATIVE FOR PARTIAL SUMMARY JUDGMENT

COMES NOW Defendant Glovis Alabama, LLC ("Glovis" or "Defendant"), and files this Motion for Summary Judgment on the five claims pled by Plaintiff Sukenia Marshall ("Plaintiff"). In the event summary judgment is denied on either of Plaintiff's Title VII claims, Glovis also moves for partial summary judgment on the damages sought by Plaintiff for those claims.

In support of its Motion, Glovis has concurrently filed:

- A Memorandum of Law in Support of the Motion;

- Deposition Transcripts from the depositions of Plaintiff Sukenia Marshall and Elizabeth Lindemann, and cited exhibits from those depositions; and

- Declaration of Elizabeth Lindemann

Respectfully submitted this 12th day of February, 2008.

**Nelson Mullins Riley & Scarborough LLP**

Daniel M. Shea
Christopher S. Enloe
ENL001

999 Peachtree Street, N.E.
Suite 1400
Atlanta, Georgia 30309
Telephone:     (404) 817-6000
Facsimile:     (404) 817-6050

**ATTORNEYS FOR DEFENDANT
GLOVIS ALABAMA, LLC**

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA

SUKENIA MARSHALL,                 )
                                     )
            Plaintiff,       )
                                     )   Civil Action No. 2:06CV973-ID
   v.                              )
                                     )
GLOVIS ALABAMA, LLC,        )
                                   )
            Defendant.    )
_____)
                                     )

## CERTIFICATE OF SERVICE

I hereby certify that on February 12, 2008, a true and correct copy of the foregoing Motion for Summary Judgment and Motion for Partial Summary Judgment, along with all cited deposition transcripts, exhibits and declarations, was served on Plaintiff's counsel of record via the "Notice of Electronic Filing" that is automatically generated by the Court's Electronic Filing System, addressed as follows:

        Dwayne L. Brown, Esq.
        dbrown@dbrownatty.com
        P.O. Box 230205
        Montgomery, AL  36123-0205

Chris Enloe

1          THE UNITED STATES DISTRICT COURT

2          IN THE MIDDLE DISTRICT OF ALABAMA

3                MONTGOMERY DIVISION

4

5    SUKENIA MARSHALL,

6              Plaintiff,

7

8    vs.                    CASE NO.: 2:06CV973

9

10   GLOVIS ALABAMA, LLC,

11             Defendant.

12

13      C O N D E N S E D   T R A N S C R I P T

14

15         DEPOSITION OF SUKENIA MARSHALL,

16   taken pursuant to notice and stipulation on

17   behalf of the Defendant, in the offices of

18   Dwayne L. Brown, PC, 4150-A Carmichael

19   Road, Montgomery, Alabama, before Vila

20   Davenport, Judicial Reporter and Notary

21   Public in and for the State of Alabama at

22   Large, on Tuesday, October 2, 2007,

23   commencing at approximately 9:50 a.m.

1

SUKENIA MARSHALL -- 10/2/07

THE UNITED STATES DISTRICT COURT
IN THE MIDDLE DISTRICT OF ALABAMA
MONTGOMERY DIVISION

SUKENIA MARSHALL,

      Plaintiff,

vs.          CASE NO.: 2:06CV973

GLOVIS ALABAMA, LLC,

      Defendant.

   *   *   *   *   *   *

DEPOSITION OF SUKENIA MARSHALL,
taken pursuant to notice and stipulation on
behalf of the Defendant, in the offices of
Dwayne L. Brown, PC, 4150-A Carmichael
Road, Montgomery, Alabama, before Vila
Davenport, Judicial Reporter and Notary
Public in and for the State of Alabama at
Large, on Tuesday, October 2, 2007,
commencing at approximately 9:50 a.m.

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

2

SUKENIA MARSHALL -- 10/2/07

APPEARANCES

FOR THE PLAINTIFF:

**DWAYNE L. BROWN, ESQUIRE**
Dwayne L, Brown, P.C.
4150-A Carmichael Road
Montgomery, Alabama  36106

FOR THE DEFENDANT:

**CHRIS ENLOE, ESQUIRE**
Nelson, Mullins, Riley &
  Scarborough, LLP
999 Peachtree Street, N.E.
14th Floor
Atlanta, Georgia  30309-3964

**ALSO PRESENT:**
Liz Lindemann

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

3

SUKENIA MARSHALL -- 10/2/07

1           STIPULATIONS
2      It is hereby stipulated and
3  agreed by and between counsel representing
4  the parties that the deposition of **SUKENIA**
5  **MARSHALL** is taken pursuant to notice and
6  stipulation on behalf of the defendant;
7  that all formalities with respect to
8  procedural requirements are waived; that
9  said deposition may be taken before Vila
10  Davenport, Judicial Reporter and Notary
11  Public in and for the State of Alabama at
12  Large, without the formality of a
13  commission; that objections to questions,
14  other than objections as to the form of the
15  questions, need not be made at this time
16  but may be reserved for a ruling at such
17  time as the deposition may be offered in
18  evidence or used for any other purpose as
19  provided for by the Civil Rules of
20  Procedure for the State of Alabama.
21      It is further stipulated and
22  agreed by and between counsel representing
23  the parties in this case that the filing of

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

4

SUKENIA MARSHALL -- 10/2/07

1  the deposition of **SUKENIA MARSHALL** is
2  hereby waived and that said deposition may
3  be introduced at the trial of this case or
4  used in any other manner by either party
5  hereto provided for by the Statute,
6  regardless of the waiving of the filing of
7  same.
8      It is further stipulated and
9  agreed by and between the parties hereto
10  and the witness that the signature of the
11  witness to this deposition is hereby
12  waived.

15      *   *   *   *   *   *

18           INDEX
19  **EXAMINATION:**          **PAGE**
20  By Mr. Enloe .........................  7

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

**5**

SUKENIA MARSHALL -- 10/2/07

| | | |
|---|---|---|
| 1 | **EXHIBITS:** | **PAGE** |
| 2 | DX-1 | Hager Hinge Company    50 |
| 3 | | Application For |
| 4 | | Employment of Sukenia |
| 5 | | Marshall, dated 8/17/06. |
| 6 | DX-2 | Hager-Montgomery Personnel   60 |
| 7 | | Performance Record of |
| 8 | | Sukenia Marshall, dated |
| 9 | | 3/16/07. |
| 10 | DX-3 | Davis Family Medicine, PC,   78 |
| 11 | | Medical Records of Sukenia |
| 12 | | Marshall, dated 2/24/03 |
| 13 | | and 3/5/07. |
| 14 | DX-4 | AIDT Application for    99 |
| 15 | | Training for Glovis of |
| 16 | | Sukenia Marshall, dated |
| 17 | | 4/12/05. |
| 18 | DX-5 | Offer of Employment Letter   107 |
| 19 | | from Liz Lindemann, Human |
| 20 | | Resource Specialist, Glovis |
| 21 | | Alabama, L.L.C., to |
| 22 | | Sukenia Marshall, dated |
| 23 | | 6/7/05. |

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

**6**

SUKENIA MARSHALL -- 10/2/07

| | | |
|---|---|---|
| 1 | DX-6 | Employees Positions and    118 |
| 2 | | Duties, Bates stamped |
| 3 | | GLOVIS 0060, not dated. |
| 4 | DX-7 | E-mails between Liz    196 |
| 5 | | Lindemann and Dave |
| 6 | | Harris at Glovis, |
| 7 | | various dates. |
| 8 | | |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

**7**

SUKENIA MARSHALL -- 10/2/07

1    * * * * * *
2        **SUKENIA MARSHALL**, of lawful age,
3    having first been duly sworn, testified as
4    follows:
5        THE REPORTER:  Usual stipulations?
6        MR. BROWN:  That's fine for me.
7        MR. ENLOE:  That will be fine.
8        **EXAMINATION**
9    **BY MR. ENLOE:**
10   Q.   Good morning, Ms. Marshall, my name is
11       Chris Enloe.  I'm the attorney for the
12       defendant in the lawsuit that you filed,
13       Glovis Alabama, LLC.  And before we get
14       started just to be sure I'm referring to
15       you correctly, is your name still Sukenia
16       Marshall, or has it changed since you filed
17       the case?
18   A.   **It has changed.**
19   Q.   What's your name now?
20   A.   **Sukenia Gordon.**
21   Q.   Would it be better, then, if I refer to you
22       as Ms. Gordon today?
23   A.   **Yes, sir.**

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

**8**

SUKENIA MARSHALL -- 10/2/07

1    Q.   Okay.  I just wanted to be sure.  I noticed
2        that change on some of the documents.
3            THE REPORTER:  Excuse me.  Can you
4            speak up, please?
5            THE WITNESS:  Okay, I will.
6            THE REPORTER:  Thank you.
7    Q.   There's a tape recorder picking up some of
8        this too so --
9    A.   **Okay.**
10   Q.   -- it can be difficult in a deposition when
11       you first start talking, because most
12       people aren't accustomed to speaking loudly
13       and trying to throw their voices, but it
14       makes the court reporter's job easier if we
15       both try to do that.  One of the things I
16       like to do at the beginning of a deposition
17       is ask the person a couple of questions,
18       just preliminary questions, to try to
19       figure out whether or not a person's been
20       through situations like this before.  Have
21       you ever been in a deposition, a proceeding
22       like this before?
23   A.   **No, sir.**

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

9

SUKENIA MARSHALL -- 10/2/07

1    Q.    Okay.  Then what I'll do is just cover a
2          few ground rules with you that may make
3          today a little bit easier for both of us
4          and for the court reporter.  Your lawyer
5          may have covered this with you already, but
6          I'm the attorney for the company, and we
7          were just introduced a moment ago, and I'm
8          going to be asking you a series of
9          questions today about your claims in the
10         lawsuit that you filed against Glovis.  The
11         court reporter, who is the lady sitting to
12         your left, is going to be taking down
13         everything that I say and that you say and
14         for that reason, there are a couple of
15         ground rules that lawyers like to observe
16         in depositions to try to make things go
17         more smoothly.  The first is as the court
18         reporter just noted, it's important for
19         both of us to try to speak loudly enough
20         for her to understand us.
21   A.    Okay.
22   Q.    The second thing that's important, and we
23         need to work together on this, is to try

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

10

SUKENIA MARSHALL -- 10/2/07

1          not to talk over one another, because she
2          can only hear one of us at a time.  At
3          times, I'll ask questions that probably
4          seem endless so you may have to be patient,
5          but if you can try to wait until I'm done
6          with my question, and I'll try to wait
7          until you're done with your answer, we
8          won't talk over one another.  You
9          understand that you've just been placed
10         under oath; is that right?
11   A.    Yes, sir.
12   Q.    And you understand that that oath obligates
13         you to testify truthfully; is that correct?
14   A.    That's correct.
15   Q.    Okay.  As I'm asking questions today, if at
16         any point you don't understand the
17         question, let me know and I'll rephrase it
18         or I'll repeat it; is that okay?
19   A.    Yes, sir.
20   Q.    Okay.  And if you want to take a break at
21         any point, we'll probably break every hour
22         or so, but if at any point you need a
23         break, just let me know and I'll do my best

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

11

SUKENIA MARSHALL -- 10/2/07

1          to accommodate you.
2    A.    Okay.
3    Q.    A couple of the preliminary questions ---
4          these are questions that I have to ask just
5          to be sure that you are capable of
6          testifying today.  First, are you taking
7          any medication today that might affect your
8          ability to testify truthfully and honestly?
9    A.    No, sir.
10   Q.    Okay.  And are you under the influence of
11         any drugs or alcohol today?
12   A.    No, sir.
13   Q.    Is there any other reason why you wouldn't
14         be able to testify truthfully and
15         accurately this morning?
16   A.    No, sir.
17   Q.    Okay.  Did you review any documents or
18         other material in preparation for your
19         deposition?
20   A.    No.  I just glanced over my paperwork that
21         I had at home already.
22   Q.    Okay.  And what paperwork is that?
23   A.    From where I filed the complaint and then I

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

12

SUKENIA MARSHALL -- 10/2/07

1          glanced them today.
2    Q.    Okay.  So you looked at the amended
3          complaint that you filed in this case?
4    A.    Yes, sir.
5    Q.    Did you look at any other documents?
6    A.    No, sir.
7    Q.    Okay.  And aside from your attorney, did
8          you speak with anyone about your
9          deposition?
10   A.    No, sir.  Well, my mom.
11   Q.    Okay.  And what did y'all discuss about the
12         deposition?
13   A.    She just told me just to be calm and just
14         answer the questions that I had to them --
15         just that was it basically.
16   Q.    Okay.  Had your mom been in a deposition
17         before?  Did she understand how the process
18         worked?
19   A.    No.
20   Q.    Okay.  Let me show you a document.
21               MR. ENLOE:  And, Dwayne, this is
22               y'all's initial disclosures.  I
23               don't think we need to make it an

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

13

1              exhibit, but if you want to, we
2              can.
3          MR. BROWN:  That's fine.  I don't
4          see any need to make an exhibit.
5          MR. ENLOE:  Yeah, I didn't think
6          so.
7     Q.   So I'm handing you a document, Ms. Gordon.
8          It's your initial disclosure in this
9          lawsuit.  This is a document that your
10         attorney filed on your behalf right after
11         the case began.  If I could turn your
12         attention to the first page here, the first
13         question that this form asks is for the
14         name and additional information about any
15         individual you know of who may have
16         discoverable information about this case,
17         and you list yourself obviously and then
18         you list Mr. Albright, and we'll talk about
19         Mr. Albright in a moment.  You've listed
20         Ms. Lindemann who is here with us today and
21         then you list three other folks, and I have
22         a couple of questions about those folks for
23         you.

14

1              First, you listed a man
2          named Timothy Wells, W-E-L-L-S.  How do you
3          know Mr. Wells?
4     A.   I also reported to him in the morning at
5          Glovis.
6     Q.   So you reported to Mr. Wells when you were
7          working at Glovis?
8     A.   Yes, sir.
9     Q.   Okay.  Did you report to him the whole time
10         you were there?
11    A.   No, sir.
12    Q.   Do you recall how long you reported to him?
13    A.   Every day that I was employed just about.
14         It was he -- him and another -- him and
15         Mr. Albright.
16    Q.   Okay.  So did you report to both of them or
17         at some point did one of them take over for
18         the other?
19    A.   Well, Mr. Wells was out, and Mr. Albright
20         was the only one that we could report to
21         when Mr. Wells got injured.
22    Q.   Okay.  So initially it was Mr. Wells that
23         you reported to and then when he was out

15

1          with an injury, you reported to
2          Mr. Albright?
3     A.   It was both of them at the same time.
4     Q.   Okay.
5     A.   Both of them were there so either one that
6          we got to first, we reported to them.
7     Q.   Okay.  Do you recall what Mr. Wells' job
8          title was at that time?
9     A.   We assumed he was our supervisor also.
10    Q.   And when you say you assumed he was your
11         supervisor, why did you assume that, did
12         somebody tell you he was your supervisor?
13    A.   Well, the day of our orientation, it was
14         told that it would be Mr. Albright or Tim
15         Wells.
16    Q.   Okay.  You mentioned an orientation, were
17         you the only person in this orientation or
18         were other folks there as well?
19    A.   It was other people also.
20    Q.   Do you recall roughly how many other --
21         first, I guess, I should ask, at this
22         orientation was it you and some other new
23         employees?

16

1     A.   Yes, sir.
2     Q.   And do you recall how many new employees
3          were there aside from yourself?
4     A.   Maybe 25 or so.
5     Q.   Okay.  Aside from you and these other new
6          employees, who else was at the orientation
7          session?
8     A.   Ms. Lindemann.  And they also brought in --
9          well, she also brought in other, like, the
10         supervisor that, I think, it was Mike -- I
11         can't remember his last name -- but he
12         walked in also, and we met with him.
13    Q.   And Mike -- and I know you don't know his
14         last name, did -- do you recall if he held
15         the same position as Mr. Wells or
16         Mr. Albright?
17    A.   Yes, he did.  But he was on night shift.
18    Q.   Okay.  And do you know Mr. Wells phone
19         number?
20    A.   No, sir.
21    Q.   Do you know his address?
22    A.   No, sir.
23    Q.   Do you know what town he lives in?

SUKENIA MARSHALL V. GLOVIS ALABAMA -- 10/3/07

---

17

SUKENIA MARSHALL -- 10/2/07

1   A.  **I think it might be Montgomery, I'm not for**
2      **sure.**
3   Q.  Okay.  And you've listed him here as a
4      witness.  What do you think he might know
5      that might be relevant in this case?
6   A.  **He -- well, he knows a lot about what was**
7      **going on, on the job.**
8   Q.  And specifically what do you think he might
9      know?
10  A.  **He know how Mr. Albright was harassing me**
11     **during the time that he was out.  After he**
12     **came back after he was injured, he talked**
13     **to me and let me know that he knew what was**
14     **going on, that people had told him how**
15     **Mr. Albright had been treating me and that**
16     **he would talk with Ms. Lindemann and**
17     **Mr. Harris about it.**
18  Q.  Did Mr. Wells see you and Mr. Albright
19     interact?
20  A.  **No, I don't think he did.**
21  Q.  Do you know if he overheard any
22     conversation between you and Mr. Albright?
23  A.  **He's overheard little remarks that**

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

18

SUKENIA MARSHALL -- 10/2/07

1      **Mr. Albright would say.**
2   Q.  What kinds of remarks did Mr. Wells
3      overhear, if you know?
4   A.  **Well, one day in particular, he asked me to**
5     **go out and take some stuff out to the**
6     **dumpster, and when I was getting ready to**
7     **go out, he made a remark to me about taking**
8     **me out, and I told him know, no, and that I**
9     **had a boyfriend at the time, and he said**
10     **that he didn't give a...**
11  Q.  You can say exactly.
12  A.  **Damn about my boyfriend.**
13  Q.  Okay.  And this is Mr. Albright you're
14     speaking about?
15  A.  **Mr. Albright said this.**
16  Q.  And you think Mr. Wells may have overheard
17     that?
18  A.  **Yes, he did.**
19  Q.  Okay.  Do you know if Mr. Wells overheard
20     any other remarks that Mr. Albright made to
21     you that you thought were improper?
22  A.  **I'm not for sure if he did or -- I know for**
23     **a fact he heard that one, but I'm not for**

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

19

SUKENIA MARSHALL -- 10/2/07

1      sure.
2   Q.  And do you know if Mr. Wells ever saw
3      Mr. Albright do anything to you that you
4      thought was improper?
5   A.  **No.  Mr. Wells never saw it.**
6   Q.  Okay.  But Mr. Wells told you that he had
7      heard other people talking about how
8      Mr. Albright had acted around you?
9   A.  **Yes.**
10  Q.  Okay.  And do you know if Mr. Wells
11     actually spoke to Ms. Lindemann or
12     Mr. Harris?
13  A.  **No.  I'm not for sure if he did.**
14  Q.  Okay.  Does Mr. Wells know anything else
15     that you think might be important in your
16     case?
17  A.  **I'm not sure.**
18  Q.  Okay.  Have you talked to Mr. Wells since
19     you stopped working at Glovis?
20  A.  **I saw him once in the mall.**
21  Q.  When was that, roughly?
22  A.  **Probably in about -- maybe two months ago.**
23  Q.  Okay.  Did y'all talk?

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

20

SUKENIA MARSHALL -- 10/2/07

1   A.  **Yes, sir.**
2   Q.  What did y'all talk about?
3   A.  **He just asked me how was I doing and asked**
4     **where was I working now.**
5   Q.  Did y'all talk about this case?
6   A.  **No, sir.**
7   Q.  Do you know if Mr. Wells knows that you
8     have the lawsuit against the company?
9   A.  **I think he probably would know.**
10  Q.  And why is that?
11  A.  **Because another girl that I was talking**
12     **with that I was friends with, she was still**
13     **there at the time, and she would -- I mean,**
14     **her and I were real close so --**
15  Q.  Okay.
16  A.  **-- I'm pretty sure she -- it could have got**
17     **to him.**
18  Q.  You think she might have told Mr. Wells?
19  A.  **She could have, I'm not sure.**
20  Q.  Have you ever discussed this lawsuit with
21     Mr. Wells?
22  A.  **No, sir.**
23  Q.  Okay.  Did you ever discuss your EEOC

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

**21**

SUKENIA MARSHALL -- 10/2/07

1  charge with Mr. Wells?
2  A.  No, sir.
3  Q.  And you mentioned this friend of yours,
4      would that be Ms. Jackson?
5  A.  Yes, sir.
6  Q.  Okay.  And is that the lady who is listed
7      here in the initial disclosures?
8  A.  Yes, sir.
9  Q.  And is that the correct spelling of her
10     first name, Shonterri?
11 A.  Yes, sir.  I think it is.
12 Q.  Okay.  And so Ms. Jackson was a co-employee
13     of yours at Glovis?
14 A.  Yes, sir.
15 Q.  And what was her job, do you recall?
16 A.  She worked in, I think it was shipping.
17 Q.  In shipping?
18 A.  In the shipping department.
19 Q.  Was that the same department you worked?
20 A.  No, sir.
21 Q.  Did y'all work the same shift?
22 A.  Yes, sir.
23 Q.  Okay.  And you may need to educate me a

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

**22**

SUKENIA MARSHALL -- 10/2/07

1  little bit about the layout at Glovis.  The
2  shipping department, where was that located
3  in the company facility?
4  A.  It's in the back of the building right next
5      to the department that I worked in, in
6      laydown.
7  Q.  And what department did you work in?
8  A.  Laydown.
9  Q.  Laydown?
10 A.  Uh-huh.
11 Q.  And y'all worked the same shift during the
12     time you were there?
13 A.  Yes, sir.
14 Q.  Did y'all interact while you were working?
15 A.  Yes, sir.
16 Q.  Okay.  And how so, did you work together,
17     or did you just visit with one another when
18     you had a break?
19 A.  No.  She drove the tugger, so some days she
20     would have to come --
21     THE COURT REPORTER:  I'm sorry?
22     THE WITNESS:  Tugger.
23 Q.  Is that T-U-G-G-E-R?

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

**23**

SUKENIA MARSHALL -- 10/2/07

1  A.  Uh-huh.
2  Q.  Okay.
3  A.  So if she had an order on my aisle, she
4      would come -- have to come to my aisle to
5      pull her order.
6  Q.  How many times did that happen over an
7      average shift would you guess?
8  A.  Maybe once or twice.
9  Q.  Once or twice a shift?
10 A.  Well, one -- yeah, maybe once or twice that
11     she would have to come to my aisle.
12 Q.  Okay.  And do you know if Ms. Jackson ever
13     saw you and Mr. Albright interact at work?
14 A.  She saw it several times, like --
15 Q.  Okay.  Well, let's talk about that.  What
16     do you know that Ms. Jackson saw that
17     Mr. Albright did or said to you?
18 A.  One day we were about to go to lunch, and
19     he walked out, and this other guy -- I
20     don't remember his first name, but we
21     always called him King, and he asked King
22     what could he do with me, and King told
23     him, he said, I can't do anything with that

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

**24**

SUKENIA MARSHALL -- 10/2/07

1  lady, that lady is a married woman.  And he
2  said, there's a lot of things that I could
3  do with her.  And King just laughed it off
4  and walked, and I never responded to it.  I
5  just kept walking that day.
6  Q.  Okay.  So just so I have the picture
7      straight, you were going to -- about to go
8      to lunch?
9  A.  Yes, sir.
10 Q.  And you overheard Mr. Albright say to this
11     employee who y'all called King --
12 A.  Uh-huh.
13 Q.  -- what can I do with you?
14 A.  Uh-huh.
15 Q.  And was Ms. Jackson present and overheard
16     that as well?
17 A.  Yes, sir.  We was walking together.
18 Q.  Okay.  Anybody else overhear that, do you
19     know?
20 A.  I don't -- I'm not for sure if they paid
21     any attention to what he was saying or not.
22 Q.  Do you know if anybody else was within
23     earshot?

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

**25**

SUKENIA MARSHALL -- 10/2/07

1  A.  I can't remember who all it was.
2  Q.  Okay.  Do you recall what month that was?
3      You were there for two months, June and
4      July '05?
5  A.  That was in June.  I think it was in June.
6  Q.  Okay.  All right.  Did Ms. Jackson see or
7      hear anything else that Mr. Albright did
8      that you thought was improper?
9  A.  They -- she noticed how if I would have to,
10     like, leave my aisle for anything if I went
11     to the restroom how he constantly walked
12     the floor and looked for me.  If I moved,
13     he always was harassing me.
14 Q.  So did Ms. Jackson see Mr. Albright look
15     around for you?
16 A.  He would ask her.
17 Q.  Okay.  And what would he ask her?
18 A.  Where -- did she see me, did she know where
19     I was.
20 Q.  Okay.  And do you know if anybody else ever
21     heard Mr. Albright ask about you in that
22     manner?
23 A.  Yes.  Ms. Terri Corbett.

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

**26**

SUKENIA MARSHALL -- 10/2/07

1      THE REPORTER:  Corbett?
2      THE WITNESS:  Corbett.
3  Q.  Anyone else?
4  A.  C. J. Jackson.
5  Q.  Is that a man or a woman?
6  A.  A man.
7  Q.  Okay.  Were these co-employees of yours?
8  A.  Yes, sir.
9  Q.  Were they in the laydown department or
10     shipping?
11 A.  Laydown.
12 Q.  Okay.  Did Ms. Jackson -- aside from what
13     you've already told me, did Ms. Jackson
14     see or hear anything else that Mr. Albright
15     did that you thought was improper?
16 A.  No, sir, not that I can recall.
17 Q.  And does Ms. Jackson know anything else
18     that you think might be relevant in your
19     case?
20 A.  No, sir.  I don't think.  I'm not for sure.
21 Q.  And then you've listed a third person here,
22     a gentleman named Nathanial Greyhouse?
23 A.  Greyhouse, uh-huh.

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

**27**

SUKENIA MARSHALL -- 10/2/07

1  Q.  Is it Greyhouse?
2  A.  Uh-huh.
3  Q.  Okay.  And how do you know Mr. Greyhouse?
4  A.  Mr. Greyhouse worked on the same aisle as I
5      did.
6  Q.  Okay.  So in the laydown department?
7  A.  Yes, sir.
8  Q.  Was he on your shift?
9  A.  Yes, sir.
10 Q.  And what do you think Mr. Greyhouse might
11     know that might matter in your case?
12 A.  Mr. Greyhouse, he knows a lot.  He was
13     there all day.
14 Q.  Okay.  And did he see you and Mr. Albright
15     interact any time?
16 A.  Yes, sir.
17 Q.  And do you think he saw you -- Mr. Albright
18     do or say anything to you that you thought
19     was improper?
20 A.  Yes, sir.
21 Q.  And what do you think Mr. Greyhouse saw
22     that you thought was improper?
23 A.  The day that Mr. Albright grabbed my belt

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

**28**

SUKENIA MARSHALL -- 10/2/07

1      buckle and pulled my pants out,
2      Mr. Greyhouse, he was there.  He saw it.
3  Q.  Okay.  Tell me exactly what happened then.
4  A.  I was working that day, and I had just got
5      off of the shelf, and I was bending down to
6      pick up another tote, and Mr. Albright
7      walked behind me and grabbed the loop of my
8      jeans and pulled it back, and he said, I
9      like the panties that you're wearing, and I
10     told him that he shouldn't be touching me,
11     that I didn't appreciate him touching me
12     and that he -- I mean, I -- he just needed
13     to stop and leave me alone.
14 Q.  And what did Mr. Albright say?
15 A.  He laughed about it.
16 Q.  Did he keep touching you, or did he walk
17     away?
18 A.  No, sir, he walked away.
19 Q.  And you think Mr. Greyhouse saw that?
20 A.  He saw it.
21 Q.  Did anybody else see that?
22 A.  No, sir.
23 Q.  So you were working in your aisle?

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

29

SUKENIA MARSHALL -- 10/2/07

1   A.   Yes, sir.
2   Q.   And you bent over to pick up a tote?
3   A.   Yes, sir.
4   Q.   And a tote, is that a big plastic bucket of
5        sorts?
6   A.   Yes, sir.
7   Q.   Okay. And it's got material in it or it's
8        empty, and you're moving it someplace else;
9        is that right?
10  A.   It has material in it.
11  Q.   Okay. And so you were leaning over to pick
12       one up, and as you were bending over,
13       Mr. Albright came back around behind you?
14  A.   No, sir. He walked up behind me after I
15       stood up with the tote.
16  Q.   Okay.
17  A.   I was already standing.
18  Q.   Okay. So you were standing up holding the
19       tote, and he came up behind you?
20  A.   Yes, sir.
21  Q.   And where did he grab you?
22  A.   He grabbed the center of my belt buckle --
23  Q.   Okay. So he -

30

SUKENIA MARSHALL -- 10/2/07

1   A.   -- the loop.
2   Q.   He grabbed the belt loop?
3   A.   Yes, sir.
4   Q.   Did he touch your body?
5   A.   To me that was touching enough. I felt him
6        when he pulled it.
7   Q.   Did he touch your skin or just grab the
8        loop?
9   A.   He grabbed the loop.
10  Q.   Okay. And he pulled the loop towards him?
11  A.   Yes, sir.
12  Q.   How far did he pull you? Did he move you
13       at all, or did he just tug?
14  A.   He moved me. He moved.
15  Q.   How far?
16  A.   It wasn't --
17            MR. BROWN: If you know.
18  A.   -- very far. I just, you know, he -- once
19       he pulled, I jerked a little bit when he
20       pulled it.
21  Q.   Okay. And then at that point he said to
22       you --
23  A.   He said, I like those panties that you have

31

SUKENIA MARSHALL -- 10/2/07

1        on.
2   Q.   Okay. How close was Mr. Greyhouse while
3        all of this was happening?
4   A.   He was right at the end on the aisle.
5   Q.   Did Mr. Greyhouse say anything or do
6        anything when this happened?
7   A.   When Mr. Albright turned and walked away
8        and when he was laughing, Mr. Greyhouse
9        approached me and said, Did he just touch
10       you, and I said, yes, he did.
11  Q.   Okay. And you told Mr. Albright when he
12       made that comment to you that you didn't
13       think that was appropriate?
14  A.   Yes, sir, I did.
15  Q.   And he laughed and then he walked away?
16  A.   He laughed.
17  Q.   How long would you say this whole incident
18       took, if you can recall, from the time he
19       first grabbed the belt loop to the time he
20       laughed?
21  A.   Maybe a minute or so.
22  Q.   Okay. Okay. Did Mr. Greyhouse see
23       anything else happen between you and

32

SUKENIA MARSHALL -- 10/2/07

1        Mr. Albright that you think was improper?
2   A.   Yeah. He walked up to me one morning, and
3        he said, Do -- you still haven't changed
4        your mind about letting me take you out,
5        and I said, no, Ellis. I've told
6        you over and over that I have someone. I
7        said, no, I don't want you to take me out,
8        I wish you would leave me alone. He went
9        to Mr. Greyhouse and talked to
10       Mr. Greyhouse and told him don't help me
11       anymore that they just -- he don't care how
12       heavy a tote was just let me pick it up
13       myself because I was a spoiled brat.
14  Q.   And did you witness this conversation?
15  A.   No, I didn't witness it.
16  Q.   Okay. How did you hear about it?
17  A.   Mr. Greyhouse told me. He came to me and
18       repeated what Mr. Albright said to him, and
19       he let me know. He was, like, I'm not
20       listening to him, because I'm not going to
21       hold anything against you because you won't
22       do what he ask -- what he wants you to do.
23  Q.   So Mr. Greyhouse told you that Mr. Albright

33

SUKENIA MARSHALL -- 10/2/07

1    told him, don't help her, she's a spoiled
2    brat?
3    A.    Uh-huh.  He told him that he didn't care
4          how heavy a tote was to let me get it
5          myself.
6    Q.    Okay.  And do you know if Mr. Greyhouse
7          heard or saw Mr. Albright do anything else
8          that you thought was improper?
9    A.    It was a lot of times Mr. Albright would
10         make comments about my shape or different
11         things that Mr. Greyhouse he heard.
12   Q.    Do you recall any other specifics?
13   A.    He would talk about how he -- one day he
14         came by, and I was bending over picking up
15         another tote about to put it on the shelf,
16         and he said something about in effect about
17         how -- why my rear end was -- and he
18         laughed about it.  I guess he thought
19         Mr. Greyhouse would laugh about it, or it
20         was another employee by the name of Ron,
21         and I can't remember his name.  His name --
22   Q.    Ryan?
23   A.    Ron.

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

34

SUKENIA MARSHALL -- 10/2/07

1    Q.    How do you spell that, do you know?
2    A.    It's R-O-N.
3    Q.    R-O-N?
4    A.    Uh-huh.
5    Q.    I'm sorry.  So on this occasion, you
6          overheard Mr. Albright make a comment about
7          your backside?
8    A.    Yes, sir.
9    Q.    Do you recall what he said?
10   A.    I was bent -- I can't -- I couldn't
11         remember exactly what he said, but he said
12         something about my rear end being wide
13         or --
14   Q.    Okay.
15   A.    -- something.  And I guess he wanted them
16         to laugh, but they didn't.
17   Q.    So you think Mr. Greyhouse and this
18         employee named Ron overheard that comment?
19   A.    They overheard it.
20   Q.    Okay.  And did anyone else overhear it?
21   A.    No, sir.  It was just them.
22   Q.    And did Mr. Albright say anything else on
23         that particular occasion or just make that

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

35

SUKENIA MARSHALL -- 10/2/07

1    comment and laugh and walk off.
2    A.    He just made that comment.
3    Q.    Okay.  And aside from what you've already
4          told me, did Mr. Greyhouse see or do
5          anything -- excuse me.  Did Mr. Greyhouse
6          see Mr. Albright say or do anything, to
7          your knowledge?
8    A.    No, sir.  I think that could have been it.
9          Like I said, it was several occasions that
10         he would make remarks that Mr. Greyhouse,
11         he always knew.
12   Q.    Okay.  As we go through today, you may
13         remember other things that Mr. Greyhouse
14         may have seen or heard, if you remember
15         those things, just let me know and we can
16         go back to this topic?
17   A.    Okay.
18   Q.    But for now, those are the things that you
19         know that Mr. Greyhouse saw or heard
20         Mr. Albright do to you or say to you that
21         you thought was improper?
22   A.    Yes, sir.
23   Q.    Okay.  Aside from the employees that you've

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

36

SUKENIA MARSHALL -- 10/2/07

1    listed here and then the ones you just
2    mentioned, do you know if any other
3    employees at Glovis saw or heard
4    Mr. Albright do or say anything to you that
5    you thought was inappropriate?
6    A.    Everybody in the department, they knew, but
7          I know for a fact though, they witnessed
8          several incidents that Mr. Albright did.
9    Q.    But can you think of anyone specifically
10         who would have seen or heard any of these
11         things aside from the people you've told me
12         about?
13   A.    No, sir.
14   Q.    Okay.  And aside from the people that
15         you've told me about right now and the
16         folks that you've listed here, do you know
17         of anyone else who might know anything
18         about your case for the allegations that
19         you've made in this case?
20   A.    No, sir.
21   Q.    Okay.  Do you have any documents from any
22         of these folks that discuss what they saw
23         or they heard with respect to you and

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

37

SUKENIA MARSHALL -- 10/2/07

1   Mr. Albright?
2   **A.   No, sir.**
3   Q.   Do you have any tape recordings or video
4   recordings of you and Mr. Albright
5   interacting?
6   **A.   No, sir.**
7   Q.   Do you know if any of these folks do?
8   **A.   No, sir, they don't.**
9   Q.   Okay.
10  **A.   Not that I know of.**
11  Q.   To your knowledge there's no video or audio
12  recording of you and Mr. Albright
13  interacting at Glovis?
14  **A.   No, sir.**
15  Q.   Okay.  You can put that aside.
16  MR. BROWN:  Do you want these
17  back?
18  MR. ENLOE:  Just in case we have
19  to refer back to them, you will
20  have them handy.  I've got some
21  questions about the
22  interrogatories, Dwayne, I don't
23  think we need to make these an

38

SUKENIA MARSHALL -- 10/2/07

1   exhibit either unless you
2   disagree.
3   MR. BROWN:  Okay.
4   Q.   Ms. Gordon, I'm going to hand you a
5   document now, and this is another document
6   that your attorney provided on your behalf.
7   These are your answers to some written
8   questions that we sent to you.  These
9   questions are called interrogatories, and
10  I've got a couple of questions for you
11  about your answers here so if you could
12  take a look at -- excuse me, page three, I
13  believe.  Question No. 5, it asks for your
14  employment history, do you see that?
15  **A.   Yes, sir.**
16  Q.   I've got a couple of questions for you
17  about your answer here.  You've listed a
18  variety of companies here and so I'm going
19  to ask you some questions about each one.
20  **A.   Okay.**
21  Q.   The first company you listed is Big Lots.
22  **A.   Yes.**
23  Q.   And you indicate that you were employed

39

SUKENIA MARSHALL -- 10/2/07

1   there from 2000 to 2003; is that right?
2   **A.   Yes, sir.  To the best of my knowledge,
3   yes, sir.**
4   Q.   Okay.  And your supervisor was Mr. Howell?
5   **A.   Yes, sir.**
6   Q.   What was your job there?
7   **A.   Shipping department and on the module.**
8   THE REPORTER:  I'm sorry.
9   Shipping department and what?
10  THE WITNESS:  Module.
11  THE REPORTER:  Okay.
12  MR. ENLOE:  M-O-D-U-L-E.
13  Q.   And it says here that you made ten dollars
14  an hour while you were there?
15  **A.   Yes, sir.**
16  Q.   Was that true the whole time?
17  **A.   No, sir.**
18  Q.   Okay.  Did it ever change?
19  **A.   In the beginning, I started off at -- I
20  think it was eight zero five or something
21  like that.**
22  Q.   But the last rate that you were earning was
23  ten bucks an hour?

40

SUKENIA MARSHALL -- 10/2/07

1   **A.   Yes, sir.**
2   Q.   Okay.  And it states that you were
3   terminated, what were you terminated for?
4   **A.   Absentees, tardy.**
5   Q.   Were you tardy a lot or were you not
6   present at work a lot, do you recall?
7   **A.   I think --**
8   MR. BROWN:  Object to the form of
9   the question.
10  **A.   I think --**
11  MR. ENLOE:  I -- unless --
12  MR. BROWN:  I just object to the
13  term "a lot".  I mean, there's
14  certain employee --
15  MR. ENLOE:  Oh, I understand.  I
16  wasn't --
17  MR. BROWN:  Yeah.
18  MR. ENLOE:  -- I didn't have a
19  problem with your objection.  I
20  wasn't sure the witness
21  understood she could still answer
22  the question.
23  MR. BROWN:  Oh, yeah, yeah.  I'm

SUKENIA MARSHALL -- GEOVIS v. DAVENPORT -- 10/3/07

---

41

SUKENIA MARSHALL -- 10/2/07

1               sorry, you can still answer.

2    A.  **I would think it was mostly absentees.**

3    Q.  Okay.  Were you ever written up or

4       disciplined while you were at Big Lots?

5    A.  **Yes, sir.**

6    Q.  And do you recall why you were written up

7       or disciplined?

8    A.  **For my absentees.**

9    Q.  Okay.  And you left the company in 2003?

10    A.  **Yes, sir.**

11    Q.  And that was because you were discharged at

12       that point?

13    A.  **Yes, sir.**

14    Q.  Okay.  Do you have any documents from your

15       time at Big Lots?

16    A.  **No, sir.**

17    Q.  Okay.  Then the next company you have

18       listed here, is that Arkay Plastic?

19    A.  **Yes, sir.**

20    Q.  And was that the employer where you worked

21       after you worked at Big Lots?

22    A.  **Yes, sir.  I think it was.**

23    Q.  Okay.  And this indicates that your job

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

42

SUKENIA MARSHALL -- 10/2/07

1       there was assembler?

2    A.  **Yes, sir.**

3    Q.  And your supervisor was Debra Bassel?

4    A.  **Yes, sir.**

5    Q.  Wage was eight zero five an hour; is that

6       right?

7    A.  **Yes, sir.**

8    Q.  Was that your wage the whole time there?

9    A.  **Yes, sir.**

10    Q.  Okay.  And it says you were laid off

11       because the contract ended?

12    A.  **Yes, sir.**

13    Q.  What kind of contract was that?

14    A.  **They had a contract through -- I think it**

15       **was Nissan at the time, and once Nissan --**

16       **the contract ended, they had to downsize,**

17       **and laid off some of the employees.**

18    Q.  Okay.  And then you were laid off as a part

19       of that?

20    A.  **Yes, sir.**

21    Q.  Okay.  Were you ever written up or

22       disciplined there that you recall?

23    A.  **No, sir.**

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

43

SUKENIA MARSHALL -- 10/2/07

1    Q.  How long were you there?

2    A.  **I think it was maybe five or six months.**

3    Q.  Okay.  And do you recall where they're

4       located?

5    A.  **It's in Prattville.  I think it's Doster**

6       **Road.**

7    Q.  How do you spell that, do you know?

8    A.  **D-O-S-T-E-R.**

9    Q.  Do you know if they're still in business?

10    A.  **I think the name has changed.  They're**

11       **Amtek or something.**

12    Q.  Okay.  And then the next one you have

13       listed is Glovis, and obviously we know

14       about that.  And then the next one is

15       WorkForce.  Was that the first job that you

16       held after you left Glovis?

17    A.  **WorkForce was a temp agency.**

18    Q.  Okay.  And so they placed you at various

19       jobs for short period of time?

20    A.  **Yes, sir.**

21    Q.  Do you recall when you started working

22       through WorkForce, what month it would be?

23    A.  **No, sir.**

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

44

SUKENIA MARSHALL -- 10/2/07

1    Q.  Was it in 2005?

2    A.  **No, sir.  It was '06.**

3    Q.  Okay.  And so how long were you not working

4       between the time you left Glovis and the

5       time you started working for WorkForce?

6    A.  **It was a while before I went back to work.**

7       **I can't recall exactly how long.  I'm**

8       **thinking maybe a year or so before I went**

9       **back to work.**

10    Q.  And why was that?

11    A.  **I looked for work, and I just didn't hear**

12       **anything for any jobs at the time.**

13    Q.  Do you recall how many places you applied

14       to during that period?

15    A.  **No, sir.  It wasn't right after I left -- I**

16       **was terminated from Glovis, because I**

17       **didn't go immediately to look for work.**

18    Q.  Do you recall how long after you left

19       Glovis you started looking?

20    A.  **Maybe six months.**

21    Q.  Why did you not look for six months?

22    A.  **Stress.**

23    Q.  Explain that to me.

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

---

**45**

SUKENIA MARSHALL -- 10/2/07

1    A.    **I was just down and depressed a lot after.**

2    Q.    So you were down and depressed and didn't

3           start looking for work until about six

4           months had gone by?

5    A.    **Yes, sir.**

6    Q.    So if you left Glovis in July of '05 and

7           six months passed before you start looking,

8           do you think you may have started looking

9           after Christmas?

10   A.    **It could have been after Christmas. I'm**

11       **not really real sure about it.**

12   Q.    Okay. So you started looking, then, at

13       some point six months or so after you left

14       Glovis?

15   A.    **Yes, sir.**

16   Q.    And then the first job you located was

17       through WorkForce?

18   A.    **Yes, sir.**

19   Q.    Do you recall roughly when you started

20       working through WorkForce in '06?

21   A.    **No, sir. I can't remember.**

22   Q.    Do you have any pay stubs from WorkForce?

23   A.    **No, sir, I don't have any.**

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

**46**

SUKENIA MARSHALL -- 10/2/07

1    Q.    Okay. But at some point in 2006, you

2           started working through them?

3    A.    **Yes, sir.**

4    Q.    And was your wage seven fifty an hour the

5           whole time you were working through them?

6    A.    **It depends on which job they would send me**

7       **to. Sometimes the pay would change. It**

8       **was seven dollars sometimes. Sometimes it**

9       **could have been eight.**

10   Q.    And how long, roughly, did you work through

11       WorkForce?

12   A.    **Maybe a couple of months or so.**

13   Q.    Okay. And then after that, it looks as

14       though you started working for another temp

15       company called Instaffing Personnel?

16   A.    **Yes, sir.**

17   Q.    And why did you make that switch, do you

18       recall?

19   A.    **Instaffing, they would pay you a little bit**

20       **more to send me to a job, and they sent me**

21       **to a job that once I got there, I really**

22       **liked it so.**

23   Q.    Was that the job at Hager Hinge?

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

**47**

SUKENIA MARSHALL -- 10/2/07

1    A.    **Yes, sir.**

2    Q.    Do you recall how long you worked for

3           Instaffing before you went on as a full

4           time employee at Hager Hinge?

5    A.    **Just the two -- well, three months.**

6    Q.    So -- and I know that your memory on this

7           isn't great, but as best you can recall,

8           you worked through WorkForce for a couple

9           of months, two or three months and then you

10       worked through Instaffing for two or three

11       months and then you were hired on at Hager?

12   A.    **Yes, sir.**

13   Q.    And are you currently with Hager?

14   A.    **Yes, sir.**

15   Q.    Okay. Hold on to this, but I've got

16       another document that might help you. How

17       much money did you make when you first

18       started working at Hager, do you recall?

19   A.    **I was doing the temp service at Hager, and**

20       **it was seven dollars and some change, and**

21       **they gave me a raise through the temp**

22       **service.**

23   Q.    And when -- do you recall when you became a

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

**48**

SUKENIA MARSHALL -- 10/2/07

1          full-time employee at Hager?

2    A.    **It was, I want to say, September.**

3    Q.    Of '06?

4    A.    **Yes, sir.**

5    Q.    And do you recall how much they offered you

6           when you started there as a full-time

7           employee?

8    A.    **Eleven sixty-five.**

9    Q.    Okay. And what job did you start doing

10       when you came on full time there?

11   A.    **Secondary operator.**

12   Q.    Is that the job you hold now?

13   A.    **No, sir.**

14   Q.    What do you do now?

15   A.    **I'm a C&C operator.**

16   Q.    Is that a promotion?

17   A.    **Yes, sir.**

18   Q.    Okay. When did that promotion take place?

19   A.    **It was four months ago.**

20   Q.    Okay. Are those the two jobs you've held

21       at Hager since you were full time?

22   A.    **Yes, sir.**

23   Q.    And it looks like you may have gotten a

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

49

SUKENIA MARSHALL -- 10/2/07

1  raise as well; is that right?

2  **A.   Yes, sir.**

3  Q.   Was that raise to fifteen twenty-four an

4  hour?

5  **A.   I've gotten two more since that one.**

6  Q.   Okay.  And what's your current wage?

7  **A.   Sixteen sixteen.**

8  Q.   Sixteen sixteen?

9  **A.   Yes, sir.**

10  Q.   And that's your current wage?

11  **A.   Yes, sir.**

12  Q.   How many hours a week do you normally work?

13  **A.   Forty-five sometimes.**

14  Q.   Do you get over time for the extra five?

15  **A.   Yes, sir.**

16  Q.   And have you been working forty-five on

17  average since you started there full time?

18  **A.   Yes, sir.**

19  Q.   Okay.  Take a look at this document,

20  please.  We are going to mark this as

21  Defendant's 1.  I will just mark my copy

22  and give it to you.  That's a double-sided

23  document so there's stuff on the back

50

SUKENIA MARSHALL -- 10/2/07

1  side.

2         (The referred-to document was

3         marked for identification as

4         Defendant's Exhibit No. 1.)

5         MR. BROWN:  This is 1; right?

6         MR. ENLOE:  Yeah.

7  Q.   Did you have a moment to take a look at

8  that, Ms. Gordon?

9  **A.   Yes, sir.**

10  Q.   And can you identify this document?

11  **A.   Yes, sir.**

12  Q.   What is it?

13  **A.   It's my application for employment for**

14  **Hager.**

15  Q.   Okay.  And so you filled this out in August

16  of '06 when you applied to be a full-time

17  employee there?

18  **A.   Yes, sir.**

19  Q.   And is all the information on here

20  accurate?

21  **A.   Yes, sir.**

22  Q.   Take a look at the back page under

23  Employment Record?

51

SUKENIA MARSHALL -- 10/2/07

1  **A.   Uh-huh.**

2  Q.   This lists your employment history -- or at

3  least most recent employment history; is that

4  right?

5  **A.   Yes, sir.**

6  Q.   Is Glovis listed here?

7  **A.   No, sir.**

8  Q.   And why not?

9  **A.   I didn't have any room.**

10  Q.   Didn't you work at Glovis after you worked

11  at Arkay?  You worked at Glovis in June and

12  July of '05; right?

13  **A.   You mean right here in the middle where I**

14  **have Kelley?**

15  Q.   Yeah.

16  **A.   Kelley was through the temp service.**

17  Q.   My question though is why doesn't Glovis

18  appear instead of Arkay since you worked at

19  Glovis more recently than you worked at

20  Arkay?

21  **A.   At the time when I filled out that**

22  **application, I wasn't thinking.  I just put**

23  **the most recent I thought that was at the**

52

SUKENIA MARSHALL -- 10/2/07

1  **time.**

2  Q.   Did you omit Glovis on purpose because you

3  had been terminated?

4         MR. BROWN:  Object to the form of

5         the question.

6         MR. ENLOE:  What is objectionable

7         about it?

8         MR. BROWN:  I -- objection noted.

9         I just want to object to that.  I

10         think she just told you.  You may

11         not accept her answer, but that's

12         your prerogative, but I just want

13         to object to it.

14  Q.   And this also indicates that you started

15  working in August of '05 at Kelley

16  Aerospace -- what's that?  What's the next

17  word there?

18  **A.   I tried to put Instaffing.**

19  Q.   Is that accurate, did you start working at

20  Kelley Aerospace in August of '05?

21  **A.   It -- the dates I'm not real sure about --**

22  **I mean, I just, I'm not sure about the**

23  **dates.**

SUKENIA MARSHALL v. GLOVIS ALABAMA -- 10/3/07

53

SUKENIA MARSHALL -- 10/2/07

1  Q.  Well, is it possible that you started
2      working at Kelley Aerospace in August of
3      '05?
4  A.  **I'm not saying that it could be or it**
5      **couldn't, I'm not sure about the dates.**
6  Q.  And I don't want you to get turned around
7      here. I'm not trying to say one's right or
8      the other's right. What I want is what
9      occurred, and a moment ago you testified
10     that you hadn't looked for work for six
11     months or so after you left Glovis in July
12     of '05, but here, it seems to indicate that
13     you started working at Kelley Aerospace in
14     August of '05?
15 A.  **I said around or maybe. I'm not sure --**
16     **real sure about the dates, but I know after**
17     **Glovis, I didn't work right immediately.**
18 Q.  Did you work at a company called Kelley
19     Aerospace?
20 A.  **Yes, sir.**
21 Q.  Okay. And did you work there for about
22     five months?
23 A.  **If five months -- it was -- no, sir. I**

54

SUKENIA MARSHALL -- 10/2/07

1      **don't think it was five months, I'm not**
2      **sure.**
3  Q.  Do you know how long it was?
4  A.  **No, sir. I'm not sure about it.**
5  Q.  Did you work there through Instaffing or
6      through WorkForce?
7  A.  **Instaffing.**
8  Q.  Did you work there in 2005 though? I know
9      dates can be hard, but if you'd --
10 A.  **It could have been the very end or the**
11     **beginning of '06, I'm not sure.**
12 Q.  But at the time you filled out your
13     application at Hager, at least you were
14     under the impression that you started
15     working there in August of '05?
16 A.  **Yes, sir, I did.**
17 Q.  Do you know if Kelley Aerospace is still in
18     business?
19 A.  **Yes, sir, they are.**
20 Q.  And is that an accurate address for them,
21     108 Airport Boulevard at Fort Deposit?
22 A.  **Yes, sir. They have two locations.**
23 Q.  Okay. And you worked there through

55

SUKENIA MARSHALL -- 10/2/07

1      Instaffing?
2  A.  **Yes, sir.**
3  Q.  Okay. Is there anything else on this
4      application that on second glance here may
5      not be right or may need to be updated?
6  A.  **Yes, sir. The addresses, they could be**
7      **updated on my references.**
8  Q.  Okay. What are the correct addresses for
9      those folks?
10 A.  **Well, Cheryl Lowe, she just moved so I**
11     **really don't know her address. Latasha,**
12     **she just moved, and Shon Jackson, which is**
13     **Shonterri Jackson --**
14 Q.  She's the lady that you listed in the
15     interrogatory --
16 A.  **Yes, sir.**
17 Q.  -- where that initial disclosure is filed.
18     Okay. Is that a correct address for her,
19     do you know?
20 A.  **No, sir. It's not now.**
21 Q.  Do you know her current address?
22 A.  **She just moved back to Lowndes County so**
23     **I'm not sure what the address is there**

56

SUKENIA MARSHALL -- 10/2/07

1      either.
2  Q.  Do you know her phone number by any chance?
3  A.  **No, sir. She don't have one not that I**
4      **know of.**
5  Q.  And I'd forgot to ask you, but do you know
6      Mr. Greyhouse's phone number?
7  A.  **No, sir.**
8  Q.  Do you speak to any of the folks you worked
9      with at Glovis now?
10 A.  **No, I don't talk to them, no.**
11 Q.  Okay. Have you ever discussed your case
12     with Ms. Jackson?
13 A.  **Yes, sir. She knows about it.**
14 Q.  And how many times have you talked to her
15     about it?
16 A.  **Maybe once or twice or so.**
17 Q.  Okay. When was the last time y'all spoke
18     about it?
19 A.  **It's probably been over a year.**
20 Q.  Okay. Do you recall what y'all discussed
21     on either occasion?
22 A.  **The last time that I spoke with her about**
23     **it, she was still employed with Glovis, and**

---

57

SUKENIA MARSHALL -- 10/2/07

1      she just told me that Mr. Albright was --
2      had been terminated.
3   Q.   Okay. Did she say why?
4   A.   She told me it was something dealing with
5      another employee or something with his
6      behavior or something.
7   Q.   Did she say anything else that you recall?
8   A.   No, sir.
9   Q.   Did she say what kind of behavior it was?
10   A.   It was something dealing with another
11      female on the job or something like that.
12   Q.   Did she say how she knew why he had been
13      terminated?
14   A.   No, she didn't tell me how.
15   Q.   And the other time you spoke with her about
16      your case, do you recall what y'all talked
17      about?
18   A.   No. She just knew that I was going to
19      file.
20   Q.   Because you had told her, I guess?
21   A.   Yes, sir.
22   Q.   Okay. Did y'all discuss any specifics
23      about the case?

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

58

SUKENIA MARSHALL -- 10/2/07

1   A.   No, sir.
2   Q.   Okay. What about Mr. Greyhouse, have you
3      talked to him since you left Glovis?
4   A.   Yes, sir, I talked to him once.
5   Q.   And when was that, roughly?
6   A.   It's been way over a year?
7   Q.   Okay. Do you recall what y'all discussed?
8   A.   He just asked me how was I doing, and I
9      told him I was fine now, and he asked me
10      did I take any actions for what
11      Mr. Albright did to me, and I told him yes.
12   Q.   Okay. What did you tell him?
13   A.   I just told -- he -- I just answered the
14      question, and I told him I did take action.
15   Q.   Did he discuss any of the allegations in
16      the case?
17   A.   No, sir.
18   Q.   And Mr. Greyhouse, how did you come to
19      speak with him on that occasion?
20   A.   Mae, his wife, she works for the same
21      company that my husband works for.
22   Q.   Currently?
23   A.   Currently.

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

59

SUKENIA MARSHALL -- 10/2/07

1   Q.   Okay.
2   A.   And they had a family gathering that day,
3      and we all was there, and I just happened
4      to see him that day.
5   Q.   Okay. Do you talk to his -- you said his
6      wife works with your husband?
7   A.   Yes, sir.
8   Q.   Do you talk to his wife often?
9   A.   No, sir, I don't.
10   Q.   Are y'all friends?
11   A.   No, sir.
12   Q.   Just friendly?
13   A.   Yes, sir.
14   Q.   Okay. Would his wife know anything about
15      your allegations in this case?
16   A.   No, sir. She -- I'm pretty sure she knows
17      what her husband talked to her about what
18      he saw.
19   Q.   But you've never discussed it with her?
20   A.   No, sir.
21   Q.   You ever talk with her about your
22      experiences at Glovis?
23   A.   No, sir.

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

60

SUKENIA MARSHALL -- 10/2/07

1   Q.   Okay. You can put this aside. And have
2      you ever been written up or disciplined
3      since you've been at Hager?
4   A.   I've had a warning.
5   Q.   For what?
6   A.   I think it was a tardy.
7   Q.   For a tardy?
8   A.   Yes, sir.
9   Q.   Let me show you this. We'll mark this as
10      Exhibit 2. Let me know when you are ready
11      to talk about this and we can cover it.
12            (The referred-to document was
13            marked for identification as
14            Defendant's Exhibit No. 2.)
15   A.   Okay.
16   Q.   Do you recognize this document, Ms. Gordon?
17   A.   Yes, sir.
18   Q.   And what is it?
19   A.   It's the performance record that they gave
20      me at Hager.
21   Q.   I'm sorry?
22   A.   It's my performance record there.
23   Q.   And it's dated March 19, '07; is that

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

61

1       right?

2    A.   **Yes, sir.**

3    Q.   This is from Hager, your current employer?

4    A.   **Yes, sir.**

5    Q.   And if I'm reading this right, it's a

6       counseling due to your exceeding the

7       allowable tardy, leave early, or

8       partial-day absences in March; is that

9       right?

10   A.   **Yes, sir.**

11   Q.   Okay.  Have you had any write-ups or

12      warning since this one?

13   A.   **No, sir.**

14   Q.   Okay.  You can set that aside.  We were

15      talking a little bit ago about your job

16      since you left Glovis, and I know you're

17      not certain about when you worked at Kelley

18      Aerospace so we'll leave that aside for the

19      moment, but let's see if we can approach it

20      this way.  How many places did you apply

21      for work before you found employment after

22      you left Glovis, just a ballpark figure.  I

23      know you're not going to know the exact

62

1       number.

2    A.   **I -- it wasn't -- I never just really**

3       **directly applied to companies.  I always**

4       **just used the temp service.**

5    Q.   Okay.  So how long after you started using

6      the temp service after you left Glovis did

7      it take until you actually found work?

8    A.   **I can't really remember after, because I**

9       **would call in, in the mornings, and I would**

10      **have to wait on them so I can't really**

11      **remember when, but they called me and said**

12      **that they had an assignment for me.**

13   Q.   Would it have been a month between the time

14      you first sought work through the temp

15      company and the time you started working,

16      or was it longer, or you just don't recall?

17   A.   **I just don't recall.**

18   Q.   Okay.  And you're currently working; is

19      that correct?

20   A.   **Yes, sir.**

21   Q.   Okay.  Are there any limitations currently

22      in your ability to work?

23   A.   **Yes, sir, there are.  Well, no, there**

63

1       **aren't any.**

2    Q.   You are not under any work-related

3      restrictions that your doctor's imposed?

4    A.   **No, sir.**

5    Q.   And you're currently performing your job

6      without any accommodations for any

7      disability?

8    A.   **Yes, sir.**

9    Q.   Okay.  Have you ever sought disability

10      benefits since leaving Glovis?  Do you know

11      what I'm talking about there?

12   A.   **No, sir.**

13   Q.   Okay.

14   A.   **Can you explain it?**

15   Q.   Some companies offer a type of insurance

16      that covers employees in the event they

17      become disabled.  Have you had to seek

18      disability benefits because of any injury

19      or condition?

20   A.   **Yes, sir.  I just used the FLMA.**

21   Q.   Okay.  And tell me about that.  When did

22      you seek FMLA leave?

23   A.   **It's been two weeks now.**

64

1    Q.   Okay.  And are you currently on FMLA leave?

2    A.   **No, sir.  I'm back at work.**

3    Q.   Okay.  And how long were you out on FMLA

4      leave?

5    A.   **For a week and a half or two weeks.**

6    Q.   And why did you need to take FMLA leave?

7    A.   **I've been having migraines and sinus and**

8       **allergy problems.**

9    Q.   Okay.  And when you were out on FMLA leave,

10      did you get some treatment that helped with

11      those issues?

12   A.   **Yes, sir.  They helped a little.**

13   Q.   Are you taking any medication for that now?

14   A.   **No, sir.**

15   Q.   Okay.  So you were out on FMLA for about

16      two weeks?

17   A.   **Yes, sir.**

18   Q.   During that period, were you still getting

19      paid by Hager, or was it unpaid leave?

20   A.   **It -- for part of it, it was unpaid,**

21      **because I think that FMLA don't start till,**

22      **like, after so many days so some of the**

23      **days were unpaid.**

SUKENIA MARSHALL -- FLGOVIS V ALABAMA -- 10/2/07

65

SUKENIA MARSHALL -- 10/2/07

1   Q.  Were others paid for by Hager through their

2      paid time off?

3   A.  **Through the FMLA, yes, sir.**

4   Q.  Okay.  So you were paid for part of that

5      time and not paid for part of that time?

6   A.  **Yes, sir.**

7   Q.  Do you recall, roughly, how much of that

8      time you were paid for, you were out two

9      weeks?

10  A.  **I think it probably may be three or four**

11     **days.**

12  Q.  Okay.  And have you ever sought social

13     security benefits -- benefits for the --

14     federal government, the Social Security

15     Administration?

16  A.  **No, sir.**

17  Q.  Okay.  And, again, so you understand, the

18     people who are disabled or believe they are

19     disabled may seek benefits through the

20     federal government that Social Security may

21     pay?

22  A.  **No, sir.**

23  Q.  Okay.  You haven't sought that since you

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

67

SUKENIA MARSHALL -- 10/2/07

1       THE WITNESS:  Glenton Davis.

2   Q.  -- and do you recall when you would have

3      gone and seen Dr. Davis about that?

4   A.  **No, sir.  I can't recall when it was.**

5   Q.  It was after you left Glovis?

6   A.  **Yes, sir.**

7   Q.  Would it have been in 2005?

8   A.  **Yes, sir.  It could have been in those**

9     **dates.**

10  Q.  Are you sure?

11  A.  **No.  I'm not real sure about it.**

12  Q.  On this occasion that you're speaking of,

13     what did you go and see Dr. Davis about,

14     what led you to go see him?

15  A.  **Depression, headaches.**

16  Q.  And do you recall what -- well, first of

17     all, is that what you told Dr. Davis that

18     you were depressed and having headaches?

19  A.  **Yes, sir.**

20  Q.  And do you recall what Dr. Davis told you?

21  A.  **He put me on -- I can't call the name of**

22     **the medicine that he had me taking.**

23  Q.  Okay.  Was it a prescription medication?

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

66

SUKENIA MARSHALL -- 10/2/07

1      left Glovis?

2   A.  **No, sir.**

3   Q.  Okay.  And aside from the period that you

4     just told me about when you were out on

5     FMLA since you left Glovis, has there been

6     any other period of time when you've been

7     unable to work?

8   A.  **No, sir, not that I can recall.**

9   Q.  Okay.  And by unable to work, what I mean

10     is that you physically or otherwise

11     couldn't perform the key functions of any

12     job that you might want to perform?

13  A.  **Right after I was terminated from Glovis, I**

14     **just couldn't go back right then.**

15  Q.  Okay.  Why is that?

16  A.  **Depression, anxiety.**

17  Q.  Okay.  Did you seek any treatment for that?

18  A.  **I saw one of my doctors.**

19  Q.  Who was that?

20  A.  **Dr. Glenton Davis.**

21  Q.  And --

22       THE REPORTER:  I'm sorry.  I

23      couldn't hear your answer.

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

68

SUKENIA MARSHALL -- 10/2/07

1   A.  **Yes, sir.**

2   Q.  Was it only one medication?

3   A.  **Yes, sir, only one.**

4   Q.  But you don't recall the name?

5   A.  **It could be Lorabletabs or Lora -- I can't**

6     **really recall the name of it.**

7   Q.  Is it Paxil?

8   A.  **No, sir, it wasn't Paxil.**

9   Q.  Valium?

10  A.  **No, sir.**

11  Q.  I'm not very good at this either.  I don't

12     know many drug names, but if it comes to

13     mind later today, just let me know.

14  A.  **Okay.**

15  Q.  Do you know what the aim of the drug was,

16     what condition it was supposed to address?

17  A.  **It was supposed to help just, I guess, keep**

18     **me -- make me feel better where I wasn't so**

19     **depressed and down all the time.**

20  Q.  So as you can recall, it was directed

21     towards your depression rather than towards

22     your headaches?

23  A.  **Yes, sir.  He -- I can't really remember**

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

SUKENIA MARSHALL v. GLOVIS ALABAMA  10/9/07

69

SUKENIA MARSHALL -- 10/2/07 .

1      exactly what it was for.
2   Q.   Okay. And how long were you on this
3      medication, do you recall?
4   A.   I can't remember. He -- no, sir, I can't
5      remember.
6   Q.   Okay. Did you pay for it out-of-pocket, or
7      did some insurance company pay for it?
8   A.   My insurance paid so much and then I had to
9      pay.
10   Q.   You had a co-pay?
11   A.   Yes, sir.
12   Q.   Okay. Do you recall who your insurance
13      company was at the time?
14   A.   Blue Cross and Blue Shield --
15   Q.   Was that insurance --
16   A.   -- of Alabama.
17   Q.   I'm sorry.
18   A.   Of Alabama.
19   Q.   Okay. Do you recall, was that insurance
20      that you had through an employer, or was
21      that insurance you were paying for
22      out-of-pocket?
23   A.   No, sir. It's my husband's insurance.

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

70

SUKENIA MARSHALL -- 10/2/07

1   Q.   Okay. And which employer of your husband's
2      was providing that insurance --
3   A.   Hyundai.
4   Q.   -- do you recall? Hyundai?
5   A.   Uh-huh.
6   Q.   Okay. How long has your husband worked
7      there?
8   A.   Three years.
9   Q.   Do you know when he started, roughly? Was
10      that before y'all met?
11   A.   No. We was together when he started.
12   Q.   Okay. Was that before you started working
13      at Glovis?
14   A.   Yes, sir. He was there before I started at
15      Glovis.
16   Q.   Okay. So you think he started there in
17      '05, or would it have been before that?
18   A.   I think it was, like, the end of '05 --
19   Q.   Okay. But you would have --
20   A.   -- no, it could have -- yes, sir, by
21      around the end of '05, I think.
22   Q.   -- was it after you'd stopped working at
23      Glovis or --

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

71

SUKENIA MARSHALL -- 10/2/07

1   A.   It was before I went to Glovis so it had to
2      be around the end of '05.
3   Q.   Well, then, it would have been earlier in
4      '05 because you were at Glovis in June and
5      July of '05; right?
6   A.   So it had to be, like, the end of '04
7      probably.
8   Q.   Okay. And he's still employed there?
9   A.   Yes, sir.
10   Q.   Were you on your husband's insurance
11      through Hyundai the whole time you were
12      unemployed after you left Glovis?
13   A.   Yes, sir.
14   Q.   Okay. Take a look -- I still need to hop
15      us around here, but take a look at
16      Interrogatory answer No. 4. It's right
17      before the one we've just been talking
18      about. This one asks you to identify any
19      person spoken to or sought treatment from
20      concerning any mental or emotional distress
21      that you seek recovery for in this case, do
22      you see that?
23   A.   Yes, sir.

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

72

SUKENIA MARSHALL -- 10/2/07

1   Q.   And you've listed here your pastor, Bobby
2      England and Dr. Glenton Davis; is that
3      right?
4   A.   Yes, sir.
5   Q.   Have you spoken to or sought treatment from
6      anyone else with respect to any distress
7      you seek recovery for in this case?
8   A.   No, sir.
9   Q.   And Dr. Davis, is he the doctor you
10      mentioned a moment ago?
11   A.   Yes, sir.
12   Q.   Okay. We'll talk about him in a moment.
13      What about your pastor, Reverend England,
14      how many times did you speak to him about
15      any mental or emotional distress?
16   A.   I spoke to him maybe four or five times
17      about it.
18   Q.   Okay. And was this during the time you
19      were at Glovis or after you left?
20   A.   After I left.
21   Q.   Do you recall what y'all talked about?
22   A.   I mean, I just -- I spoke to him about the
23      incident about what happened, and --

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

73

SUKENIA MARSHALL -- 10/2/07

1   Q.   And I don't mean to cut you off, but when
2        you say about the incident, what incident
3        are you talking about?
4   A.   **About me being terminated from Glovis.**
5   Q.   What else did you speak with him about?
6   A.   **I talked to him about what happened, the**
7        **reason why I was home. I felt like that I**
8        **was terminated -- I told him about**
9        **Mr. Albright and his unwanted -- some of**
10       **the remarks and things that he would say**
11       **and do to me.**
12   Q.   And what did you tell him you thought had
13       happened at Glovis? Obviously, you told
14       him about Mr. Albright, but you said you
15       also told him about what you thought had
16       happened to you?
17   A.   **I thought -- I just told him that I was --**
18       **I felt like I was wrongfully terminated.**
19   Q.   Okay. What else did you speak with
20       Reverend England about except for what you
21       just told me?
22   A.   **I told him about how I felt, how down I was**
23       **about it, how depressed I was, and that was**

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

74

SUKENIA MARSHALL -- 10/2/07

1       **basically it --**
2   Q.   When -- I'm sorry, go ahead.
3   A.   **-- that was basically it.**
4   Q.   And you spoke with him, I think you said
5       four or five times about this?
6   A.   **Yes, sir.**
7   Q.   Was this all in 2005, do you recall?
8   A.   **No, sir. I talked to him in '06 also.**
9   Q.   Okay. And what did he say in response, do
10       you recall?
11   A.   **He would tell me to pray about it, that God**
12       **wasn't asleep, that everybody was human,**
13       **and just to go on, that I couldn't just be**
14       **down about it is, just to go on.**
15   Q.   And did that help?
16   A.   **It helped in a sense, but, I mean, there**
17       **was time that I still would get upset about**
18       **it, because I like the job. I, kind of,**
19       **missed the job so.**
20   Q.   Did you speak with anybody else at your
21       church about your time at Glovis or
22       Mr. Albright? Do you want to take a
23       moment?

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

75

SUKENIA MARSHALL -- 10/2/07

1   A.   **I'm okay.**
2       MR. ENLOE: Do you want to take a
3       break?
4       MR. BROWN: Yeah.
5       (Brief recess taken.)
6   Q.   (By Mr. Enloe) Ms. Gordon, we're back on
7       the record now. You understand you're
8       still under oath from earlier?
9   A.   **Yes, sir.**
10   Q.   We were talking about your conversations
11       with your pastor, and I just want to ask a
12       few follow-up questions. You said you
13       spoke with him, I believe, was it four or
14       five times you think --
15   A.   **Yes, sir.**
16   Q.   -- is that about right? Okay. And
17       discussed what the two of y'all talked
18       about and then I'd asked you if your talks
19       with him helped, and I think that's where
20       we left off.
21   A.   **They helped in a sense --**
22   Q.   Okay.
23   A.   **-- they did. I mean, I know that -- I knew**

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

76

SUKENIA MARSHALL -- 10/2/07

1       **that I had to just go on that I couldn't**
2       **stop there. He always told me that he**
3       **would, you know, keep me in his prayers and**
4       **he would pray for me that things got better**
5       **for me so it would be times that I would**
6       **think back on it sometimes, but.**
7   Q.   Why did you stop talking with him about
8       this?
9   A.   **I just -- at some point I felt like I was**
10       **trying to put it behind me and let it**
11       **go but then it would be fine, but I just --**
12       **I just felt like it would -- it -- the**
13       **things that happened to me and the way that**
14       **it happened, it was wrong, and I just**
15       **prayed about it myself.**
16   Q.   So why did -- what made you decide to stop
17       going and talking with your pastor about
18       this?
19   A.   **I guess eventually I just stopped that. I**
20       **don't know what made me decide not to go to**
21       **him anymore, but he would all -- he's --**
22       **like even now, he'll still just ask me am I**
23       **okay or how are things going, but I just**

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

SUKENIA MARSHALL v. GLOVIS ALABAMA   10/2/07

77

SUKENIA MARSHALL -- 10/2/07

1    **don't go to him just directly. As time**
2    **passed by, I just didn't.**
3  Q.  Okay. Did you stop talking with him
4    because you felt like you were getting in a
5    better place with respect with what had
6    occurred?
7  A.  **Yeah. Over time, I got better.**
8  Q.  Okay. And then I think you'd also
9    indicated in your interrogatories that
10    you'd gone to see Dr. Glenton Davis?
11  A.  **Yes, sir.**
12  Q.  Okay. Let me show you some documents here.
13        MR. ENLOE:  Dwayne, do you have a
14        stapler handy?
15        MR. BROWN:  Yes.
16        (Brief recess taken.)
17  Q.  I'm going to hand you another document,
18    Ms. Gordon. If you would, look at that for
19    me. There are two pages to it so.
20        MR. BROWN:  You're going to mark
21        this; right?
22        MR. ENLOE:  Yeah. Defendant's 3,
23        I believe.

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

78

SUKENIA MARSHALL -- 10/2/07

1        (The referred-to document was
2        marked for identification as
3        Defendant's Exhibit No. 3.)
4  Q.  And just let me know when you are ready to
5    talk about it.
6  A.  **I'm ready.**
7  Q.  Okay. Can you identify these two pages
8    that I've marked as Defendant's Exhibit 3,
9    Ms. Gordon? Let me ask you this: Have you
10    ever seen these documents before?
11  A.  **No, sir.**
12  Q.  That's possible. I've probably never seen
13    anything like this from my doctor either.
14    I will tell you that these are documents
15    that your doctor, Dr. Davis, produced to us
16    when we sent them a subpoena asking for
17    documents related to any care that he'd
18    given you, and what I've done is I've
19    pulled two pages from those records. The
20    first one is dated February 24, 2003.
21    That's the first page that you saw there,
22    and this indicates that you went and saw
23    Dr. Davis or someone in his office on the

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

79

SUKENIA MARSHALL -- 10/2/07

1    day in question about some ongoing anxiety
2    disorder due to social stressers, poor
3    sleep, and concerned about financial
4    situation. It also indicates that your job
5    at the time was getting more difficult, do
6    you recall this visit?
7  A.  **Not this visit, I can't recall, and**
8    **I'm not...**
9  Q.  Okay. Do you recall going to Dr. Davis at
10    some point in 2003 with these concerns?
11  A.  **Yes, sir.**
12  Q.  Okay. And it indicates that his assessment
13    was acute anxiety, and it looks as though
14    he had prescribed some medication for you,
15    Ativan, do you recall if that's right?
16  A.  **It could have been.**
17  Q.  Do you recall taking any drug called
18    Ativan?
19  A.  **No, sir, I don't recall it.**
20  Q.  Okay. It indicates that you were
21    experiencing social stressers at the time,
22    do you recall what those stressers were?
23    And, again, this would be in 2003.

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

80

SUKENIA MARSHALL -- 10/2/07

1  A.  **Yes, sir. It was during the time that I**
2    **was terminated from Big Lots if I recall,**
3    **and I was also going through a divorce.**
4  Q.  Okay. So in '03, you were going through a
5    divorce, and you were discharged at Big
6    Lots?
7  A.  **Yes, sir.**
8  Q.  And that was causing you distress?
9  A.  **Yes. I was -- well, my divorce wasn't**
10    **final in that year, but I was having -- me**
11    **and my ex-husband was having a lot of**
12    **problems then.**
13  Q.  Okay. And it also indicates that you were
14    concerned about your financial situation?
15  A.  **Yes, sir.**
16  Q.  Do you recall what those concerns were?
17  A.  **Yes, sir. Like I said, me and my**
18    **ex-husband, we weren't getting along, and**
19    **he wasn't helping me at all at home as far**
20    **as the bills and things. That's what**
21    **really led up to our separation.**
22  Q.  It also indicated that your job was getting
23    more difficult, do you recall what that was

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

SUKENIA MARSHALL V. CLOVIS ALABAMA -- 10/3/07

81

SUKENIA MARSHALL -- 10/2/07

1    about?
2    A.   It was just by me having all of those
3         problems that I wasn't able to just perform
4         like I should, because I had a lot on me.
5    Q.   And then if I recall your testimony from
6         earlier, you were terminated by Big Lots
7         because of attendance issues?
8    A.   Yes, sir.
9    Q.   Okay.  And then if you look on the second
10        page, this is a record from March 5, 2007.
11        Apparently you went to Dr. Davis' office on
12        that occasion.  And this may help to ring a
13        bell.  This is an office in Selma.
14   A.   Yes, sir.
15   Q.   Do you recall this visit?  It would have
16        been, gosh, I guess, six months ago now?
17   A.   Yes, sir.
18   Q.   And it indicates that you came in and you
19        had complained of anxiety disorder and
20        headache, do you recall that?
21   A.   Yes, sir.
22   Q.   And were the headaches which you'd noted
23        earlier the migraines that led to your FMLA

82

SUKENIA MARSHALL -- 10/2/07

1    leave?
2    A.   No, sir.  Because my headaches, they
3         were -- I'm -- I guess it could have been.
4    Q.   Well, I -- and I don't want you to guess.
5         I mean, if you don't recall, that's fine if
6         you don't recall, just let me know.  I'm
7         just trying to figure out, you know, what
8         the visit was about so.
9    A.   No, sir.  It wasn't -- Dr. Davis wasn't the
10        doctor that I saw.
11   Q.   Okay.  Who did you see?
12   A.   I saw Dr. Sanchez here in Montgomery.
13   Q.   In March of '07?
14   A.   No, sir.  Not in March.  In March of '07,
15        it was Dr. Davis that I saw --
16   Q.   Okay.
17   A.   -- but my recent visit were --
18   Q.   A different doctor?
19   A.   Yes, sir.
20   Q.   And that's for the headaches associated
21        with the FMLA leave?
22   A.   Yes, sir.
23   Q.   Okay.  And we can talk about that in a

83

SUKENIA MARSHALL -- 10/2/07

1    moment, then, but if we focus on this visit
2    in March of '07, do you recall this
3    particular visit?
4    A.   I recall going and seeing my -- I can't say
5         if it was just this particular visit.
6    Q.   Okay.  And it also indicates that in March
7         of '07 that you were complaining of an
8         anxiety disorder, do you recall that?
9    A.   Yes, sir.
10   Q.   And what were you suffering anxiety
11        disorder about?
12   A.   It was -- I just -- stress.  Being
13        stressed, and I can't really explain it.
14   Q.   What's -- I mean, just explain it as best
15        you can.  I'm not looking for any medical
16        terminology here.  I wouldn't understand
17        it if you used it.  Just tell me in your
18        own words what you were experiencing and
19        then why you were experiencing it?
20   A.   I was just to the point where I was
21        restless sometime, or sometimes I just -- I
22        really can't explain it.  I can't explain
23        how I felt.  It was --

84

SUKENIA MARSHALL -- 10/2/07

1    Q.   Were you working at Hager at the time, at
2         this time, March of '07, if you recall?
3    A.   I don't -- I can't recall.  I don't think I
4         was.  I'm not sure.
5    Q.   We can check on that --
6    A.   Okay.
7    Q.   -- at a break and then maybe I can
8         follow-up with you with some documents that
9         might jog your memory?
10   A.   Okay.
11   Q.   Was your anxiety -- or your feelings of
12        anxiety, did they have anything to do with
13        your job at the time?
14   A.   No, sir.
15   Q.   Did they have anything to do with financial
16        matters?
17   A.   No, sir.
18   Q.   Did they have anything to do with your
19        family or friends?
20   A.   No, sir.  Every -- I just didn't -- I
21        really can't explain it.  I --
22   Q.   Did it have any -- maybe let's focus on it
23        this way, because I don't want to get into

SUKENIA MARSHALL V. GLOVIS ALABAMA -- 10/3/07

85

SUKENIA MARSHALL -- 10/2/07

1    stuff beyond the case. Did this anxiety
2    disorder have anything to do with your
3    experiences at Glovis?
4    A.    **I'm not sure. I really can't say. I mean,**
5          **in some ways, yes, because there could be**
6          **times that I could know people that tell me**
7          **that they just got hired on at Glovis, and**
8          **I would feel depressed then so I really, I**
9          **don't know.**
10   Q.    So you're not certain what was driving
11         these feelings of anxiety earlier this
12         year?
13   A.    **No, sir.**
14   Q.    And it doesn't indicate -- I don't believe
15         that you were prescribed anything on this
16         occasion, do you know if you were?
17   A.    **Yes, sir, I was.**
18   Q.    Do you recall what you were prescribed?
19   A.    **I can't recall the name. That's the**
20         **medication that I was trying to tell you**
21         **about.**
22   Q.    Okay. Was that Ativan, do you know?
23   A.    **No, it wasn't Ativan. It was -- I can find**

86

SUKENIA MARSHALL -- 10/2/07

1          **out the name of it, but it wasn't Ativan.**
2    Q.    But you were prescribed something in March
3          of this year?
4    A.    **Yes, sir.**
5    Q.    Okay. And now are you still taking that?
6    A.    **No, sir, I'm not.**
7    Q.    How long were you taking that, do you
8          recall?
9    A.    **Maybe, I think, it could have been a month,**
10         **because he's put me on one dosage of it,**
11         **like, one milligram and then he changed it**
12         **to two so I'm not sure.**
13   Q.    A couple of months?
14   A.    **Yes, sir, maybe.**
15   Q.    Did that help?
16   A.    **Not really, because I told him that it was**
17         **making me feel terrible after I would take**
18         **it so.**
19   Q.    Okay. Did you take anything else after you
20         stopped taking that?
21   A.    **No, sir.**
22   Q.    Did you continue to have these feelings of
23         anxiety?

87

SUKENIA MARSHALL -- 10/2/07

1    A.    **Yes, sir. I'd get like that sometimes.**
2    Q.    Do you still have those feelings?
3    A.    **Yes, sir.**
4    Q.    How long have you been experiencing these
5          feelings?
6    A.    **I really can't recall how long, but I can't**
7          **recall.**
8    Q.    Well, this first note here indicates that
9          you were having some anxiety feelings back
10         in '03.
11   A.    **Uh-huh.**
12   Q.    Was that the first time that you
13         experienced them, or was it sometime before
14         that?
15   A.    **I'm not sure if it was before.**
16   Q.    Do you know if you went and saw Dr. Davis
17         in 2005 or six after you stopped working at
18         Glovis?
19   A.    **I think that -- I know I did go. I think I**
20         **did go.**
21   Q.    And the reason I asked is that I've pulled
22         out the two pages from Dr. Davis' records
23         that he produced us where there's any

88

SUKENIA MARSHALL -- 10/2/07

1    reference to any sort of anxiety issues or
2    any other emotional issues, and maybe what
3    we need to do after a break is I can pull
4    out all the documents and we can go through
5    them all, but I don't recall any records
6    from Dr. Davis for 2005 or 2006 with
7    respect to you. Is it possible that you
8    didn't go and see him in 2005 and 2006 or
9    that you went to another doctor?
10   A.    **There wasn't another doctor.**
11   Q.    For example, you'd mentioned a Dr. Sanchez,
12         could you have gone and seen him in '05 or
13         '06 about this?
14   A.    **No, sir. I just recently started seeing**
15         **Dr. Sanchez, and it wasn't -- I'm not sure,**
16         **but I know I went and saw him.**
17   Q.    Okay. Is there anything -- I know you
18         didn't recall the 2003 visit, but taking a
19         look at the second page about the 2007
20         visit, did you discuss anything during this
21         visit that's not indicated here that you
22         can recall?
23   A.    **Not that I recall.**

89

SUKENIA MARSHALL -- 10/2/07

1    Q.    Okay.  You can set that aside.  Aside from
2          Dr. Davis and your pastor, did you speak
3          with any other healthcare provider or
4          counselor about any emotional or mental
5          distress you thought you were experiencing
6          as a result of your time at Glovis?
7    A.    No, sir.
8    Q.    Okay.  Let's turn to a different topic.
9          Have you ever filed a lawsuit aside from
10         this one?
11   A.    No, sir.
12   Q.    Okay.  Have you ever been a party to
13         another lawsuit?
14   A.    No, sir.
15   Q.    Nobody's ever sued you?
16   A.    It was back in -- during the time when --
17         it was -- had to be in '02 or '03, this guy
18         came out to clean off some land for me, and
19         he never did the job --
20   Q.    Okay.
21   A.    -- but that was dismissed out of court
22         though.
23   Q.    And did he sue you?

90

SUKENIA MARSHALL -- 10/2/07

1    A.    Yes, sir, he tried.
2    Q.    Okay.  And what did you ask him to do?
3    A.    He was supposed to -- I'm thinking it was
4          supposed to be the septic tank --
5    Q.    Uh-huh.
6    A.    -- hole or something, but he never
7          completed the job, and he still wanted me
8          to pay him, and I didn't feel like I --
9    Q.    I wouldn't feel like you should either.
10         Okay.  So you didn't pay him, he sued you,
11         and the case was dismissed?
12   A.    Yes, sir.
13   Q.    Okay.  Any other cases that you've been
14         involved in aside from this one?
15   A.    No, sir.  Not that I recall.
16   Q.    Okay.  Have you ever filed bankruptcy?
17   A.    Yes, sir.
18   Q.    How many times?
19   A.    Once.
20   Q.    Okay.  When was that?
21   A.    I can't remember the exact year, but it --
22         I know it was after all -- it could have
23         been in '03.  I can't remember.  It was

91

SUKENIA MARSHALL -- 10/2/07

1          during the time that --
2    Q.    After Big Lots?
3    A.    -- it was during -- while I was at Big
4          Lots.
5    Q.    Was that case still open when you started
6          working at Glovis?
7    A.    I really don't understand a lot about
8          bankruptcy so I don't know if you -- if
9          it's --
10   Q.    That makes two of us.
11             MR. BROWN:  Were you actually
12         released from bankruptcy whereby
13         you didn't have to go back to
14         court or anything?
15             THE WITNESS:  No, I didn't have to
16         go back to court or anything.
17             MR. BROWN:  She was probably
18         discharged.
19             MR. ENLOE:  Okay.  I'm sure the
20         documents will show it.
21             MR. BROWN:  Yeah.
22   Q.    Have you ever been charged with a crime?
23   A.    Yes, sir.

92

SUKENIA MARSHALL -- 10/2/07

1    Q.    And what's that?
2    A.    It was assault third and harassment charge.
3    Q.    When was that?
4    A.    The assault third charge, I think it took
5          place -- it could have been in '03 or
6          the end of '02 or something around there.
7    Q.    Tell me about that.  What happened?
8    A.    It was an incident that was -- it was
9          involving my sister and another young lady,
10         but I got tangled up in it.
11   Q.    Uh-huh.
12   A.    And what happened was we had an
13         altercation, me and the girl where --
14   Q.    Not you and your sister but you and this
15         other woman?
16   A.    No, me and this other woman, yes, sir.
17   Q.    Okay.  And tell me a little bit about that.
18         Did y'all come to blows, or what happened?
19   A.    Yes, sir, we did.  She -- I had just gotten
20         off from work one night.  It would be,
21         like, saying she kept calling my house
22         harassing me, and I had spoken to her mom
23         earlier, and she told me just to let her

93

SUKENIA MARSHALL -- 10/2/07

1    know if she kept doing it and that she
2    would take care of if, and I went to her
3    house to talk to her mom and let her know
4    that she was still calling my house
5    harassing me. She came to the door and,
6    you know, tried to attack me with a hammer,
7    and I still had my clothes on from Big Lots
8    so in my jacket I had a box cutter, and I
9    ended up pulling it out which I shouldn't
10   have.
11   Q.  Did you cut her with it?
12   A.  Yes, sir, I did.
13   Q.  And did she have to go to the hospital?
14   A.  Yes, sir, I think she did.
15   Q.  Do you know if she had stitches or anything
16       as a result of it?
17   A.  Yes, sir, she did.
18   Q.  Okay. Did -- and where was this?
19   A.  It was located in Selma. I can't recall --
20       remember the name of the street.
21   Q.  Okay. So that -- is that Dallas County?
22   A.  Yes.
23          MR. BROWN:  Yes.

95

SUKENIA MARSHALL -- 10/2/07

1    same -- my niece and her daughter is --
2    they have the same father. So she would
3    always pick at my sister, but -- and my
4    sister was living with me at the time so
5    she would -- that night she called my
6    house, and when I answered, she would curse
7    me out all -- each time that she called my
8    house. That's why I spoke to her mom about
9    it and that night I had just walked in from
10   work, and when I answered the phone, it was
11   her on the phone that night again cursing,
12   and I was just tired of it so I went back
13   to her mom thinking I was going back just
14   to let her mom know --
15   Q.  Uh-huh.
16   A.  -- because I told her that I would contact
17       Bell South and that they said if somebody
18       kept playing on your phone, they would cut
19       it off.
20   Q.  Yeah.
21   A.  So she asked me to please not have her
22       phone cut off if it happened again to let
23       her know, and that's what I went to do.

94

SUKENIA MARSHALL -- 10/2/07

1    Q.  What happened with that charge?
2    A.  Well, we went to trial for it, and they
3        no-billed it, discharged it, threw it
4        out --
5    Q.  Okay.
6    A.  -- and then later the DA came back and
7        brought it up all over again --
8    Q.  Okay.
9    A.  -- so what happened was they ended up
10       putting me on, I think, three years
11       unsupervised probation --
12   Q.  Okay.
13   A.  -- and that was it.
14   Q.  So did you plead to the offense?
15   A.  The second time, yes, I did.
16   Q.  Was that a felony?
17   A.  They put it on me as a misdemeanor.
18          MR. ENLOE:  Dwayne, do you know?
19          MR. BROWN:  Yeah, it's a Class B
20       misdemeanor.
21   Q.  Okay. And why were you and this girl at
22       odds, do you remember?
23   A.  This girl and my sister, they both have the

96

SUKENIA MARSHALL -- 10/2/07

1    Q.  So you went to the house, but this girl
2        opens the door instead of her mom?
3    A.  Her mom opened the door. She shoved her
4        mom out of the way and came at me with a
5        hammer.
6    Q.  Okay. Was this other woman charged as
7        well?
8    A.  The other girl?
9    Q.  The girl who came at you with the hammer?
10   A.  No, sir, she wasn't --
11   Q.  She wasn't charged? Okay. And were you
12       also charged with harassment --
13   A.  Yes, sir.
14   Q.  -- was that a separate charge?
15   A.  Yes, sir, that was a separate charge.
16   Q.  So the assault, just so I'm clear, was in
17       2003 in Selma?
18   A.  Yes, sir. I think it was '02 or '03.
19   Q.  And that resulted in three years
20       unsupervised probation?
21   A.  Yes, sir.
22   Q.  So did you ever violate probation?
23   A.  No, sir.

97

SUKENIA MARSHALL -- 10/2/07

1    Q.    So you are off probation now?
2    A.    **Yes, sir.**
3    Q.    And then what's -- what happened with the
4          harassment charge?
5    A.    **The harassment charge, it is, again, for my**
6          **sister and her daughter's father.  It was**
7          **her and her mother-in-law, they was all**
8          **having issues or whatever, and my sister**
9          **issued a warrant on her mother-in-law's**
10         **sons, and I think it was the daughter.**
11         **Well, the lady, she went and issued a**
12         **warrant on me and my brother just because**
13         **my sister issued it on her kids, and that**
14         **was thrown out.**
15   Q.    Okay.  And was that in Dallas county as
16         well?
17   A.    **Yes, sir.**
18   Q.    What year was that?
19   A.    **This was this year, I think, this year.**
20   Q.    Were you arrested as a result of that?
21   A.    **No.  I went and I just turned myself in --**
22   Q.    Turned yourself in?
23   A.    **-- because I knew that they issued it.**

98

SUKENIA MARSHALL -- 10/2/07

1    Q.    And what happened with it, again?
2    A.    **Once we got to court they just -- the**
3          **judge, he just told us to stay away from**
4          **each, and he threw it out.**
5                MR. BROWN:  Restraining order.
6    A.    **Restraining order, yes, sir.**
7    Q.    So a restraining order was issued?
8    A.    **Yes, sir.**
9    Q.    Was that restraining you from talking to or
10         approaching the other person?
11   A.    **For us not to contact each other at all.**
12   Q.    Just everybody leave everybody alone?
13   A.    **Yes, sir.**
14   Q.    Okay.  Is -- have you been charged with
15         violating that restraining order?
16   A.    **No, sir.**
17   Q.    Okay.  Any other crimes?
18   A.    **No, sir.**
19   Q.    And have you ever filed any EEOC charges
20         except for the one you filed against
21         Glovis?
22   A.    **No, sir.**
23   Q.    Let's talk about your time at Glovis.

99

SUKENIA MARSHALL -- 10/2/07

1    A.    **Yes, sir.**
2    Q.    Do you recall when you applied for the job
3          there?
4    A.    **Yes, sir.**
5    Q.    Roughly, when was that?
6    A.    **I -- it could have been in March or**
7          **April --**
8    Q.    Sorry.  I didn't mean to cut you off.
9    A.    **-- I think it could have been in March or**
10         **April.  I can't remember when it was that I**
11         **applied.**
12   Q.    Do you recall if you applied through
13         Glovis, or did you apply through a temp
14         agency or some other entity?
15   A.    **They -- I applied through the employment**
16         **office.**
17   Q.    Let me give you a document.  I guess this
18         will be Defendant's 4.  Take a moment to
19         look at that if you would, Ms. Gordon.
20               (The referred-to document was
21                marked for identification as
22                Defendant's Exhibit No. 4.)
23   Q.    Whenever you're ready to talk about it,

100

SUKENIA MARSHALL -- 10/2/07

1    just let me know.
2    A.    **I'm ready.**
3    Q.    Okay.  Do you recognize this document,
4          ma'am?
5    A.    **Yes, sir.**
6    Q.    Okay.  And is this the application that you
7          filed with the agency you mentioned a
8          moment ago?
9    A.    **Yes, sir.**
10   Q.    Okay.  It looks like it was actually filed
11         with the Alabama Industrial Development
12         Training Institute, does that ring a bell?
13   A.    **Yes, sir.**
14   Q.    And it looks like you filled it out April
15         of '05; is that right?
16   A.    **Yes, sir.**
17   Q.    Okay.  And this is actually the application
18         that led to your employment at Glovis; is
19         that right?
20   A.    **Yes, sir.**
21   Q.    Okay.  And is all the information in here
22         accurate?
23   A.    **Yes, sir, it is.**

SUKENIA MARSHALL v. GLOVIS ALABAMA -- 10/2/07

---

101

SUKENIA MARSHALL -- 10/2/07

1   Q.   Okay.  And take a look on the second page,
2        the first company you list under Dates of
3        Employment, the company called -- is that
4        Visco Fan USA?
5   A.   **Yes, sir.**
6   Q.   I don't think Visco has come up today.  Did
7        you work for the company called Visco Fan?
8   A.   **Yes, sir.**
9   Q.   When did you work there?
10  A.   **It was before I went to Glovis.**
11  Q.   It looks like it was after Arkay; is that
12       right?
13  A.   **Yes, sir.**
14  Q.   And I don't think you identified that in
15       your interrogatory answers earlier.  Tell
16       me about Visco, what did you do there?
17  A.   **I was a machine operator there.**
18  Q.   Okay.  And were you there from March of '04
19       until you started to work at Glovis?
20  A.   **Yes, sir --**
21  Q.   I'm sorry.  Go ahead.
22  A.   **-- I think so.  I'm not good with dates.**
23  Q.   Okay.  Indicates starting salary was $10,

---

102

SUKENIA MARSHALL -- 10/2/07

1        and you ended at 10.50 an hour?
2   A.   **Yes, sir.**
3   Q.   And is that an accurate description of your
4        duties, what you've written there?
5   A.   **Yes, sir.**
6   Q.   It says my duties are to operate the
7        machine and to pack the merchandise?
8   A.   **Yes, sir.**
9   Q.   Okay.  And is that their address, to the
10       best of your knowledge?
11  A.   **Yes, sir.**
12  Q.   Is that 15 -- can you read that next word
13       for the address?
14  A.   **County Court.  It's -- I took the address**
15       **out of the phonebook so.**
16  Q.   Okay.  But if you -- according to the
17       phonebook, it's 50 County Court Lane?
18  A.   **Yes, sir.**
19  Q.   And that's Montgomery?
20  A.   **Yes, sir.**
21  Q.   What does this company do?
22  A.   **They make some material for, like, hot dog**
23       **companies and.**

---

103

SUKENIA MARSHALL -- 10/2/07

1   Q.   Okay.  So it's a manufacturer?
2   A.   **Yes, sir.**
3   Q.   Okay.  And like I said, this isn't
4        identified in your interrogatories, did you
5        just forget about this one?
6   A.   **Yes, sir.  I really didn't -- it was before**
7        **Glovis so I really didn't even think about**
8        **it really.**
9   Q.   How long did you work there?
10  A.   **I didn't work there long.  It wasn't long**
11       **that I was hired before I went to Glovis.**
12  Q.   This indicates that you started there in
13       March of '04 and then it looks like you
14       applied to Glovis in April of '05.  Did you
15       work there for over a year?
16  A.   **It could have been around a year.**
17  Q.   Okay.
18  A.   **Or little.  I can't really remember exactly**
19       **how long it would have been.**
20  Q.   Okay.  Aside from Visco, are there any
21       other employers that you didn't identify
22       earlier that you worked at since 2003?
23            THE REPORTER:  Excuse me just one

---

104

SUKENIA MARSHALL -- 10/2/07

1        second.  Okay.
2   A.   **There was one other company, Jim Bishop**
3        **Cabinets, that I worked for, and that was**
4        **before Visco Fan.**
5   Q.   When did you work there?
6   A.   **I can't remember the exact month that I**
7        **worked there.**
8   Q.   Do you know if it was before or after Big
9        Lots?
10  A.   **It was after Big Lots.**
11  Q.   How long were you there?
12  A.   **Not long at all.  It wasn't long at all.**
13  Q.   A month?
14  A.   **Maybe a month or so.**
15  Q.   Okay.  What did you do there?
16  A.   **They -- putting the finish on the cabinets.**
17  Q.   And how much did you make?
18  A.   **I think it was eight dollars, I'm not real**
19       **sure.**
20  Q.   And why did you leave?
21  A.   **I quit because at the time I was living in**
22       **Hayneville, and I just really didn't -- my**
23       **son -- because of my son, I didn't want**

---

SUKENIA MARSHALL V. GLOVIS ALABAMA -- 10/3/07

105

SUKENIA MARSHALL -- 10/2/07

1    to -- I didn't have any family there, and I
2    didn't trust anybody to keep him so I just.
3  Q.  Where is this company, again?
4  A.  It's here in Montgomery on Bell --
5         MR. BROWN:  Bell Road.
6  A.  -- Bell Road.
7  Q.  Bell Road in Montgomery?
8  A.  Yes, sir.
9         MR. BROWN:  36117.
10  Q.  Okay.  Anybody else -- so we've got Visco
11       and Jim Bishop, anybody else that we didn't
12       talk about earlier where you worked after
13       Big Lots?
14  A.  No, sir.  Not that I can recall.
15  Q.  Okay.  So you submitted this application, I
16       take it, in April of '05?
17  A.  Yes, sir.
18  Q.  And at some point, did you get an
19       interview?
20  A.  For?
21  Q.  Glovis.
22  A.  Yes, sir, I did.
23  Q.  Do you recall when that interview was, what

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

106

SUKENIA MARSHALL -- 10/2/07

1    month?
2  A.  No, sir.
3         THE REPORTER:  Excuse me a moment.
4          Sorry.
5         MR. ENLOE:  That's okay.
6         (Brief recess taken.)
7         THE REPORTER:  Okay.
8         MR. ENLOE:  Okay.
9  Q.  Do you recall who you interviewed with?
10  A.  Yes, sir.
11  Q.  Who was that?
12  A.  Ms. Lindemann.
13  Q.  Okay.  And do you recall what was discussed
14       in that interview?
15  A.  Just my past job experience.
16  Q.  Okay.
17  A.  And she just told me about Glovis and what
18       they did at Glovis, and I think that was
19       pretty much it.  She just told me that she
20       would be contacting me if they were
21       interested.
22  Q.  Okay.  What did you tell her about your job
23       history?

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

107

SUKENIA MARSHALL -- 10/2/07

1  A.  I told her that I worked the job -- I
2       explained to her about the jobs that I had
3       had before, and we talked about what I did
4       at the jobs, and I think that was basically
5       it, I think.
6  Q.  Okay.  And you got a job offer at some
7       point?
8  A.  Yes, sir.
9  Q.  Who contacted you about the job offer?
10  A.  Ms. Lindemann.
11  Q.  Okay.  And you got an offer letter as well;
12       is that right?
13  A.  Yes, sir.
14  Q.  Let me show you that.  Take a look at that.
15       This will be Defendant's --
16         MR. BROWN:  Five.
17  Q.  -- five.
18         (The referred-to document was
19          marked for identification as
20          Defendant's Exhibit No. 5.)
21  A.  Okay.  I'm ready.
22  Q.  Have you had a chance to take a look at
23       this document, Ms. Gordon?

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

108

SUKENIA MARSHALL -- 10/2/07

1  A.  Yes, sir.
2  Q.  And can you identify it?
3  A.  Yes, sir.
4  Q.  What is it?
5  A.  It is my offer letter for the job for
6       Glovis.
7  Q.  Okay.  And did you receive a copy of this
8       letter, I guess, sometime right after June
9       7, 2005?
10  A.  Yes, sir, I did.
11  Q.  Okay.  And this states the terms of Glovis'
12       job offer to you; is that right?
13  A.  Yes, sir.
14  Q.  Okay.  And let's look at this.  It offers
15       you the job of Material Handler/General
16       Labor; is that right?
17  A.  Yes, sir.
18  Q.  And it indicates that the job was on the
19       second shift; is that correct?
20  A.  Yes, sir.
21  Q.  And it indicates that the shift begins at
22       5:30 p.m., and runs through 2:30 a.m.; is
23       that right?

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

SUKENIA MARSHALL -- 10/2/07

1   A.   **Yes, sir.**
2   Q.   And it also says that the initial
3        on-the-job training would be conducted on
4        the first shift beginning at 6:30 a.m.; is
5        that right?
6   A.   **Yes, sir.**
7   Q.   Okay.  And it also says that on hire that
8        you would receive training relating to
9        various things including human resource
10       policies and procedures; is that right?
11  A.   **Yes, sir.**
12  Q.   Looking at the second paragraph, the
13       starting wage was ten dollars an hour; is
14       that correct?
15  A.   **Yes, sir.**
16  Q.   And then indicates that there would be
17       scheduled pay increases at fifty cents an
18       hour after completion of the first and
19       second six months of employment; is that
20       right?
21  A.   **Yes, sir.**
22  Q.   Okay.  So it offered you the job of
23       Material Handler/General Labor?

SUKENIA MARSHALL -- 10/2/07

1   A.   **Yes, sir.**
2   Q.   And that offer was for a job on the second
3        shift; is that right?
4   A.   **Yes, sir.**
5   Q.   Okay.  But your training was going to be on
6        the first shift?
7   A.   **Yes, sir.**
8   Q.   Okay.  Do you know a procedure at Glovis
9        for getting transferred from one shift to
10       the other?
11  A.   **Can you explain to me what --**
12  Q.   Sure.  Do you know how a person would go
13       about, if they wanted to move from one
14       shift to another, how they would go about
15       making that happen?
16  A.   **No, sir.  I've never really been told how**
17       **that procedure would work.**
18  Q.   Okay.  Did you have any questions about the
19       terms of this offer?
20  A.   **No, sir.**
21  Q.   And did you ask anybody to explain any
22       parts of this?
23  A.   **No, sir.  I didn't.**

SUKENIA MARSHALL -- 10/2/07

1   Q.   It was pretty clear to you?
2   A.   **Yes, sir.**
3   Q.   And did you accept this offer?
4   A.   **Yes, sir, I did.**
5   Q.   Okay.  Let me ask you this:  Did ten
6        dollars an hour remain your rate of pay the
7        whole time you were there?
8   A.   **Yes, sir, it did.**
9   Q.   Okay.  And when did you actually start
10       work, was it later that month of June?
11  A.   **Yes, sir, it was.**
12  Q.   Okay.  And did you go through an
13       orientation session when you started?
14  A.   **Yes, sir.**
15  Q.   I think you may have talked about that
16       briefly earlier, but let's focus on that
17       for a spell.  I think you indicated there
18       were 25 or so other employees in that
19       session?
20  A.   **Yes, sir.**
21  Q.   I know that's a rough figure.
22  A.   **Yeah.**
23  Q.   Were these other employees who were in the

SUKENIA MARSHALL -- 10/2/07

1        same job position as you?
2   A.   **We all -- once we got to orientation,**
3        **Ms. Lindemann told us which departments we**
4        **would be in.**
5   Q.   Okay.  So at that point, you learned that
6        you would be in the -- was it --
7   A.   **Laydown.**
8   Q.   Laydown department, okay.  So there were
9        other employees in there who were starting,
10       and they would be in various departments in
11       the company?
12  A.   **Yes, sir.**
13  Q.   Okay.  And Ms. Lindemann was the person who
14       conducted that orientation session?
15  A.   **Yes, sir.**
16  Q.   Do you recall how long it lasted?  I guess,
17       first, let me ask you this:  Was there just
18       one session, or was there more than one?
19  A.   **It was just one orientation session.**
20  Q.   Okay.  Was it on the first day of work?
21  A.   **Yes, sir, it was.**
22  Q.   And do you recall how long it lasted?
23  A.   **No, sir, I can't recall.**

SUKENIA MARSHALL -- v. GLOVIS ALABAMA -- 10/2/07

113

SUKENIA MARSHALL -- 10/2/07

1   Q.  Ballpark figure, do you remember if it took
2      a couple of hours or whether it was all
3      day, or do you just not recall one way or
4      the other?
5   A.  **I just don't recall.**
6   Q.  Do you recall what topics were discussed
7      during this orientation session?
8   A.  **Yes, sir. Some of them.**
9   Q.  What do you recall that was discussed?
10  A.  **Vacation time. We picked the sizes of our**
11     **tee shirts and -- while our shirts were in.**
12  Q.  Was this the uniform that you would wear at
13     work?
14  A.  **Yes, sir.**
15  Q.  Okay.
16  A.  **Again, it was our pay.**
17  Q.  How payroll issues were handled?
18  A.  **Yes, sir.**
19  Q.  Okay. Actually, let's look at the letter
20     and see. I think it indicates some topics
21     here and see if this jogs your memory. Did
22     you get any training on the SAP system
23     during this orientation session?

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

114

SUKENIA MARSHALL -- 10/2/07

1   A.  **I can't remember if we did or didn't.**
2   Q.  What about on the scanners?
3   A.  **No, sir. I didn't get trained on scanners.**
4   Q.  Okay. What about material flow, did y'all
5     discuss that during this session?
6   A.  **No, sir.**
7   Q.  Did you discuss the types of material
8     during this session?
9   A.  **No, sir, we didn't.**
10  Q.  Did y'all discuss -- I know you mentioned
11     payroll, did you discuss any other human
12     resource policies or procedures that you
13     recall?
14  A.  **No, sir.**
15  Q.  What about safety procedures, did y'all
16     talk about that?
17  A.  **No.**
18  Q.  Did you talk about forklift safety
19     training?
20  A.  **No, sir.**
21  Q.  And was there any discussion of cultural
22     training?
23  A.  **No, sir.**

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

115

SUKENIA MARSHALL -- 10/2/07

1   Q.  So what did y'all do aside from talking
2     about vacation, uniforms, and payroll?
3   A.  **We filled out a lot of paperwork.**
4   Q.  Okay. And Ms. Lindemann, she spoke with
5     y'all during this session?
6   A.  **Yes, sir.**
7   Q.  What do you recall her telling y'all?
8   A.  **Just basically about the -- she let us --**
9     **on, like, the variety of color of shirts we**
10     **could get and just about the job itself**
11     **again, and I really can't quite remember**
12     **everything that was, you know, talked about**
13     **in orientation, but basically.**
14  Q.  Okay. And there was only one session that
15     you recall?
16  A.  **Yes, sir.**
17  Q.  Okay. What were your duties once you
18     started work at Glovis?
19  A.  **In the laydown department, I would keep the**
20     **shelves stocked for the --**
21  Q.  Laydown department?
22  A.  **-- yes, sir -- people in shipping to be**
23     **able to pull their order.**

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

116

SUKENIA MARSHALL -- 10/2/07

1   Q.  Okay. What else, if anything?
2   A.  **That was basically it, keep our aisle**
3     **clean, and that was it. It was just**
4     **stocking shelves.**
5   Q.  Maybe let's do it this way: Nobody --
6     well, except for Ms. Lindemann, of course,
7     nobody in the room here has, sort of, seen
8     what you did there so if you had to explain
9     this to somebody who had never been to the
10     facility, how your days went when you were
11     at Glovis, how would you paint that picture
12     for them?
13  A.  **What we would do was sometimes we had to go**
14     **up to the different aisles and pull our own**
15     **material and bring it back to the aisle so**
16     **we can keep the shelves stocked --**
17  Q.  By --
18  A.  **-- so --**
19  Q.  -- I'm sorry. By pulling the material, are
20     you talking about manually grabbing some
21     thing, or did you move it with the machine?
22  A.  **Well, it was other people that drove the**
23     **forklift, and we would just have to find**

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

SUKENIA MARSHALL V. GLOVIS ALABAMA -- 10/3/07

117

SUKENIA MARSHALL -- 10/2/07

1    somebody on a lift and take them to the
2    location and then get them to pull a pallet
3    for us.
4    Q.    How did you know which pallets needed to be
5          pulled?
6    A.    We had a -- they gave us a sheet with our
7          material on it, and we knew what aisle to
8          go to and get our -- what -- everything
9          we -- we had to memorize what was on our
10         aisle so we know what we needed to stock up
11         on.
12   Q.    Okay.  So somebody would give you a paper,
13         a piece of paper, with various material on
14         it?
15   A.    Yes, sir.
16   Q.    Then you would then find a forklift
17         operator and go and grab that stuff and
18         then bring it back and place it somewhere
19         in your aisle --
20   A.    Yes, sir.
21   Q.    -- is that right?  Did you have to sort the
22         material or arrange it, or was it
23         prearranged or presorted?

118

SUKENIA MARSHALL -- 10/2/07

1    A.    It was prearranged.
2    Q.    Okay.  So that basically was your duty was
3          to make sure that everything that was
4          supposed to be in your aisle was in your
5          aisle?
6    A.    Yes, sir.
7    Q.    Okay.  Let me take a look at this.  You can
8          set that job-offer document aside.  I know
9          this seems like a lot of paper, but it's
10         actually not bad for a case like this.  In
11         big cases, there's just mounds of it.  It's
12         not fun.  And this will be six.
13               (The referred-to document was
14                marked for identification as
15                Defendant's Exhibit No. 6.)
16   Q.    If you could, take a look at that for me,
17         Ms. Gordon.
18   A.    Okay.
19   Q.    Do you recognize this document?
20   A.    No, sir.
21   Q.    Okay.  It's entitled Employees Positions
22         and Duties, and I'll tell you that we
23         produced this document to your attorney in

119

SUKENIA MARSHALL -- 10/2/07

1    response to the request he made for us for
2    documents that may be relevant to the case,
3    and if you look at the third paragraph
4    there, it's the job description, I believe,
5    for Material Handler in the general labor
6    position, the job that you held.  Is the
7    description that appears under that
8    heading, is that an accurate description of
9    what you did on your job?
10   A.    No, sir.
11   Q.    Okay.  Tell me what --
12   A.    Where it says assembles products,
13         containers, and crates --
14               THE REPORTER:  I'm sorry, you're
15                going to have to speak up where I
16                can hear you.
17               THE WITNESS:  Okay.
18   A.    Where it says assembles products,
19         containers, and crates using hand tools and
20         precut lumber.
21   Q.    You didn't do that?
22   A.    No, sir.
23   Q.    Okay.  And nobody who held your job that

120

SUKENIA MARSHALL -- 10/2/07

1    you worked around did that, I take it?
2    A.    Can you -- no, sir.
3    Q.    Okay.
4    A.    The products, we didn't have to assemble
5          them.
6    Q.    Anything else in here inaccurate in your
7          opinion?  And, again, I'm just looking at
8          the Material Handler/General Labor job just
9          trying to get a sense of what you did
10         day-to-day?
11   A.    I don't remember recording the number of
12         units handled and moved using daily
13         production sheets or --
14   Q.    So you don't recall the part of this -- or
15         strike that.  You didn't record the number
16         of units handled and moved using daily
17         productions sheets or other work ticket
18         items?
19   A.    I don't recall --
20   Q.    Okay.
21   A.    -- having to do that.
22   Q.    Okay.  What about attaching identifying
23         tags or marking information on containers,

121

SUKENIA MARSHALL -- 10/2/07

1     did you do that?

2    **A.  No, sir.**

3    Q.  Did you clean the work area using brooms,

4    rags, and cleaning compounds?

5    **A.  Yes, sir.  I was cleaning the work area.**

6    Q.  Okay.  And did you install protective

7    devices such as bracing, padding, or

8    strapping to prevent shifting or damage to

9    items being transported?

10    **A.  I never had to just actually transport any**

11    **items.  They were already brought to me.**

12    Q.  But you did load and unload materials to

13    and from designated areas, such as racks

14    and shelves?

15    **A.  I loaded them onto the shelf, yes, sir.**

16    Q.  And you stacked and piled materials?

17    **A.  Yes, sir.**

18    Q.  Okay.  And you then sorted and stored items

19    according to the paper that you'd received?

20    **A.  Yes, sir.  I sorted it for each rack that**

21    **it would go to.**

22    Q.  So the racks would indicate what kind of

23    material should be there?

122

SUKENIA MARSHALL -- 10/2/07

1    **A.  Yes, sir.**

2    Q.  And then you, in turn, would make sure that

3    on your aisle the right stuff was in the

4    right place?

5    **A.  Yes, sir.**

6    Q.  Okay.  I don't think I have any more

7    questions about this one.  What was your

8    work schedule when you started, do you

9    recall?

10    **A.  When I first started the first week of**

11    **orientation, it was, I think, maybe six to**

12    **five or six thirty to five.  I can't**

13    **remember exactly.**

14    Q.  Six in the morning?

15    **A.  Yes, sir.**

16    Q.  How many days a week?

17    **A.  Monday through Friday, maybe a Saturday.**

18    Q.  How often did you work Saturdays, I know

19    you weren't there long, but.

20    **A.  Not too often that I can recall.  I can't**

21    **remember if I worked a Saturday or not.**

22    Q.  Okay.  So initially when you were just

23    starting, you were working from six thirty

123

SUKENIA MARSHALL -- 10/2/07

1    or so in the morning until about five in

2    the afternoon?

3    **A.  Yes, sir.**

4    Q.  Okay.  And who supervised you directly, who

5    was your immediate supervisor?

6    **A.  Mr. Ellis Albright.**

7    Q.  Okay.  And I think you'd indicated earlier

8    that Mr. Wells also had some supervisory

9    role?

10    **A.  Yes, sir.**

11    Q.  Was Mr. Wells above Mr. Albright?

12    **A.  I really didn't know --**

13    Q.  Okay.

14    **A.  -- which one was --**

15    Q.  But you took instructions from both

16    Mr. Wells and Mr. Albright?

17    **A.  Yes, sir.**

18    Q.  Okay.  Was Mr. Albright a team leader, do

19    you know?

20    **A.  No, sir.  From my understanding, he was a**

21    **supervisor.**

22    Q.  Okay.  And what about Mr. Wells, what was

23    his title, do you know?

124

SUKENIA MARSHALL -- 10/2/07

1    **A.  From my understanding, he was a supervisor**

2    **as well.**

3    Q.  So correct me if I'm wrong, then, but if

4    nobody took you around and pointed out

5    various people and told you what their job

6    titles were, you just sort of --

7    MR. BROWN:  I'm going to object to

8    the form of the question, because

9    she testified earlier about that.

10    Q.  Well, let's talk about that.  How did you

11    know that Mr. Albright was a supervisor?

12    **A.  The day of our orientation, we were told by**

13    **Ms. Lindemann that we would report to**

14    **Mr. Albright.**

15    Q.  Okay.  And what about Mr. Wells, how did

16    you --

17    **A.  It was also reported that we would --**

18    **Mr. Wells would also -- we could report to**

19    **him also.**

20    Q.  Do you know how many employees at that time

21    reported to Mr. Albright?  Obviously, you

22    did, but --

23    **A.  Everybody in our -- in the laydown**

---

125

SUKENIA MARSHALL -- 10/2/07

1        **department or, I think, it was breakdown,**
2        **the breakdown department, I think they did.**
3        **I'm not sure.**
4   Q.   How many people were in the laydown
5        department on that shift you were working
6        at the time?
7   A.   **Maybe about 30.**
8   Q.   Okay. And what about Mr. Wells, how many
9        folks reported to him?
10   A.   **Well, we all just reported to either or.**
11   Q.   Okay. So as far as you understood, both
12        Mr. Wells and Mr. Albright basically had
13        the same role?
14   A.   **Yes, sir.**
15   Q.   And they supervised the 30 or so of y'all
16        in the laydown department on that shift?
17   A.   **Yes, sir.**
18   Q.   Do you know who supervised Mr. Albright
19        and Mr. Wells?
20   A.   **Mr. Dave Harris.**
21   Q.   Okay. And then do you know who supervised
22        Mr. Harris?
23   A.   **No, sir, I don't.**

---

126

SUKENIA MARSHALL -- 10/2/07

1   Q.   Okay. Do you know what Mr. Harris' job
2        title was?
3   A.   **No, sir.**
4   Q.   Okay.
5   A.   **Well, as far as I'm concerned, I think it**
6        **was plant manager or.**
7   Q.   Did you see Mr. Harris much when you were
8        working?
9   A.   **Yes, sir.**
10   Q.   Was he out there in the warehouse with
11        y'all?
12   A.   **Well, he would come out and talk with**
13        **Mr. Albright.**
14   Q.   Okay. How often would that happen, would
15        you guess?
16   A.   **Maybe two or three times a day.**
17   Q.   Okay. Did he ever talk to you, Mr. Harris?
18   A.   **Could you repeat the question?**
19   Q.   Sure. Did Mr. Harris ever speak with you
20        when you were working?
21   A.   **Yes, sir, he did speak with me.**
22   Q.   Okay. How often did y'all talk?
23   A.   **He only spoke with me once.**

---

127

SUKENIA MARSHALL -- 10/2/07

1   Q.   Okay. But you saw him talk with
2        Mr. Albright --
3   A.   **Yes, sir.**
4   Q.   -- two or three times a day?
5   A.   **Yes, sir.**
6   Q.   What about Mr. Harris and Mr. Wells, did
7        they talk about two or three times a day?
8   A.   **Yes, sir, he would talk to them also.**
9   Q.   Okay. You worked only on the day shift
10        during the time that you were there; is
11        that right?
12   A.   **Yes, sir.**
13   Q.   How many employees were on the day shift,
14        roughly?
15   A.   **In our department, I could say probably**
16        **maybe 30.**
17   Q.   Okay. And I understand that that's your
18        best estimate, and so you think maybe 30
19        employees in the laydown department?
20   A.   **Yes, sir.**
21   Q.   How many departments were there?
22   A.   **I think maybe five or six.**
23   Q.   Okay. Did you have any sense of how many

---

128

SUKENIA MARSHALL -- 10/2/07

1        employees total Glovis had at that time?
2   A.   **No, not really.**
3   Q.   Okay. And the company ran two shifts; is
4        that right?
5   A.   **Yes, sir.**
6   Q.   So you -- and did you ever work -- actually
7        work on the night shift?
8   A.   **No, sir.**
9   Q.   Okay. So do you know how many employees
10        worked on the night shift?
11   A.   **No, sir.**
12   Q.   Okay. When you were at the company, did
13        you ever have occasion to go to the
14        employee breakroom?
15   A.   **Yes, sir.**
16   Q.   Did you ever eat any meals there?
17   A.   **Yes, sir.**
18   Q.   Okay. Do you recall if there was any
19        literature or documentation on the wall in
20        the breakroom?
21   A.   **No, not that I recall.**
22   Q.   Okay. Would you have gone over and looked
23        at the documentation if some had been

---

129

SUKENIA MARSHALL -- 10/2/07

1       there?
2    A.    **Yes, sir.**
3    Q.    Had that been your habit at your other
4       jobs?
5    A.    **No.  It's not a habit, I'll just -- if I**
6       **see something, I'll glance sometime.**
7    Q.    And I think you mentioned a couple earlier,
8       but on the shift that you worked, what
9       employees besides yourself were supervised
10      by Mr. Albright?
11    A.    **Everyone in our department.**
12    Q.    Can you give me some names, I know
13      Mr. Greyhouse?
14    A.    **Uh-huh.  Myself, Terri Corbett -- it was**
15      **another girl, Alice, I don't remember her**
16      **last name.**
17    Q.    Alice --
18    A.    **I can't --**
19    Q.    -- somebody?
20    A.    **Yeah.  C. J. Jackson, Terri Corbett.  I**
21      **can't remember the other lady's name.**
22      **Another girl by the name of Tasha.  Ryan, I**
23      **can't remember his last name.**

---

130

SUKENIA MARSHALL -- 10/2/07

1    Q.    Bryan?
2    A.    **Ryan.**
3    Q.    Ron?
4    A.    **Uh-huh.**
5    Q.    Okay.
6    A.    **Charles King.**
7    Q.    Is he the gentleman you referred to earlier
8       just as King?
9    A.    **No, sir, it's not --**
10    Q.    Different guy?
11    A.    **-- that's a different guy.**
12    Q.    Okay.
13    A.    **A girl they called Keekee.**
14    Q.    Okay.
15    A.    **I can't remember.**
16    Q.    Okay.  If anybody else comes to mind while
17       we're talking today, just let me know?
18    A.    **Okay.**
19    Q.    Do you know what Mr. Albright's job duties
20       were?
21    A.    **To supervise us.**
22    Q.    Same for Mr. Wells?
23    A.    **Yes, sir.**

---

131

SUKENIA MARSHALL -- 10/2/07

1    Q.    And how did Mr. Albright go about
2       performing his supervisory duties, what did
3       he do?
4    A.    **He gave the orders.**
5    Q.    What kind of orders?
6    A.    **He told us what to do, when to do it, and**
7      **how to do it.**
8    Q.    Is that the same for Mr. Wells?
9    A.    **Yes, sir.**
10    Q.    Do you know if Mr. Wells or Mr. Albright
11      had the authority to hire employees?
12    A.    **No, sir.**
13    Q.    Do you know if they had the authority to
14      fire employees?
15    A.    **No, sir.**
16    Q.    Do you not know or did they not have that
17      authority?
18    A.    **I just don't know.**
19    Q.    Okay.  I just wanted to make sure that was
20      clear.  Do you know if either Mr. Albright
21      or Mr. Wells had the authority to give
22      anybody a pay raise?
23    A.    **No, sir, I don't know.**

---

132

SUKENIA MARSHALL -- 10/2/07

1    Q.    What about a pay cut, do you know if they
2       had that authority?
3    A.    **No, sir, I don't.**
4    Q.    Do you know if either one of them had the
5       authority to give an employee a demotion?
6    A.    **No, sir, I don't.**
7    Q.    Okay.  Do you know if they have the
8       authority to tell the employees how to
9       perform their jobs?
10    A.    **Yes, sir, they did.**
11    Q.    Okay.  Can you think of an example of that
12      that you witnessed?
13    A.    **Mr. Albright would always come, like I**
14      **said, and ask me to take different things**
15      **out to the dumpster or tile to the**
16      **organizers, racks to shelves, and it was --**
17      **I mean, he just -- it was everything.**
18    Q.    Okay.  And that's how he'd interact with
19      other employees who worked with you?
20    A.    **Yes, sir.**
21    Q.    Okay.  The same for Mr. Wells?
22    A.    **Yes, sir.**
23    Q.    Did you receive any -- aside from your

---

SUKENIA MARSHALL v. GLOVIS ALABAMA -- 10/3/07

**133**

SUKENIA MARSHALL -- 10/2/07

1  offer letter, did you receive any other
2  information from Glovis at the time you
3  started your job?
4  **A.  Not that I can recall.**
5  Q.  Okay.  Did you receive any sort of -- any
6  documentation at all from the company?
7  **A.  I think I received a handbook.**
8  Q.  Did you keep it?
9  **A.  Yes, sir, I kept it.  I kept it.**
10  Q.  Do you still have it?
11  **A.  No, sir.**
12  Q.  Do you recall when you got rid of it?
13  **A.  I had a house fire.  Everything was**
14  **destroyed.**
15  Q.  I'm sorry about that.  When was that?
16  **A.  It was October of last year.**
17  Q.  That's terrible.  My family has been
18  through something like that too.  It's
19  really awful.  I'm sorry about that.
20  MR. BROWN:  It is.  It is.
21  Q.  But you believe you got a handbook when you
22  started?
23  **A.  Yes, sir.**

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

**134**

SUKENIA MARSHALL -- 10/2/07

1  Q.  Okay.  Do you recall any of the contents of
2  that handbook?
3  **A.  No.  No, sir.**
4  Q.  Let me show you something.
5  MR. BROWN:  Can we take a quick
6  lavatory break?
7  MR. ENLOE:  Yeah, we can take a
8  break right now.  Now's a good
9  time.
10  (Lunch recess taken.)
11  Q.  (By Mr. Enloe)  Ms. Gordon, we are back on
12  the record, and, again, you understand
13  you're still under oath.
14  **A.  Yes, sir.**
15  Q.  Okay.  I think we were talking before we
16  took a break for lunch about information
17  that you got from Glovis around the time
18  you started work, and you had indicated
19  that you recall getting a handbook; is that
20  right?
21  **A.  Yes, sir.**
22  Q.  Take a look at this, and tell me -- I know
23  you said you had kept a copy of it and

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

**135**

SUKENIA MARSHALL -- 10/2/07

1  then, unfortunately, your family had
2  suffered a house fire, and not
3  understandably, I didn't think this
4  appeared in that so take a look at this
5  document.
6  MR. BROWN:  Yeah, this was
7  produced to me as well.
8  Q.  So flip through it.  It's obviously -- I
9  don't expect you to read every word, but
10  familiarize yourself with it and see if
11  you've seen this before, and it just might
12  be the one.
13  **A.  Okay.**
14  Q.  Do you recognize this document?
15  **A.  Yes, sir.  I think I remember this one.**
16  Q.  Is this the document that you think you
17  received when you started?
18  **A.  I really can't recall, but it could have**
19  **been the exact document or not but.**
20  Q.  Okay.  Did you receive something like this
21  when you started?
22  **A.  Yes, sir.**
23  Q.  Was it called an employee handbook, do you

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

**136**

SUKENIA MARSHALL -- 10/2/07

1  remember?
2  **A.  I think it was.**
3  Q.  Okay.  And flip to -- let's see here, page
4  2.  This handbook, if you look halfway
5  three quarters of the way down, has a
6  policy against unlawful harassment.  Do you
7  see that?
8  **A.  Yes, sir.**
9  Q.  Do you recall if the handbook you received
10  had a similar policy in it?
11  **A.  I can't really recall.**
12  Q.  Okay.  But you recall receiving some kind
13  of employee handbook from the company?
14  **A.  Yes, sir.**
15  Q.  And I'm assuming to the best of your
16  recollection, that handbook included
17  various company policies?
18  **A.  Yes, sir.**
19  Q.  Okay.
20  MR. ENLOE:  Dwayne, I don't think
21  I'm going to mark it since she
22  can't say that this is the one
23  that she got.

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

SUKENIA MARSHALL V. GLOVIS ALABAMA -- 10/3/07

137

SUKENIA MARSHALL -- 10/2/07

1    MR. BROWN:  Yeah.
2    MR. ENLOE:  But I'll state for the
3       record that this is a document
4       Bates labeled Glovis 69 through
5       Glovis 87.  It's been produced to
6       counsel for Plaintiff by counsel
7       for Defendant.
8    MR. BROWN:  That's correct.
9    MR. ENLOE:  Give that back to me.
10   Q.  You mentioned earlier that you had an
11       orientation session when you first started
12       with some other employees; is that right?
13   A.  Yes, sir.
14   Q.  And I believe you said you only had one
15       orientation session?
16   A.  Yes, sir.
17   Q.  Did you have any other sessions where you
18       were trained for what you would be doing on
19       the job?
20   A.  Yes, sir.
21   Q.  How many sessions did you have like that?
22   A.  I can't remember if we went to class for --
23       whether it was a week or two weeks.

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

138

SUKENIA MARSHALL -- 10/2/07

1    Q.  Okay.  And when you say class, what kind of
2       class was it, what topics were covered?
3    A.  We had training before the orientation that
4       we had to complete before hire --
5    Q.  Okay.
6    A.  -- and I can't remember a lot of the topics
7       that we went over in class.
8    Q.  Was this a -- when you say it was training,
9       I assume, though, it was focused on what
10       you'd actually be doing on the job; is that
11       right?
12   A.  No.  It wasn't just focused on what I would
13       be doing, because it was several people in
14       there, and each one was sent to different
15       departments there.  I think the class -- I
16       don't even think it was anything that was
17       dealing with the job itself at Glovis.
18   Q.  Do you recall what it dealt with?
19   A.  I think it could have had something to do
20       with, like, getting along with co-workers
21       and things of that sort, but I can't just
22       exactly remember exactly what it was.
23   Q.  Okay.  Do you recall if it discussed what

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

139

SUKENIA MARSHALL -- 10/2/07

1       to do if you didn't get along with your
2       coworkers?
3    A.  No, I can't remember.
4    Q.  Okay.  How many other -- how many sessions
5       like this did you have?  I know we talked
6       about the orientation session and then you
7       mentioned a training session before you
8       actually had the orientation session, were
9       there any training sessions or classes
10       after the orientation?
11   A.  No, sir.
12   Q.  And how many training sessions do you think
13       you had total.  And we're not talking about
14       the orientation session?
15   A.  I think I only remember going to just
16       orientation, and that was it.
17   Q.  And then the training session before
18       orientation?
19   A.  Before orientation, yes, sir.
20   Q.  Okay.  How did you learn what you'd be
21       doing on the job?
22   A.  We went out to the floor.  One guy -- well,
23       the guy that worked on the aisle with me,

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

140

SUKENIA MARSHALL -- 10/2/07

1       he just showed us what to do and.
2    Q.  Do you recall his name?
3    A.  It was Nate.  Nate --
4    Q.  Mr. Greyhouse?
5    A.  -- Mr. Greyhouse.
6    Q.  Okay.  So after you had the orientation
7       session with Ms. Lindemann, you then were
8       led out to the warehouse, introduced to
9       Mr. Greyhouse, and he, sort of, walked
10       y'all through the paces?
11   A.  Yes, sir.
12   Q.  And when -- and this was in the -- is it
13       laydown department or breakdown department?
14   A.  It was in the breakdown.
15   Q.  Breakdown?  Okay.
16   A.  Yeah.  I think it was the breakdown
17       department.
18   Q.  Okay.  So Mr. Greyhouse, sort of, walked
19       around doing the job, and you -- and did
20       anybody else -- was anyone else with you at
21       this time, any other new employee?
22   A.  No.  I think it was just Mister -- me and
23       Mr. Greyhouse.

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

141

SUKENIA MARSHALL -- 10/2/07

1   Q.   Okay.  So you followed him around for how
2        long?
3   A.   I think it was a day or so --
4   Q.   Okay.
5   A.   -- that I -- yeah, it was a day or so that
6        we worked on and then after that, the rest
7        of the week, I worked right on the same
8        aisle but on my side.
9   Q.   So you got the swing of things after a day
10       or so and then you started working on your
11       own aisle?
12  A.   Yes, sir.
13  Q.   Okay.  And did you receive any other
14       training?
15  A.   No, sir.
16  Q.   Okay.  Were you ever tardy when you were at
17       Glovis?
18  A.   No, sir.  Not that I can remember.
19  Q.   Did you have any absences from work?
20  A.   No, sir, not that I remember.
21  Q.   Were you ever disciplined for any reason --
22       not talking about termination here, but
23       aside from that, were you ever disciplined

142

SUKENIA MARSHALL -- 10/2/07

1        for any reason?
2   A.   No, sir.
3   Q.   Okay.  You were a probationary employee for
4        the first 90 days of your employment; is
5        that right?
6   A.   Yes, sir.
7   Q.   Okay.  What was your understanding as to
8        what that meant?
9   A.   My understanding was that I had to meet the
10       qualifications for -- if it was 90 days, 90
11       days, and that was -- that -- to me that
12       was what the probationary period meant.
13  Q.   Okay.  So you viewed it as a kind of a test
14       period to see if you were up to the job?
15  A.   Yes, sir.
16  Q.   And you ended up being terminated before
17       the 90 days was over; is that right?
18  A.   Yes, sir.
19  Q.   Okay.  Do you know if Glovis always
20       retained probationary employees at the end
21       of the 90-day period?
22  A.   Do I know whether they kept them?
23  Q.   Whether everyone who was a probationary

143

SUKENIA MARSHALL -- 10/2/07

1        employee ended up being kept on after the
2        90 days?
3   A.   As far as I know, yes.
4   Q.   Okay.  How many folks do you know who were
5        probationary employees?
6   A.   I know at least -- I really can't give
7        names, but, I mean, as far as I knew,
8        everybody was on the same probationary
9        period when we was hired.
10  Q.   Right.  But I guess -- and I'm probably not
11       asking the question the right way, but what
12       I'm asking for is whether you know whether
13       or not it was always Glovis' practice to
14       retain probationary employees beyond the
15       90-day period or whether occasionally they
16       let folks go after those 90 days had run?
17  A.   I really don't know.
18  Q.   Okay.  Let's take a look at this.  I'm
19       going to hand you a document now,
20       Ms. Gordon.  This is a copy of the amended
21       complaint.  And, again, you don't have to
22       read every word of this right now.  I just
23       wanted to hand it to you because I've got

144

SUKENIA MARSHALL -- 10/2/07

1        some questions about this, and I wanted to
2        touch base with you about that so just let
3        me know when you're ready for the
4        questions.
5   A.   All right.
6   Q.   Okay.  Can you identify this document?
7   A.   Yes, sir.
8   Q.   Is this the amended complaint that was
9        filed in your name in this lawsuit?
10  A.   Yes, sir, it is.
11  Q.   Okay.  And does this state all of your
12       claims in that lawsuit?
13  A.   Yes, sir, it did.
14  Q.   Turn to page 3, please.  This is the first
15       claim for negligent supervision.  Do you
16       see that there?  There's a header at the
17       bottom of the page.
18  A.   Yes, sir.
19  Q.   Okay.  Your first claim is that Glovis
20       negligently supervised Mr. Albright; is
21       that right?
22  A.   Yes, sir.
23  Q.   Okay.  Do you know what, if any, training

---

145

SUKENIA MARSHALL -- 10/2/07

1    Mr. Albright received at Glovis?
2    **A.   No, sir.**
3    Q.   Do you know if he was ever disciplined
4        while he worked there?
5    **A.   No, sir, I don't.**
6    Q.   Do you think Glovis didn't supervise
7        Mr. Albright properly?
8    **A.   Well, no, I don't think they supervised him**
9        **properly.**
10   Q.   Okay.  And why is that?
11   **A.   Well, the reason why I think they didn't is**
12       **because he -- if they did, I feel he would**
13       **have carried hisself in a better way than**
14       **what he did.**
15   Q.   And I think you testified earlier that to
16       your knowledge Mr. Albright's direct
17       supervisor was Mr. Harris; is that right?
18   **A.   Yes, sir.**
19   Q.   Dave Harris?
20   **A.   Yes, sir.**
21   Q.   And I think you testified that Mr. Harris,
22       you saw him interact with Mr. Albright two
23       or three times a day on average; is that

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

146

SUKENIA MARSHALL -- 10/2/07

1    right?
2    **A.   Yes, sir.**
3    Q.   Did you ever see Mr. Harris counseling or
4        instructing Mr. Albright on anything on the
5        job?
6    **A.   I really never knew what they would talk**
7        **about, but I just would see them talk.**
8    Q.   Okay.  Did you ever witness any of those
9        conversations?
10   **A.   No, sir.**
11   Q.   Do you know if Mr. Albright had any
12       supervisors aside from Mr. Harris?
13   **A.   No, sir.**
14   Q.   Okay.  Take a look at the next page,
15       please.  This is your second claim for
16       invasion of privacy, and I've got a few
17       questions for you about this.  If you look
18       at paragraph 24 for a moment -- if you
19       could read that to yourself, I have a
20       couple of questions about it.
21   **A.   Okay.**
22   Q.   Okay.  Paragraph 24 of your complaint
23       states, in part, that Mr. Albright invaded

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

147

SUKENIA MARSHALL -- 10/2/07

1    your privacy in that he asked you the
2    color, I think it says, of your
3    undergarments?
4    **A.   Yes, sir.**
5    Q.   Tell me about that.
6    **A.   The day -- I really can't remember exactly**
7        **the day or whatever, but he asked me plenty**
8        **of times about what kind of panties I would**
9        **be wearing or the color of them.**
10   Q.   So this isn't referring to one specific
11       occasion, this paragraph.  There was more
12       than one occasion when Mr. Albright said
13       something to you about your underwear?
14   **A.   Yes, sir.**
15   Q.   Okay.  Do you recall how many times he said
16       something to you about it, and you --
17   **A.   Maybe it was --**
18   Q.   -- told me earlier -- I'm sorry.  I
19       apologize for interrupting.  You told me
20       earlier about the occasion when he grabbed
21       the belt loop --
22   **A.   Yes, sir.**
23   Q.   -- and made the comment at that time?

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

148

SUKENIA MARSHALL -- 10/2/07

1    **A.   Yes, sir.**
2    Q.   So that's once.
3    **A.   I think maybe one or two times -- it was**
4        **before that, before the incident where he**
5        **pulled.**
6    Q.   Okay.  And what did he tell you on those
7        one or two times before the belt-loop
8        incident?
9    **A.   He asked me what type of panties I was**
10       **wearing.**
11   Q.   And what did you say?
12   **A.   I told him it was none of his business and**
13       **he shouldn't be asking me that.**
14   Q.   Okay.  The same thing happened on both of
15       these occasions?
16   **A.   Well, one other time he asked me -- he say**
17       **he wouldn't mind knowing -- he said, I**
18       **wouldn't mind if you would tell me what**
19       **color those panties are that you have on**
20       **today.**
21   Q.   And that was a separate occasion?
22   **A.   That was a separate occasion, and he didn't**
23       **say panties, he said thong.**

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

---

149

SUKENIA MARSHALL -- 10/2/07

1  Q.  Okay.  And tell me exactly what he said on
2      that occasion.
3  A.  **He just -- he said, well, I wouldn't mind**
4      **if you would let me know what color those**
5      **thongs are that you're wearing today.**
6  Q.  And what did you say?
7  A.  **I told -- I said, It's none of your**
8      **business what color my thongs are.  I said,**
9      **They're none of your business.**
10 Q.  Okay.
11 A.  **And I also told him that I was sick of him**
12     **asking me stuff like that.**
13 Q.  Okay.  Now, you'd mentioned earlier that a
14     couple of folks, at least one for the
15     first, had witnessed the belt-loop
16     incident.  Do you know if anybody overheard
17     these other comments to you about your
18     underwear?
19 A.  **He would say it, and in -- he -- Ellis --**
20     **Mr. Albright didn't care who was around.**
21     **He said it so I'm pretty sure other people**
22     **heard it I just can't remember who exactly**
23     **was around when it was said.**

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

150

SUKENIA MARSHALL -- 10/2/07

1  Q.  Okay.  So you don't remember who, if
2      anyone, would have heard these other
3      comments?
4  A.  **I can't remember Ron's last name, but I'm**
5      **thinking that he was there on one -- one of**
6      **the occasions that he said it.**
7  Q.  Do you recall which one?
8  A.  **It was the day that he asked me -- the day**
9      **that he said he wouldn't mind knowing what**
10     **color they was.  I'm thinking it was that**
11     **day.**
12 Q.  Okay.  Aside from these questions about
13     your underwear, did Mr. Albright do
14     anything else that in your opinion invaded
15     your privacy?
16 A.  **No, sir.**
17 Q.  Let me ask you this:  I should have asked
18     you this earlier when we were talking about
19     the jobs after you worked at Glovis, but it
20     slipped my mind.  When were you actually
21     married to your current husband, is it
22     Mr. Gordon, I take it?
23 A.  **Yes, sir.**

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

151

SUKENIA MARSHALL -- 10/2/07

1  Q.  When did y'all get married?
2  A.  **We were married in June of last year.**
3  Q.  So June '06?
4  A.  **Yes, sir.**
5  Q.  Okay.  And was that the point at which you
6      became covered by his health insurance?
7  A.  **No, sir.**
8  Q.  Okay.  When did you became covered by his
9      insurance?
10 A.  **I became covered by his insurance shortly**
11     **after he was hired for Hyundai.**
12 Q.  Well, so back in '04 or early '05?
13 A.  **Yes, sir.**
14 Q.  Even though y'all weren't married?
15 A.  **They considered it common-law because we**
16     **lived together.**
17 Q.  Okay.  So you had coverage through his job
18     at Hyundai at least since late '04 or
19     beginning of '05?
20 A.  **Yes, sir.**
21 Q.  Okay.  Did you -- strike that.  When you
22     started at Glovis, then, did you elect to
23     get health insurance for Glovis, or did you

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

152

SUKENIA MARSHALL -- 10/2/07

1      just keep the coverage that you had for
2      your husband?
3  A.  **I kept the insurance that I already had.**
4  Q.  Okay.  And have you been insured
5      continuously since late '04 or beginning of
6      '05 through your husband's coverage at
7      Hyundai?
8  A.  **Yes, sir.**
9  Q.  And I believe -- did you have a baby
10     recently?
11 A.  **No, sir.**
12 Q.  Okay.  That was before that you had the
13     coverage?
14 A.  **Yes, sir.**
15 Q.  Okay.  While we're talking about coverage
16     maybe, give me a moment and let me show you
17     something.  Well, I think I left that in
18     the car.
19     MR. BROWN:  You want to go to your
20     car?
21     MR. ENLOE:  Yeah let me go grab
22     something real quick, I
23     apologize.

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

153

SUKENIA MARSHALL -- 10/2/07

1    MR. BROWN:  Okay.

2    (Brief recess taken.)

3  Q.  Let's turn back to your complaint again.  I

4    think you have it opened to the right page.

5    Your third claim is for assault and

6    battery.  Do you see that there?

7  A.  Yes, sir.

8  Q.  And if you could read Paragraph 30, I've

9    got a question for you about that.

10  A.  Okay.

11  Q.  Okay.  The incident that is discussed here

12    at Paragraph 30 of your complaint that

13    occurred on June -- on or about June 24th,

14    is that the belt-loop incident that you

15    told me about?

16  A.  Yes, sir.

17  Q.  Okay.  Was there any other time when

18    Mr. Albright intended to touch or threaten

19    to touch you in an offensive manner?

20  A.  No, sir.

21  Q.  Okay.  Was there any other time when he did

22    touch you in a manner that struck you as

23    offensive?

154

SUKENIA MARSHALL -- 10/2/07

1  A.  No, sir.

2  Q.  Okay.  To your knowledge, did -- aside from

3    the folks you told me about earlier, did

4    anyone else see that incident?

5  A.  No, sir.  Not that I know of.

6  Q.  Okay.  Do you know if Mr. Harris saw that

7    incident?

8  A.  No, he didn't see that.

9  Q.  Okay.  Do you know if any other manager saw

10    that incident?

11  A.  No, sir, they didn't.

12  Q.  Okay.  Do you know if anybody at Glovis

13    knew about that incident at the time it

14    occurred aside from the folks you told me

15    about?

16  A.  I'm not sure if they knew.

17  Q.  Okay.  Do you think anybody at Glovis

18    encouraged Mr. Albright to do that to you?

19  A.  No, sir.

20  Q.  Do you think anybody there wanted him to do

21    that to you?

22  A.  No, sir.

23  Q.  Do you think that was part of his job?

155

SUKENIA MARSHALL -- 10/2/07

1  A.  No, it wasn't.

2  Q.  Do you think he did it to help the company

3    in any way?

4  A.  No, sir, he didn't.

5  Q.  Do you think he did it for his own selfish

6    purposes?

7  A.  Yes, sir.

8  Q.  And that's the only time he ever touched

9    you?

10  A.  Yes, sir.

11  Q.  Okay.  I think I asked you this earlier,

12    but just to be certain, did you record any

13    of your thoughts or impressions about your

14    time at Glovis in either a journal or a

15    diary or anything like that?

16  A.  I use a journal.

17  Q.  Do you still have that?

18  A.  No, sir.  It was destroyed.

19  Q.  Was that lost in the fire?

20  A.  Yes, sir.

21  Q.  Do you recall any of the contents of that

22    journal?

23  A.  I wrote the incident down the day -- well,

156

SUKENIA MARSHALL -- 10/2/07

1    I wrote a lot of the remarks that he would

2    make.  I just, on a daily basis or every

3    other day, I would write some.

4  Q.  And aside from what you've told me about

5    already, do you recall anything that you

6    wrote in your journal?

7  A.  Besides how I felt about it, my feelings,

8    no, sir.

9  Q.  Okay.  Did you take any pictures of your

10    interactions with Mr. Albright?

11  A.  No, sir, I didn't.

12  Q.  Any tape recordings or either audio

13    recordings?

14  A.  No, sir.

15  Q.  Do you know if anybody else took any

16    pictures or made any videos of your

17    interaction with him?

18  A.  Not to my knowledge, no.

19  Q.  Any tape or audio recordings to your

20    knowledge?

21  A.  No, sir.

22  Q.  Okay.  Do you know if Mr. Albright --

23    strike that.  Did you meet Mr. Albright at

SUKENIA MARSHALL v. GLOVIS ALABAMA -- 10/3/07

157

SUKENIA MARSHALL -- 10/2/07

1    Glovis?
2    A.    Yes, sir.  That's how I met him.
3    Q.    Okay.  Did you -- so you didn't know him
4          before you started working there?
5    A.    No, sir.
6    Q.    Okay.  Did you know of him or of his
7          reputation before you started working
8          there?
9    A.    No, sir.
10   Q.    Do you know anything about his prior
11         employment?
12   A.    I was told by Mr. Wells that Mr. Albright
13         used to work at this company a long time
14         ago, and -- but I don't remember him
15         though.  I didn't remember it.
16   Q.    Do you recall what company he used to work
17         at?
18   A.    Big Lots.  He said he worked for Big Lots.
19   Q.    Okay.  Did Mr. Wells tell you anything else
20         about Mr. Albright's employment there?
21   A.    No, sir.  He asked me that the day that we
22         all -- I started on orientation did I know
23         him when he found out that I worked for Big

158

SUKENIA MARSHALL -- 10/2/07

1    Lots --
2    Q.    Oh, I see.
3    A.    -- did I know Mr. Albright, and I told him,
4          no, I never remembered him.
5    Q.    I got you.  So Mr. Wells said, Hey, I hear
6          you worked for Big Lots, and you said that
7          you had and then he said do you know
8          Mr. Albright, he used to work there?
9    A.    Yes, sir.
10   Q.    Okay.  Do you know why Mr. Albright stopped
11         working at Big Lots?
12   A.    No, sir.
13   Q.    Okay.  Do you know if Mr. Albright had ever
14         been let go from a job for harassing
15         employees?
16   A.    No, sir.
17   Q.    Do you know if Mr. Albright had ever been
18         let go from a job for any other
19         inappropriate conduct?
20   A.    No, sir.
21   Q.    Do you know if Mr. Albright had any
22         criminal record?
23   A.    No, sir.

159

SUKENIA MARSHALL -- 10/2/07

1    Q.    Do you know that -- any of these things
2          now?
3    A.    The only thing that I know is that he was
4          terminated from Glovis.
5    Q.    Take a look at your next claim for
6          retaliation, and I'll ask you a few
7          questions about that so if you want to read
8          a few of those paragraphs.
9    A.    Okay.
10   Q.    Do you think Glovis was retaliating against
11         you when you were terminated?
12   A.    Yes, sir.
13   Q.    And why do you think that?
14   A.    I think because -- well, I had never had
15         any problems on the job until the day that
16         I reported what Mr. Albright had done to
17         me, and I just feel like they retaliated
18         against me for me reporting sexual
19         harassment.
20   Q.    And aside from the fact that you hadn't had
21         problems before you talked or you made your
22         report, is there any other reason you think
23         you were retaliated against?

160

SUKENIA MARSHALL -- 10/2/07

1    A.    That's the only reason why I think that
2          they could.
3    Q.    So you think the company is not telling the
4          truth when it has said that it ended your
5          employment because you walked off the job
6          without permission?
7    A.    No, sir, they are not telling the truth.
8    Q.    Okay.  Has anyone said anything to you to
9          lead you to believe that they're not
10         telling the truth?
11   A.    Some of the responses that I've heard that
12         my attorney has gotten back from Glovis,
13         they're not --
14              MR. BROWN:  We will discuss
15           what --
16              MR. ENLOE:  Yeah, I'm not
17           asking --
18              MR. BROWN:  No, no.  I'm just
19           advising her.  You know, that's
20           attorney/client privilege in
21           terms of what we discuss, but I
22           think he wants to know any
23           other --

161

SUKENIA MARSHALL -- 10/2/07

1    MR. ENLOE: Yeah. Let me rephrase
2       the question.
3    MR. BROWN: -- outside of what
4       we -- do you understand?
5    MR. ENLOE: No questions I'm
6       asking today are going to -- are
7       asking you to tell me anything
8       you may have discussed with
9       Mr. Brown. What y'all discussed
10       is confidential.
11    THE WITNESS: Okay.
12    MR. ENLOE: So I'll never ask you
13       for anything that y'all have
14       talked about.
15  Q.  So with that in mind, has anyone else said
16       anything to you that leads you to believe
17       that Glovis is not telling the truth when
18       it said that it let you go because you
19       walked off the job?
20  A.  **The day that I was terminated, I got a**
21       **phone call from Ms. Jackson from -- she was**
22       **still at work, and she said that it was**
23       **going around on the floor that they had**

162

SUKENIA MARSHALL -- 10/2/07

1       **terminated me, and she said that I heard**
2       **that they terminated you because they said**
3       **that you walked off of the job, and she**
4       **said I know you didn't.**
5  Q.  And that's Shonterri Jackson?
6  A.  **Shonterri Jackson.**
7  Q.  Okay. What time of day did she call you,
8       do you remember?
9  A.  **I think it was around a lunchtime or**
10       **something.**
11  Q.  Okay. Aside from that, and, of course,
12       aside from anything you discussed with your
13       attorney, has anyone said anything to you
14       that leads you to believe that the reason
15       Glovis has given for your termination is
16       not the real reason?
17  A.  **No, sir.**
18  Q.  Okay. Have you seen any documents that led
19       you to believe that that's not the real
20       reason?
21  A.  **No, sir.**
22  Q.  Have you seen anything else that would lead
23       you to believe that's not the real reason?

163

SUKENIA MARSHALL -- 10/2/07

1  A.  **No, sir.**
2  Q.  Okay. Do you know of any other employees
3       who complained about harassment or improper
4       conduct by any employee were retaliated
5       against?
6  A.  **No, sir.**
7  Q.  Okay.
8       (Off-the-record discussion.)
9  Q.  We've talked a little bit about
10       Mr. Albright, and we'll talk some more
11       about him, but did you have any problems
12       with any other supervisors or employees
13       when you worked at Glovis?
14  A.  **No, sir.**
15  Q.  Okay. Did anybody else mistreat you in any
16       way?
17  A.  **No, sir.**
18  Q.  Okay. All right. Well, let's talk now
19       about Mr. Albright, then.
20       (Off-the-record discussion.)
21  Q.  You started to talk about this earlier, but
22       I want to be sure we cover this completely.
23       I want you to tell me everything that

164

SUKENIA MARSHALL -- 10/2/07

1       Mr. Albright did to you that you thought
2       was offensive or wrong.
3    MR. BROWN: Other than what she's
4       testified about?
5    MR. ENLOE: Well, I may touch base
6       on some of those, but I want to
7       make sure that I've covered the
8       waterfront on this front. The
9       earlier questions were directed
10       to anything that may have been
11       witnessed. Now I want to talk
12       about anything that happened
13       whether there were witnesses
14       there or not.
15    MR. BROWN: Okay. I just --
16    MR. ENLOE: I'm not going to play
17       games.
18    MR. BROWN: Yeah, no. I
19       understand. I mean, I'm just --
20    MR. ENLOE: And actually maybe the
21       best way to do this rather than
22       have you repeat what you said
23       earlier, to cover what you said

165

SUKENIA MARSHALL -- 10/2/07

1    earlier and then ask you if
2    there's anything in addition to
3    that.  Why don't we do it that
4    way.
5    Q.    This is what you told me about so far.  You
6          told me that one day when you were about to
7          go to lunch, Mr. Albright asked something
8          along the lines of, What can I do with her,
9          referring to you; is that correct?
10   A.    **He asked King what could he do with me,**
11         **yes, sir.**
12   Q.    And you overheard this conversation?
13   A.    **Yes, sir.**
14   Q.    And what did you take him to mean by that?
15   A.    **I took it to be is if -- what could he do**
16         **with me as far as in the bedroom.**
17   Q.    Okay.  But what were his exact words on
18         that occasion?
19   A.    **He asked King, he said, what could -- he**
20         **said, What do you think you could with that**
21         **lady, and King said, I can't do nothing**
22         **with her.**
23   Q.    Okay.  So that's one thing that you thought

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

166

SUKENIA MARSHALL -- 10/2/07

1    was inappropriate and then you also told me
2    that -- let's see -- that Mr. Albright made
3    a remark something along the lines of, Did
4    you see her or -- I'm sorry.  Mr. Albright
5    told some other employee to keep tabs on
6    you in some way, do you remember telling me
7    about that?  Do you understand the
8    question?
9    A.    **No, sir.  Could you repeat?**
10         MR. BROWN:  I think she said that
11         not to give her help.
12         MR. ENLOE:  Okay.  Thank you.
13   Q.    Mr. Albright told another employee not to
14         aid you in some way?
15   A.    **Yes, sir.**
16   Q.    What exactly happened with respect to that?
17   A.    **I wasn't there when he told him, but**
18         **Mr. Greyhouse came and told me.  He said,**
19         **Can you believe Ellis just came from over**
20         **here and told me, don't help you.  He don't**
21         **care how heavy a tote is or how heavy your**
22         **pallet is, don't help you.  He was going to**
23         **let -- he said something about I was**

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

167

SUKENIA MARSHALL -- 10/2/07

1    **spoiled -- I was a spoiled brat and just**
2    **don't help me.**
3    Q.    Okay.  And you didn't actually hear that
4          comment, Mr. Greyhouse told you it?
5    A.    **Yes, sir.**
6    Q.    Okay.  So we have that.  Then there was the
7          belt-loop incident that we've talked about
8          in detail where you had stood up holding a
9          tote, and he grabbed the belt loop and made
10         the comment about your underwear?
11   A.    **Yes, sir.**
12   Q.    Is there anything else about that incident
13         that you haven't already told me about?
14   A.    **No, sir.**
15   Q.    Okay.  And then he asked you one morning if
16         you had still not changed your mind about
17         going out with him?
18   A.    **Yes, sir.**
19   Q.    Is there anything else that he said to you
20         on that occasion?
21   A.    **No, sir.**
22   Q.    Okay.  And then he made a couple of
23         comments, I think you said two or three

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

168

SUKENIA MARSHALL -- 10/2/07

1    comments, about your underpants in addition
2    to the belt-loop incident?
3    A.    **Yes, sir.**
4    Q.    Aside from what you already told me about
5          those comments, did he say anything else on
6          those occasions?
7    A.    **No, sir, not that I can remember.**
8    Q.    Did he do anything else on those occasions?
9    A.    **No, sir.**
10   Q.    Okay.  That's what my notes indicate, and
11         the record will speak for itself,
12         obviously.
13         MR. BROWN:  I understand.
14   Q.    Did Mr. Albright do anything else to you or
15         say anything else to you that you thought
16         was improper or inappropriate aside from
17         what you've told about?
18   A.    **Not that I can remember.**
19   Q.    Okay.  Aside from the belt-loop incident,
20         did he ever touch you?
21   A.    **No, sir, not that I can remember.**
22   Q.    Did he ever curse at you?
23   A.    **Yes, sir.**

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

169

1   Q.  How did he curse at you?

2   A.  **He would say things like, get your ass back**

3       **to work or things like that he would say.**

4   Q.  Did you take that in a sexual way?

5   A.  **I took it as if he was just mean and.**

6   Q.  Okay.  Did you ever hear him say that to

7       anybody else?

8   A.  **Yes.**

9   Q.  Who else did he say that to?

10  A.  **This girl, Ciara White.**

11  Q.  Anybody else?

12  A.  **Not that I can remember.**

13  Q.  Okay.  Aside from the time when he asked

14      you if you hadn't changed your mind about

15      going out with him, did he ever ask you out

16      on a date?

17  A.  **He asked me out before.**

18  Q.  Okay.  So twice?

19  A.  **Yes, sir.**

20  Q.  Any other times?

21  A.  **No, sir.**

22  Q.  Did he ever proposition you in any way?

23  A.  **No, sir, not that I can remember he did.**

170

1   Q.  Did he ever talk about sex around you?

2   A.  **No, sir.  Not just come out and -- no, he**

3       **didn't.**

4   Q.  Okay.  Did you ever overhear him talking

5       about sex?

6   A.  **No, sir.**

7   Q.  Did he ever show you any sexually explicit

8       pictures?

9   A.  **No, sir.**

10  Q.  Did he ever bring any sexually explicit

11      material to work and show it to you?

12  A.  **No, sir.**

13  Q.  Did he do anything else aside from what you

14      told me and what we just covered that you

15      thought was inappropriate or improper?

16  A.  **No, sir.**

17  Q.  Okay.  Did you ever complain about

18      Mr. Albright to anybody at Glovis?

19  A.  **Yes, sir.**

20  Q.  How many times?

21  A.  **Once.  Well, once to two different people.**

22  Q.  Okay.  Let's talk about that.  Who did you

23      complain to about Mr. Albright on that one

171

1     occasion?

2   A.  **I went to Ms. Liz Lindemann.**

3       THE REPORTER:  I'm sorry.  What

4       was the name?

5       THE WITNESS:  Liz -- Ms. Liz

6       Lindemann.

7       MR. ENLOE:  L-I-N-D-E-M-A-N-N.

8   A.  **And she said I would have to talk to Dave**

9       **Harris.**

10  Q.  Okay.  Do you recall what day that was?

11  A.  **It was the day before I was terminated.**

12  Q.  And so you were terminated on the 21st of

13      July, does that sound right?

14  A.  **Right now I can't really remember the exact**

15       **date, but it was the day before I was**

16       **terminated.**

17  Q.  Okay.  So I believe it was the 20th, and

18      we'll -- but let's assume it was the 20th

19      for purposes of this discussion.  Why did

20      you complain on that particular day?

21  A.  **Because that was the day that Nate --**

22       **Mr. Greyhouse walked up to me and he told**

23       **me what Mr. Albright had just walked up to**

172

1     him and said about me, and I was just fed

2     up with it.

3   Q.  And that, again, was?

4   A.  **He walked to Mr. Greyhouse and told him**

5       **that don't help me and he didn't care how**

6       **heavy things were, don't help me.**

7   Q.  Okay.  Is that the first time to your

8       knowledge that Mr. Albright had instructed

9       anybody not to help you?

10  A.  **Yes, sir.**

11  Q.  Okay.  Did anybody else ever tell you that

12      Mr. Albright told them not to help you?

13  A.  **No, sir.**

14  Q.  Okay.  So on that particular occasion when

15      Mr. Greyhouse told you that, you decided to

16      go make a complaint?

17  A.  **Yes, sir.**

18  Q.  And that's the first time you made a

19      complaint about Mr. Albright?

20  A.  **Yes, sir.**

21  Q.  Okay.  Was it in the morning or the

22      afternoon?

23  A.  **It was in the morning, I think.**

SUKENIA MARSHALL V. GLOVIS ALABAMA -- 10/3/07

---

173

SUKENIA MARSHALL -- 10/2/07

1   Q.   Okay.  You were still on the day shift;
2        right?
3   A.   Yes, sir.
4   Q.   So you would have started around 6:30 in
5        the morning?
6   A.   Yes, sir.
7   Q.   Do you recall how long you'd been on the
8        job that day?
9   A.   No, sir, I can't recall.
10  Q.   So walk me through that.  Mr. Greyhouse
11       came over and told you what he said
12       Mr. Albright had said?
13  A.   Yes, sir.
14  Q.   And then what did you do?
15  A.   I talked with Mr. Greyhouse, and I told him
16       I was sick of it, and I just -- that I
17       think I should go and report him how he was
18       harassing me and how he hounded me, and
19       Mr. Greyhouse, he was, like, well, I would,
20       you know, enough is enough.  Just go talk
21       to somebody.  And when I was headed up
22       front, another lady that worked on the
23       floor, Ms. Corbett, she stopped me and

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

174

SUKENIA MARSHALL -- 10/2/07

1        asked me what was wrong, because I was
2        upset about it, and I told her that I just
3        needed to go and talk with someone up front
4        about Mr. Albright.
5   Q.   So you talked to Mr. Greyhouse and
6        Ms. Corbett, and you told them both you
7        were going to go talk to somebody about it?
8   A.   Yes, sir.
9   Q.   Okay.  Did you go talk to somebody about it
10       then.
11  A.   Yes, sir.
12  Q.   Okay.  And you went and talked to
13       Ms. Lindemann?
14  A.   Yes, sir.
15  Q.   Okay.  Tell me about that, what did you
16       say?
17  A.   Before I went there, I went to the restroom
18       up front, and by that time, Shonterri
19       Jackson made it up front --
20  Q.   Okay.
21  A.   -- because they -- I guess they told her,
22       and we both went in to Ms. Lindemann, and I
23       told her about some of the things that were

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

175

SUKENIA MARSHALL -- 10/2/07

1        going on with Mr. Albright.  She said that
2        she would have Mr. Harris to call me, and I
3        don't -- I can't remember if he was in his
4        office or whether he was busy or not, and I
5        went in to talk to Mr. Harris.  I can't
6        remember how long it was after that.
7   Q.   Tell me exactly what you told
8        Ms. Lindemann.
9   A.   I told her that Mr. Albright had been
10       saying some inappropriate things to me and
11       that he was -- how he was trying to make my
12       job difficult for me and that I was just
13       sick of it.
14  Q.   Did you tell Ms. Lindemann what
15       inappropriate things he had said to you?
16  A.   I can't remember.  I don't think I went in
17       to just details to tell her because she
18       said I had to talk to Mr. Harris.
19  Q.   Did you tell her that he had mentioned your
20       underwear?
21  A.   No, sir.  I don't think I got to talk to
22       her about that.
23  Q.   Did you tell her that he had grabbed you by

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

176

SUKENIA MARSHALL -- 10/2/07

1        the belt loop?
2   A.   No, sir, I don't think I did.
3   Q.   You just said that Mr. Albright had made --
4        said inappropriate things to you?
5   A.   And how he had kept harassing me and trying
6        to make my job hard for me.
7   Q.   How long did you talk with Ms. Lindemann
8        before you went and talked to Mr. Harris?
9   A.   Not very long.
10  Q.   Okay.  Five minutes or so?
11  A.   Yeah, maybe three to five minutes.
12  Q.   Okay.  Was Ms. Jackson there for the whole
13       time?
14  A.   Yes, sir, she was.
15  Q.   Did she say anything?
16  A.   She listened.  She never said anything.
17  Q.   Okay.  Was anybody else in the office but
18       for you and Ms. Lindemann and Ms. Jackson?
19  A.   I can't remember if the young lady that
20       worked at the front desk was there or not,
21       but it was, I think, on the day that I -- I
22       talked with her later that day.
23  Q.   Who was that?

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

SUKENIA MARSHALL v. GLOVIS ALABAMA -- 10/3/07

---

177

SUKENIA MARSHALL -- 10/2/07

1   A.   **I can't remember her name. She worked at**
2        **the desk.**
3   Q.   Do you remember what her job was?
4   A.   **I just knew she answered the phone.**
5        **Probably receptionist or something.**
6   Q.   Do you recall how old she is?
7   A.   **To me, it looked as if she probably was 20**
8        **or something maybe.**
9   Q.   Okay. And it was a woman, a girl?
10   A.   **Yes.**
11   Q.   She white or was she black?
12   A.   **She was white.**
13   Q.   Blonde hair or darker hair?
14   A.   **I really can't remember.**
15   Q.   Okay. How long did you talk with her?
16   A.   **Not long. It was right when I got**
17        **permission to leave, and I just -- we just**
18        **shared a few words, and I left.**
19   Q.   What did y'all discuss?
20   A.   **I'm thinking she probably overheard cause**
21        **she just told me it would be okay that, you**
22        **know, she -- just go home and get some**
23        **rest.**

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

178

SUKENIA MARSHALL -- 10/2/07

1   Q.   But that was later on in the day when you
2        were leaving?
3   A.   **Yes, sir.**
4   Q.   Okay. So -- and this first meeting you had
5        with Ms. Lindemann, y'all talked for about
6        five minutes, and she said that she would
7        contact Mr. Harris and have you talk with
8        him?
9   A.   **Yes, sir.**
10   Q.   Okay. And did you talk with Mr. Harris
11        that day?
12   A.   **Yes, sir, I did.**
13   Q.   How much later was that?
14   A.   **I can't remember how long it was before I**
15        **got a chance -- I don't think it was very**
16        **long before I talked to him.**
17   Q.   Okay. When you were talking with
18        Ms. Lindemann this first time, did you ask
19        if you could go home for the day?
20   A.   **No. Not right then I don't think. It**
21        **wasn't then, right then.**
22   Q.   Okay. So then at some point you went and
23        you spoke with Mr. Harris; is that right?

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

179

SUKENIA MARSHALL -- 10/2/07

1   A.   **Yes, sir.**
2   Q.   Did you do that alone or was Ms. Jackson
3        with you?
4   A.   **Ms. Jackson wasn't there. It was**
5        **Ms. Vanessa -- I don't know her last name,**
6        **she was present.**
7   Q.   What was her job?
8   A.   **I'm not even sure.**
9   Q.   Why was she in on this conversation?
10   A.   **No. Ms. Va -- she wasn't there then. She**
11        **was there when he terminated me.**
12   Q.   Okay. So who was in on the conversation
13        between you and Mr. Harris?
14   A.   **Nobody. Nobody.**
15   Q.   Just the two of y'all?
16   A.   **Yes, sir.**
17   Q.   Okay. And tell me everything you and
18        Mr. Harris discussed?
19   A.   **I explained to him how Mr. Albright kept**
20        **harassing me. How he pulled -- I told him**
21        **about the belt-loop incident. I told him**
22        **about the incidents where he would ask me**
23        **about my panties and when he made the**

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

180

SUKENIA MARSHALL -- 10/2/07

1        **comment about my rear end. I just told him**
2        **about what he had said to Mr. Greyhouse,**
3        **and I just told him that how I constantly**
4        **asked him to just leave me alone and to**
5        **stop that I didn't appreciate it.**
6   Q.   Did you say anything else to Mr. Harris?
7   A.   **No, sir. I just told him about the**
8        **incident that was going on.**
9   Q.   And what did Mr. Harris say to you?
10   A.   **He told me that they would do an**
11        **investigation.**
12   Q.   Okay. Did he say anything else?
13   A.   **No, sir. He told me that I could go back**
14        **to work.**
15   Q.   Okay. And did you go back to work?
16   A.   **Well, I think I went back out on the floor**
17        **and then -- yeah, I went back to work right**
18        **after that.**
19   Q.   Okay. And so do you recall anything else
20        about your meeting with Mr. Harris?
21   A.   **No, sir.**
22   Q.   Okay. So at that point, you went back to
23        work?

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

181

SUKENIA MARSHALL -- 10/2/07

1    A.   Yes, sir.
2    Q.   Okay.  What happens next?
3    A.   After that, once I got back out on the
4         floor and then, I guess, they had spread it
5         all across the floor what was going on, and
6         I went to the restroom again and Shonterri
7         followed me there, and she went back up
8         front with me, because I told her I just
9         didn't think I could stay for the rest of
10        the day, I needed to go home.  And I went
11        to Ms. Lindemann and I told her, I said
12        that I felt like I needed to go home, and
13        she said, okay, that's fine.
14   Q.   How long was this after you talked to
15        Mr. Harris?
16   A.   It wasn't long.  I don't think it even
17        could have been 30 minutes or so.
18   Q.   So you went back up and talk to
19        Ms. Lindemann, and you told her, I think I
20        need to go home?
21   A.   Yes, I told her that I needed to go home
22        for the day -- the rest of the day.
23   Q.   Did you say anything else to her?

182

SUKENIA MARSHALL -- 10/2/07

1    A.   No, that was it.
2    Q.   Okay.  And what did Ms. Lindemann say to
3         you?
4    A.   She said just, Okay, Sukenia, that's fine.
5    Q.   What time of day was this?
6    A.   I can't remember what time it was when I
7         left.
8    Q.   Do you recall if it was in the afternoon?
9    A.   I think it was afternoon.
10   Q.   And then you left?
11   A.   Yes, sir.
12   Q.   Okay.  Did you complain at any other times
13        about Mr. Albright to anybody in management
14        at Glovis?
15   A.   Mr. Wells.
16   Q.   Okay.
17   A.   I talked with him.
18   Q.   When did you tell Mr. Wells or complain to
19        Mr. Wells about Mr. Albright?
20   A.   Mr. Wells, he was out.  He had broken his
21        ankle or something, and he had just gotten
22        back to work, and when I saw him that
23        morning, he called me to the side and he

183

SUKENIA MARSHALL -- 10/2/07

1         said -- he didn't tell me who had told him
2         what was going on, but he said someone had
3         talked to him about how Mr. Albright had
4         been doing me while he was out, and he was,
5         like, well, I'll talk with someone about it
6         and --
7    Q.   What day was that?
8    A.   I can't -- it was -- I can't remember what
9         day it was.
10   Q.   Is it the same day as these meetings that
11        you've been telling me about, or was it
12        before then?
13   A.   It was -- I think it was before then.
14   Q.   Do you know if Mr. Wells said anything to
15        anybody?
16   A.   No, I don't know.
17   Q.   And did you say anything to Mr. Wells on
18        that day about what Mr. Albright had done
19        to you?
20   A.   No, I didn't.
21   Q.   He just told you that he had heard things?
22   A.   Yes, sir.
23   Q.   Did he say what he had heard?

184

SUKENIA MARSHALL -- 10/2/07

1    A.   No, he didn't.
2    Q.   Okay.  Do you know if Mr. Albright received
3         a company handbook when he started working
4         there?
5    A.   No.  I'm not sure.  I don't know if he did.
6    Q.   Do you know if he got the company policy
7         against sexual harassment?
8    A.   I don't know.
9    Q.   Do you know if he got any training?
10   A.   No, I don't.
11   Q.   Okay.  Do you want to take a sec?
12   A.   I'm okay.
13   Q.   You sure?
14   A.   (Nodded head.)
15   Q.   Okay.  When you were hired, you were hired
16        to work the night shift; is that right?
17   A.   Yes, sir.
18   Q.   Okay.  And at some point, you were told you
19        were going to move to the second shift; is
20        that correct?
21   A.   Yes, sir.
22   Q.   Do you recall when that was?
23   A.   The day of orientation.

185

SUKENIA MARSHALL -- 10/2/07

1  Q.  Okay. Were you ever told after orientation

2      that you wouldn't have to be moving to the

3      second shift?

4  A.  **No, sir.**

5  Q.  So on the 20th, the day that you made these

6      complaints, did anybody tell you that you

7      were going to be moved to the second shift

8      on that day?

9  A.  **No. Not on the 20th when I first went to**

10     **them.**

11  Q.  Okay. What about the next day when you

12      came back to work, did anybody tell you

13      that you were going to have to move to the

14      second shift then?

15  A.  **The day -- the same day that I went to them**

16     **on the 20th before I went to Ms. Lindemann**

17     **and told her that I needed to leave,**

18     **Mr. Harris walked out on the floor, and he**

19     **said, Ms. Marshall, he said, it was brought**

20     **to my understanding that you were supposed**

21     **to be -- you was hired for second shift.**

22     **He said, Is that correct. I said, Yes,**

23     **sir. He said, Well, as of next·week, you**

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

186

SUKENIA MARSHALL -- 10/2/07

1     **need to come in on second shift.**

2  Q.  Okay. And that was before you had gone and

3      said anything to Ms. Lindemann?

4  A.  **No. This was after.**

5  Q.  Okay. Well, let me make sure we get all

6      the chronology here correct, because there

7      was a lot going on, on that day. When did

8      Mr. Harris come to you and tell you that

9      you'd be moved to second?

10  A.  **After I went and talked to him.**

11  Q.  After you first talked to him?

12  A.  **After I talked to him.**

13  Q.  Okay. And what did you say to him when he

14      told you that?

15  A.  **When he came to me, I just said okay.**

16  Q.  Okay. Were you upset about it?

17  A.  **No, sir.**

18  Q.  You didn't tell Mr. Harris that you didn't

19      want to work the second shift?

20  A.  **No, sir.**

21  Q.  Did you tell anybody that you didn't want

22      to work the second shift?

23  A.  **No, sir.**

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

187

SUKENIA MARSHALL -- 10/2/07

1  Q.  Did you want to work the second shift?

2  A.  **It really didn't matter. I knew when I was**

3     **hired that they told me it was going to be**

4     **night shift.**

5  Q.  So you never said anything to anybody at

6      Glovis that would have indicated that you

7      were unhappy with being moved to second

8      shift?

9  A.  **No, sir.**

10  Q.  And then after you were told you were going

11      to be moved to second shift, after that you

12      went and told Ms. Lindemann that you wanted

13      to leave early?

14  A.  **Well, after -- he saw me in the aisleway**

15     **and then after I went back to work and then**

16     **everybody was still talking about what was,**

17     **you know, going on, and after I went to the**

18     **restroom or whatever and then I went up**

19     **front, and I told them that I needed to**

20     **leave.**

21  Q.  Okay. So just to make sure I've got it

22      clear in my mind, first thing that happens

23      is Mr. Greyhouse tells you the comment by

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

188

SUKENIA MARSHALL -- 10/2/07

1      Mr. Albright, not to help you out; right?

2  A.  Yes, sir.

3  Q.  At that point, you decided you were going

4      to talk to Ms. Lindemann?

5  A.  Yes, sir.

6  Q.  You went and talked to Ms. Lindemann along

7      with Ms. Jackson?

8  A.  Yes, sir.

9  Q.  And you told her what you told me that you

10      said. Ms. Lindemann said that she would

11      tell Mr. Harris, and he would look in to

12      it?

13  A.  Yes, sir.

14  Q.  You then went and spoke with Mr. Harris

15      just one-on-one the two of y'all?

16  A.  Yes, sir.

17  Q.  And you told him what you told me that you

18      said?

19  A.  Uh-huh.

20  Q.  And he indicated that the company would

21      investigate the matter?

22  A.  Yes, sir.

23  Q.  Okay. You then went back out on the floor,

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

SUKENIA MARSHALL v. GLOVIS ALABAMA -- 10/3/07

189

SUKENIA MARSHALL -- 10/2/07

1    and Mr. Harris came up to you at some point

2    then and told you that you would be moving

3    to the second shift the following week?

4  **A.  Yes, sir.**

5  Q.  Sometime after that, you became upset.  You

6    went to the restroom and then you decided

7    that you needed to go home for the day.

8        MR. BROWN:  I object to the form

9        of the question, go ahead.

10  Q.  Is that right?

11  **A.  Yes, sir.**

12  Q.  Okay.  And then you went and you spoke with

13    Ms. Lindemann for the last time, and you

14    spoke to the receptionist?

15  **A.  On my way out, yes, sir.**

16  Q.  Okay.  And that's -- did anything else

17    happen on that day with respect to your

18    complaint about Mr. Albright?

19  **A.  No, sir, not that I can remember.**

20  Q.  Okay.  Anybody else present during any of

21    your discussions with Ms. Lindemann or

22    Mr. Harris aside from the folks that you've

23    mentioned?

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

190

SUKENIA MARSHALL -- 10/2/07

1  **A.  No, sir.**

2  Q.  And I may have asked you this a moment ago,

3    forgive me if so, but what time of day did

4    you leave work?

5  **A.  I really can't remember exactly what time**

6    **it was when I left there after --**

7  Q.  Do you recall how much -- how far into your

8    shift you were?

9  **A.  No, sir, I don't.**

10  Q.  Okay.  Was your shift over?

11  **A.  No, it wasn't over.**

12  Q.  Okay.  Did you know Glovis' policy on

13    leaving work early?

14  **A.  No -- well, I knew that I probably would**

15    **have been -- I didn't know if I was going**

16    **to have, like, a point against me or**

17    **anything like that, but I knew if I -- as**

18    **long as I went to human resources and let**

19    **them know that I was going to leave, it**

20    **was -- and she okayed it that it was okay.**

21  Q.  Did you know that normally company policy

22    was that you shouldn't leave work until

23    your shift was done?

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

191

SUKENIA MARSHALL -- 10/2/07

1  **A.  No, sir.  I didn't know that.**

2  Q.  Well, did you ever leave work before your

3    shift was done on any other day?

4  **A.  No, sir.**

5  Q.  Well, why not?

6  **A.  I mean, on the other days, I was fine.  I**

7    **didn't have any problems, I didn't have to**

8    **leave.**

9  Q.  Did any other employees leave before the

10    end of their shifts to your knowledge?

11  **A.  If they had anything to do, they would get**

12    **it okayed, and they would leave.**

13  Q.  Do you know that happened?

14  **A.  I've seen people leave before.**

15  Q.  Do you recall anybody?

16  **A.  I know Ms. Jackson had to leave before.**

17    **C. J., I think he left a couple of times**

18    **before.**

19  Q.  Do you know why Ms. Jackson had to leave?

20  **A.  I can't remember why.  It was several**

21    **employees that left.  I didn't know the**

22    **reason why they had to leave early, but**

23    **they did.**

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

192

SUKENIA MARSHALL -- 10/2/07

1  Q.  Okay.  Let's talk about the next day.  You

2    come back to work on the 21st; is that

3    right?

4  **A.  Yes, sir.**

5  Q.  Okay.  And what happens when you come back

6    to work?

7  **A.  I went to work.  I think I worked a couple**

8    **of hours, and Mr. Albright walks up to me**

9    **and said that Mr. Harris needed to see me.**

10  Q.  Okay.  And did you go see Mr. Harris?

11  **A.  Yes, I did.**

12  Q.  Okay.  And what did y'all talk about?

13  **A.  When I got upstairs where he was, it was**

14    **him and Ms. Vanessa sitting there, and he**

15    **talked to me and told me that I had**

16    **abandoned my job, that I just basically**

17    **just left the job and that he had to**

18    **terminate me for it.**

19  Q.  And what did you say?

20  **A.  I explained to him that I had talked with**

21    **Ms. Lindemann and that she okayed it.  And**

22    **he was, like, Well, Ms. Lindemann isn't**

23    **here today, you can call back up here and**

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

193

SUKENIA MARSHALL -- 10/2/07

1     talk with her in the morning about it.  He

2     said, But as of right now, I have to

3     terminate you.

4    Q.   Okay.  Did you say anything else to him?

5    A.   I said, Just because I came to you all and

6     I reported what Mr. Albright done to me,

7     y'all are terminating me, because I knew I

8     didn't just walk off of my job.

9    Q.   Take a moment.

10         MR. ENLOE:  Do you want to take a

11         break?

12         MR. BROWN:  Uh-huh.

13         MR. ENLOE:  Yeah, let's take a

14         break.

15         (Brief recess taken.)

16    Q.   (By Mr. Enloe)  We're back on the record,

17     Ms. Gordon, and like with the other breaks,

18     you realize you're still under oath; right?

19    A.   Yes, sir.

20    Q.   Okay.  I think when we took a break, we

21     were talking about your meeting with

22     Mr. Harris on July 21st and what y'all

23     talked about.  And I don't want to dwell on

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

194

SUKENIA MARSHALL -- 10/2/07

1     it, but I want to make sure I understand

2     everything that took place during that

3     meeting.  You said Mr. Harris was there and

4     a lady named Vanessa?

5    A.   Yes, sir.

6    Q.   Do you know what her job was?

7    A.   No, sir.

8    Q.   Okay.  And was this in the morning?

9    A.   Yes, sir.

10    Q.   And Mr. Harris informed you that you would

11     be terminated for job -- for walking off

12     the job; is that right?

13    A.   Yes, sir.

14    Q.   Okay.  Did he -- what did he actually say,

15     job abandonment?

16    A.   Yes, sir.  I think that's what he said.

17    Q.   Okay.  And then you told him what you said

18     a moment ago.  Did anything else take place

19     during this meeting or was anything else

20     said?

21    A.   No, sir.

22    Q.   Okay.  And what did you do at that point?

23    A.   I left.

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

195

SUKENIA MARSHALL -- 10/2/07

1    Q.   Okay.  Did you say to Mr. Harris that you

2     didn't need this?

3    A.   No, sir.

4    Q.   So you said what you testified to a moment

5     ago and then you left?

6    A.   Yes, sir.

7    Q.   And I think you'd indicated that Mr. Harris

8     told you that Ms. Lindemann was out that

9     day?

10    A.   Yes, sir.

11    Q.   That you could call back and talk with her?

12    A.   Yes, sir.

13    Q.   Did you call back?

14    A.   Yes, sir, I did.

15    Q.   When did you call?

16    A.   I can't remember, it -- well, I called her

17     back the next day.  It was that morning

18     when I called and talked with her, and I

19     went over what happened the day before, and

20     I told her, I said, Ms. Lindemann, and I

21     asked you if I could leave, and you said,

22     okay, that's fine.  She said, Well, I know,

23     but what Dave said -- I'm going to have to

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

196

SUKENIA MARSHALL -- 10/2/07

1     go with what Dave said.

2    Q.   She said --

3    A.   She said -- I said, I asked you if I could

4     leave, and you said, okay, that's fine.

5     She said, I know, but I'm gonna -- what

6     Dave says, it stands.  I'm going to have to

7     go with what Dave said or something to

8     that.

9    Q.   Do you know what Ms. Lindemann meant by

10     "what Dave says stands"?

11    A.   Whatever actions he took the day before,

12     she was going to have to go along with.

13    Q.   And what did you say to that?

14    A.   I said okay.

15    Q.   Okay.  I want you to take a look at a

16     document for me.  There are two pages to

17     this so take your time looking over it.

18         (The referred-to document was

19         marked for identification as

20         Defendant's Exhibit No. 7.)

21    Q.   Did you have a moment to take a look at

22     this document?

23    A.   Yes, sir.

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

197

SUKENIA MARSHALL -- 10/2/07

1  Q.  This is to --

2          MR. ENLOE:  Mr. Brown, I don't

3          know if you've had a chance to

4          see this before.  You wouldn't

5          have been copied on this while

6          you were with Glovis, but these

7          are e-mails between Ms. Lindemann

8          and Dave Harris with respect to

9          the events of July 20 and 21,

10         2005, at least from the company's

11         perspective.

12 Q.  And I've got some questions for you about

13     these e-mails or the facts here.  First of

14     all, take a look at the first page.  At the

15     bottom of it, you'll see an e-mail from Ms.

16     Lindemann to

17     Mr. Harris to Subject: Breakdown, do you

18     see that?

19 A.  Yes, sir.

20 Q.  And this is an e-mail that Ms. Lindemann

21     apparently sent to Mr. Harris on that day

22     at nine o'clock in the morning.  And the

23     first paragraph indicates, among other

198

SUKENIA MARSHALL -- 10/2/07

1  things, that you came to see Ms. Lindemann

2  that morning about 8:45 asking to go home.

3  First, let me ask you, does that sound

4  about right?  Did you go see Ms. Lindemann

5  do you think about 8:45 on the 20th?

6  A.  No, sir, not that I can recall.

7  Q.  Does that seem too early or too late based

8      on what you can remember?

9  A.  They're saying -- it was too early.

10 Q.  Okay.  And why is that?

11 A.  How is that?

12 Q.  I said, why is that, why does it seem too

13     early?

14 A.  Because when I went and spoke with

15     Ms. Lindemann about going home that day, it

16     was after everything else had taken place,

17     and I don't think it was that early.

18 Q.  Okay.  And if you look at the second

19     paragraph, Ms. Lindemann says here that you

20     told her that Ellis is on you all the time

21     telling people not to help her, telling

22     people just to let her do it if she's going

23     to have that type of attitude like she

199

SUKENIA MARSHALL -- 10/2/07

1  does, do you recall telling Ms. Lindemann

2  that?

3  A.  No.  No, sir.

4  Q.  So you didn't tell Ms. Lindemann what she

5      says you said there?

6  A.  No, sir.  I don't recall telling her that.

7  Q.  Okay.  And then if you look at the third

8      paragraph, there's some more mention of

9      Ellis telling another employee some things

10     that you say was just to pick at you, do

11     you remember telling her that?

12 A.  I don't remember if I told her.  I don't

13     remember.  I don't think I told her.  I

14     don't remember telling her that.

15 Q.  Okay.  Do you recall if you did or not?

16 A.  No.

17 Q.  Okay.  What about the second paragraph, do

18     you recall if you told her that

19     Mr. Albright was on you all the time

20     telling people not to help you?

21 A.  When I went to her that morning, I don't

22     think I went to her in -- just in detail

23     about things.  I just told her that he had

200

SUKENIA MARSHALL -- 10/2/07

1  been harassing me, and she just said I

2  needed to talk with Dave about it.

3  Q.  Do you know if you used the word harass?

4  A.  Yes, I told her.

5  Q.  Did you say that he was harassing you or

6      that he was picking on you?

7  A.  I told her that he was harassing me.

8  Q.  Did you tell her she was -- or excuse me.

9      Did you tell Ms. Lindemann he was sexually

10     harassing you?

11 A.  I don't think I just went into detail to

12     talk to her because it was so fast.

13 Q.  Because?

14 A.  It was -- the conversation ended between me

15     and Ms. Lindemann real quickly so I didn't

16     go into detail.  She just told me that I

17     would talk to Dave about it.

18 Q.  How did you know to go to talk to a

19     Ms. Lindemann when you had this concern?

20 A.  I just figured that if I could -- I mean, I

21     could go to human resources about it.

22 Q.  Why did you think that?

23 A.  I knew I couldn't go to Mr. Albright.  He

201

SUKENIA MARSHALL -- 10/2/07

1    was the supervisor or the next person would
2    be human resources.
3    Q.    Okay.  Did you know that other employees
4          had gone to Ms. Lindemann with similar
5          concerns?
6    A.    No, sir.
7    Q.    You just figured that that made sense?
8    A.    Yes, sir.
9    Q.    Okay.  And Ms. Lindemann talked to you
10         about your concerns?
11   A.    She just said that she would let me talk
12         with that -- speak with Dave about it.
13   Q.    And then if you look at the top of the
14         e-mail, that first page, this is the
15         response from Mr. Harris to Ms. Lindemann,
16         and take a look at what he says there,
17         because I've got some questions for you
18         about that.  Have you had a moment to take
19         a look at that?
20   A.    Yes, sir.
21   Q.    This e-mail indicates that you had been
22         reported as having problems staying in your
23         area.  Now, I know you don't know what

202

SUKENIA MARSHALL -- 10/2/07

1    other people might have said about you, but
2    did anyone talk to you or counsel you about
3    staying in your work area?
4    A.    No, sir, never.
5    Q.    Did you ask other employees to help you
6          with your job?
7    A.    Nate.  He was right on the aisle.  Same
8          aisle with me.
9    Q.    What kind of help would you ask for with
10         Nate?
11   A.    When it came time to -- once I emptied the
12         totes off the pallets, we would take the
13         pallets to the end of the aisle and stack
14         them where they belonged.
15   Q.    Okay.  Why would you ask him for help?
16   A.    The pallet, it was kind of heavy so he
17         would help me tote it.
18   Q.    Was it part of your job to move that
19         pallet?
20   A.    Yes, sir.
21   Q.    Do you know if other employees who did your
22         job could do that without help?
23   A.    Everybody just about got help.

203

SUKENIA MARSHALL -- 10/2/07

1    Q.    Did Mr. Greyhouse need help?
2    A.    Yeah.  It was times I would help him.
3    Q.    Did anybody ever tell you that you needed
4          to be doing your work without asking other
5          folks for help?
6    A.    No, sir.
7    Q.    Take a look at the second page, and, again,
8          I've got some questions so you may want to
9          look over this just to be sure it's fresh
10         in your mind.
11   A.    Okay.
12   Q.    Okay.  And, again, this is an e-mail that
13         was sent -- Mr. Harris to Ms. Lindemann on
14         the 21st.  So it says here that he spoke to
15         you, that is, Mr. Harris spoke to you and
16         that you told him that Mr. Ellis was
17         constantly giving you instructions and
18         always picking you out for work
19         assignments, did you tell Mr. Harris that?
20   A.    No, sir.
21   Q.    And that you complained no one was helping
22         you, did you tell Mr. Harris that?
23   A.    No, sir.

204

SUKENIA MARSHALL -- 10/2/07

1    Q.    Also indicates that he met with you and
2          Mr. Albright and tried to resolve this
3          issue between the two of you, did that
4          happen?
5    A.    No, sir.
6    Q.    And at the end of that meeting that you
7          were -- seemed satisfied with what had
8          taken place and said thank you, did that
9          happen?
10   A.    No, sir.
11   Q.    Then he says that he came to you after
12         reviewing staffing records and told you
13         that you would go to the second shift, and
14         that did happen; right?
15   A.    Yes, sir.
16   Q.    And then he says you became very agitated
17         and said that you weren't going to report
18         to the second shift?
19   A.    No, sir, that didn't happen.
20   Q.    And then from there you went to the HR
21         office to discuss the matter further, did
22         that happen?
23   A.    What -- it happened after I went back to

205

SUKENIA MARSHALL -- 10/2/07

1    work for a while and then that's when I

2    went to HR.

3    Q.    Did you go to HR and discuss the fact that

4          you were going to be moved to the second

5          shift?

6    A.    No, sir.

7    Q.    And it says that you became very irritated

8          with that news and that's why you walked

9          off the job?

10   A.    No, sir.

11   Q.    So none of that's true?

12   A.    No, sir, it isn't.

13   Q.    Do you have any idea why Mr. Harris would

14         say those things if they weren't true?

15   A.    No, sir, I don't.

16   Q.    And then it indicates that on July 21st at

17         9:30 a.m., or I guess right after 9:30

18         a.m., he met with you and notified you that

19         you had been discharged for walking off the

20         job, that did happen?

21   A.    Yes, sir.

22   Q.    And he said that you had told him that you

23         thought HR gave you permission, and that is

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

206

SUKENIA MARSHALL -- 10/2/07

1    true; right?

2    A.    That is true.

3    Q.    Okay.  But that you stated that being

4          discharged was fine that you really didn't

5          need this stuff, did you say that?

6    A.    No, sir, I didn't.

7    Q.    Okay.  Why do you think Mr. Harris would

8          have said these things if they weren't

9          true?

10             MR. BROWN:  Object to the form of

11         the question.

12   A.    I don't know.

13   Q.    In your experience with Mr. Harris, had he

14         ever said things that weren't true before?

15   A.    I never really talked to him so I don't

16         know.

17   Q.    What about Ms. Lindemann, in your

18         experience with her, had she ever said

19         anything that wasn't true?

20   A.    No, sir, not that I know of.

21   Q.    Okay.  You can put it aside.

22             MR. BROWN:  What is that marked as

23         six or five?

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

207

SUKENIA MARSHALL -- 10/2/07

1             MR. ENLOE:  Seven.  Six is the job

2          description.  Five's the offer

3          letter.

4    Q.    Do you know if Glovis has ever terminated

5          anybody else for walking off the job or for

6          job abandonment?

7    A.    No, sir, not that I know of.

8    Q.    I'm sorry?

9    A.    Not that I know of.

10   Q.    Okay.  Do you know one way or the other if

11         that's occurred?

12   A.    No, I don't.

13   Q.    Okay.  And during the time you were at

14         Glovis, did you see or hear anyone else

15         being treated improperly by Mr. Albright?

16   A.    Yes, sir.

17   Q.    Who?

18   A.    Ciara White.

19   Q.    Okay.  And what did you see or hear him do

20         to Ms. White?

21   A.    This was during the week of our

22         orientation, and he had constantly been

23         going to her talking with her trying to get

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

208

SUKENIA MARSHALL -- 10/2/07

1    her to give her his phone number and one

2    day she confronted him or said -- they

3    argued about something when we was walking

4    up, and she just said, Ellis, just leave me

5    alone, just leave me alone.  He said, Well,

6    since you want me to leave you alone, get

7    your ass over to your department or get out

8    of my department or something like that he

9    said to her.

10   Q.    Okay.  Do you know what her job was?

11   A.    Ciara, she was sent to -- I think it was

12         Receiving or -- she was in another

13         department.

14   Q.    Did he supervise her?

15   A.    No, sir, he didn't.

16   Q.    Did you witness Mr. Albright do anything

17         else to another employee that you thought

18         was improper?

19   A.    No, sir, not that I can recall.

20   Q.    Did you ever hear him say anything else to

21         another employee that you thought was

22         improper?

23   A.    He said things to this girl Keekee.  He

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

SUKENIA MARSHALL v. GLOVIS ALABAMA -- 10/3/07

**209**

SUKENIA MARSHALL -- 10/2/07

1  would say things to her, and I heard him
2  comment about Terri -- to Terri Corbett
3  before about --
4  Q.  Well, let's start with Keekee, what did you
5  hear him say to her about her that you
6  thought was inappropriate?
7  A.  She -- he was talking about how fine she
8  was or that she was pretty, different
9  things like that.
10 Q.  And what did Keekee do in response?
11 A.  She never said anything.  She never
12 responded.  She never said anything to him.
13 Q.  Did she ever say anything to you about
14 that?
15 A.  No, she never talked to me about it.
16 Q.  Okay.  What about Ms. Corbett, what did you
17 see or hear Mr. Ellis do or say to her?
18 A.  I can't exactly remember what it was that
19 he said to her, but she would tell him,
20 like, to get out of her face or just get on
21 and leave her alone and stuff like that.
22 Q.  So you heard her reaction, but you
23 didn't --

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

**210**

SUKENIA MARSHALL -- 10/2/07

1  A.  I never really heard exactly what it was
2  that he would say to her.
3  Q.  Okay.  Anything else you saw or heard him
4  do or say that you thought was
5  inappropriate?
6  A.  No, sir.
7  Q.  Aside from everything you've told me?
8  A.  No, sir.
9  Q.  Okay.  Do you know if Glovis -- aside from
10 what you claim happened to you, do you know
11 if Glovis retaliated against anybody for
12 complaining about Mr. Albright?
13 A.  No, sir, not that I know of.
14 Q.  Do you know if Glovis retaliated against
15 anybody for making a complaint about sexual
16 harassment --
17 A.  No, I don't.
18 Q.  -- aside from what you claim happened to
19 you?
20 A.  No, I don't.
21 Q.  Do you know who made the decision to end
22 your employment at Glovis?
23 A.  As far as my understanding, I thought it

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

**211**

SUKENIA MARSHALL -- 10/2/07

1  was Mr. Harris.
2  Q.  Do you know if Mr. Albright played any role
3  in that decision?
4  A.  No, I don't.
5  Q.  Okay.  Your lawyer produced some tax
6  returns that you filed with the federal
7  government from 2003, 2004, 2005, and 2006,
8  and rather than introduce those into the
9  record, I'm just going to ask you about the
10 income listed on those and ask you if
11 that's an accurate figure.  If you'd like
12 to look at the documents, I have them, but
13 it will save us time if we don't have to
14 wade through it.
15 A.  Okay.
16 Q.  But don't hesitate to ask to look at it if
17 you just don't remember.  I wouldn't
18 remember my own.
19 A.  Okay.
20     MR. BROWN:  Your income's too high
21     to remember.
22     MR. ENLOE:  What's that?
23     MR. BROWN:  Your income's too high

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

**212**

SUKENIA MARSHALL -- 10/2/07

1  to remember.
2     MR. ENLOE:  Okay.  I wouldn't
3     worry about remembering it if it
4     was too high.  Unfortunately,
5     that's not the case.
6  Q.  2003 states that your adjusted gross income
7  was ten thousand dollars two hundred and
8  ninety-seven cents, does that sound about
9  right for 2003?
10 A.  Yes, sir.
11 Q.  Okay.  2004 is listed at six thousand seven
12 hundred and fifty-seven dollars?
13 A.  It could have been, yes, sir.
14 Q.  Okay.  2005 is eighty-nine hundred?
15 A.  Yes, sir, okay.
16 Q.  Okay.  2006 was sixteen thousand nine
17 hundred and ninety-eight dollars?
18 A.  Okay.
19 Q.  Does that sound about right?
20 A.  Uh-huh.
21 Q.  Okay.  And then I know you don't -- not
22 going to know the exact number, but have
23 you been employed at Hager all this year?

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

213

SUKENIA MARSHALL -- 10/2/07

1    A.    Yes, sir.

2    Q.    Okay.  And so your year-to-date income from

3          Hager would be some multiple of the

4          forty-five hours a week times whatever your

5          hourly rate was, and I know that's changed?

6    A.    Yes, sir.

7    Q.    Okay.  And you've been with them this whole

8          year?

9    A.    Yes, sir.

10   Q.    Okay.  You make more now than you did when

11         you were at Glovis?

12   A.    Yes, sir.

13   Q.    And your starting wage at Hager was higher

14         than your last wage at Glovis; is that

15         right?

16   A.    Yes, sir.

17   Q.    Okay.  Let's talk a little bit about

18         damages.  How have you been damaged as a

19         result of the things that you say happened

20         to you?

21   A.    Mentally.  I would say at first it was -- I

22         hadn't -- I --

23   Q.    Let's do it this way.  This might make it

215

SUKENIA MARSHALL -- 10/2/07

1    Q.    Okay.  Through your boyfriend and then your

2          husband?

3    A.    Yes, sir.

4          MR. BROWN:  Common-law husband.

5          MR. ENLOE:  Common-law husband,

6             okay.

7    Q.    Is there any money that you claim Glovis

8          owes you, and I'm not talking about your

9          damages here, I'm talking about did they

10         not pay you anything that you say that they

11         should have paid you?

12   A.    Uh --

13   Q.    Any wages that they didn't pay you that you

14         think you're owed, for example?

15   A.    No, not that I can recall, I don't think

16         there are.

17   Q.    Okay.  Any vacation pay that you think you

18         had coming that you didn't get?

19   A.    I thought that I was supposed to still get

20         vacation time, but I never, you know,

21         followed-up on it or asked them anything

22         about it.

23   Q.    Do you know what the policy was with

214

SUKENIA MARSHALL -- 10/2/07

1          easier.  Let's try to break it down into

2          different categories.  We touched earlier

3          on your employment after you left Glovis,

4          and I know that you may have started

5          working after you left Glovis before you

6          thought you did so at this point, do you

7          know when you first started working after

8          you left Glovis?

9    A.    No, sir, I don't.

10   Q.    Okay.  And we may be able to establish

11         that.  You and your lawyer can work

12         together, and we can follow-up on some

13         interrogatories.  That way, you don't have

14         to rely on memory.

15   A.    Okay.

16   Q.    You had insurance coverage through your

17         husband; is that right?

18   A.    Yes, sir.

19   Q.    The whole time you were at Glovis?

20   A.    Yes, sir.

21   Q.    And you maintained that coverage after you

22         left Glovis?

23   A.    Yes, sir.

216

SUKENIA MARSHALL -- 10/2/07

1          respect to payment of vacation for somebody

2          who was a probationary employee?

3    A.    No, sir.

4    Q.    Okay.  And then there are two other types

5          of damages that you're claiming in this

6          case.  One is compensatory damages and the

7          other is punitive damages.  I know you're

8          not an attorney and so these are legal

9          terms, but let me ask you some questions

10         that hopefully will shed some light on

11         this.  You say you suffered mental and

12         emotional distress as a result of what

13         happened at Glovis and your termination; is

14         that right?

15   A.    Yes, sir.

16   Q.    Okay.  Did you suffer any anxiety?

17   A.    Yes, sir, I did.

18   Q.    Okay.  Tell me about that.

19   A.    I just -- I mean, I can't explain it.  I

20         really can't explain it.  It was just to

21         the point where I just -- I didn't want to

22         go anywhere.  I didn't want to be around

23         people.  I was just depressed and down

217

SUKENIA MARSHALL -- 10/2/07

1    about it all the time.  Sleepless, couldn't
2    sleep.  I really can't even describe it.
3    Q.   Why do you think you were feeling that way?
4    A.   Because I was depressed about how I was
5    treated, how the situation was handled.
6    Q.   Did you feel this way after you lost your
7    job from Big Lots?
8    A.   No, sir, I didn't.
9    Q.   Because remember we saw the document from
10   your doctor in 2003 that said you were
11   suffering anxiety in 2003.  I don't know if
12   that was before or after you lost that job?
13   A.   That was during the time that I was there,
14   because of my situation with my ex-husband.
15        MR. BROWN:  Yeah, she testified to
16            that and her financial situation
17            and the divorce.  I think we've
18            been over that.
19   Q.   So you'd suffered anxiety before; is that
20   right?
21   A.   Yes, sir.
22   Q.   Okay.  And then earlier this year as well;
23   is that right?

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

218

SUKENIA MARSHALL -- 10/2/07

1    A.   Yes, sir.
2    Q.   Did you suffer any mental or emotional
3    distress?
4    A.   Yes, sir, I did.
5    Q.   And maybe the way to do this is to break it
6    into.  Did you suffer any mental or
7    emotional distress as a result of your
8    termination?
9    A.   Yes, sir, I did.
10   Q.   Okay.  How?
11   A.   After I was terminated, it was to the point
12   where I really -- I couldn't think
13   straight.  I couldn't focus on a lot of
14   things.  I was just depressed for a while,
15   and, like -- that's what led me into having
16   to talk with -- I talked to -- I would talk
17   to -- with my mom about it and my husband,
18   and that's what led me to -- them to making
19   me talk with my pastor about it.
20   Q.   Did it feel like it felt when you were
21   discharged at Big Lots?
22   A.   No.
23   Q.   How was it different?

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

219

SUKENIA MARSHALL -- 10/2/07

1    A.   Because I've never -- I knew at Big Lots
2    that -- I knew that I had been being absent
3    from work, I knew that.  But for me to be
4    terminated for something -- and I knew I
5    did nothing wrong, and I didn't deserve to
6    be terminated for that, or I didn't feel
7    like they did me right so it was a totally
8    different feeling behind it.
9    Q.   And I think you've said that you went to
10   see your doctor about how you were feeling
11   in 2005 or 2006; is that right?
12   A.   Yes, sir.
13   Q.   And you're sure that was Dr. Davis?
14   A.   I never went into detail to tell him
15   exactly what was going on, but I told him
16   how I couldn't sleep and how I was --
17   had -- depressed and things, but I never
18   went into details and tell him what was
19   going on with me.
20   Q.   And you're certain that you went and you
21   saw him sometime in 2005 or 2006?
22   A.   Yes, sir.
23   Q.   Okay.  And were you prescribed any

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

220

SUKENIA MARSHALL -- 10/2/07

1    medication to deal with these feelings?
2    A.   He -- the medicine that I spoke with you
3    about earlier.
4    Q.   Is there a way you could find out what that
5    is, not here today but --
6    A.   I can find out.
7    Q.   Okay.  The other type of damages -- well,
8    first, let me ask you is there any other
9    aspect of the mental or emotional distress
10   that you experienced that you can tell me
11   about that you haven't mentioned.  I know
12   you talked to your mom, you talked to your
13   husband, you talked to your pastor?
14   A.   I wasn't eating well behind it.  I didn't
15   eat.  I didn't want to eat behind it.
16   Q.   Could you sleep?
17   A.   No, I couldn't sleep.
18   Q.   Okay.  How much sleep did you lose on
19   average on a given night?
20   A.   I lost -- I really can't say.  I can't
21   recall how much sleep that I would lose.
22   Q.   Did you lose or gain weight?
23   A.   I lost weight.

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

SUKENIA MARSHALL V. GLOVIS ALABAMA -- 10/5/07

221

SUKENIA MARSHALL -- 10/2/07

1    Q.    How much weight did you lose?

2    A.    **It was maybe 10 to 15 pounds or something.**

3    Q.    In what period of time?

4    A.    **I can't remember how -- the period of time**

5          **it was that I lost it.**

6    Q.    Did you continue to engage in socializing

7          with friends and family?

8    A.    **No, I didn't.**

9    Q.    Did you stop going to church?

10   A.    **No, I didn't, I went.**

11   Q.    Did you go -- do you go to church every

12         week?

13   A.    **No, I didn't go every week.**

14   Q.    Okay.  But did you go as regularly as you

15         had before this happened?

16   A.    **No, I didn't.**

17   Q.    What was the change?

18   A.    **I just -- I didn't -- I got to the point**

19         **where I just closed myself up a lot.  I**

20         **didn't want to be out among people.  I --**

21         **at first I felt like I just could deal with**

22         **it myself for -- I just -- I could - the**

23         **change -- I was going probably every Sunday**

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

222

SUKENIA MARSHALL -- 10/2/07

1          **or every other Sunday if I didn't go**

2          **every -- and it got to the point where I**

3          **would go maybe once a month or so.**

4    Q.    What about socializing aside from that with

5          friends and family?

6    A.    **I didn't.**

7    Q.    How often had you socialized with friends

8          and family before this happened?

9    A.    **Every day.**

10   Q.    And what happened after this happened?

11   A.    **I didn't want to talk.  I didn't want to be**

12         **bothered.  I wouldn't go anywhere.**

13   Q.    Okay.  Can you give me some names of folks

14         that you stopped interacting with after you

15         left Glovis?

16   A.    **Yes, sir, I can.  I didn't talk to my**

17         **sisters a lot when they would call.  Thelma**

18         **Groomster.**

19         THE REPORTER:  Thelma who?

20         THE WITNESS:  Groomster.

21   Q.    How do you spell that?

22   A.    **Her last name was G-R-O-O-M-S-T-E-R.**

23   Q.    Groomster.  Do you talk to her now?

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

223

SUKENIA MARSHALL -- 10/2/07

1    A.    **Yes, sir, I talk to her now.**

2    Q.    Anyone else that you stopped talking with

3          during all of this?

4    A.    **Makia McPearson.**

5    Q.    How do you spell that name?

6    A.    **M-A-K-I-A, M-C-P-E-A-R-S-O-N.**

7    Q.    Is she a friend or a relative?

8    A.    **A friend.**

9    Q.    Okay.  Do you talk to Ms. McPearson now?

10   A.    **Yes, I do.**

11   Q.    Okay.  Anyone else that you lost touch with

12         during this time?

13   A.    **I didn't talk with my mother-in-law much.**

14   Q.    What about now?

15   A.    **I talk to her now.**

16   Q.    And what's your mother-in-law's name?

17   A.    **Lenora Gordon.**

18   Q.    Okay.  Anyone else?

19   A.    **My sister-in-law.**

20   Q.    What's her name?

21   A.    **Shantasha.**

22   Q.    What's her last name?

23   A.    **Aaron.**

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

224

SUKENIA MARSHALL -- 10/2/07

1    Q.    How do you spell that?

2    A.    **A-A-R-O-N.**

3    Q.    Okay.  Do you talk to her now?

4    A.    **Yes, sir.**

5    Q.    Anybody else?

6    A.    **No.  Those were the people that were**

7          **closest.**

8    Q.    When did you start interacting with them

9          again normally?

10   A.    **It was a couple of months maybe before I**

11         **would just get back out with them.**

12   Q.    So if you left Glovis around July of '05,

13         would you say you were talking with them

14         again come Christmas?

15   A.    **Yeah, I was.**

16   Q.    Okay.  What about your relationship with

17         your husband, did that suffer as a result

18         of what happened at Glovis?  If you want to

19         take a moment, we can pick up on this.

20         Normally, I don't like to break between

21         questions, but it's not like --

22         MR. BROWN:  No, go ahead.  Do you

23         want another water?

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

225

SUKENIA MARSHALL -- 10/2/07

1    MR. ENLOE:  No, I'm good.
2  Q.  Obviously, I don't want to dwell, again,
3    but I have to ask you these questions
4    because it's part of the case.  How was
5    your relationship with your husband
6    impacted by what happened to you at Glovis?
7  A.  **We were happy before that.  We used to go**
8    **all the time.  Every weekend we were out**
9    **somewhere doing something, but I just**
10   **didn't feel up to going anywhere.  I**
11   **wouldn't talk as much.**
12 Q.  Any other ways it was affected?
13 A.  **I didn't want him to touch me.**
14 Q.  So it affected the intimacy of the
15   marriage?
16 A.  **Yes.**
17 Q.  Okay.  What about -- you -- do you have a
18   child?
19 A.  **Yes, sir.**
20 Q.  One or more?
21 A.  **One.**
22 Q.  Okay.  Little boy or little girl?
23 A.  **Little boy.**

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

226

SUKENIA MARSHALL -- 10/2/07

1  Q.  How old is your little boy?
2  A.  **He'll be nine this month.**
3  Q.  Did it affect your relationship with your
4    son?
5  A.  **Yes, sir.**
6  Q.  How did it affect your relationship with
7    him?
8  A.  **Because I didn't want to be bothered.  I**
9    **didn't spend as much time with him.  I --**
10   **normally it would be me, my son, and my**
11   **husband.  We would do things together every**
12   **weekend.  I couldn't help him with his**
13   **homework any more, I couldn't.**
14 Q.  Okay.  What about your relationship with
15   your parents?
16 A.  **I didn't talk to them on a regular basis.**
17   **They always would call to check on me, or**
18   **it either would be some -- I stopped**
19   **answering the phone when I didn't want to**
20   **talk.**
21 Q.  Anything else?
22 A.  **I didn't go be with them.**
23 Q.  How long did this period, these

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

227

SUKENIA MARSHALL -- 10/2/07

1    difficulties with your family last?
2  A.  **With my dad, it lasted for a while.**
3  Q.  What about with your husband, how long did
4    that last?  You started talking to your
5    friends again, you said, about Christmas of
6    '05, when would you say things started to
7    get back to normal with your husband and
8    you?
9  A.  **Say it --**
10   MR. BROWN:  I'm going object to
11     the form of the question, because
12     that assumes that normalcy has
13     been reestablished, and I don't
14     think she testified to it.
15 Q.  Are things back to normal with you and your
16   husband?
17 A.  **Yes, now they are.**
18 Q.  Okay.  When do you think things got back to
19   normal?
20 A.  **Maybe in November sometime.**
21 Q.  Well, y'all got married in June of '06;
22   right?
23 A.  **Yes, sir.**

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

228

SUKENIA MARSHALL -- 10/2/07

1  Q.  Were things normal then?
2  A.  **Yes, sir.**
3  Q.  Okay.  Would you say they got back to
4    normal about November of '05, then?
5  A.  **Yes, sir.**
6  Q.  Okay.  What about with your son, when did
7    you start feeling back to normal in terms
8    of your relationship with your son?
9  A.  **It was around November when.**
10 Q.  Okay.  The same true with your folks, or
11   was it longer?
12 A.  **I really can't even remember when.  It just**
13   **got back to normal.**
14 Q.  Any other -- aside from the ones you've
15   mentioned, any other relationships that you
16   feel suffered as a result of these
17   experiences?
18 A.  **It was basically my whole family, my entire**
19   **family.**
20 Q.  And in that regard, would you say -- this
21   is a rough figure -- about November of '05
22   things started to improve?
23 A.  **Yes, sir.**

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

SUKENIA MARSHALL v. GLOVIS ALABAMA -- 10/3/07

229

SUKENIA MARSHALL -- 10/2/07

1  Q.  Okay.  The other -- let me strike that.  Is

2      there any other mental or emotional

3      distress that you feel you've suffered

4      because of what you experienced at Glovis

5      aside from what you told me?

6  A.  (No audible response.)

7  Q.  Okay.

8          THE REPORTER:  I'm sorry, was

9          that -- I didn't hear her.

10         THE WITNESS:  No.

11         MR. ENLOE:  I think she said no.

12         THE WITNESS:  No, sir.

13         THE REPORTER:  Okay.

14 Q.  The other type of damages, the last type of

15     damages that you seek in your complaint is

16     a form of damages called punitive damages.

17     What punitive damages are for is to punish

18     a defendant in a case.  Do you believe that

19     Glovis deserves to be punished for what

20     happened?

21 A.  Yes, sir.

22 Q.  And why is that?

23 A.  Because they -- they -- I think they

230

SUKENIA MARSHALL -- 10/2/07

1      handled the whole situation wrong.

2  Q.  Okay.  And tell me how you think they

3      handled it wrong?

4  A.  There was never an investigation.  That's

5      what they told me it would be.  I was

6      terminated wrongfully.  I guess that's why

7      I feel that way.

8  Q.  Do you think it's possible that you were

9      terminated due to a misunderstanding?

10 A.  No, sir.  I made it very clear.

11 Q.  Do you know if Mr. Albright's currently

12     employed at Glovis?

13 A.  Is he?

14 Q.  Currently employed at Glovis?

15 A.  No, I don't think he is.

16 Q.  Okay.  Do you know why he was terminated?

17 A.  From my understanding, I just knew that he

18     got terminated.  Something dealing with

19     another young lady.

20 Q.  Okay.  Does that indicate to you that the

21     company takes complaints or harassments

22     seriously?

23 A.  I really don't know how to answer that

231

SUKENIA MARSHALL -- 10/2/07

1      question.

2  Q.  I'm going to ask you some background

3      questions and then we'll take a break.

4      I'll look at my notes, and I may be done.

5      These are just questions in case this case

6      goes to trial we need to know some stuff

7      before we select a jury.  What's your

8      current address?

9  A.  5801 Hammermill Loop, Montgomery, Alabama.

10 Q.  Hammermill Loop?

11 A.  Yes, sir.

12 Q.  Okay.  Did you have a cell phone when you

13     were with Glovis?

14 A.  Yes, sir, I did.

15 Q.  Is it the same phone you have now, do you

16     know?

17 A.  No, sir, it isn't.

18 Q.  Do you recall who the provider was when you

19     were with Glovis?

20 A.  Alltel, I think.

21 Q.  Okay.  Do you recall what the number was?

22 A.  I think it was 334-267-0120.

23 Q.  0120?

232

SUKENIA MARSHALL -- 10/2/07

1  A.  Yes, sir.

2  Q.  And what's your cell phone number now?

3  A.  334-267-1237.

4  Q.  1230?

5  A.  37.

6  Q.  37.  And it was 0120?

7  A.  Yes, sir.

8  Q.  Who's your current provider?

9  A.  Alltel.

10 Q.  Same company.

11 A.  Yes, sir.

12 Q.  Okay.  And you mentioned that you were

13     married, what's your husband's full name?

14 A.  Jerome Gernard Gordon.

15 Q.  Do you spell Jerome, J-E-R-O-M-E?

16 A.  Yes, sir.

17 Q.  And how do you spell his middle name?

18 A.  G-E-R-N-A-R-D.

19 Q.  N-A-R-D?

20 A.  Yes, sir.

21 Q.  And Gordon is his last name?

22 A.  Yes, sir.

23 Q.  Okay.  And you have one son?

233

SUKENIA MARSHALL -- 10/2/07

1    A.    Yes, sir.
2    Q.    He's too young to be on the jury quite yet?
3          Do you have any other children --
4    A.    No, sir.
5    Q.    -- or dependants?  What about your husband?
6    A.    No, he don't have any.
7    Q.    Okay.  And your husband works at HMMA?
8    A.    Yes, sir.
9    Q.    Okay.  What does he do there?
10   A.    General assembly.
11   Q.    General assembly, okay.  That sounds like
12         you have a lot of relatives in the area; is
13         that right?  The reason I'm asking this
14         because I can either ask you for all of
15         them or I can just send the request to your
16         attorney and he can list them all.  If you
17         only have a handful, it's quicker to do it
18         here, but if you got more than a dozen or
19         so --
20   A.    No.  Not in --
21         MR. BROWN:  I think most of her
22         relatives are in Selma.
23         THE WITNESS:  Yes, sir.

235

SUKENIA MARSHALL -- 10/2/07

1    A.    I have another, a cousin.  Her name is
2          Natasha Marshall.
3    Q.    Okay.  What's the first Ms. Marshall's
4          address, do you know?
5    A.    She lives off of Atlanta Highway in an
6          apartment complex over at -- I don't --
7          it's on Sylvest Drive.
8    Q.    Is it in the City of Montgomery?
9    A.    Yes, sir, it is.
10   Q.    And then you mentioned --
11   A.    Natasha.
12   Q.    Uh-huh.
13   A.    She's here -- I don't know her exact
14         address either but.
15   Q.    Okay.  And then there was one other person
16         that you'd mentioned?
17   A.    Natasha Marshall, that's my cousin.
18   Q.    Okay.
19   A.    And she lives on -- off of the Southern
20         Boulevard on Rainbow Circle.
21   Q.    Also in Montgomery?
22   A.    Also in Montgomery.
23   Q.    Okay.  Those three folks, anybody else in

234

SUKENIA MARSHALL -- 10/2/07

1          MR. BROWN:  And Selma's in --
2          MR. ENLOE:  It's in the Southern
3          District.
4          MR. BROWN:  -- the Southern
5          District.  Right.
6          MR. ENLOE:  Okay.
7          MR. BROWN:  We're in the Middle
8          District.
9    Q.    We're in a different federal district for
10         purposes of court cases in federal court so
11         how many relatives -- and by relatives, I
12         mean immediate relatives -- do you have in
13         the Montgomery area?
14   A.    Two.
15   Q.    Okay.  What are their names?
16   A.    Cheryl Marshall and Latasha Edwards.
17   Q.    Are they your sisters?
18   A.    My sister and my aunt.
19   Q.    Okay.  Which one's which?
20   A.    Cheryl Marshall is my sister, and Latasha
21         is my aunt.
22   Q.    What is Ms. Marshall's address, that's
23         probably a common name.

236

SUKENIA MARSHALL -- 10/2/07

1          the Montgomery area?
2    A.    No, sir.
3    Q.    Your other relatives are all over in Selma?
4    A.    Yes, sir.
5    Q.    Okay.
6          (Brief recess taken.)
7    Q.    Ms. Gordon, I just have a couple more
8          questions for you, follow-up questions, and
9          I appreciate your time and your patience
10         today.
11   A.    Okay.
12   Q.    First of all, I want to make sure that --
13         you know we talked about a lot of different
14         things today, and some things
15         understandably you didn't recall, but is
16         there anything that we talked about earlier
17         that you didn't recall that you've
18         remembered since we spoke about it.  I know
19         that's pretty broad, but sometimes over the
20         course of the deposition a person will
21         remember something that they'd forgotten
22         earlier?
23   A.    No, sir.

SUKENIA MARSHALL -- GLOVIS ALABAMA -- 10/6/07

---

**237**

SUKENIA MARSHALL -- 10/2/07

1  Q.  Okay.  And one thing, earlier we were
2      trying to figure out when you started work
3      at Hager, and at the time, you didn't
4      recall exactly when you had started there,
5      can you remember now when that was?
6  A.  **I can't remember the exact date that the**
7      **temp service sent me there, but I think it**
8      **was in August or September is my hire date.**
9  Q.  Of this year or last year?
10 A.  **Last year.**
11 Q.  Okay.  Sometime in '08, you think?
12 A.  **Yes, sir.**
13 Q.  Okay.  And you're certain that the only doc
14     you would have seen in '05 or '06 would
15     have been Dr. Davis?
16         MR. BROWN:  I'm just going to
17         object.  I think we've been over
18         this.  I just object to the form.
19 A.  **I think I'm sure that he was the only one.**
20 Q.  Okay.  Aside from what you've already told
21     me, is there anything else that
22     Mr. Albright did to you or said to you when
23     you were at Glovis that you thought was

---

**238**

SUKENIA MARSHALL -- 10/2/07

1      improper or inappropriate?
2  A.  **No, sir.**
3  Q.  Okay.
4         MR. ENLOE:  I don't think I have
5         any more questions.
6         MR. BROWN:  Okay.
7         MR. ENLOE:  Thank you for your
8         time, Ms. Gordon.
9         THE WITNESS:  Thank you.
10        (The deposition of **SUKENIA**
11        **MARSHALL** concluded at
12        approximately 3:25 p.m., on
13        Tuesday, October 2, 2007.)
14
15
16
17
18
19
20
21
22
23

---

**239**

1      * * * * * * * * * * *
2      REPORTER'S  CERTIFICATE
3      * * * * * * * * * * *
4
5      STATE OF ALABAMA
6      COUNTY OF MONTGOMERY
7
8          I, Vila Davenport, Judicial
9      Reporter and Notary Public in and for the
10     State of Alabama at Large, do hereby
11     certify that on Tuesday, October 2, 2007,
12     pursuant to notice and stipulation on
13     behalf of the defendant, I reported the
14     deposition of **SUKENIA MARSHALL**, who was
15     first duly sworn by me to speak the truth,
16     the whole truth, and nothing but the truth,
17     in the matter of SUKENIA MARSHALL,
18     Plaintiff, versus GLOVIS ALABAMA, LLC,
19     Defendant, Civil Action No.: 2:06CV973, now
20     pending In The United States District
21     Court, In the Middle District of Alabama,
22     Montgomery Division, that the foregoing 238
23     typewritten pages contain a true and

---

**240**

SUKENIA MARSHALL -- 10/2/07

1      accurate transcription of the examination
2      of said witness by counsel for the parties
3      set out herein; that the reading and
4      signing of said deposition was waived by
5      witness and counsel for the parties.
6          I further certify that I am
7      neither of kin nor of counsel to the
8      parties to said cause, nor in any manner
9      interested in the results thereof.
10         This 24th day of October, 2007.
11
12
13         _____
           Vila Davenport, CCR
           Reporter and Notary Public
14         State of Alabama at Large
15         My Commission Expires
           September 6, 2009
16
17
18
19
20
21
22
23

**GLOVIS**
ALABAMA, LLC.

GLOVIS Alabama, L.L.C.
300 Hyundai Blvd.
Montgomery, Alabama 36105
phone: 334.244.2025 fax: 334.244.2176

June 7, 2005

Sukenia Marshall
193 Hulett Corner
Hayneville, AL 36040

RE: Material Handler/General Labor Position

Dear Sukenia::

Glovis Alabama, LLC would like to offer you a position of Material Handler/General Labor located in our Consolidation Center at 300 Hyundai Blvd, Montgomery, AL 36105. This position is on Second Shift which begins at 5:30 p.m. through 2:30 a.m.; however the initial on the job training will be conducted on first shift which begins at 6:30 a.m. Upon hire you will receive hands on training as it relates to our systems such as SAP, Scanners, Material Flow, Types of Material, Human Resource Policies and Procedures, Safety Procedures, Forklift Safety Training, Cultural Training, and any other training that applies.

The starting wage for this position is $10.00 per hour; with scheduled pay increases of $.50 per hour after the completion of the first and second six months of employment. All employees are paid on the 15th and last day of each month which is in accordance with our policy.

Glovis Alabama, LLC currently offers to its employees a benefits package that includes the following:
- **Blue Cross Blue Shield – Health, Vision and Dental Insurance-**
- **Paid Vacation**
- **Paid Personal Days**
- **Paid Holidays**
- **Paid Life Insurance, LTD and STD.**

All employment offers are conditional upon the successful passing of a drug test and a successful background check. Anyone failing to pass either of these screens will not be eligible for employment with Glovis Alabama, LLC. All employees are subject to a 90 day introductory period. During this period the employee is evaluated on his/or her ability to perform the position in which they were hired.

We look forward to having you join our team, please sign and return this form upon acceptance of this position. If you have any questions, please contact me at 334-387-4203 or 334-399-2346.

Sincerely,

*Liz Lindemann*

Liz Lindemann
Human Resource Specialist

PENGAD 800-631-6989

DEFENDANT'S
EXHIBIT

GLOVIS 0001

1          THE UNITED STATES DISTRICT COURT

2          IN THE MIDDLE DISTRICT OF ALABAMA

3                 MONTGOMERY DIVISION

4

5     SUKENIA MARSHALL,

6              Plaintiff,

7

8     vs.                    CASE NO.: 2:06CV973

9

10    GLOVIS ALABAMA, LLC,

11              Defendant.

12

13      C O N D E N S E D   T R A N S C R I P T

14

15        **DEPOSITION OF ELIZABETH LINDEMANN,**

16    taken pursuant to notice and stipulation on

17    behalf of the Plaintiff, in the offices of

18    Dwayne L. Brown, PC, 4150-A Carmichael

19    Road, Montgomery, Alabama, before Vila

20    Davenport, Judicial Reporter and Notary

21    Public in and for the State of Alabama at

22    Large, on Wednesday, October 3, 2007,

23    commencing at approximately 10:10 a.m.

ELIZABETH LINDEMANN -- 10/3/07

1

1         THE UNITED STATES DISTRICT COURT

2        IN THE MIDDLE DISTRICT OF ALABAMA

3              MONTGOMERY DIVISION

4

5   SUKENIA MARSHALL,

6         Plaintiff,

7

8   vs.           CASE NO.: 2:06CV973

9

10   GLOVIS ALABAMA, LLC,

11         Defendant.

12

13      *    *    *    *    *    *

14

15      DEPOSITION OF ELIZABETH LINDEMANN,

16   taken pursuant to notice and stipulation on

17   behalf of the Plaintiff, in the offices of

18   Dwayne L. Brown, PC, 4150-A Carmichael

19   Road, Montgomery, Alabama, before Vila

20   Davenport, Judicial Reporter and Notary

21   Public in and for the State of Alabama at

22   Large, on Wednesday, October 3, 2007,

23   commencing at approximately 10:10 a.m.

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

2

ELIZABETH LINDEMANN -- 10/3/07

1            APPEARANCES

2

3   FOR THE PLAINTIFF:

4     **DWAYNE L. BROWN, ESQUIRE**

5     Dwayne L, Brown, P.C.

6     4150-A Carmichael Road

7     Montgomery, Alabama  36106

8   FOR THE DEFENDANT:

9     **CHRIS ENLOE, ESQUIRE**

10     Nelson, Mullins, Riley &

11      Scarborough, LLP

12     999 Peachtree Street, N.E.

13     14th Floor

14     Atlanta, Georgia  30309-3964

15

16

17

18

19

20

21

22

23

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

3

ELIZABETH LINDEMANN -- 10/3/07

1          STIPULATIONS

2      It is hereby stipulated and

3   agreed by and between counsel representing

4   the parties that the deposition of

5   **ELIZABETH LINDEMANN** is taken pursuant to

6   notice and stipulation on behalf of the

7   plaintiff; that all formalities with

8   respect to procedural requirements are

9   waived; that said deposition may be taken

10   before Vila Davenport, Judicial Reporter

11   and Notary Public in and for the State of

12   Alabama at Large, without the formality of

13   a commission; that objections to questions,

14   other than objections as to the form of the

15   questions, need not be made at this time

16   but may be reserved for a ruling at such

17   time as the deposition may be offered in

18   evidence or used for any other purpose as

19   provided for by the Civil Rules of

20   Procedure for the State of Alabama.

21      It is further stipulated and

22   agreed by and between counsel representing

23   the parties in this case that the filing of

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

4

ELIZABETH LINDEMANN -- 10/3/07

1   the deposition of **ELIZABETH LINDEMANN** is

2   hereby waived and that said deposition may

3   be introduced at the trial of this case or

4   used in any other manner by either party

5   hereto provided for by the Statute,

6   regardless of the waiving of the filing of

7   same.

8      It is further stipulated and

9   agreed by and between the parties hereto

10   and the witness that the signature of the

11   witness to this deposition is hereby

12   waived.

13      *    *    *    *    *    *

14          INDEX

15   **EXAMINATION:**          **PAGE**

16   By Mr. Brown ........................  6

17

18   **EXHIBITS:**            **PAGE**

19   PX-1    Offer of Employment Letter   59

          from Liz Lindemann, Human

20          Resource Specialist, Glovis

          Alabama, L.L.C., to Sukenia

21          Marshall, dated 6/7/05.

22   PX-2    E-mails between Liz    133

          Lindemann and Dave Harris

23          at Glovis Alabama, L.L.C.,

          various dates.

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

ELIZABETH LINDEMANN -- 10/3/07

5

1    PX-3    Glovis Alabama, L.L.C.,    190
2            Notice of Separation of
             Ellis Albright, dated
             2/15/06.
3
4    PX-4    Alabama Department of    192
             Industrial Relations,
5            Unemployment Compensation
             Division, Notice of Claim
6            and Request for Separation
             Information to Glovis
7            Alabama, L.L.C., for Ellis
             Albright, dated 3/13/06.
8    PX-5    Alabama Department of    196
             Industrial Relations,
9            Unemployment Compensation
             Agency, Employer Notice
10           of Determination, Glovis
             Alabama, L.L.C., of
11           Ellis Albright, dated
             3/20/06.
12
13
14
15
16
17
18
19
20
21
22
23

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

ELIZABETH LINDEMANN -- 10/3/07

6

1           *   *   *   *   *   *
2           ELIZABETH LINDEMANN, of lawful
3    age, having first been duly sworn,
4    testified as follows:
5           THE REPORTER:  Usual stipulations?
6           MR. BROWN:  That's fine for me.
7           MR. ENLOE:  Absolutely.
8           **EXAMINATION**
9    **BY MR. BROWN:**
10   Q.   Good morning, again, Ms. Lindemann.
11   A.   **Good morning.**
12   Q.   My name's Dwayne Brown, and we met
13        yesterday during my client, Sukenia
14        Marshall -- Sukenia Gordon is now the name
15        she goes by during her deposition, and you
16        were here for the entirety of her
17        deposition, but I'll just go over some
18        additional ground rules --
19   A.   **Okay.**
20   Q.   -- that Mr. Enloe went over with
21        Ms. Gordon, and I will be calling her
22        Ms. Marshall for the purposes of the
23        deposition, because it seems like all the

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

ELIZABETH LINDEMANN -- 10/3/07

7

1    documents have Sukenia Marshall so I just
2    want to, kind of, keep it consistent --
3    A.   **Okay.**
4    Q.   -- but, you know, you understand you are
5         under oath --
6    A.   **Yes.**
7    Q.   -- and you are here to give your deposition
8         today based on your best recollection --
9    A.   **Yes.**
10   Q.   -- of the events surrounding this lawsuit.
11        I'll be asking you a series of questions
12        that I believe that are relevant to this
13        lawsuit.  If I should ever ask you a
14        question that you don't understand, please
15        don't answer it.  Say, Mr. Brown, I can't
16        understand you, you're talking too fast, or
17        whatever, but just let me know.
18   A.   **Okay.**
19   Q.   If you answer the question then I will
20        assume that you understand it, is that fair
21        enough?
22   A.   **Sure.**
23   Q.   Okay.  State your full name for the record,

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

ELIZABETH LINDEMANN -- 10/3/07

8

1    please.
2    A.   **Liz Lindemann.**
3    Q.   Okay.  I also saw some documents where it
4         was Elizabeth, do you like to go by Liz?
5    A.   **Yeah, I go by Liz.**
6    Q.   Okay.  How do you prefer for me to address
7         you, would you prefer Ms. Lindemann or Liz?
8    A.   **Liz is fine.**
9    Q.   Okay.  Liz is fine?
10   A.   **Uh-huh.**
11   Q.   Okay.  Liz, are you currently employed?
12   A.   **Yes, I am.**
13   Q.   Okay.  And where are you so employed?
14   A.   **Glovis Alabama.**
15        THE REPORTER:  Excuse me.  Can you
16            speak up?
17        THE WITNESS:  You want me to speak
18            up?  Okay, I'm sorry.  That's
19            what I was going to ask you.
20   Q.   Okay.  And Glovis is located here in
21        Montgomery?
22   A.   **Yes, it is.**
23   Q.   And are they classified as a Tier 1

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

9

ELIZABETH LINDEMANN -- 10/3/07

1    supplier of Hyundai?
2    A.   Yes, it is.
3    Q.   Okay.  And just tell me what are some of
4    the things that Glovis does for Hyundai?
5    A.   Okay.  Glovis -- I'll just -- is a
6    warehouse --
7    Q.   Okay.
8    A.   -- and we -- in that warehouse we store the
9    parts that they use to make the cars.
10   Q.   Okay.
11   A.   And then we just deliver those parts.
12   Q.   Is it a multitude of different parts, and
13   you have to educate me, because I've never
14   visited Glovis, I haven't been at Hyundai,
15   but is it a multiplicity of parts or is it
16   just specific parts that Glovis --
17   A.   It's over five thousand different parts.
18   Q.   Oh, okay.
19            MR. ENLOE:  Let me just in inject
20            something quickly for the record.
21            Dwayne, you and I didn't discuss
22            this before the depo, and I don't
23            know that it will be an issue,

10

ELIZABETH LINDEMANN -- 10/3/07

1            but in the event that we touch on
2            anything that in the company's
3            opinion is confidential or trade
4            secret material --
5            MR. BROWN:  I understand.
6            MR. ENLOE:  -- if we get to that
7            point, Liz, if you could indicate
8            if you believe it might be
9            confidential or trade secret
10           material --
11           MR. BROWN:  Yeah.
12           MR. ENLOE:  -- in the company's
13           opinion, in that case, I'd like
14           to talk about --
15           MR. BROWN:  Sure.
16           MR. ENLOE:  -- entering into a
17           confidentiality or protective
18           order --
19           MR. BROWN:  Sure.
20           MR. ENLOE:  -- to protect that
21           information.
22           MR. BROWN:  Sure.  And I don't
23           think we'll get into that, but I

11

ELIZABETH LINDEMANN -- 10/3/07

1            certainly think that's a
2            legitimate concern.
3    Q.   Ms. -- Liz, how long have you been employed
4    with Glovis?
5    A.   Three and a half years.
6    Q.   Okay.  And what is your current position
7    with them?
8    A.   Assistant Manager of Human Resources.
9    Q.   Okay.  And since your inception of
10   employment with them, have you always been
11   the Assistant Manager of Human Resources?
12   A.   No.  I was hired as the specialist, Human
13   Resource Specialist.
14   Q.   Okay.  When you were initially hired, what
15   did you understand to be your duties and
16   responsibilities?
17   A.   Operate the human resource department, take
18   care of all the hiring, policies,
19   procedures.  Initially, I did all of the --
20   all of the hiring was done within the first
21   few months.
22   Q.   Okay.  Would you, like, give a
23   recommendation on applicants in terms of

12

ELIZABETH LINDEMANN -- 10/3/07

1    whether they should be hired or not?
2    A.   No.
3    Q.   Okay.
4    A.   I -- he -- I would -- I would interview
5    them.  We would put them in a training
6    class --
7    Q.   Okay.
8    A.   -- and evaluate them from the training
9    class.
10   Q.   And my understanding is if they perform
11   satisfactorily during the training class
12   then they would be offered employment on a
13   probationary status?
14   A.   Yes.
15   Q.   Okay.  And the probationary status is 90
16   days?
17   A.   Yes.
18   Q.   Okay.  And would you evaluate each
19   prospective employee after they completed a
20   training program?
21   A.   Yes.
22   Q.   Okay.  Would it be anybody else who would
23   evaluate them to determine if they should

13

ELIZABETH LINDEMANN -- 10/3/07

1　　be hired as a probationary employee?
2　A.　**No.**
3　Q.　Other than yourself?
4　A.　**No.**
5　Q.　So that was within your exclusive domain so
6　　　to speak?
7　A.　**Yes.**
8　Q.　Okay. And I also understand that you --
9　　　did you help implement policies and
10　　procedures?
11　　　　　MR. ENLOE: Are we talking about
12　　　　　　when she was a specialist?
13　　　　　MR. BROWN: Yeah, yeah, yeah. I'm
14　　　　　　sorry.
15　Q.　As an HR specialist?
16　A.　**Yes.**
17　Q.　Okay. And what were some of the policies
18　　　and procedures that you helped to implement
19　　　at Glovis?
20　A.　**I mean, all of our standard HR policies as**
21　　　**far as hiring, recruitment, harassment,**
22　　　**vacations --**
23　Q.　Harassment would be based on sex, gender,

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

14

ELIZABETH LINDEMANN -- 10/3/07

1　　race --
2　A.　**Correct.**
3　Q.　-- national origin?
4　A.　**Correct.**
5　Q.　Okay. Anyone else that helped to implement
6　　　those type of policies other than yourself
7　　　while you were a HR specialist?
8　A.　**No.**
9　Q.　Okay. Now, I understand now that your
10　　position is -- you are the Assistant
11　　Manager; is that correct?
12　A.　**Yes.**
13　Q.　And do you still have any responsibilities
14　　in the implementation of policies and
15　　procedures?
16　A.　**Yes.**
17　Q.　Okay. What about in hiring?
18　A.　**Yes.**
19　Q.　Okay. Do you still evaluate the trainees
20　　and basically make the determination as to
21　　whether they should be offered an offer as
22　　an employee on a probationary status
23　　period?

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

15

ELIZABETH LINDEMANN -- 10/3/07

1　A.　**Yes.**
2　Q.　Okay. Anyone else that helps you make that
3　　　decision now as the Assistant Manager of
4　　　HR?
5　A.　**Depending on the position. It sometimes --**
6　　　**if it's a salaried position, managers of**
7　　　**the department.**
8　Q.　Okay. Now, before you came to Glovis, were
9　　　you employed with a previous --
10　A.　**Yes.**
11　Q.　Where were you employed?
12　A.　**At a company in Wisconsin.**
13　Q.　What's the name of the company?
14　A.　**Bending Branches.**
15　Q.　What is their address?
16　A.　**I can't remember the street address. It's**
17　　　**Osceola, Wisconsin.**
18　Q.　Osceola?
19　A.　**Uh-huh.**
20　Q.　Is that within a proximity of Milwaukee?
21　A.　**No. It's close to Minneapolis/St. Paul.**
22　Q.　Okay. And what was your position with
23　　　Bending Branches?

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

16

ELIZABETH LINDEMANN -- 10/3/07

1　A.　**Human Resource Manager.**
2　Q.　Okay. And what did you do for them?
3　A.　**All of the -- the hiring, the orientation,**
4　　　**just set up training plans, payroll.**
5　Q.　Okay. Did you -- did you do any
6　　　implementation of policies there?
7　A.　**Yes.**
8　Q.　Okay. And would the implementation of
9　　　policies also been dealing with sexual
10　　harassment, racial discrimination,
11　　religious discrimination?
12　A.　**Yes.**
13　Q.　Now, relative to the implementation of
14　　these policies, you didn't draft these
15　　policies or anything, did you?
16　A.　**As far as?**
17　Q.　I mean, in other words, what I'm saying
18　　is -- let me just start from this
19　　perspective.
20　A.　**Okay.**
21　Q.　Glovis has an employee manual, does it not?
22　A.　**Right now --**
23　Q.　Yeah.

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

17

ELIZABETH LINDEMANN -- 10/3/07

1  A.  -- no.
2  Q.  They don't have an employee handbook right
3      now?
4  A.  No.
5  Q.  Okay.  Well, back when Ms. Marshall was
6      hired --
7  A.  Uh-huh.
8  Q.  -- they did have an employee handbook, did
9      they not?
10 A.  At that time no.
11 Q.  They did not?
12 A.  No.
13 Q.  Okay.  When -- has Glovis ever had an
14     employee handbook, manual -- I'm using the
15     terms, kind of, interchangeably?
16 A.  We did in the beginning when we hired our
17     first few employees in January of 2005.
18     It -- the manual was retracted because the
19     scope of our work had changed which
20     affected some of the policies.
21 Q.  Now, when you say the scope of your work,
22     what are you talking about?  In terms of
23     what Glovis was doing --

18

ELIZABETH LINDEMANN -- 10/3/07

1  A.  Originally --
2  Q.  -- for Hyundai?
3  A.  -- Glovis was only going to have salaried
4      employees.
5  Q.  Uh-huh.
6  A.  All hourly employees were going to be
7      contract employees, not direct employees of
8      Glovis.
9  Q.  Okay.  Okay.  Now, for Bending Branches,
10     how long did you work for them?
11 A.  Three years.
12 Q.  And what were the years -- so you worked
13     for them, you stopped working for them in
14     around -- right around 2003/2004?
15 A.  2003.
16 Q.  Okay.  And why did you leave Bending
17     Branches?
18 A.  We moved to Alabama.  My husband took a job
19     here.
20 Q.  Okay.  So you resigned that position?
21 A.  Yes.
22 Q.  Okay.  And before you became employed, I
23     believe, in around -- it would have been

19

ELIZABETH LINDEMANN -- 10/3/07

1      around the year 2000; correct, with Bending
2      Branches?
3  A.  Correct.
4  Q.  Did you work?
5  A.  Previously?
6  Q.  Yeah.
7  A.  I worked when we lived in Georgia, yes.
8  Q.  Okay.  Where did you work before you went
9      to Bending Branches?
10 A.  A company called Yokogawa.
11 Q.  Spell that for me.
12 A.  Y-O-K-O-G-A-W-A.
13 Q.  And aren't they in Atlanta?
14 A.  Newnan.
15 Q.  Newney?
16 A.  Newnan, Georgia.
17     MR. BROWN:  What is that next to?
18     MR. ENLOE:  It's between LaGrange
19        and Atlanta.  It's spelled
20        N-E-W-N-A-N.
21     MR. BROWN:  Okay.
22 Q.  And what did you do for that company?
23 A.  I was a HR specialist and handled their

20

ELIZABETH LINDEMANN -- 10/3/07

1      insurance.
2  Q.  This is an insurance company?
3  A.  This is a manufacturing company --
4  Q.  Okay.
5  A.  -- but I was responsible for insurance for
6      their employees.
7  Q.  Okay.  And how long were you with this
8      company?
9  A.  Six months.
10 Q.  So you were with them sometime in the year
11     2000 or 1999?
12 A.  '99.
13 Q.  Why did you leave -- how do you pronounce
14     it?
15 A.  Yokogawa.
16 Q.  Yokogawa.  Why did you leave Yokogawa?
17 A.  My husband took a job in Wisconsin.
18 Q.  Is your husband in the military?
19 A.  No.
20 Q.  What does your husband do?
21 A.  He's purchasing manager.
22 Q.  For who?
23 A.  Hyundai.

21

ELIZABETH LINDEMANN -- 10/3/07

1   Q.   That's Hyundai here in Montgomery; right?

2   A.   **Correct.**

3   Q.   Okay. Now, before you were with Yokogawa,

4       where did you work?

5   A.   **Immediately, I had stopped working to go to**

6       **school, but I worked at a company called**

7       **Olsonite before that.**

8   Q.   I can't hear you.

9   A.   **Olsonite before Yokogawa.**

10   Q.   Where is Olsonite?

11   A.   **That was in Newnan, Georgia as well.**

12         THE REPORTER: Can you spell that

13            for me, please?

14         THE WITNESS: O-L-S-O-N-I-T-E.

15   Q.   How long did you work for them?

16   A.   **Three years.**

17   Q.   What did you do?

18   A.   **I was the HR assistant.**

19   Q.   Okay. All right. I don't want to go too

20       far back. I think that's sufficient

21       employment history. So basically the

22       majority of your experience, let me say,

23       over the last, looks like eight to nine to

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

22

ELIZABETH LINDEMANN -- 10/3/07

1       ten years, has been in HR --

2   A.   **Correct.**

3   Q.   -- is that a fair assessment?

4   A.   **Yes.**

5   Q.   And is it also fair to say that during your

6       duties with these respective companies in

7       the HR department that you have had some

8       process in hiring, implementation of

9       policies?

10   A.   **Yes.**

11   Q.   Okay.

12         (Brief interruption.)

13   Q.   Tell me a little bit about your education.

14       Where did you graduate from high school?

15   A.   **Graduate? Oh, Worthington, Minnesota.**

16   Q.   What's the name of the high school, is it

17       Worthington --

18   A.   **Worthington High School.**

19   Q.   -- High School. And where is that, that's

20       in Worthington --

21   A.   **Minnesota.**

22   Q.   Okay. I'm sorry. I thought you said that.

23       And what year did you complete your high

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

23

ELIZABETH LINDEMANN -- 10/3/07

1       school work?

2   A.   **'85.**

3   Q.   Okay. And did you subsequently matriculate

4       to college?

5   A.   **I started and stopped.**

6   Q.   Okay. When did you enter college, was it

7       immediately after you got out of high

8       school?

9   A.   **Immediately after high school, yes.**

10   Q.   Okay. So that would have been '85/'86?

11   A.   **Correct.**

12   Q.   Where did you start going to college?

13   A.   **It's Worthington Community College.**

14   Q.   And what did you major in?

15   A.   **At that time I was just doing general.**

16   Q.   All right. Did you complete an entire

17       semester or year at Worthington Community

18       College?

19   A.   **Yes.**

20   Q.   When did you cease your studies there?

21   A.   **I had gotten married in April of '86 --**

22   Q.   Okay.

23   A.   **-- and --**

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

24

ELIZABETH LINDEMANN -- 10/3/07

1   Q.   Married --

2   A.   **Yes. And I finished out that semester and**

3       **stopped.**

4   Q.   Okay. And then there came a time when you

5       resumed your collegiate studies; correct?

6   A.   **Correct.**

7   Q.   When did you resume your college studies?

8   A.   **When I was living in Newnan, Georgia.**

9   Q.   And what school did you resume your studies

10       at?

11   A.   **University of West Georgia.**

12   Q.   And what year was that?

13   A.   **'97.**

14   Q.   And did you have a major at that time?

15   A.   **Business Administration, concentration in**

16       **HR.**

17   Q.   Did you get your degree?

18   A.   **Yes.**

19   Q.   And what degree was that?

20   A.   **Bachelor.**

21   Q.   BA in -- with a concentration in HR?

22   A.   **Yeah, Bachelor's in Business**

23       **Administration, concentration in HR.**

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

SUKENIA MARSHALL v. GLOVIS ALABAMA -- 10/3/07

25

ELIZABETH LINDEMANN -- 10/3/07

1  Q.  And what year did you graduate?
2  A.  2000.
3  Q.  Did you matriculate to graduate school?
4  A.  No.
5  Q.  Okay.  That's your current degree?
6  A.  Correct.
7  Q.  Okay.  Any specialized training other than
8      your college degree in HR?
9  A.  I take the professional human resource
10     certification.
11         THE REPORTER:  I'm sorry.  What
12             was that?
13         THE WITNESS:  Professional human
14             resource certification.
15 Q.  When did you get that?
16 A.  2003.
17 Q.  Now, you got to educate me a little bit,
18     what is that about?
19 A.  It's a general HR knowledge test, and you
20     sit in a room basically and you take four
21     hours to do a test.  They test you on all
22     your HR understanding of knowledge, and to
23     keep that certification, you have to do

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

26

ELIZABETH LINDEMANN -- 10/3/07

1      training classes periodically.
2  Q.  You say periodically, is this a yearly
3      basis, every six months?
4  A.  It's every three years.  It -- it's
5      renewable.
6  Q.  Okay.
7          THE REPORTER:  It's what?
8          THE WITNESS:  Renewable.
9  Q.  So your last renewal would have been in
10     2006?
11 A.  Yes.
12 Q.  Okay.  Other than your certificate -- you
13     said professional human resource
14     certification?
15 A.  Correct.
16 Q.  Any additional enhanced training that you
17     received in HR?
18 A.  Other than just training classes
19     sponsored --
20 Q.  Okay.  Tell me --
21 A.  -- by different agencies.
22 Q.  Okay.  Tell me about some of the other
23     training classes that were sponsored.

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

27

ELIZABETH LINDEMANN -- 10/3/07

1  A.  I guess, legal training on lawsuits, on
2      harassment, on employee relations.
3  Q.  Okay.  Let's start with the legal training
4      relative to litigation.
5  A.  Uh-huh.
6  Q.  Okay.  Where did you receive that training?
7  A.  I attended a class last year.
8  Q.  Was that class sponsored by Glovis?
9  A.  No.  It was sponsored by Hyundai.
10 Q.  What was some of the things that were
11     discussed during this training?
12 A.  The big thing during that was union
13     avoidance and proper paperwork to document,
14     you know, things with employees and stuff
15     like that.
16 Q.  Okay.  So it talked about documentation and
17     paper trails and all of that stuff?
18 A.  Correct.
19 Q.  And you said this was -- was this in 2003,
20     did you say, or was that last year, I'm
21     sorry?
22 A.  That was last year.
23 Q.  Okay.  And did that legal training dealing

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

28

ELIZABETH LINDEMANN -- 10/3/07

1      with litigation, that occurred here in
2      Montgomery?
3  A.  Yes.
4  Q.  Okay.  Any additional legal training that
5      you've received on the issue of litigation?
6  A.  No.
7  Q.  Okay.  And you also said that you have
8      received legal training on the issue of
9      harassment; is that correct?
10 A.  It was a class.
11 Q.  Okay.  Who was that class sponsored by?
12 A.  By Hyundai as well.
13 Q.  Okay.  Did you take these class
14     simultaneously?
15 A.  No.  Within a few months of each other.
16 Q.  Okay.  Were these required classes or was
17     it something you did on your own volition?
18 A.  No.  But on my own.  They offered them to
19     us.
20 Q.  Okay.  So it wasn't required, it was
21     something you voluntarily did?
22 A.  Correct.
23 Q.  How long were these legal training classes?

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

29

1   A.   **Four to eight hours.**
2   Q.   Total or four to --
3   A.   **Like, each class, it --**
4   Q.   Okay.  And relative to harassment, you
5        understand harassment is a very broad term
6        so I'm going to ask you what aspects of
7        harassment did you receive legal training
8        on last year?
9   A.   **Okay.**
10  Q.   What --
11  A.   **Basically, it was a general topic of**
12       **harassment.  If, you know, if someone comes**
13       **and reports a harassment, what is the best**
14       **way to approach it, how should we sit down**
15       **and talk about it, and harassment can be in**
16       **different forms.  It can be, you know, each**
17       **person has a different perception of**
18       **harassment so it can be sexual, it can be**
19       **just a --**
20  Q.   Just verbal; right?
21  A.   **Yeah.**
22  Q.   Okay.  All right.  I should have asked you
23       this earlier, is this your -- the first

30

1        time you've given a deposition?
2   A.   **Yes.**
3   Q.   Okay.  What, if anything, did you do in
4        preparation for your deposition today?
5   A.   **I reviewed the e-mails that I had sent.**
6   Q.   Okay.  How many e-mails?
7   A.   **It was the ones that we looked at yesterday**
8        **just those two.**
9   Q.   Okay.  Did you have a chance to review the
10       amended complaint in this case?  Well, let
11       me ask you this:  Have you ever seen the
12       amended complaint in this case?
13  A.   **Yes.**
14  Q.   Okay.  And when was the first time you saw
15       it?
16  A.   **Shortly after it was --**
17  Q.   Was filed?
18  A.   **-- filed, yeah.**
19  Q.   Okay.  Who showed you that, was that your
20       attorney, or what that someone else?
21  A.   **Attorney.**
22  Q.   Okay.
23            MR. ENLOE:  And, Dwayne, I would

31

1        assume you're not going to get
2        into --
3            MR. BROWN:  No, no, no.  Not,
4        again, what was discussed.  I
5        mean, that's -- that's -- I mean,
6        I been doing this long enough to
7        know that's strictly
8        confidential.
9   Q.   Other than -- first of all, let me ask you
10       this:  When did you review the e-mails, was
11       that this morning, was that yesterday, was
12       that last week?
13  A.   **Monday.**
14  Q.   Okay.  Anything else?
15  A.   **No.**
16  Q.   Okay.  Now, did there come a time when you
17       were informed that Sukenia Marshall was
18       complaining that a gentleman by the name of
19       Ellis Albright was sexually harassing her?
20  A.   **No.**
21  Q.   Okay.  There never came a time that you
22       were informed of that?
23  A.   **No.**

32

1   Q.   Okay.  You were not informed of that when
2        you read the complaint?
3   A.   **The?**
4   Q.   About her allegations?
5   A.   **But that -- the amended complaint?**
6   Q.   Right.
7        Yes.  At that point yes.
8   Q.   Okay.  So that's the first time you were
9        notified that you were on notice that she
10       was making sexual harassment allegations
11       against Mr. Albright?
12  A.   **I think the first time it was mentioned in**
13       **her EEOC complaint.**
14  Q.   Okay.  All right.  Do you recall when --
15       first of all, did you receive a copy of the
16       EEOC complaint?
17  A.   **Yes.**
18  Q.   Do you know when that was?
19  A.   **No.**
20  Q.   Okay.  And did you read her complaint in
21       it's entirety?
22  A.   **Yes.**
23  Q.   Okay.  Did anyone else at Glovis read it

**33**

ELIZABETH LINDEMANN -- 10/3/07

1 other than yourself?
2 A. **Myself and Mr. Park, who was my boss.**
3 Q. Now, what's Mr. Park's first name?
4 A. **I'll spell it for you because it's Korean.**
5 **It's H-Y-U-N, Hyunsoo, and S-O-O.**
6 THE REPORTER: I'm sorry?
7 Q. Hyunsoo is his name, Hyunsoo Parker?
8 A. **Hyunsoo.**
9 Q. Okay. And what is Mr. Hyun -- well, let me
10 just instead of --
11 MR. ENLOE: Park.
12 Q. -- saying Hyunsoo, let me say Mr. Parker.
13 What is Mr. Parker's position?
14 A. **He's a -- what they call HR Coordinator.**
15 MR. ENLOE: I'm sorry, it's just
16 Park.
17 MR. BROWN: Oh, it's just Park?
18 THE WITNESS: Got no Parker.
19 MR. ENLOE: Yes, sir.
20 Q. Mr. Park, he's HR Coordinator?
21 A. **Yes.**
22 Q. And is this the person you now report to?
23 A. **Yes.**

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

**34**

ELIZABETH LINDEMANN -- 10/3/07

1 Q. Did you report to him when you were
2 initially hired?
3 A. **No.**
4 Q. Who did you report to?
5 A. **Mr. Soung Sik Noh.**
6 I'll just say Mr. Noh.
7 A. **It's N-O-H is how you spell his last name.**
8 Q. Okay. All right. So you reviewed
9 Ms. Marshall's EEOC complaint along with
10 Mr. Park; is that correct?
11 A. **Correct.**
12 Q. Okay. And after the review, did you
13 discuss anything with Mr. Park about the
14 allegations that Ms. Marshall made in the
15 EEOC complaint?
16 A. **No. We took the complaint and forwarded it**
17 **to our attorney.**
18 Q. Okay. That would have been Mr. Ensloe --
19 A. **Yeah.**
20 Q. -- Mr. Enloe, I'm sorry. All right. So
21 what you're testifying is that you didn't
22 discuss anything with Mr. Noh about the
23 allegations in her complaint?

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

**35**

ELIZABETH LINDEMANN -- 10/3/07

1 A. **Not with Mr. Noh, no.**
2 Q. Okay.
3 A. **He had passed away.**
4 Q. Oh, I'm sorry.
5 A. **Mr. Noh is no longer --**
6 Q. I'm sorry, not Mr. Noh, Mr. Park. I
7 apologize, Mr. Park.
8 A. **Other than he read the complaint, no.**
9 Q. Okay. And what did you understand the
10 source of Ms. Marshall's complaints? Let
11 me rephrase that, that's a bad question.
12 Did -- after reading the complaint, did you
13 understand what she was complaining about?
14 MR. ENLOE: I'm going to -- are
15 you referring to the EEOC
16 complaint?
17 MR. BROWN: Yeah, the EEOC
18 complaint.
19 A. **I understood what was in the complaint,**
20 **yes.**
21 Q. Okay. And other than forwarding it to
22 Mr. Enloe --
23 A. **Uh-huh.**

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

**36**

ELIZABETH LINDEMANN -- 10/3/07

1 Q. -- did you or Mr. Park take any action?
2 A. **No.**
3 Q. Okay. And at the time that you received
4 the EEOC complaint was Mr. Albright still
5 employed with Glovis?
6 A. **Yes.**
7 Q. Okay. So after receiving a complaint, you
8 didn't undertake to speak with
9 Mr. Albright, did you?
10 A. **At that time, no.**
11 Q. Okay. And do you know if Mr. Park spoke
12 with Mr. Albright --
13 A. **No --**
14 Q. -- about the complaint?
15 A. **-- he did not.**
16 Q. Okay. He did not or you don't know?
17 A. **He did not.**
18 Q. He did not. Okay. And did you understand
19 after reading the EEOC complaint that
20 Ms. Marshall was accusing Mr. Albright of
21 sexually harassing her?
22 A. **That's what I read the com -- in the**
23 **complaint, yes.**

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

37

1  Q.  Okay.  Now, you testified -- you just said
2      that not at that time that you didn't talk
3      to Mr. Albright about the allegations that
4      Ms. Marshall made in the EEOC complaint,
5      did there ever come a time when you spoke
6      to Mr. Albright about those allegations?
7  A.  **No.**
8  Q.  Okay.  You never spoke with him?
9  A.  **No.**
10 Q.  Okay.  What about Mr. Park, do you know if
11     he ever spoke with him?
12 A.  **No.**
13 Q.  No, he did not or, no, you don't know.
14 A.  **I do not believe he did.**
15 Q.  Okay.  In response to Ms. Marshall's
16     complaints, did Glovis undertake an
17     internal investigation?
18 A.  **No.**
19 Q.  Okay.  And why not?
20 A.  **I did not have a reason to at that point.**
21     **I didn't have a complaint from her about**
22     **sexual harassment.**
23 Q.  You didn't perceive her EEOC complaint to

38

1      be sufficient -- a sufficient complaint to
2      at least undertake an investigation?
3  A.  **Not at that time, no.**
4  Q.  Okay.  And why was that?
5  A.  **I had reviewed her file, and based on that,**
6      **and didn't see any indication that she had**
7      **ever had that problem so I didn't**
8      **investigate.**
9  Q.  Okay.  So in essence, did you question the
10     validity of her complaint?
11 A.  **Yes.**
12 Q.  Okay.  And what were the reasons you
13     questioned the validity of her complaint?
14     MR. ENLOE:  And, again, are you
15     referring to the EEOC --
16     MR. BROWN:  EEOC complaint.  And
17     basically -- let me just say
18     this.  This line of questions is
19     directed to the EEOC complaint.
20     We'll get into the formal
21     complaint later, but I'm just
22     dealing with the EEOC complaint
23     so when I say complaint, I'm just

39

1      trying to be as brief as possible
2      when I'm talking about the
3      complaint.
4  A.  **Okay.  Could you repeat the question,**
5      **please?**
6      MR. BROWN:  If you could read it
7      back, I forgot, sorry.
8      THE REPORTER:  Okay.
9      (Requested portion of record
10     read, Page 38, Line 12 and 13.)
11 A.  **Because that was the first time that I had**
12     **ever heard mention of anything along that**
13     **nature.**
14 Q.  Okay.  And you were present, again, during
15     the entirety of Ms. Marshall's deposition,
16     were you not?
17 A.  **Yes.**
18 Q.  And do you recall her testimony when she
19     said she spoke with you about some
20     complaints that she had about Mr. Albright
21     of a sexual nature?
22 A.  **I recall that what she said, yes.**
23 Q.  Okay.  So just so I understand your

40

1      testimony --
2  A.  **Uh-huh.**
3  Q.  -- is it your contention that never
4      happened?
5  A.  **Yes.**
6  Q.  Okay.  Okay.  And is it always your
7      contention that no employee at Glovis has
8      ever told that you Mr. Albright made some
9      inappropriate sexual remarks towards
10     Ms. Marshall?
11 A.  **Yes.**
12 Q.  So that's also your contention?
13 A.  **Yes.**
14 Q.  Okay.  Now, after you received the EEOC
15     complaint, did you talk with any of the
16     employees to see if Ms. Marshall's
17     complaint had any validity?
18 A.  **No.**
19 Q.  Okay.  And why not?
20 A.  **Since it was the first time that I had seen**
21     **that and it came out of the blue, I guess,**
22     **I didn't perceive it as something that**
23     **needed to be investigated.**

SUKENIA MARSHALL v. GLOVIS ALABAMA -- 10/3/07

41

ELIZABETH LINDEMANN -- 10/3/07

1   Q.   Okay. Do you know why Ms. Marshall would
2        file a false EEOC complaint against Glovis?
3   A.   **No.**
4   Q.   Okay. And prior to her termination, and
5        we'll, kind of, talk about that later, but
6        prior to her termination, had you ever
7        known Ms. Marshall to lie about issues?
8   A.   **I didn't know her very long. I couldn't**
9        **tell you if she did or didn't.**
10  Q.   Were you the one that actually recommended
11       that Ms. Marshall be hired on a
12       probationary status?
13  A.   **Yes.**
14  Q.   Okay. And basically during the
15       orientation, you were satisfied with how
16       she completed the orientation --
17  A.   **Yes.**
18  Q.   -- is that correct? Was a background check
19       performed before she was offered the
20       probationary employment?
21  A.   **We had checked previous employers.**
22  Q.   Okay. And there was nothing that concerned
23       you; right?

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

42

ELIZABETH LINDEMANN -- 10/3/07

1   A.   **No.**
2   Q.   You were also here yesterday when
3        Ms. Marshall testified in response to
4        Mr. Enloe's questions about a harassment
5        complaint that was brought against her,
6        criminal complaint; right?
7   A.   **Un-huh.**
8   Q.   Okay. During your background check, did
9        you discover that she had been arrested
10       previously, had you discovered?
11  A.   **I knew that there was a misdemeanor, but --**
12  Q.   Right.
13  A.   **-- nothing.**
14  Q.   It was nothing that in your opinion
15       disqualified her for employment at Glovis;
16       is that correct?
17  A.   **Correct.**
18  Q.   All right. Now, did you have an occasion
19       to hire Ellis Albright?
20  A.   **Yes.**
21  Q.   Okay. And do you know around the time that
22       he was hired?
23  A.   **January '05, I believe.**

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

43

ELIZABETH LINDEMANN -- 10/3/07

1   Q.   And that was -- was that right around the
2        time that Ms. Marshall was hired?
3   A.   **She was hired later.**
4   Q.   And did Mr. Albright, did he go through any
5        orientation program?
6   A.   **The -- our orientation or the training**
7        **class -- I'm not understanding.**
8   Q.   Your orientation?
9   A.   **Yes.**
10  Q.   Okay. And how long did this orientation
11       consist of?
12  A.   **How long?**
13  Q.   Yes.
14  A.   **I spent about four hours with those people.**
15  Q.   Okay. And once he completed the
16       orientation program, we were talking about
17       Mr. Albright, was he subsequently offered a
18       position with Glovis?
19  A.   **After he completed the AIDT training, the**
20       **orientation -- I guess I misunderstood.**
21  Q.   Okay. Yeah, I understand. First, it's the
22       orientation?
23  A.   **First, it's the AIDT training.**

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

44

ELIZABETH LINDEMANN -- 10/3/07

1   Q.   Okay. Then it's the orientation?
2   A.   **Yes.**
3   Q.   Okay, I'm sorry. Tell me about the AIDT
4        training?
5   A.   **It's a general training class that talks**
6        **about -- does -- covers basic math skills,**
7        **quality, safety, teamwork.**
8   Q.   Okay. And that's -- and basically these
9        training programs are required for anybody
10       that wants to either work at Hyundai or
11       work at a Tier 1 supplier?
12  A.   **At that time, yes.**
13  Q.   Yeah. Okay. And then after -- now, tell
14       me how long are these AIDT classes?
15  A.   **Six weeks.**
16  Q.   Okay. And then once you complete that,
17       assuming you complete it satisfactorily, is
18       that when you go through the orientation?
19  A.   **If you're offered employment, yes.**
20  Q.   Right. If you're offered employment. And
21       the orientation, how long is that, like,
22       four hours did you say?
23  A.   **Yes.**

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

45

ELIZABETH LINDEMANN -- 10/3/07

1    Q.   Okay. Now, before anyone who's hired as a
2        probationary employee at Glovis, do they
3        first receive a letter similar to what
4        Ms. Marshall received?
5    A.   **Yes.**
6    Q.   Okay. And do you know if Mr. Albright
7        received that copy of the same letter?
8    A.   **Yes.**
9    Q.   Okay. And when he was hired, was he hired
10       initially as a probationary status
11       employee?
12    A.   **Yes.**
13    Q.   Okay. So he had to complete his 90-day
14       probationary status?
15    A.   **Yes.**
16    Q.   Okay. When Mr. Albright was hired, what --
17       what was his position of hire?
18    A.   **General labor.**
19    Q.   Okay. And as a general laborer at Glovis,
20       and I'm talking about back in '05, I don't
21       know what it is now. That's really not
22       relevant, but back in '05, what would
23       Mr. Albright's responsibilities have been

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

46

ELIZABETH LINDEMANN -- 10/3/07

1       as a general laborer?
2    A.   **Receive parts, store parts on -- put parts**
3       **on the racks, label them.**
4    Q.   Okay. Now, during Mr. Albright's tenure,
5       did he come to receive an advance in pay at
6       any time?
7    A.   **Yes.**
8    Q.   Okay. Did he receive several advances in
9       pay or was it just one?
10    A.   **Well, after he completed his first six**
11      **months, he received one.**
12    Q.   Okay.
13    A.   **After he completed his first year, he**
14      **received one. He received one for going to**
15      **team leader.**
16    Q.   Okay. What was the extent of his six-month
17      advancement?
18    A.   **The amount?**
19    Q.   Yes.
20    A.   **50 cents.**
21    Q.   And --
22       MR. ENLOE: An hour?
23    A.   **An hour.**

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

47

ELIZABETH LINDEMANN -- 10/3/07

1    Q.   Right. And I assumed that, but I should
2       have followed-up. What about one year?
3    A.   **Another fifty cents.**
4    Q.   Per hour?
5    A.   **Yes.**
6    Q.   And you said he received a third advance in
7       pay when he was promoted to team leader?
8    A.   **Correct.**
9    Q.   How much was that?
10    A.   **A dollar.**
11    Q.   Per hour?
12    A.   **Yes.**
13    Q.   Okay. And what would some of his duties
14       and responsibilities have been as team
15       leader?
16    A.   **He would receive the work orders each day**
17      **and distribute the work amongst the**
18      **employees in his group.**
19    Q.   Now, who would Mr. Albright -- now, let me
20       back up. Would he receive daily work
21       orders?
22    A.   **Yes.**
23    Q.   Okay. And who would he receive these daily

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

48

ELIZABETH LINDEMANN -- 10/3/07

1       work orders from?
2    A.   **Dave Harris.**
3    Q.   Okay. Did -- Mr. Albright, would he report
4       directly to Mr. Harris?
5    A.   **Yes.**
6    Q.   Okay. What was Mr. Harris' position?
7    A.   **Operations Manager.**
8    Q.   Now, who would Mr. Harris report to, would
9       he report to you?
10    A.   **No. He would report to his boss who is a**
11      **Jinho Choi.**
12    Q.   Okay.
13       THE REPORTER: I'm sorry?
14       THE WITNESS: Jinho.
15       MR. BROWN: Jinho Choi.
16       THE WITNESS: J-I-N-H-O. Choi is
17       C-H-O-I.
18    Q.   Now, I understand that when Mr. Albright
19       would receive these daily work orders from
20       Mr. Harris, Dave Harris; right?
21    A.   **Uh-huh, yes.**
22    Q.   That he would also distribute these work
23       orders to the people who were in his group?

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

SUKENIA MARSHALL V. GLOVIS ALABAMA -- 10/3/07

49

ELIZABETH LINDEMANN -- 10/3/07

1   A.   Yes.

2   Q.   Okay.  And I understand that Sukenia
3        Marshall was hired subsequent to
4        Mr. Albright; is that correct?

5   A.   Yes.

6   Q.   Did there ever come a time when Sukenia was
7        placed in Mr. Albright's group?

8   A.   Yes.

9   Q.   Okay.  And was that upon her hire, or was
10       it -- did it come after she was initially
11       hired?

12  A.   When she was hired, she was put in the
13       breakdown group.

14  Q.   Okay.  And we've talked about the break
15       ground -- breakdown group, I'm sorry.  How
16       many people at that time were assigned to
17       Mr. Albright's group?

18  A.   Approximately ten.

19  Q.   Ten people.  Now, Mr. Albright, would he
20       actively work every day on that particular
21       line, or what would he do on a day-to-day
22       basis?  Just describe to me what his normal
23       day would be like.

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

50

ELIZABETH LINDEMANN -- 10/3/07

1   A.   He would receive the work orders,
2        distribute those amongst his -- the members
3        in the group.  He would follow-up on those
4        work orders to make sure that the parts
5        were being either stocked or pulled based
6        on what needed to be done.  If new orders
7        came in during the day, he would make sure
8        he distributed those.

9   Q.   Okay.  All right.  Now, would he -- would
10       part of his responsibility as team leader
11       have been to make sure that the work orders
12       were implemented?

13  A.   Yes.

14  Q.   Okay.  So it was his responsibility to make
15       sure that the ten people who were, in fact,
16       in his group that they performed the work
17       orders that he distributed to them?

18  A.   Yes.

19  Q.   Okay.  Now, would Mr. Albright actively
20       work on the line?

21  A.   Yes, if necessary, yes.

22  Q.   Okay.  But only if necessary would he
23       actively work on the line, and when I say

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

51

ELIZABETH LINDEMANN -- 10/3/07

1        actively work, I'm talking about getting
2        his hands and actively getting involved at
3        that particular job?

4   A.   Normally, our team leaders do.

5   Q.   Okay.  So that would be something normally
6        that Mr. Albright would have done?

7   A.   Correct.

8   Q.   Okay.  Now, again, you've got to educate
9        me, because I've never been out to Glovis.

10  A.   Uh-huh.

11  Q.   Is this like an assembly-line-type
12       operation?

13  A.   No.  It's, as I said earlier, a warehouse,
14       and we have different racks, different bins
15       and racks set up for different parts, and
16       those parts are labeled.  And one part of
17       our building now has to go and pull those
18       parts and put them on a truck.

19  Q.   Okay.  All right.  Now, if Mr. Albright had
20       any questions or concerns about how a
21       member of his group was performing, who
22       would he report to.  Would that be Dave?

23  A.   Yes.

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

52

ELIZABETH LINDEMANN -- 10/3/07

1   Q.   Okay.  Now, was he the sole team leader of
2        this group, or was there another team
3        leader?

4   A.   That was another one.

5   Q.   Okay.  And what is his or her name.  I
6        don't want to be presumptuous and say his
7        name.

8   A.   Tim Wells.

9        THE REPORTER:  Wells?

10       THE WITNESS:  Uh-huh.  W-E-L-L-S.

11  Q.   Who was hired first, Mr. Wells or
12       Mr. Albright?

13  A.   Mr. Wells.

14  Q.   Okay.  Was -- Mr. Wells, was he made a team
15       leader prior to Mr. Albright being named a
16       team leader?

17  A.   Yes.

18  Q.   Okay.  So were they like co-team leaders
19       for the lack of a better term?

20  A.   Yes.

21  Q.   Okay.  Well, why don't I ask you this:  Did
22       they have the same responsibility as team
23       leaders or did those responsibilities vary?

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

53

ELIZABETH LINDEMANN -- 10/3/07

1    A.    Same.
2    Q.    Same responsibilities?
3    A.    (Nodded head.)
4    Q.    And were Mr. Albright and Mr. Wells, were
5          they team leaders on the first shift?
6    A.    Yes.
7    Q.    Okay. And the first shift, is that 7:30
8          to -- excuse me, 7:30 to 4:30?
9                THE REPORTER: Excuse me just a
10               moment.
11   A.    At that --
12               THE REPORTER: Excuse me.
13                (Brief interruption.)
14               THE REPORTER: Okay.
15               MR. BROWN: Okay. I'm sorry --
16               THE WITNESS: That's okay.
17               MR. BROWN: -- Liz.
18   A.    At that time, it was starting at 6:30, the
19         first shift was.
20   Q.    Was it 6:30 to 3:30?
21   A.    Sounds about right.
22   Q.    Okay. And relative to Mr. Wells, if he had
23         any questions or concerns about how an

54

ELIZABETH LINDEMANN -- 10/3/07

1          employee in his group was performing, would
2          he also report to Dave Wells? I mean, not
3          Dave Wells, Dave Harris?
4    A.    Yes.
5    Q.    Okay. And was David Harris -- was that
6          also his immediate supervisor?
7    A.    Whose?
8    Q.    Tim Wells.
9    A.    Yes.
10   Q.    Okay. Now, if an employee who was working
11         in the group of Mr. Wells and Mr. Albright,
12         if they had any questions or concerns about
13         production, let's say, who would they
14         address those concerns to?
15   A.    Production would go to Dave Harris.
16   Q.    Okay. If they had any complaints about
17         their employment, would they also go to
18         Dave Harris?
19   A.    They could go to him or they could come to
20         me.
21   Q.    Okay. Now, during the orientation, were
22         the employees instructed if they had any
23         questions or concerns who they would need

55

ELIZABETH LINDEMANN -- 10/3/07

1          to report to?
2    A.    Yes.
3    Q.    Okay. And I understand that you do the
4          orientation; right?
5    A.    Correct.
6    Q.    Okay. Did you, in fact, indicate to them
7          that, you know -- and when I say them, I
8          should say Ms. Marshall. During her
9          orientation session, did you communicate to
10         her that if you had any questions or
11         concerns about your employment that you can
12         report to myself or Dave Harris?
13   A.    Yes.
14   Q.    Okay. All right. And, again, you heard
15         her testimony when she testified that
16         Mr. Albright was her supervisor, did you
17         remember that testimony?
18   A.    Yes.
19   Q.    And do you have any reason why she would
20         designate Mr. Albright as her supervisor?
21   A.    No.
22   Q.    Okay. Do you know if Mr. Albright told her
23         what to do on a daily basis?

56

ELIZABETH LINDEMANN -- 10/3/07

1    A.    He distributed work on a daily basis.
2    Q.    Okay. And to your understanding, that's
3          all he did?
4    A.    Yes.
5    Q.    Okay. Would you ever have the occasion to
6          come out on the floor?
7    A.    Yes.
8    Q.    Okay. Would you basically do this on a
9          routine basis?
10   A.    No. Because at that time, I was doing a
11         lot of hiring, and I was in and out of the
12         office.
13   Q.    Right. So it would just be sporadic?
14   A.    Correct.
15   Q.    What about Mr. Harris as Operations
16         Manager, would he have the occasion to
17         canvas the area?
18   A.    Yes.
19   Q.    Okay. Do you know how often he would do
20         that?
21   A.    Several times a day.
22   Q.    Maybe two or three times during a
23         particular shift?

57

ELIZABETH LINDEMANN -- 10/3/07

1            MR. ENLOE: Object to form --

2  A.  **Yeah.**

3            MR. ENLOE: -- I'm not sure

4        that -- of her knowledge.

5            MR. BROWN: Okay.

6  Q.  Well, let me ask you this: Did you guys

7     only have one shift at that time?

8  A.  **Yes.**

9  Q.  Okay. And that was 6:30 to 3:30, around

10    6:30 to 3:30. I'm not going to hold you to

11    that time, but around that time, you guys

12    had a first shift?

13  A.  **Yes.**

14  Q.  Did there come a time when you guys

15    implemented a second shift?

16  A.  **Yes.**

17  Q.  When was that?

18  A.  **July of '05.**

19  Q.  Okay. So prior to July of '05, Glovis only

20    had the first shift?

21  A.  **Yes.**

22  Q.  Okay. So I understand your testimony,

23    Mr. Harris would canvas the floor, and I

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

58

ELIZABETH LINDEMANN -- 10/3/07

1    understand this is based on your knowledge,

2    a few times a day?

3  A.  **Yes.**

4  Q.  Okay. And do you know what his purpose may

5    have been in doing that?

6  A.  **No.**

7  Q.  Okay. So basically when Mr. Harris -- when

8    he was not canvassing the area, would there

9    be anyone else on the floor other than the

10   team leaders and members of their group?

11  A.  **No.**

12  Q.  Okay. And it was the team leaders'

13    responsibility, and it would have been in

14    the group that I'm concerned with which is

15    the group that Ms. Marshall was under, the

16    group of Mr. Albright and Mr. Wells. It

17    would have been Mr. Wells and

18    Mr. Albright's responsibility to make sure

19    that things were functioning properly on

20    their line?

21  A.  **Yes.**

22  Q.  Okay. And if either Mr. Wells or

23    Mr. Albright had any questions about how

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

59

ELIZABETH LINDEMANN -- 10/3/07

1    members of their particular team were

2    performing, they would go to Dave Wells as

3    the Operations Manager?

4  A.  **They would go to Dave Harris.**

5  Q.  Dave Harris. I'm sorry. I keep getting

6    them confused. Dave Harris, okay. All

7    right. Now, we already marked this, I hate

8    to mark it again, but I guess I have to --

9         (Off-the-record discussion.)

10       (The referred-to document was

11      marked for identification as

12      Plaintiff's Exhibit No. 1.)

13  Q.  Can you identify that document for me,

14    please, Liz?

15  A.  **Yes, it's her offer letter.**

16  Q.  Okay. And that's the offer letter that you

17    offered; is that correct?

18  A.  **Yes.**

19  Q.  And your signature appears at the bottom?

20  A.  **Yes.**

21  Q.  And is this a true and accurate copy of the

22    offer letter dated June 7, 2005?

23  A.  **Yes.**

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

60

ELIZABETH LINDEMANN -- 10/3/07

1  Q.  Okay. All right. You can set that aside.

2            MR. ENLOE: For the record, I

3       think it may be a slightly

4       different copy than the one we

5       used yesterday. I could be

6       wrong, but I don't recall the

7       word successful background check

8       having been underlined on the

9       other one. I don't think it

10      matters, but I just wanted to --

11      MR. BROWN: All right. That's

12      fine. I think if you need a

13      break now, this might be a good

14      time, like a four or five-minute

15      break and then we'll pick up and

16      hopefully we can go ahead and get

17      finished.

18      MR. ENLOE: Sure.

19      MR. BROWN: I just like to go

20      right through, I mean, I'm not

21      going to be much longer, I don't

22      think.

23      MR. ENLOE: Okay.

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

61

ELIZABETH LINDEMANN -- 10/3/07

1        (Brief recess taken.)
2   Q.   (By Mr. Brown) I want to just deal with a
3        few matters with the employee handbook, and
4        I only have one copy. I probably need to
5        make a another copy.
6            MR. ENLOE: I got copies in the
7            car.
8            MR. BROWN: Okay.
9            MR. ENLOE: I'll go grab it.
10           MR. BROWN: Yeah, okay. I
11           appreciate it. That will save me
12           from making all these copies.
13           MR. ENLOE: Sure.
14           (Brief recess taken.)
15           MR. ENLOE: This is the document
16           we produced to y'all, is that is
17           the one you're looking at?
18           MR. BROWN: Yeah. Yes, sir. I
19           just want to make sure --
20           MR. ENLOE: You can start.
21           MR. BROWN: -- that I had. Okay.
22   Q.   (By Mr. Brown) As your attorney has been
23        kind enough to provide a copy to you of the

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

62

ELIZABETH LINDEMANN -- 10/3/07

1        employee handbook that was produced to
2        plaintiffs in response to their discovery
3        to Glovis, I just want to make sure that I
4        have everything, and it appears to be that
5        the employee handbook is Bates stamped
6        GLOVIS 69 through 87, and you tell me if
7        that's what you have.
8   A.   Yes.
9   Q.   Just to make sure that we have the entire
10       document, if you can just take a moment,
11       take as much time as you need, flip through
12       it, make sure that that's the entire
13       document. I want to just ask you a few
14       questions about it.
15  A.   Yes.
16  Q.   I want to direct your attention to the
17       third page, that's the page that's Bates
18       stamped GLOVIS 71?
19           MR. ENLOE: 74?
20           MR. BROWN: No, 71.
21           MR. ENLOE: Sorry.
22           MR. BROWN: 71.
23  Q.   Now, I did understand, Liz, that according

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

63

ELIZABETH LINDEMANN -- 10/3/07

1        to your testimony, the first time that you
2        had been made aware of Ms. Marshall's
3        complaints against Mr. Albright and Glovis
4        was when she filed her complaint with the
5        EEOC?
6   A.   Yes.
7   Q.   Okay. And that after receiving that
8        complaint, you read it along with -- I
9        can't remember his name -- your supervisor;
10       right?
11  A.   Yes.
12  Q.   Okay. And that Glovis did not undertake to
13       do an investigation?
14           MR. ENLOE: Object to form.
15  Q.   Is that your testimony -- that's your
16       testimony, wasn't that?
17  A.   Yes.
18  Q.   Okay. And does Glovis have any policies
19       on, once it receives a complaint of sexual
20       harassment, whether the complaint should be
21       investigated or not?
22  A.   Yes.
23  Q.   Okay. And is it pursuant to their policy

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

64

ELIZABETH LINDEMANN -- 10/3/07

1        that once a complaint of sexual harassment
2        is made that it is to be investigated?
3   A.   Yes.
4   Q.   Okay. And is that complaint of sexual
5        harassment to be investigated regardless of
6        who the complaining party is?
7   A.   Yes.
8   Q.   Okay. And is it also supposed to be
9        investigated regardless of whether Glovis
10       believes the allegations that are
11       complained of?
12  A.   Yes.
13  Q.   Okay. And in this particular case, that
14       was not done; is that correct?
15           MR. ENLOE: Object to form.
16  Q.   Do you understand my question? In this
17       particular case, there was no investigation
18       that was done regarding Ms. Marshall's
19       allegations?
20           MR. ENLOE: Object to form. You
21           can answer.
22  A.   Correct.
23  Q.   Okay. And if you can go to the second

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

**65**

ELIZABETH LINDEMANN -- 10/3/07

1     paragraph where it talks about -- if you
2     could just read that portion of the
3     paragraph, it's not necessary to read it
4     out loud.  Just read it to yourself if you
5     will.
6   A.  Which --
7          MR. ENLOE:  Which one?
8          MR. BROWN:  It's the second --
9            second paragraph.  If an employee
10           believes.
11   A.  Okay.
12   Q.  Okay.  Now, upon receiving the EEOC
13     complaint, did yourself or your supervisor
14     speak with Mr. Albright?
15   A.  No.
16   Q.  Okay.  And at that time, were there any
17     other allegations of sexual harassment that
18     had been levied against Mr. Albright?
19   A.  No.
20   Q.  Okay.  Did you or your supervisor talk with
21     any of the employees to see if they had
22     felt -- strike that.  Did you or your
23     supervisor after receiving the EEOC

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

**66**

ELIZABETH LINDEMANN -- 10/3/07

1     complaint, did you guys talk to any of the
2     workers who are a part of his team to see
3     if he had made any inappropriate sexual
4     remarks towards them?
5   A.  No.
6   Q.  Okay.  And there were other females, were
7     there not, who were a part of
8     Mr. Albright's team at that time that you
9     received the EEOC complaints?
10   A.  Yes.
11   Q.  Okay.  Now, you heard the testimony, did
12     you not, yesterday that Ms. Marshall claims
13     that she informed you about her complaints
14     about Mr. Albright which you deny that that
15     conversation ever took place --
16   A.  Yes.
17   Q.  -- is that correct?  Okay.
18          MR. ENLOE:  Object to form.
19          MR. BROWN:  Okay.  Objection
20           noted.
21   Q.  And you also remember Ms. Marshall
22     testified that she requested -- she asked
23     you if she could leave, do you recall that

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

**67**

ELIZABETH LINDEMANN -- 10/3/07

1     testimony?
2   A.  **Yes.**
3   Q.  Okay.  And are you saying that did not
4     happen, that she did not request -- she
5     didn't ask you if she could leave?
6   A.  **She requested if she could leave, yes.**
7   Q.  Okay.  And did you give her an answer to
8     her request?
9   A.  **Yes.**
10   Q.  Okay.  What did you tell her?
11   A.  **No.**
12   Q.  Okay.  Why did you tell her no?
13   A.  **Because based on what she was telling me,**
14     **there was no reason for her to leave work.**
15   Q.  Okay.  And when she came to you, did she
16     appear upset?
17   A.  **Yes.**
18   Q.  Okay.  Was she crying at all?
19   A.  **Not that I recall.**
20   Q.  Okay.  When she spoke with you, was there
21     anyone else present?
22   A.  **No.**
23   Q.  Okay.  It was just you and her?

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

**68**

ELIZABETH LINDEMANN -- 10/3/07

1   A.  **Just me.**
2   Q.  Where did this conversation take place?
3   A.  **In my office.**
4   Q.  Okay.  Is your office a closed door, or is
5     it like in an open corridor?
6          MR. ENLOE:  I don't mean -- I
7           don't want to step on your
8           questioning, but I think the
9           testimony yesterday was that
10           there were two times when they
11           talked, and so just for purposes
12           of clarity, you may want to --
13          MR. BROWN:  Yeah.  No, I'm just
14           asking her about the specific
15           issue regarding when Ms. Marshall
16           came to her and asked her to
17           leave.
18          MR. ENLOE:  Okay.  I understand.
19          MR. BROWN:  Yeah.  That's the
20           conversation that I'm referring
21           to.
22   Q.  And based on my understanding of your
23     testimony, she requested to you if she

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

69

ELIZABETH LINDEMANN -- 10/3/07

1    could leave, and you told her no.

2  A.  **Correct.**

3  Q.  Okay. And I asked you why you told her no,

4      and I believe you said based on what she

5      told you, you felt it was no need for her

6      to leave --

7  A.  **Yes.**

8  Q.  -- is that correct? And then I

9      subsequently asked you if she appeared to

10     be upset, and you said yes?

11 A.  **Yes.**

12 Q.  Okay. And I also asked you if -- was

13     anybody else present during that particular

14     conversation, and you replied no; is that

15     correct?

16 A.  **Yes.**

17 Q.  And this conversation happened in your

18     office?

19 A.  **Yes.**

20 Q.  Right? Which is a closed door?

21 A.  **Yes.**

22 Q.  Okay. Now, specifically, everything that

23     you can remember here today under oath,

70

ELIZABETH LINDEMANN -- 10/3/07

1      what did Ms. Marshall tell you when you

2      talked with her that time?

3  A.  **She told me Mr. Albright was picking on**

4      **her.**

5  Q.  Okay.

6  A.  **And I asked her to explain that, and her**

7      **explanation was that he was making her do**

8      **her aisle without anybody's help.**

9  Q.  Okay. And so just so I'm clear, she came

10     to you and told you that Mr. Albright was

11     picking on her; is that correct?

12 A.  **Yes.**

13 Q.  And do you know the date of this

14     conversation, was that sometime in July?

15 A.  **Yes.**

16 Q.  Of '05?

17 A.  **Yes.**

18 Q.  Do you recall a specific date?

19 A.  **I believe it was the 20th.**

20 Q.  Okay. The 20th of July. Do you remember

21     if it was in the morning or afternoon?

22 A.  **That conversation in the morning.**

23 Q.  Okay. Do you know around what time, 7:30,

71

ELIZABETH LINDEMANN -- 10/3/07

1      8:30, 10:30?

2  A.  **About 8:45.**

3  Q.  Okay. Okay. And when she indicated to you

4      that Mr. Albright was picking on her, you

5      asked her to explain; right?

6  A.  **Yes.**

7  Q.  And she -- is it your testimony she did not

8      explain what she meant?

9  A.  **She explained in the form of, he was making**

10     **me do my job and not letting anyone help**

11     **me. That was her explanation of picking on**

12     **me.**

13 Q.  Okay. Was there anything else that

14     Ms. Marshall said to you at that particular

15     time?

16 A.  **No.**

17 Q.  Okay. Was there anything else that you

18     said in response to Ms. Marshall's

19     complaint?

20 A.  **No.**

21 Q.  Okay. Now, just so I'm getting my point of

22     reference correct, on July 20th of '05

23     around 8:45 -- I'm not going to hold you to

72

ELIZABETH LINDEMANN -- 10/3/07

1      the exact time, but around 8:45 during that

2      particular conversation, did Ms. Marshall

3      ask you to go home?

4  A.  **Yes.**

5  Q.  Okay. And you told her no?

6  A.  **That's correct.**

7  Q.  Okay. Now, in response to her complaint,

8      did you go talk to Mr. Albright?

9  A.  **No. I went -- I spoke to -- or sent an**

10     **e-mail to Dave Harris, the Operations**

11     **Manager --**

12 Q.  Okay.

13 A.  **-- because it had to do with work**

14     **assignments, in my opinion, so I wanted to**

15     **find out more about what was going on in**

16     **the area.**

17 Q.  Okay. So you basically construed that

18     Ms. Marshall's complaint had to do with a

19     work assignment?

20 A.  **Yes.**

21 Q.  Okay. Now, is it uncommon -- was it

22     uncommon let me say it, let me just keep it

23     back in 2005, was it uncommon back in 2005

73

ELIZABETH LINDEMANN -- 10/3/07

1    at various different stages for Glovis
2    employees to get help from other employees?
3    Was it uncommon?
4  **A.  It happened.**
5  Q.  Okay.  And from some of the materials, now,
6    we'll talk about this a little later, but
7    from some of the materials that I've
8    reviewed, isn't it a fact that Glovis
9    employees are encouraged to be serious
10   about teamwork?
11 **A.  Yes.**
12 Q.  Okay.  And to help other employees when the
13   need arises?
14 **A.  Yes.**
15 Q.  Okay.  So, do you think it was
16   unreasonable, depending on the nature of
17   the complaint, for Ms. Marshall at certain
18   points to expect help?
19 **A.  No.**
20 Q.  Okay.  So when she lodged that complaint
21   with you around 8:45 on July 20th, you
22   didn't talk to Mr. Albright, but you, in
23   fact -- did you send an e-mail to

74

ELIZABETH LINDEMANN -- 10/3/07

1    Mr. Harris?
2  **A.  Yes.**
3  Q.  Okay.  I believe we talked about that
4    yesterday, and we'll, kind of, talk about
5    the e-mail a little later, and you've told
6    me that you opined that her concern had
7    more to do with a work assignment?
8  **A.  Yes.**
9  Q.  Okay.  Now, you told me earlier that in the
10   early part of July of 2005 that Glovis went
11   to a second shift --
12 **A.  Yes.**
13 Q.  -- is that correct?  And Glovis went to
14   that second shift before July 20th of '05,
15   did they not?
16 **A.  I believe so, yes.**
17 Q.  Okay.  And when Ms. Marshall was doing her
18   AIDT training, she did that during her
19   first shift; correct?
20 **A.  AIDT training classes --**
21 Q.  Yeah.
22 **A.  -- were held in the evening on their own**
23 **     time.**

75

ELIZABETH LINDEMANN -- 10/3/07

1  Q.  Okay.  Let me -- and I appreciate that
2    clarification.  When Ms. Marshall began to
3    work, she was working on first shift;
4    right?
5  **A.  Yes.**
6  Q.  And according to Ms. Marshall's testimony,
7    she was hired for the second shift; is that
8    correct?
9  **A.  Yes.**
10 Q.  Now, Ms. Marshall, even though she was
11   hired for the second shift, she reported on
12   the first shift; is that correct?
13 **A.  Yes.**
14 Q.  And I would assume she reported on the
15   first shift, because she was expected to
16   report on the first shift?
17 **A.  She -- yes.**
18 Q.  Okay.  And so you didn't have any problem
19   with Ms. Marshall initially reporting on
20   the first shift, do you?
21 **A.  No.**
22 Q.  Okay.
23 **A.  We asked her to.**

76

ELIZABETH LINDEMANN -- 10/3/07

1  Q.  That's right.  And even though she was
2    hired for the second shift, it would have
3    been Glovis' responsibility to tell her
4    when they wanted her to start working the
5    second shift as she was hired to do?
6  **A.  Yes.**
7  Q.  Initially.  Okay.  And when the second
8    shift started -- I'm saying when Glovis
9    implemented the second shift, at that time
10   nobody came to Ms. Marshall and told her
11   that you were hired for the second shift
12   and you need to work on the second shift;
13   is that correct?
14 **A.  I don't -- I mean, I don't know.**
15 Q.  You didn't?
16 **A.  I know I did not.**
17 Q.  Okay.  And as a matter of fact,
18   Ms. Marshall continued to report to Glovis
19   working on the first shift after the second
20   shift was implemented?
21 **A.  Correct.**
22 Q.  Okay.  And after Ms. Marshall made her
23   initial complaint to you on July 20th of

**77**

ELIZABETH LINDEMANN -- 10/3/07

1  '05 around 8:45, you sent an e-mail to Dave
2  Harris; is that correct?
3  A.  Yes.
4  Q.  And then some time after that, Ms. Marshall
5  was told that she would have to report on
6  the second shift the following week?
7  A.  Yes.
8  Q.  Okay.  And isn't it true that after she, in
9  fact, made her initial complaint to you on
10 July 20th of '05 that someone went back,
11 and I guess they looked at some information
12 and decided that she was hired for the
13 second shift?
14       MR. ENLOE:  Object to form.
15 Q.  Isn't that true?
16 A.  They -- yes.
17 Q.  Okay.  And do you know who that person was
18 that went back and looked at some
19 information and decided that she was hired
20 for the second shift?
21 A.  Dave Harris.
22 Q.  Okay.  Now, do you know why Mr. Harris
23 shortly after Ms. Marshall made her first

**78**

ELIZABETH LINDEMANN -- 10/3/07

1  complaint to you on July 20th of '05 would
2  go back and look at some information
3  pertaining to Ms. Marshall regarding when
4  she should work?
5  A.  No.
6  Q.  Okay.  So you don't have any -- you haven't
7  talked to Mr. Harris as to why he took that
8  action?
9  A.  No.
10 Q.  Now, do you know if after
11 Ms. Marshall made the initial complaint to
12 you indicating that Mr. Albright was
13 picking on her, do you know if Dave Harris
14 spoke with Ellis Albright at all?
15 A.  I don't know.
16 Q.  Okay.  Do you know if Dave Harris as
17 operation manager undertook an
18 investigation into Ms. Marshall's
19 complaints?  About Mr. Albright picking on
20 her.
21 A.  I believe so, yes.
22 Q.  You believe he did.  And can you tell me
23 everything that you remember that

**79**

ELIZABETH LINDEMANN -- 10/3/07

1  Mr. Harris did in that investigation?
2  A.  Honestly, I don't know.
3  Q.  Okay.  Do you know if he talked with Ellis
4  Albright?
5  A.  I don't know.
6  Q.  Well, as -- at that particular time, you
7  were the assistant -- were you the
8  Assistant Human Resource Specialist, was
9  that your title?
10 A.  I was the Human Resource Specialist.
11 Q.  Okay.  Human Resource Specialist.  Now, at
12 that time part of your responsibility would
13 have been to address any legitimate
14 employee concerns regarding work; is that
15 correct?
16 A.  Yes.
17 Q.  Okay.  And once you sent the e-mail to
18 Mr. Harris about Ms. Marshall's complaints,
19 you didn't do anything else as the HR
20 Specialist pertaining to that particular
21 matter?
22 A.  After I forwarded to Dave Harris, I let him
23 look into her complaint about -- because I

**80**

ELIZABETH LINDEMANN -- 10/3/07

1  thought it was production related.
2  Q.  Okay.  So just so I'm clear, you don't deem
3  a fellow employee complaining about another
4  employee specifically making allegations
5  that that team leader was picking on her,
6  you deem that to be a production-related
7  issue and not a human-resource-related
8  issue?
9       MR. ENLOE:  Object to form.
10      MR. BROWN:  Objection noted.
11 A.  I came to that conclusion based on the
12 contents of what she said he was picking on
13 her.
14 Q.  Okay.  Explain when you said the context?
15 A.  Well, when she said he was picking on me,
16 not letting people help lift, you know, I
17 took that as more of a production issue
18 versus not necessarily the people issue.
19 Q.  Okay.  So although we've talked earlier
20 that teamwork is something that's
21 encouraged by employees, and it's also
22 documented in some of the materials that
23 your attorney turned over to me about the

81

ELIZABETH LINDEMANN -- 10/3/07

1  encouragement of teamwork, that whenever an
2  employee makes an allegation that they are
3  not getting the appropriate assistance, to
4  you is that a teamwork issue?
5  A.  **It depends on what the assistance --**
6  Q.  Okay.
7  A.  **-- that they are not getting is.**
8  Q.  I understand.  Prior to Ms. Marshall making
9      her first complaint to you on July 20th of
10     '05, had you ever known her to complain
11     about Mr. Albright?
12 A.  **I had never received anything.**
13 Q.  Okay.  Had you -- did you receive any
14     information that she was not performing her
15     job satisfactorily?
16 A.  **No.**
17 Q.  Now, if there had been some concerns about
18     Ms. Marshall's productivity, he most likely
19     would have communicated that to Dave;
20     right?
21 A.  **Correct.**
22 Q.  To Dave Harris?
23 A.  **Correct.**

82

ELIZABETH LINDEMANN -- 10/3/07

1  Q.  And then if Dave thought it was
2      appropriate, he might report that to you?
3  A.  **Yes.**
4  Q.  Okay.  Back in July of 2005, did you guys
5      have any production problems with any
6      employees back in July of 2005?
7  A.  **Possibly, I --**
8  Q.  Okay.  You just can't remember?
9  A.  **It's --**
10 Q.  Okay.  Reason I'm asking you that question,
11     because I'm trying to get an understanding
12     is regarding the normal practices whenever
13     you would have a problem -- regardless of
14     what the problem is --
15 A.  **Uh-huh.**
16 Q.  -- it's a production-related problem,
17     however you want to categorize it, but when
18     you have a problem with an employee, would
19     a team leader like Mr. Wells or
20     Mr. Albright, if they had a problem, would
21     they generally report it to Operation
22     Manager, Dave Harris and then would
23     Mr. Harris subsequently tell you about it.

83

ELIZABETH LINDEMANN -- 10/3/07

1  A.  **Yes.**
2  Q.  Okay.  And prior to the July 20th incident
3      involving Ms. Marshall, you had not
4      received any information as the HR
5      Specialist that there was any problem with
6      how Ms. Marshall was performing her job?
7  A.  **No.**
8  Q.  No issues of punctuality and tardiness?
9  A.  **No.**
10 Q.  Okay.
11 A.  **Not that I recall.**
12 Q.  Okay.  No issues that she was not a team
13     player; correct?
14 A.  **No.**
15 Q.  Okay.  No issues that she had previously
16     reported to work late or left early;
17     correct?
18 A.  **Correct.**
19 Q.  Now, there's been some discussion about
20     Glovis' position that Ms. Marshall
21     abandoned her job, do you remember that
22     testimony?
23 A.  **Yes.**

84

ELIZABETH LINDEMANN -- 10/3/07

1  Q.  Okay.  Now, if someone leaves early, okay,
2      that could be a terminable offense; is that
3      correct?
4  A.  **Yes.**
5  Q.  Okay.  But it doesn't have to be a
6      terminable offense; is that correct?
7  A.  **Correct.**
8  Q.  Okay.  Whether it's a terminable offense or
9      not, that's within the discretion of
10     Glovis?
11 A.  **Yes.**
12 Q.  Okay.  Now, when Ms. Marshall left early,
13     okay, based on her understanding that you
14     had given her permission, and you contested
15     that didn't happen, okay, I understand
16     that.  I want to make the record clear on
17     that.  Do you know why, if she abandoned
18     her job, why she would report the following
19     Monday to her job?
20 A.  **No.**
21 Q.  It doesn't make much sense, does it?
22         MR. ENLOE:  Object to form.
23 Q.  I mean, does it -- does that make sense to

85

ELIZABETH LINDEMANN -- 10/3/07

1   you?

2   A.   **No.**

3   Q.   Okay.  And isn't it true that when

4        Ms. Marshall reported the following Monday

5        that she was allowed to work several hours?

6   A.   **That did happen, yes.**

7   Q.   Okay.  So she was allowed to come in and

8        clock in; correct?

9   A.   **Yes.**

10  Q.   Okay.  And able to receive her daily work

11       instructions from Mr. Albright or

12       Mr. Wells; correct?

13  A.   **Yes.**

14  Q.   And begin production; correct?

15  A.   **Yes.**

16  Q.   Now, I understand that you made a decision

17       to hire her.  Who made a decision to

18       terminate Ms. Marshall?

19  A.   **Dave Harris.**

20  Q.   Okay.  And as a operations manager at that

21       time in 2005, is it your testimony

22       Mr. Harris had the authority to terminate

23       employees?

86

ELIZABETH LINDEMANN -- 10/3/07

1   A.   **Yes.**

2   Q.   Did he have the sole authority to do that?

3   A.   **The sole authority?**

4             MR. ENLOE:  Object to form.

5   Q.   Uh-huh.

6   A.   **No.**

7   Q.   Okay.  So would it have been more like a

8        recommendation for termination?

9   A.   **Possibly.**

10  Q.   Okay.  Did you concur in Mr. Harris's

11       recommendation that Ms. Marshall should be

12       terminated?

13            MR. ENLOE:  Object to form.

14            MR. BROWN:  Let me rephrase that.

15            That's a good objection.  I need

16            to lay a predicate.

17  Q.   Did you at any time recommend that

18       Ms. Marshall should be terminated?

19  A.   **Yes.**

20  Q.   Okay.  And when did you give that

21       recommendation?

22  A.   **Sometime that morning I received a phone**

23       **call from Dave Harris stating that she was**

87

ELIZABETH LINDEMANN -- 10/3/07

1   at work.

2   Q.   Okay.  Anything else to Dave you said other

3        than you said she was at work?

4   A.   **No.**

5   Q.   Okay.  Dave -- he didn't tell you during

6        that conversation that he thought she

7        should be terminated?

8   A.   **Yes.**

9   Q.   Okay.  So he told you that Monday that he

10       thought she should be terminated?

11  A.   **He told me on the phone.  I don't remember**

12       **what day of the week it was to be honest**

13       **with you.**

14  Q.   Okay.  You don't remember if it was the

15       following Monday or not; is that correct?

16  A.   **I know it was the next day.**

17  Q.   Okay.

18  A.   **But I can't tell you if that was a Monday**

19       **or a Friday.**

20  Q.   Did he tell you why he felt she should be

21       terminated?

22  A.   **Because she left the job without**

23       **permission.**

88

ELIZABETH LINDEMANN -- 10/3/07

1   Q.   Without whose permission?

2   A.   **Without anybody's permission.**

3   Q.   Did you explain or -- let me strike that.

4        Do you know if Dave was aware at the time

5        that he spoke with you or recommended that

6        Ms. Marshall should be terminated, was he

7        aware of the complaint that Ms. Marshall

8        made against Mr. Albright?

9             MR. ENLOE:  Object to form.

10  A.   **He was aware of the complaint that she made**

11       **to me.**

12  Q.   Right.  So what I'm saying is --

13  A.   **Uh-huh.**

14  Q.   -- let me just attack it from this

15       perspective, and I'm trying to establish

16       some sort of time line.

17  A.   **Okay.**

18  Q.   When Dave Harris spoke with you on the

19       telephone, okay, and recommended to you

20       that Ms. Marshall should be terminated,

21       okay, did he know at that time that

22       Ms. Marshall had claimed that Ellis

23       Albright was picking on her?

SUKENIA MARSHALL V. GLOVIS ALABAMA -- 10/3/07

89

ELIZABETH LINDEMANN -- 10/3/07

1    A.  Yes.
2    Q.  Okay.  And when he recommend that she be
3        terminated, did you tell him, yes, she
4        should be terminated?
5            MR. ENLOE:  Object to form.
6    A.  Yes.
7    Q.  Okay.  And was there anyone else -- was
8        this just a two-way conversation between
9        yourself and Mr. Harris?
10   A.  Yes.
11   Q.  Okay.  And do you know who informed
12       Ms. Marshall that she was terminated?
13   A.  Dave Harris.
14   Q.  Okay.  So -- and I just want to make sure I
15       understand the context.  Although
16       Ms. Marshall -- there was no concern, that
17       you were aware of, regarding her
18       performance at her job.  She had never left
19       her job early before.  She made a complaint
20       that a male employee was picking on her.
21       In spite of all that, she was terminated
22       solely -- at least I understand, she was
23       terminated solely because Glovis believed

90

ELIZABETH LINDEMANN -- 10/3/07

1        she abandoned her job?
2    A.  Yes.
3    Q.  And that was the sole reason for her
4        termination?
5    A.  Yes.
6    Q.  Okay.  All right.  Do you know around what
7        time that Mr. Harris informed Ms. Marshall
8        that she was terminated?
9    A.  No.
10   Q.  Okay.  You were not present when he
11       notified Ms. Marshall she was terminated;
12       correct?
13   A.  Correct.
14   Q.  Okay.
15           (Off-the-record discussion.)
16   Q.  I'm going to call your attention -- well,
17       first of all, just review that, please,
18       Liz, and just tell me when you're ready,
19       we'll do it in that respect.  And I'm just
20       going to ask you about GLOVIS document 3
21       right now --
22   A.  Okay.
23   Q.  -- and ask you to identify that document.

91

ELIZABETH LINDEMANN -- 10/3/07

1    A.  The bottom portion's the e-mail I sent to
2        Mr. Harris, and the top portion is his
3        response.
4    Q.  Okay.  Now, as a matter of clarification,
5        we didn't get into this yesterday.  At the
6        bottom portion, your e-mail that was sent
7        to Dave, Subject:  Breakdown, do you see
8        that?
9    A.  Yes.
10   Q.  That says Wednesday -- it looks to me like
11       there's some sort of computer error.  Looks
12       like that should be 7/20/05 at 9:03 a.m.,
13       do you agree with that?  It says 05/07/20.
14   A.  Yes.
15   Q.  Okay.
16           MR. ENLOE:  I think that's
17           European-style dating.
18           MR. BROWN:  Well, I -- yeah.  I'm
19           not familiar with that, because
20           I'm an American.
21           MR. ENLOE:  Yeah, I know.  Day,
22           month, and year --
23           MR. BROWN:  Okay.  Okay.

92

ELIZABETH LINDEMANN -- 10/3/07

1            MR. ENLOE:  -- is how they
2            typically do it.
3    Q.  Okay.  So this would have been July 20th of
4        '05; right?
5    A.  Yes.
6    Q.  But then at the top, Mr. Harris's e-mail to
7        you, that appears to be American style.
8        That's -- it says month, day, year; right?
9    A.  Yes.
10   Q.  Okay.  And what about the time, is the time
11       also American or European?  It says 7:19
12       a.m., that seems to be American to me; is
13       that correct?
14   A.  I guess, it would be American.
15   Q.  Yeah.  And then your e-mail is 9:03 a.m.;
16       correct?
17   A.  Yes.
18   Q.  Now, it appears to me, and you correct me
19       if I'm wrong, from the context of your
20       e-mail and Dave's e-mail, it appears that
21       Dave's e-mail is in response to your
22       initial e-mail?
23   A.  Yes.

93

ELIZABETH LINDEMANN -- 10/3/07

1    Q.    Okay.  So we got a problem with the time
2          here, and I need your help on that, because
3          it says that your e-mail went to him at
4          nine --
5                THE REPORTER:  Excuse me.
6                MR. BROWN:  Okay.
7    Q.    Okay.  It says that your e-mail went to him
8          at 9:03 a.m., on the morning of July 20th
9          of 2005?
10   A.    Yes.
11   Q.    Then it says he responded to you at 7:19 on
12         that same morning.  Can you explain that
13         discrepancy?
14   A.    Other than, I don't, you know, if the clock
15         on the computer wasn't set accurately.
16   Q.    Okay.
17   A.    I, you know, I don't know.
18   Q.    Okay.  Can you explain why it appears that
19         your e-mail to him -- and I'm using your
20         counsel's words -- is sent on a European
21         format and Dave's response to you appears
22         to be on an American format?
23   A.    It would depend on who set up his computer,

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

94

ELIZABETH LINDEMANN -- 10/3/07

1          I believe.
2    Q.    I understand.  You guys don't have a
3          synchronized computer system?
4    A.    We do now.
5    Q.    Okay.  But you didn't back in '05?
6    A.    No.  We had just -- they were just getting
7          all of those things set up.  We were in
8          start-up stage.
9    Q.    Okay.  All right.  You did testify that --
10         and hopefully this refreshes your
11         recollection a little bit.  You had
12         testified that Sukenia -- Ms. Marshall,
13         excuse me, did come to you on the 20th of
14         July at around 8:45, and that's what this
15         e-mail says so it seems like that we got a
16         pretty good time frame of when she
17         initially told you that she had some
18         concerns about Mr. Albright; is that
19         correct?
20   A.    Yes.
21   Q.    And then you, you also testified that you
22         sent an e-mail to Mr. Harris, which is
23         evidenced on GLOVIS No. 3 document --

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

95

ELIZABETH LINDEMANN -- 10/3/07

1    A.    Yes.
2    Q.    -- is that correct?  Now --
3                MR. ENLOE:  And for the record,
4                    this is also, I believe,
5                    Defendant's Exhibit 7 from
6                    Ms. Marshall's deposition.
7                MR. BROWN:  Yes.
8    Q.    Okay.  Now, she told you, did she not, that
9          she talked with Tim the day before, or am I
10         not reading that correctly?
11   A.    She mentioned it, yes.
12   Q.    Okay.  And what's Tim's last name?
13   A.    Wells.
14   Q.    And that's the other team leader?
15   A.    Yes.
16   Q.    Okay.  Now, did I understand you didn't
17         talk with Mr. Albright, did you talk with
18         Mr. Wells about Ms. Marshall's complaint.
19         And I'm saying, the complaint she made to
20         you on July 20th of '05 which is the
21         subject of this e-mail?
22   A.    No.
23   Q.    Okay.  Okay.  Now, you also indicate in

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

96

ELIZABETH LINDEMANN -- 10/3/07

1          this e-mail that you told Ms. Marshall that
2          you would talk with Dave Harris about it --
3    A.    Yes.
4    Q.    -- is that accurate?
5    A.    Yes.
6    Q.    And that you would sit down and discuss
7          further?
8    A.    Well, it says she would like to sit down
9          and discuss further.
10   Q.    That's correct.  Okay.  Did -- were there
11         any further discussions that you had with
12         Ms. Marshall about her initial complaint?
13   A.    She spoke with Dave, and after that
14         conversation, she had let me know that she
15         spoke with Dave.
16   Q.    Okay.  Now, Dave's -- you know, even though
17         we're, kind of, mixed up on the times and
18         dates and all that, and I understand that
19         you said you guys were just implementing
20         your system, just getting up and running,
21         we know that Dave's e-mail was in response
22         to your initial e-mail; is that correct?
23   A.    Yes.

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

SUKENIA MARSHALL V. CLOVIS ALABAMA -- 10/3/07

97

ELIZABETH LINDEMANN -- 10/3/07

1   Q.   And Dave says that this employee has been
2        reported to have been having problems
3        staying in her area as instructed, do you
4        see that?
5   A.   Yes.
6   Q.   Okay.  Was that the first time you had been
7        informed that alleged Ms. Marshall had been
8        having problems staying in her area?
9   A.   Yes.
10  Q.   Okay.  He also goes on to say that she's
11       had problems working with others and
12       actually does what she pleases, do you see
13       that?
14  A.   Yes.
15  Q.   Okay.  Was that your first time back on
16       July 20th of '05 being notified of that
17       alleged problem?
18  A.   Yes.
19  Q.   Okay.  Then it goes on to say, Ellis -- is
20       he referring to Ellis Albright?
21  A.   Yes.
22  Q.   Is trying to work with her, but this is a
23       case where she just does not think she has

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

99

ELIZABETH LINDEMANN -- 10/3/07

1   A.   Yes.
2   Q.   And number three, it also can have a
3        negative consequence on the financial
4        vitality of the company; is that correct?
5   A.   Yes.
6   Q.   Okay.  So you don't deem if an employee is
7        not staying in their area and if they're
8        doing what they want to do that's just not
9        a minor incident, is it?
10            MR. ENLOE:  Object to form.
11            MR. BROWN:  Okay.
12  A.   No.
13  Q.   Okay.  Do you know if these alleged
14       problems that Ms. Marshall was having if
15       these factored in to Dave's recommendation
16       that she be terminated?
17  A.   No --
18  Q.   You don't know?       ———
19  A.   -- I don't know.
20  Q.   Okay.  But based on your testimony, your
21       sole reason for recommending that
22       Ms. Marshall be terminated was because you
23       believed she abandoned her job --

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

98

ELIZABETH LINDEMANN -- 10/3/07

1        a boss, do you see that?
2   A.   Yes.
3   Q.   Okay.  Now, the term "boss", is he
4        referring to Ellis?
5   A.   I assume so.
6   Q.   Okay.  And assuming that Ms. Marshall was
7        not staying in her area and she was having
8        problems working with one another,
9        generally those would be offenses that
10       would at lease require a written reprimand,
11       would they not?
12  A.   Initially, it would probably be a verbal.
13  Q.   Okay.  But it would be something -- in
14       other words what I'm saying is, no employer
15       can allow an employee not to stay in their
16       area and do what that particular employee
17       wants to do, would you agree with that?
18  A.   Yes.
19  Q.   Because that's not only -- it's disruptive
20       to other employees, would you agree?
21  A.   Yes.
22  Q.   And number two, it affects production;
23       correct?

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

100

ELIZABETH LINDEMANN -- 10/3/07

1   A.   Yes.
2   Q.   -- is that correct?  Okay.  Now, when you
3        agree with Dave that she should be
4        terminated, you had already received this
5        e-mail; isn't that correct?
6   A.   Yes.
7   Q.   Okay.  Now, when -- and do you deem an
8        issue when an employee is not staying in
9        their area and they are doing what they
10       want to do, do you deem that to be an HR
11       issue as well as a production issue?
12  A.   Yes.
13  Q.   Okay.  And once you receive this e-mail
14       from Dave, you didn't talk with
15       Ms. Marshall about these issues, did you?
16  A.   No.  Because after I received this e-mail,
17       he had -- he met with her.
18  Q.   Oh, okay.  Dave met with her?
19  A.   Yes.
20  Q.   Okay.  And do you know what Dave met with
21       her about?
22  A.   The e-mail that I had sent about her
23       complaint that Mr. Albright was picking on

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

101

ELIZABETH LINDEMANN -- 10/3/07

1      her --
2   Q.   Okay.
3   A.   -- and telling people not to help her.
4   Q.   Okay.  So it's your testimony that Dave
5        didn't meet with her about not staying in
6        her area and doing what she wanted to do?
7   A.   I don't know.
8   Q.   Okay.  You don't have any independent
9        knowledge of it is what I'm asking?
10  A.   That's correct.
11  Q.   Okay.  And is it my understanding Dave told
12       you that he would meet with Ms. Marshall?
13  A.   Yes.
14  Q.   Okay.  Do you have any independent
15       knowledge as to whether that meeting ever
16       took place?
17  A.   Only from her and him both saying that they
18       met with each other.
19  Q.   Okay.  When did you learn that Ms. Marshall
20       met with Dave Harris?
21  A.   It was sometime that same day.  I don't
22       know the exact time.
23  Q.   Was it is later on that afternoon or later

102

ELIZABETH LINDEMANN -- 10/3/07

1        on that morning, or do you know?  If you
2        don't know, I understand.
3   A.   I don't know the exact time.  I know it was
4        the same day.
5   Q.   Okay.  Now, this -- and I'm saying this,
6        I'm talking about these e-mails --
7   A.   Okay.
8   Q.   -- just so we can establish a sufficient
9        time reference, this took place before
10       Ms. Marshall left early; is that correct?
11  A.   Yes.
12  Q.   Okay.  All right.  So in Dave's e-mail --
13       and I just want to be clear, there is no
14       discussion about the problem that she
15       claims to have had with Mr. Albright; is
16       it?
17  A.   Not in that one, no.
18  Q.   Okay.  Is there another e-mail in which --
19       because I would like to know about it.  Is
20       there another e-mail in which Dave has sent
21       to you in which he addresses Ms. Marshall's
22       complaint against Mr. Albright?
23  A.   The only other e-mail would be the one on

103

ELIZABETH LINDEMANN -- 10/3/07

1        page 2.
2   Q.   Okay.  And that was an e-mail that was sent
3        on July 21st; right, of '05?
4   A.   Yes.
5   Q.   And at that time she had been terminated?
6   A.   Yes.
7   Q.   Okay.  Right.  So we know that this July
8        21, '05 e-mail had come after the decision
9        had been made to terminate her; right?
10  A.   Yes.
11  Q.   Okay.  And, again, there had been no
12       inquiry, no investigation from yourself or
13       from Mr. Harris regarding her initial
14       complaint against Mr. Albright?
15           MR. ENLOE:  Object to form.
16  A.   From myself, no.
17  Q.   Okay.  And from Mr. Harris, are you saying
18       you don't know?
19  A.   I don't know.
20  Q.   Okay.
21  A.   All I have is this information.
22  Q.   I understand.  Did you -- when Dave called
23       you by telephone and recommended that

104

ELIZABETH LINDEMANN -- 10/3/07

1        Ms. Marshall be terminated, did you ask him
2        if he talked with Ellis Albright about
3        Ms. Marshall's concerns?
4   A.   No.
5   Q.   Okay.  Did you ask him if he had talked
6        with the other team leader, Tim Wells,
7        about Ms. Marshall's concerns?
8   A.   No.
9   Q.   Did you ask him if he had spoken with
10       anybody on Ms. Marshall's team about her
11       concerns?
12  A.   No.
13  Q.   Okay.  So basically the only thing you did
14       as an HR specialist, once Ms. Marshall
15       levied her concerns with you, the only
16       thing that you did -- and I'm not
17       minimizing it, I'm just saying just so the
18       record can be clear, the only thing that
19       you did is you sent the e-mail to Dave
20       Harris --
21  A.   Correct.
22  Q.   -- correct?  And you didn't take any
23       subsequent action to determine the validity

SUKENIA MARSHALL V. GLOVIS ALABAMA -- 10/3/07

105

ELIZABETH LINDEMANN -- 10/3/07

1    or the lack thereof of her complaint

2    against Mr. Albright.

3         MR. ENLOE:  Object to form.

4    A.   **No, I didn't take it further.**

5    Q.   Okay.  Now, on GLOVIS No. 2, Bates stamped

6         No. 2 which is the e-mail from Dave Harris

7         to you, July 21st of 2005, it says at 9:12

8         a.m.?

9    A.   **Yes.**

10   Q.   So it says Cc: Gino at -- who is Gino?

11   A.   **It was Mr. Jinho Choi.**

12   Q.   And what is his job -- what was his job

13        title back in 2005, again?

14   A.   **I know what it is now, I couldn't remember**

15        **the exact title at that point.**

16   Q.   Okay.  Was he -- I assume he was Dave's

17        superior and your superior?

18   A.   **Yes.**

19   Q.   Okay.  Now, he says -- and I'm, kind of,

20        wanting to go through them methodically is

21        his first thing is, is he says, just to

22        confirm the situation with Sukenia

23        Marshall, do you see that?

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

106

ELIZABETH LINDEMANN -- 10/3/07

1    A.   **Yes.**

2    Q.   Then he has, like, what I call highlighted

3         points.  It says on July 20th,

4         approximately 10 a.m., HR notified me that

5         Sukenia had issues with Ellis, and it

6         doesn't -- it leaves it blank.  I assume he

7         was referring to Ellis Albright; right?

8    A.   **Yes.**

9    Q.   And when he says HR, would he be referring

10        to your e-mail that we've just discussed?

11   A.   **Yes.**

12   Q.   Okay.  And then it goes on to say, she was

13        referred to manager for counsel, what -- do

14        you know what he's talking about?  Who's a

15        manager?

16   A.   **I would assume he was speaking about**

17        **himself, he was a manager of operations.**

18   Q.   Operations manager.  And I believe you said

19        you don't know -- well, you don't have any

20        personal knowledge of whether any

21        subsequent meeting occurred between

22        Ms. Marshall and Mr. Harris?

23   A.   **Other than what they both told me.**

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

107

ELIZABETH LINDEMANN -- 10/3/07

1    Q.   Okay.  Well, what did Ms. Marshall tell

2         you?

3    A.   **That she met with Dave Harris --**

4    Q.   That --

5    A.   **-- and that they worked it out.**

6    Q.   She told you that they worked what out?

7    A.   **Her problems that she was having about the**

8         **work assignments or the work.**

9    Q.   Well, she -- and I just want to be clear.

10   A.   **Uh-huh.**

11   Q.   When she came to you back on July 20th of

12        '05, her concern wasn't really about an

13        assignment, her concern was more the fact

14        that she felt that she was not being helped

15        when appropriate; is that correct?

16        MR. ENLOE:  Object to form.

17   A.   **Yes.**

18   Q.   Okay.  Now, again, the second point, it

19        says manager spoke with Sukenia, and you

20        opine that that is Dave Harris.  He's

21        referring to himself as manager?

22   A.   **Yes.**

23   Q.   Okay.  And it goes on to say he spoke with

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

108

ELIZABETH LINDEMANN -- 10/3/07

1         Sukenia, understood her complaint regarding

2         Ellis -- again, we know Ellis is Ellis

3         Albright.  It was due to him cussing,

4         giving her instructions, always picking her

5         out for work assignment.  And then it goes

6         on to say she complained that no one was

7         helping her, and that's when your referring

8         that Ms. Marshall -- your testimony is

9         Ms. Marshall told you that everything had

10        been worked out between herself and

11        Mr. Albright -- strike that.  I'm sorry.

12        Ms. Marshall -- you understood that

13        Ms. Marshall's concerns that she had with

14        Mr. Albright had been worked out with Dave?

15   A.   **Yes.**

16   Q.   Okay.  And then it goes on to say, next

17        bullet point, that about an hour later,

18        says manager was reviewing staffing records

19        and noted that Sukenia was hired for the

20        second shift but was still on the first.

21        Do you opine that Mr. Harris was the one

22        that reviewed the records?

23   A.   **Yes.**

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

SUKENIA MARSHALL V. CLOVIS ALABAMA -- 10/3/07

109

ELIZABETH LINDEMANN -- 10/3/07

1   Q.   Okay.  So what we now know is based on this
2        e-mail from Mr. Harris is that he reviewed
3        the staffing records pertaining to
4        Ms. Marshall after she made the complain
5        against Mr. Albright?
6   A.   Yes.
7   Q.   Okay.  Then it goes on to say, the manager
8        informed Sukenia that the situation may
9        change when she goes to the second shift,
10       and Monday start time was five p.m., do you
11       see that?
12  A.   Uh-huh, I do.
13  Q.   Do you know why if the situation was
14       resolved Mr. Harris would say the situation
15       may change?
16  A.   I don't know.
17  Q.   It just doesn't make sense, does it?
18            MR. ENLOE:  Object to form.
19  A.   I don't know really.
20  Q.   Let me just ask you this:  Now, you've
21       testified that Ms. Marshall told you that
22       the situation -- the concerns that she had
23       between herself and Mr. Albright had been

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

110

ELIZABETH LINDEMANN -- 10/3/07

1        resolved by Dave; is that correct?
2   A.   Yes.
3   Q.   Then Dave sends you -- after the decision
4        had been made to terminate her, Dave sends
5        you this e-mail on the 21st of July of '05
6        and says basically that Sukenia said, thank
7        you; correct?
8   A.   Yes.
9   Q.   And you were of the opinion based on what
10       Sukenia Marshall told you and based on this
11       e-mail that the situation had been resolved
12       between her and Mr. Albright?
13  A.   Yes.
14  Q.   Okay.  And then it says that manager
15       informed Sukenia that the situation may
16       change when she goes to second shift;
17       right?
18  A.   That's what it says, yes.
19  Q.   What situation is he talking about?
20  A.   I don't know.
21  Q.   Okay.  Now, why is he still talking about,
22       Mr. Harris, still talking about her going
23       to second shift if the decision had already

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

111

ELIZABETH LINDEMANN -- 10/3/07

1        been made to terminate her?
2            MR. ENLOE:  Object to form.
3   A.   The way I interpret this is he was -- he
4        just had -- he sent this e-mail previously,
5        the one on the first page.
6   Q.   I understand.
7   A.   This was a follow-up part of the e-mail
8        with his conversation from her on the 20th.
9   Q.   Yeah.  But this particular e-mail -- and it
10       says THU which is Thursday; right?
11  A.   Yes.
12  Q.   Right.  So what we know -- and I apologize
13       is that the incident in which she
14       initially -- Ms. Marshall reported to you
15       that Mr. Albright was picking on her
16       basically, that occurred the previous day
17       which would have been a Wednesday --
18  A.   Yes.
19  Q.   -- right?  And he told me earlier that
20       Mr. Harris called you by telephone and
21       recommended that she be terminated?
22            MR. ENLOE:  Object to form.
23  A.   He called on the 21st.

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

112

ELIZABETH LINDEMANN -- 10/3/07

1   Q.   Right.  Right.  Earlier on the 21st; right?
2   A.   Yes.
3   Q.   And is it your testimony that this occurred
4        before or after this e-mail, because I just
5        want to get it straight?
6            MR. ENLOE:  Are you referring to
7                 the e-mail on the 21st?
8            MR. BROWN:  Right, the e-mail on
9                 the 21st.
10  Q.   Did your telephone conversation with
11       Mr. Harris -- did it proceed this e-mail,
12       or was it subsequent to this e-mail of the
13       21st of July?
14  A.   I received this e-mail after I returned to
15       the office on the 21st.  I -- you know, I
16       was out of the office when he contacted me.
17  Q.   I understand, but my question is, did you
18       receive this e-mail before the telephone
19       conversation where the discussion of
20       termination occurred or subsequent to it?
21  A.   I received it after.
22  Q.   Okay.  After.  Okay.  Now, it also goes on
23       to say that the manager -- and do you opine

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

SUKENIA MARSHALL v. CLOVIS ALABAMA -- 10/3/07

113

ELIZABETH LINDEMANN -- 10/3/07

1    that that's still Mr. Harris?

2    A.   Yes.

3    Q.   Okay.  Manager informed her, referring to

4         Ms. Marshall, that it was not an option and

5         that no authorization was given for her to

6         be permanently on first shift; is that

7         correct?

8    A.   Yes.

9    Q.   Okay.  Then it goes on to say that

10        Ms. Marshall went to HR to discuss this

11        further, do you recall having any

12        conversation with Ms. Marshall about shift

13        changes?

14   A.   **She came back to my office a second time.**

15        **We did not discuss shift changes.**

16   Q.   Okay.  Do you know what Mr. Harris is

17        referring to when he says that she went to

18        HR office -- first of all, who is HR

19        office?

20   A.   **Me.**

21   Q.   Okay.

22   A.   **That's my office.**

23   Q.   Okay.  Do you know what Mr. Harris is

114

ELIZABETH LINDEMANN -- 10/3/07

1    referring to when he says that Ms. Marshall

2    went to the HR office to discuss further

3    with the manager?

4    A.   **I know that after their meeting on the**

5         **20th, they had both come down and asked the**

6         **question, both Dave Harris and Sukenia.**

7    Q.   Came to who?

8    A.   **To the HR office.**

9    Q.   To your office?

10   A.   **Uh-huh.  On the 20th.**

11   Q.   Okay.  When were you -- okay.  So

12        Ms. Marshall -- and I'm trying to get this

13        straight sequentially, Ms. Marshall and

14        Mr. Harris came down to your office

15        together?

16   A.   **Yes.**

17   Q.   And there was some discussion about a shift

18        change?

19   A.   **They asked for confirmation if she was**

20        **hired for second shift.**

21   Q.   Was it Ms. Marshall who asked for

22        confirmation, or was it Mr. Harris?

23   A.   **I don't recall who asked the question.**

115

ELIZABETH LINDEMANN -- 10/3/07

1    Q.   Okay.  Well, I don't -- Mr. Harris, if he

2         had already reviewed the staffing records,

3         there would be no need for him to ask about

4         whether she was hired for the second shift,

5         would it?

6              MR. ENLOE:  Object to form.

7    A.   **Other than clarification.**

8    Q.   Okay.  Okay.  I understand.  I understand

9         the objection.  So this is the second

10        conversation that you had with

11        Ms. Marshall on the 20th of July; is that

12        correct?

13   A.   **Yes.**

14   Q.   Okay.  Now, when Ms. Marshall came down

15        with Dave Harris, was anyone else present

16        with Ms. Marshall?

17   A.   **No.**

18   Q.   Okay.  So it was just yourself,

19        Ms. Marshall, and Dave Harris?

20   A.   **Correct.**

21   Q.   Okay.  And did you confirm that she was, in

22        fact, hired for the second shift?

23   A.   **Yes.**

116

ELIZABETH LINDEMANN -- 10/3/07

1    Q.   Okay.  How did you make that confirmation,

2         did you review some staffing records?

3    A.   **I looked at her file to review the offer**

4         **letter.**

5    Q.   Okay.  How long did it take you to do that?

6    A.   **A couple of seconds, I --**

7    Q.   Okay.  And what, if any, response did a

8         Ms. Marshall give to your confirmation

9         regarding the shift change?

10   A.   **I don't recall she said anything to me.**

11   Q.   Did she appear to be angry with you?

12   A.   **I don't remember.**

13   Q.   Okay.  Well, this issue with the

14        conversation -- brief conversation that you

15        had with her and Dave Harris about a shift

16        change, this occurred after she had made

17        her initial complaint to you; right?

18   A.   **Yes.**

19   Q.   Okay.  All right.  Now, the next point that

20        Mr. Harris makes is that Ms. Marshall

21        became very irritated.  Now, after -- when

22        she was in your office, you can't remember,

23        if I understand your testimony correctly,

117

ELIZABETH LINDEMANN -- 10/3/07

1    you can't remember if she appeared angry or
2    not; right?
3    A.  **That's correct.**
4    Q.  Okay.  Now, he says that -- he goes on to
5        say that not only was she irritated but she
6        walked off the job without authorization
7        stating that she must leave.  Do you see
8        that?
9    A.  **Yes, I see that.**
10   Q.  Okay.  Now, this alleged job abandonment,
11       this occurred in the afternoon of July 20th
12       of '05, did it not?
13   A.  **Yes.**
14   Q.  Okay.  Now, did Ms. Marshall allegedly walk
15       off the job without authorization in your
16       presence, was that in your presence?
17   A.  **I don't understand.**
18   Q.  Was it -- in other words, what I'm saying
19       is, and I understand Glovis' contention,
20       but what I'm trying to figure out is when
21       she allegedly left early without
22       permission, okay, did she do that in your
23       presence?

118

ELIZABETH LINDEMANN -- 10/3/07

1        MR. ENLOE:  Object to form.
2    A.  **I was in the building.**
3    Q.  Let me --
4    A.  **Yeah, I guess, I'm not understanding.**
5    Q.  No, no.  Let me ask you this way:  Did you
6        see her?  Did you physically with your two
7        eyes see her leave early -- and I'm
8        saying -- when I say she, I'm talking about
9        Ms. Marshall on July 20th of '05?
10   A.  **No.**
11   Q.  Okay.  Did she tell you that she must
12       leave, Ms. Marshall?
13   A.  **Yes.**
14   Q.  She told you she must leave?
15   A.  **Yes.**
16   Q.  Okay.  So now -- so when did she tell you
17       that she must leave?
18   A.  **She stated it earlier that morning, and she**
19       **stated it the second time she came to my**
20       **office.**
21   Q.  Now, the second time she came to your
22       office would have been with Mr. Harris;
23       right?

119

ELIZABETH LINDEMANN -- 10/3/07

1    A.  **Correct.**
2    Q.  And that was regarding the confirmation of
3        the shift change; right?
4    A.  **Yes.**
5    Q.  So just so my time line is in order, she
6        first came to your office on the morning of
7        July 20th of '05.  She told that you
8        Mr. Albright had been picking on her, she
9        had not been getting help, and she
10       requested to leave early; right?
11   A.  **Yes.**
12   Q.  And you told her no?
13   A.  **Yes.**
14   Q.  Then later on that day when she comes down
15       to your office with Mr. Harris to confirm
16       the shift change, and you reviewed the
17       records, and you said, yes, they said you
18       were hired to work second shift; right?
19   A.  **Yes.**
20   Q.  So you confirm the shift change, okay?  And
21       after you confirm the shift change, it's
22       your testimony that Ms. Marshall said, I
23       must leave?

120

ELIZABETH LINDEMANN -- 10/3/07

1    A.  **Yes.**
2    Q.  Okay.  Then it says manager was informed by
3        HR that she left the job without
4        authorization after discussion.  HR is you;
5        right?
6    A.  **Yes.**
7    Q.  Okay.  And is Mr. Harris right that you
8        informed him that Ms. Marshall left without
9        authorization?
10   A.  **Yes.**
11   Q.  Okay.  When did you notify Mr. Harris of
12       this?
13   A.  **I don't -- sometime on the 20th.  Someone**
14       **had let me know that she was not in the**
15       **building, that she had left.**
16   Q.  Who let you know if she was --
17   A.  **I have no idea.**
18   Q.  Okay.  African American, Caucasian?
19   A.  **I really don't remember.**
20   Q.  Male or female?
21   A.  **I don't remember.**
22   Q.  So as an HR specialist, you didn't think it
23       was important to know who told you that a

121

ELIZABETH LINDEMANN -- 10/3/07

1   fellow employee had left the job without
2   authorization?
3               MR. ENLOE: Object to form.
4               MR. BROWN: Objection noted.
5               MR. ENLOE: You can answer.
6   A.  I considered it important. I just didn't
7       write it down at that time.
8   Q.  Okay. And did you -- do you know if Glovis
9       gave -- well, let me strike that. Did you
10      help formulate a response to -- let me
11      strike that. Did you give information to
12      the EEOC in response to Ms. Marshall's
13      complaint?
14  A.  Did I?
15  Q.  Yeah.
16  A.  No.
17  Q.  Okay. You didn't given any information
18      whatsoever; right?
19              MR. ENLOE: Are --
20              MR. BROWN: I understand about the
21          attorney situation, I'm not
22          asking that. I'm asking about
23          the EEOC.

122

ELIZABETH LINDEMANN -- 10/3/07

1               MR. ENLOE: Are you asking if
2           Ms. Lindemann directly gave
3           information --
4               MR. BROWN: Right. Right.
5               MR. ENLOE: -- or if she gave it
6           to someone else --
7               MR. BROWN: No, I'm asking if she
8           directly gave information.
9   A.  No.
10  Q.  Okay. And did you give the information to
11      your attorney?
12  A.  Yes.
13  Q.  Okay. Now, when you informed -- well, let
14      me strike that. When this person you don't
15      know their race, their gender, their
16      ethnicity, when this person informed you
17      that Ms. Marshall left a job without
18      authorization, what, if any, action did you
19      take?
20  A.  At that time other than letting Dave Harris
21      know, I don't recall taking any action at
22      that time.
23  Q.  Okay. You had Ms. Marshall's contact

123

ELIZABETH LINDEMANN -- 10/3/07

1   information, did you not?
2   A.  Yes.
3   Q.  Her telephonic contact information?
4   A.  Yes.
5   Q.  You didn't undertake to call Ms. Marshall
6       to see if there was any reasonable
7       explanation as to why she left the job
8       early?
9   A.  No.
10  Q.  Okay. Did you assume as to why she left
11      the job early?
12  A.  No.
13  Q.  Okay. When you informed -- tell me
14      everything that you can remember when you
15      informed Dave Harris that she left the job
16      early. If you can tell me everything that
17      you can remember here today that you told
18      Dave about that?
19  A.  I contacted him and told him that I was
20      notified she had left early.
21  Q.  Did you tell him who you were notified by?
22  A.  I don't believe that I did. I don't
23      remember.

124

ELIZABETH LINDEMANN -- 10/3/07

1   Q.  Okay. Now, when this person notified you
2       that Ms. Marshall had left early, did you
3       try to confirm if that was accurate or not,
4       did you go back on the floor to canvas the
5       area to see if you saw her?
6   A.  No.
7   Q.  Okay. Well, one thing we know is
8       Mr. Albright didn't tell you she left
9       early, did he?
10  A.  I don't remember who told me.
11  Q.  Could have been Mr. Albright, could have
12      been Mr. Wells, you just don't know?
13  A.  That's correct.
14  Q.  And I believe you said that there were
15      about ten workers on the line at that
16      time -- on her production line?
17  A.  In that department, yes.
18  Q.  Okay. So it could have been any one of
19      those ten individuals that could have told
20      you?
21  A.  Yes.
22  Q.  Okay. So when this person told you that
23      she left early, you didn't canvas the area

125

1   to confirm that she had left or not;
2   correct?
3   **A.   Correct.**
4   Q.   Okay.  Do you give an opinion as to what
5       time Ms. Marshall left early?
6   **A.   I don't know.**
7   Q.   Okay.  You don't know if it was a morning
8       or afternoon?
9   **A.   I know it was afternoon, that's all I --**
10  Q.   Yeah, because it was sometime after
11      Ms. Marshall allegedly told you that she
12      had -- that she must leave; right?
13  **A.   Yes.**
14  Q.   Okay.  Okay.  So if she told you that she
15      must leave, were you surprised when this
16      person -- I don't know if it was an
17      employee, janitor, I don't know -- when she
18      told you that she must leave, were you
19      surprised when this person later on told
20      you that she had left?
21  **A.   Yes.**
22  Q.   You were surprised?
23  **A.   Yes.**

126

1   Q.   Okay.  Why were you surprised?
2   **A.   I don't -- because she had not been given**
3       **permission, and that's not something she**
4       **had done before.**
5   Q.   Right.  Okay.  Then it goes on to say
6       that -- just one follow-up question
7       regarding your -- you've told me everything
8       that you can remember that you spoke with
9       Dave Harris about regarding Ms. Marshall
10      leaving early; right?
11  **A.   Yes.**
12  Q.   You told me everything that you can
13      remember?
14  **A.   Yes.**
15  Q.   Okay.  If you remember anything else during
16      this deposition, let me know.  Once you
17      informed Dave Harris, that was it?
18  **A.   Yes.**
19  Q.   On that particular -- you didn't -- at that
20      time you made no recommendation of
21      termination; right?
22  **A.   Correct.**
23  Q.   You made no recommendation of a verbal or

127

1   written reprimand?
2   **A.   Correct.**
3   Q.   Even though as the HR specialist, you are
4       intimately familiar with things that
5       constitute termination; correct?
6           MR. ENLOE:  Object to form.
7   **A.   Yes.**
8   Q.   Well, let me ask you this way:  Were you
9       aware as the HR specialist that walking off
10      the job could be a terminable offense?
11  **A.   Yes.**
12  Q.   Okay.  And although you were informed that
13      Ms. Marshall walked off the job without
14      authorization, at that time you didn't
15      recommend to Mr. Harris that she be
16      terminated; right?
17  **A.   Correct.**
18  Q.   And as the HR specialist, you had the sole
19      authority, if you chose to use it, to
20      terminate her once this employee told you
21      that she left the job early?
22  **A.   I could have yes.**
23  Q.   Okay.  Now, it says manager informed HR

128

1   that this behavior will not be accepted and
2   action will be taken.  Now, Dave Harris --
3   you were Mr. Harris' subordinate, were you
4   not?
5   **A.   I did not report to him.**
6   Q.   No, what I'm saying is, Mr. Harris -- you
7       had a higher position than Mr. Harris, did
8       you not?  He was the operations -- I think
9       you told me he was the operations manager;
10      right?
11  **A.   That's correct.**
12  Q.   Okay.  And Mr. Harris would have been under
13      you; is that correct, as the HR specialist?
14  **A.   No.**
15  Q.   Oh, I -- okay.  Is he -- is his job on the
16      same plane as yours, or is he higher than
17      you?
18  **A.   He was higher.**
19  Q.   He was higher than you?
20  **A.   Uh-huh.**
21  Q.   Okay.  All right.  And then it goes on to
22      say that manager -- meaning Mr. Harris --
23      informed you that this behavior would not

129

1    be acceptable and action will be taken.

2    When did he inform you that this behavior

3    would not be acceptable?  Was this during

4    the telephone conversation?

5    **A.**    **Yes.**

6    Q.    Okay.  And this is a conversation that you

7    had with him earlier on the 20th; right?

8    MR. ENLOE:  Object to form.

9    Q.    I'm sorry.  July 21st?

10    **A.**    **That's correct.**

11    Q.    Okay.  He told you the behavior would not

12    be acceptable -- would not be accepted, I'm

13    sorry, and action will be taken?

14    **A.**    **Yes.**

15    Q.    Did you say anything in response to that?

16    **A.**    **I mean, I agreed with the termination.**

17    Q.    Okay.  All right.  So that's when, when he

18    told you it wasn't acceptable, Mr. Harris,

19    and action would be taken, it was during

20    that telephone conversation that a decision

21    had been made to terminate Ms. Marshall?

22    **A.**    **Yes.**

23    Q.    Okay.  And that was based upon her walking

131

1    saying -- according to his e-mail, the

2    decision had been made to terminate

3    Ms. Marshall on July 20th.  No one

4    attempted to contact Ms. Marshall to let

5    her know she had been terminated by

6    telephone; right?

7    **A.**    **I know that I did not.**

8    Q.    Okay.  And do you have any independent

9    knowledge as to whether Mr. Harris

10    contacted her to inform her that she had

11    been terminated?

12    **A.**    **No.**

13    Q.    Okay.  Well, would you agree with me that

14    if Mr. Harris had called Ms. Marshall and

15    told her she was terminated, probably would

16    have been no reason to show up the

17    following day and report to work; is that

18    correct?

19    **A.**    **That would be correct.**

20    Q.    And not only did she report, she was

21    allowed to work several hours; correct?

22    **A.**    **Yes.**

23    Q.    And upon her termination, Glovis paid her

130

1    off the job?

2    **A.**    **Yes.**

3    Q.    Okay.  And do you know when Mr. Harris told

4    you this wouldn't be acceptable and action

5    would be taken, do you know if he had

6    talked with Ms. Marshall about it?

7    **A.**    **No, I do not know.**

8    Q.    Okay.  Now, the next point says that July

9    21st at 9:30 a.m., do you see that?

10    **A.**    **Yes.**

11    Q.    Okay.  Now, all of this prior conversation

12    that we've talked about, according to this

13    e-mail, that would have occurred on July

14    20th; is that correct?

15    **A.**    **That's the way it's outlined, yes.**

16    Q.    Okay.  So we know that a decision to

17    terminate her was made on July 20th; right?

18    **A.**    **I didn't have that conversation with him on**

19    **the 20th.**

20    Q.    Okay.  All right.  All right.  I'll talk to

21    Mr. Harris about a lot of things.  Now,

22    even though the decision according to his

23    e-mail -- and I understand what you're

132

1    for the hours that she worked on July 21st;

2    is that correct?

3    **A.**    **Yes.**

4    Q.    Okay.  Now, do you see down here where the

5    final point says that Ms. Marshall stated

6    that she thought that HR gave her

7    permission.  She's referring to HR, she's

8    talking about you; right?

9    **A.**    **Yes.**

10    Q.    Okay, all right.  Then it goes on to state

11    that Ms. Marshall allegedly said that she

12    didn't need this stuff, did you hear her

13    say that?

14    **A.**    **I was not present.**

15    Q.    Okay.  All right.

16    MR. BROWN:  Let me go ahead and

17    mark this, again, as Defendant's

18    Exhibit 2.

19    MR. ENLOE:  Do you want to take a

20    little break?

21    MR. BROWN:  Yeah, we can take a

22    break.

23    THE REPORTER:  Plaintiff's 2?

133

ELIZABETH LINDEMANN -- 10/3/07

1   MR. BROWN: Yeah.
2       (The referred-to document was
3       marked for identification as
4       Plaintiff's Exhibit No. 2.)
5       (Lunch recess taken.)
6  Q.  (By Mr. Brown) You understand you're still
7       under oath; right?
8  A.  Yes.
9  Q.  Okay. I should have asked you this
10      earlier, and I did -- we did, kind of, talk
11      around this, but I really didn't ask a very
12      good question. What has been marked as
13      Plaintiff's Exhibit 1, is it okay if I call
14      this an employment acceptance letter, would
15      that be accurate?
16 A.  Yes.
17 Q.  And I believe you testified earlier that
18      Mr. Albright would have received a letter
19      with similar content?
20 A.  Yes.
21 Q.  Basically indicating that he was hired on a
22      90-day probationary period?
23 A.  Yes.

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

134

ELIZABETH LINDEMANN -- 10/3/07

1  Q.  Okay. And I know that we requested a copy
2       of his employment file, and there was a lot
3       of things was included, but that was not
4       included.
5       MR. ENLOE: I produced the -- I
6       didn't withhold anything.
7       MR. BROWN: No, no, no. I'm not
8       saying you withheld -- I mean, I
9       just didn't get it. I'm not
10      saying that. I'm sure everything
11      that was turned over to your
12      client you turned over so I don't
13      mean to insinuate that at all.
14      It's just that I don't have this,
15      and I was going to go on to ask
16      you if you can just provide it to
17      me. I mean, it's just no big
18      deal.
19      MR. ENLOE: I don't think I have a
20      copy, but we'll double check and
21      see if it's -- the company has it
22      in his files, and I'll let you
23      know if we do. It's possible

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

135

ELIZABETH LINDEMANN -- 10/3/07

1       that it's not there though,
2       because the personnel file that I
3       got from the company did not
4       include the offer letter, I don't
5       believe.
6       MR. BROWN: Okay. Yeah, that's
7       what I was -- cause I understand
8       that --
9       MR. ENLOE: No, I've got what
10      you've got in that regard, and it
11      doesn't include an offer letter.
12      MR. BROWN: Okay. If you could
13      just check to see if that exists,
14      and the reason why is because I
15      know that the status of his
16      employment is a contested issue,
17      and -- you know, regarding
18      whether he was a supervisor or
19      not, and I think we've gotten
20      into some things today about
21      that, but that's -- that's the
22      only reason why I'm requesting it
23      for is relevancy sake. I'm not

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

136

ELIZABETH LINDEMANN -- 10/3/07

1       trying to give anybody a hard
2       time.
3       MR. ENLOE: Yeah, no, I
4       understand. I might be able to
5       clear that up for you if you just
6       let me ask her a couple of questions
7       on the record though.
8       MR. BROWN: Okay. Okay. I guess,
9       you know, when I'm finished.
10      MR. ENLOE: Yeah.
11      MR. BROWN: I just wanted to, you
12      know, to, kind of, see where we
13      were on that, but --
14      MR. ENLOE: Do you want to go off
15      and maybe we can clear up, and
16      you can hop back on and ask two
17      questions, it'll make it clear.
18      (Off-the-record discussion.)
19      MR. BROWN: Mr. Enloe and I just
20      had a brief discussion about what
21      has been marked as Plaintiff's
22      Exhibit 1 which is an offer of
23      employment that was directed to

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

137

ELIZABETH LINDEMANN -- 10/3/07

1       Ms. Marshall, the Plaintiff in
2       this case, and Mr. Enloe has been
3       kind enough to see if, in fact,
4       one exists for Mr. Albright.
5   Q.  Let me ask you, Liz, what, if any, policy
6       does Glovis have when an employee is
7       terminated for cause regarding the payment
8       of unemployment benefits?
9   A.  Uh --
10      MR. ENLOE: Object to form.
11  Q.  Well, let me ask you this: Is -- does
12      Glovis have a policy that they follow when
13      it comes to whether they're going to
14      contest or not contest an employee who has
15      been terminated for cause?
16  A.  No.
17  Q.  Okay. You don't have a policy?
18  A.  We don't -- no, I've never contested one.
19  Q.  Okay. And that's -- it doesn't make a
20      difference if the employee has been
21      terminated for cause or not, Glovis doesn't
22      have a specific enumerated policy
23      pertaining to that?

138

ELIZABETH LINDEMANN -- 10/3/07

1   A.  Correct.
2   Q.  Okay. Now, in this particular case, are
3       you aware if Ms. Marshall applied for
4       unemployment benefits or not?
5   A.  I don't remember if she did or not.
6   Q.  Okay. If she had applied, would that have
7       been something that Glovis would have
8       contested?
9   A.  If she had applied, I would have filled out
10      the paperwork and sent it back to them and
11      let them make that decision.
12  Q.  So is it your testimony that Glovis would
13      have, kind of, taken a neutral position?
14  A.  Yes.
15  Q.  All right. Let's specifically talk about
16      Ellis Albright for a second.
17  A.  All right.
18  Q.  Now, I believe did you testify that
19      Mr. Albright was hired sometime around
20      January '05?
21  A.  Yes.
22  Q.  Okay. And he was employed as a general
23      labor?

139

ELIZABETH LINDEMANN -- 10/3/07

1   A.  Yes.
2   Q.  Which is the same -- is that the same job
3       that Ms. Marshall was hired to perform?
4   A.  Yes.
5   Q.  Okay. And then at some point, Mr. Albright
6       was promoted to team leader?
7   A.  Yes.
8   Q.  Based on what we've discussed along with
9       Mr. Wells, I believe is his name?
10  A.  Yes.
11  Q.  Okay. Now, other than Ms. Marshall's
12      complaint against Mr. Albright, and that's
13      the complaint that she basically said that
14      he was picking on her and she had not been
15      given appropriate assistance, and I believe
16      that was made back on July 20th of 2005,
17      remember talking about that?
18  A.  Yes.
19  Q.  Okay. Other than Ms. Marshall's initial
20      complaint had -- during Mr. Albright's
21      tenure with Glovis, did anybody else come
22      to make any complaints regardless of what
23      it was against Mr. Albright?

140

ELIZABETH LINDEMANN -- 10/3/07

1   A.  Yes.
2   Q.  Okay. Was it more than one complaint after
3       Ms. Marshall, or was it just one employee?
4   A.  One complaint.
5   Q.  Okay. So it was one. In this complaint,
6       was it made prior or after Ms. Marshall's
7       complaint?
8   A.  After.
9   Q.  Okay. First of all, who actually made that
10      complaint against Mr. Albright?
11  A.  I just trying to -- I remember her last
12      name. Ms. Riviera.
13  Q.  Riviera?
14  A.  Yes.
15  Q.  Is this young lady Hispanic?
16  A.  Yes.
17  Q.  Okay. Do you know her first name?
18  A.  That's what I was trying to think. I
19      can't.
20  Q.  Well, we'll follow-up with an
21      interrogatory. You know, if you don't know
22      her first name, that's fine, we'll get the
23      information. Is -- was she -- what was her

141

ELIZABETH LINDEMANN -- 10/3/07

1        position at Glovis?

2   A.   **She worked in our recycling area.**

3   Q.   Okay.  So Mr. Ellis would not have been her

4        team leader?

5   A.   **No.**

6   Q.   Okay.  Did -- now, again, kind of educate

7        me a little bit, is Glovis just one

8        building, or is it a series of buildings

9        connected?

10  A.   **Glovis is one -- both.  There's -- Glovis**

11       **Alabama is one building.**

12  Q.   Okay.  So how far would the -- and I'm

13       thinking of the term -- breakdown, is that

14       the correct term?

15  A.   **Yes.**

16  Q.   Okay.  Which is the department that

17       Ms. Marshall worked in; is that correct?

18  A.   **Correct.**

19  Q.   How far is the breakdown department in

20       terms of yards.  If you understand a

21       football field, you understand a hundred

22       yards?

23  A.   **Yes.**

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

142

ELIZABETH LINDEMANN -- 10/3/07

1   Q.   How far is the breakdown department from

2        the recycling department?

3   A.   **It's almost right next door to it.**

4   Q.   Would you say less than 20 yards?

5   A.   **Yes.**

6   Q.   Okay.  So in close proximity?

7   A.   **Very close.**

8   Q.   And when did Ms. Riviera lodge this

9        complaint against Mr. Albright?

10  A.   **February of '06.**

11  Q.   Okay.  All right.  And how was this

12       complaint lodged, was it in a written

13       format, or was it just a verbal complaint?

14  A.   **It was a verbal complaint.**

15  Q.   Okay.  Was this complaint ever reduced to

16       writing?

17  A.   **Yes.**

18  Q.   Okay.

19  A.   **The investigation part.**

20  Q.   Okay.  But my specific question is there

21       came a time when Ms. Riviera did after

22       her -- after lodging her verbal complaint

23       did, in fact, give a written form of that;

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

143

ELIZABETH LINDEMANN -- 10/3/07

1        right?

2   A.   **She did not give a written form.**

3   Q.   She did not?

4   A.   **No.**

5   Q.   Okay.  The company basically gave their

6        version of what Ms. Riviera had told them

7        about the complaint?

8   A.   **Yeah.  I wrote down what she had told me.**

9   Q.   You wrote down?

10  A.   **Yes.**

11  Q.   Okay.  What specifically did Ms. Riviera

12       complain about?

13  A.   **Unwelcome advances, sexual advances.**

14  Q.   Okay.  What specifically did she say -- and

15       I'm, you know, obviously I need to know

16       everything specifically that was said not

17       to get too graphic, but, obviously, you

18       know, I need to know that, specifically

19       what was allegedly said by Mr. Albright

20       towards Ms. Riviera?

21  A.   **He -- he wanted -- he -- well, I mean,**

22       **actions were, he wanted to -- he put his**

23       **arm around her and wanted to touch her,**

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

144

ELIZABETH LINDEMANN -- 10/3/07

1        **asked her out on a date.**

2   Q.   Okay.  So first, the allegations are he put

3        his arm around her, and you also said he

4        touched her?

5   A.   **Touched her leg.**

6   Q.   Touched her leg?

7   A.   **Uh-huh.**

8   Q.   Okay.  And you also said that Mr. Albright

9        allegedly asked Ms. Riviera out on a date?

10  A.   **Yes.**

11  Q.   Anything else?

12  A.   **Not that I can recall vividly.**

13  Q.   Okay.

14             THE REPORTER:  I'm sorry, what did

15             you say?

16             THE WITNESS:  Not that I can

17             recall vividly.

18  Q.   Okay.  Well, if you remember anything else,

19       and I don't expect the deposition to be

20       much longer, but if you remember anything

21       else during this deposition, if you can let

22       me know.  So basically so I'm clear, as you

23       sit here today, the only thing you can

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

SUKENIA MARSHALL v. GLOVIS ALABAMA -- 10/3/07

---

145

ELIZABETH LINDEMANN -- 10/3/07

1  recall -- and it may be more but the only
2  thing that you can recall at this point --
3  that Ms. Riviera complained -- did she
4  complain to you directly?
5  A.  She complained to her supervisor.
6  Q.  And who would that have been?
7  A.  I know him by Diego.
8  Q.  Is he also of Hispanic decent?
9  A.  Yes.
10 Q.  Male or female?
11 A.  Male.
12 Q.  Is it Mr. Diego?  You don't know if that's
13     his first or last name.
14 A.  Right.
15 Q.  Okay.  And it's your understanding that
16     this complaint was first lodged by
17     Ms. Riviera to somebody by the name of
18     Diego?
19 A.  Correct.
20 Q.  Okay.  And that was sometime in February of
21     '06?
22 A.  Yes.
23 Q.  And you don't know the specific date in

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

146

ELIZABETH LINDEMANN -- 10/3/07

1  February; right?
2  A.  Not off the top of my head, no.
3  Q.  Okay.  And what was Diego's position at
4     that time in February of '06?
5  A.  He was her supervisor in the recycling
6     area.
7  Q.  Supervisor in the recycling area?
8  A.  Yes.
9  Q.  What was some of his responsibilities as --
10 A.  I don't have a complete list of his
11     responsibilities.  He -- they were not
12     Glovis employees.  They were contract
13     employees.
14 Q.  Oh, okay, Ms. Riviera?
15 A.  Ms. Riviera and --
16 Q.  Mister --
17 A.  -- Diego.
18 Q.  -- and Diego?
19 A.  Yes.
20 Q.  Even though they were working in the
21     recycling department --
22 A.  Uh-huh.
23 Q.  -- they were independent contractors?

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

147

ELIZABETH LINDEMANN -- 10/3/07

1  A.  Yeah.  We have a contract with an
2     independent contractor who manages and
3     takes care of our recycling area.
4  Q.  I understand.  Is that still the case?
5  A.  Yes.
6  Q.  Okay.  And give me the name of the
7     contractor that Ms. Riviera was working
8     for?
9  A.  It's called QLS, Quality Logistics
10     Services.
11 Q.  Quality Logistics Services, and what is
12     their address?
13 A.  Well, they're on location in our building
14     which is 300 Hyundai Boulevard.
15 Q.  Hyundai Boulevard, okay.
16 A.  And that's Montgomery.
17 Q.  Okay.  And do you know who is in charge of
18     this facility in particular.  I understand
19     Mr. Diego's position --
20 A.  Uh-huh.
21 Q.  -- but does he have a supervisor that's on
22     site there?  Who's above him?
23 A.  Then or now?  I just want to try to

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

148

ELIZABETH LINDEMANN -- 10/3/07

1  clarify.
2  Q.  Then?
3  A.  Yes.
4  Q.  And who would that have been?
5  A.  Elliud Cavos.  E-L-L-I-U-D, C-A-V --
6     last -- Cavos is the last name, C-A-V-O-S.
7  Q.  Can we just call it for the purposes of
8     this deposition, EV?  Would that be --
9         MR. ENLOE:  EC.
10 A.  EC.
11 Q.  Yeah.  Can we call him just EC?  Is -- at
12     the time was EC -- was he the head man in
13     charge of Quality Logistics at the location
14     that Glovis is at?
15 A.  Yes.
16 Q.  Okay.  Now, I understand Ms. Riviera -- and
17     I'm just trying to get some familiarity
18     here, Ms. Riviera, her paycheck would have
19     been issued by whom, Quality Logistics
20     Services or Glovis?
21 A.  Quality Logistics Services.
22 Q.  Okay.  All right.  So Ms. Riviera
23     complained in February of '06 to a

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

---

149

ELIZABETH LINDEMANN -- 10/3/07

1  gentleman by the name of Diego?

2  **A.  Correct.**

3  Q.  And did Diego, in fact, report that to you?

4  **A.  Yes.**

5  Q.  Okay.  So the chain went -- first, it was

6      Riviera complained to Diego and then Diego

7      came and reported it to you --

8  **A.  Yes.**

9  Q.  -- is that correct?  Now, do you know if

10     before Diego reported Ms. Riviera's

11     complaint to you if Diego did any sort of

12     investigation?

13  **A.  I do not know.**

14  Q.  Okay.  Did you ask him if he had done an

15     investigation?

16  **A.  I did, but I don't recall what his response**

17  **was.**

18  Q.  Did you get any statement from Diego?

19         MR. ENLOE:  I'm going to object,

20         and we should put this on the

21         record.

22         MR. BROWN:  Sure.

23         MR. ENLOE:  It's our position that

150

ELIZABETH LINDEMANN -- 10/3/07

1      any documents that were compiled

2      in the course of this

3      investigation would be protected

4      work product, and also enveloped

5      in the scope of the privilege.

6         MR. BROWN:  Well, we

7         wholeheartedly disagree, we'll --

8         MR. ENLOE:  I understand.

9         MR. BROWN:  -- you know, we'll

10         take that up with the judge, but

11         I mean, I understand your

12         objection.

13         MR. ENLOE:  But you certainly --

14         you know, we're not going to take

15         the position that you're not

16         entitled to inquire into the --

17         MR. BROWN:  Sure, sure.

18         MR. ENLOE:  -- facts either in

19         deposition or interrogatory --

20         MR. BROWN:  Sure, I understand.

21         MR. ENLOE:  -- yeah, or on our

22         position so.

23         MR. BROWN:  I think it's pattern

151

ELIZABETH LINDEMANN -- 10/3/07

1      and practice, and I think it's

2      highly relevant, because these

3      complaints are similar to what

4      Ms. Marshall made so, you know,

5      we'll take that up with the

6      Court, but I understand your

7      objection.

8         MR. ENLOE:  Yeah, and so going

9         forward today, the only time I

10         will interpose an objection will

11         be if I think it may wave the

12         privilege --

13         MR. BROWN:  I follow you.

14         MR. ENLOE:  -- or work product

15         protection that we're claiming in

16         the documents.

17         MR. BROWN:  Okay.

18  Q.  Now, so I understand the only thing that

19      you can recall in terms of the specifics

20      about Ms. Riviera's complaint against

21      Mr. Albright was allegedly Mr. Albright put

22      his arms around her -- arm -- you didn't

23      say arms, you said arm, I'm sorry, which is

152

ELIZABETH LINDEMANN -- 10/3/07

1      singular, and also that Mr. Albright

2      allegedly touched her leg, and he asked her

3      out on a date.

4  **A.  Yes.**

5  Q.  And that's all you can remember at this

6      time, I understand that.

7  **A.  Okay.**

8  Q.  Now, when you first were informed by Diego

9      about these allegations, as the Human

10      Resource Specialist, what, if anything, did

11      you do?

12  **A.  I took the information from him.  I**

13  **notified Elliud, EC --**

14  Q.  Okay.

15  **A.  -- that I would like to, with his**

16  **permission, speak to her, to Ms. Riviera,**

17  **to try to get some more details about what**

18  **had happened or, you know, what she had,**

19  **kind of, said happened.**

20  Q.  Okay.  Well, let's, kind of, take it one

21      step at a time, and we'll, kind of, see

22      where we need to go.  Now, you said you

23      took the information from Diego; right?

153

ELIZABETH LINDEMANN -- 10/3/07

1   A.   **Correct.**
2   Q.   And would that have been reduced to writing
3        when you said you took the statement, took
4        the information from Diego?
5   A.   **I probably wrote it down, I just -- I'm not**
6        **going to sit here and tell you I honestly**
7        **did.  I don't remember.**
8   Q.   Okay.  And then once you took the
9        information from Diego, that's when you
10       notified Elliud who we previously -- I'd --
11       previously I'd said EC, that's the same
12       gentleman?
13  A.   **Correct.**
14  Q.   And you asked for his authorization to
15       speak with Ms. Riviera?
16  A.   **Correct.**
17  Q.   Okay.  Did there come a time when you spoke
18       to Ms. Riviera?
19  A.   **Yes.**
20  Q.   Okay.  Did you -- when did you speak with
21       her, was this in February of '06?
22  A.   **Yes.**
23  Q.   Okay.  And tell me everything you discussed

154

ELIZABETH LINDEMANN -- 10/3/07

1        with Ms. Riviera.
2             MR. ENLOE:  Let me object to this
3             extent, and I don't want to break
4             up your questioning of her, but
5             if we can agree that --
6             MR. BROWN:  The standard
7             objection.
8             MR. ENLOE:  -- Ms. Lindemann can
9             testify, and any testimony she
10            gives won't be construed as a
11            waiver --
12            MR. BROWN:  Sure.
13            MR. ENLOE:  -- of any
14            attorney-client privilege or work
15            product argument that we might
16            make, probably will facilitate
17            things.
18            MR. BROWN:  Okay.
19  Q.   Well, let me attack it this way:  When you
20       spoke with Ms. Riviera, were you in the
21       presence of any lawyer?
22  A.   **No.  It was myself, Ms. Riviera, and since**
23       **she was Hispanic, an interpreter.**

155

ELIZABETH LINDEMANN -- 10/3/07

1   Q.   Who was the interpreter's name?
2   A.   **Mary Cavos.**
3   Q.   How do you spell the last name?
4   A.   **C-A-V-O-S.**
5   Q.   Is she an employee with Quality Logistics?
6   A.   **She was, I don't know if she still is.**
7   Q.   Okay.  When's the last time you've seen
8        Mary?
9   A.   **Six months ago.**
10  Q.   When did you see her, out at the facility?
11  A.   **Yes.**
12            **(Brief interruption.)**
13  Q.   Now, when you saw Mary, that would have
14       been sometime in April, the May/April time
15       frame, have you seen her since then?
16  A.   **No.**
17  Q.   Okay.  Now, when you spoke with
18       Ms. Riviera, it's my understanding that it
19       was yourself, Ms. Riviera, and Mary?
20  A.   **Correct.**
21  Q.   And did this -- I don't want to call it --
22       I'm going to call it a conversation.  Did
23       this conversation take place in your office

156

ELIZABETH LINDEMANN -- 10/3/07

1        at Glovis?
2   A.   **Yes.**
3   Q.   Okay.  And about how long did this
4        conversation take place?
5   A.   **I don't recall.**
6   Q.   Okay.  Was it tape recorded?
7   A.   **No.**
8   Q.   Okay.  Did you take notes about this
9        conversation?
10  A.   **Yes.**
11  Q.   Okay.  And those notes were in writing?
12  A.   **Yes.**
13  Q.   Okay.  Did you retain those notes?
14  A.   **Yes.**
15  Q.   Okay.  Did you put those notes in your
16       computer?
17  A.   **Yes.**
18  Q.   And I assume those notes of that meeting
19       are currently saved the your computer at
20       Glovis?
21  A.   **Yes.**
22  Q.   Okay.  Now, did this interview take
23       place -- did you ask Ms. Riviera a series

SUKENIA MARSHALL V. GLOVIS ALABAMA -- 10/3/07

**157**

ELIZABETH LINDEMANN -- 10/3/07

1   of questions and she responded, or did she,
2   like, give you a narrative of what she
3   alleged took place?
4   A.   **She gave me a narrative, described what**
5   **happened.**
6   Q.   Okay.  Other than what you've told me about
7   Mr. Albright allegedly putting her arm
8   around her and touching her leg and asking
9   her out on a date, is there anything else
10   she said -- whether it was of a sexual
11   nature or not, was there anything else that
12   you can remember Ms. Riviera said?
13   A.   **I don't -- I mean, I honestly don't**
14   **remember.**
15   Q.   Okay.  So the only thing you can remember
16   in terms of what she told you was what
17   you've already told me?
18   A.   **Correct.**
19   Q.   Okay.  And you can't recall how long this
20   meeting took place?
21   A.   **That's correct.**
22   Q.   Between yourself, Ms. Riviera, and Mary?
23   A.   **That's correct.**

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

**158**

ELIZABETH LINDEMANN -- 10/3/07

1   Q.   Okay.  And this meeting took place in your
2   office sometime in February of '06?
3   A.   **Yes.**
4   Q.   Okay.  And you don't know the specific
5   date?
6   A.   **No, I don't recall.**
7   Q.   Okay.  And once Ms. Riviera made those
8   allegations of a sexual nature against
9   Mr. Albright, did you take any additional
10   steps?
11   A.   **Yes, I continued to investigate the**
12   **complaint.**
13   Q.   Okay.  Tell me the next thing that you did
14   in your investigation?
15       MR. ENLOE:  And I've got the
16       standing objection on the
17       documents.
18       MR. BROWN:  Sure, sure.
19       MR. ENLOE:  Okay.
20   A.   **I spoke to Mr. Albright and --**
21   Q.   Did you speak to him on the same day.  Was
22   this the same day, it was the following
23   day, following week?

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

**159**

ELIZABETH LINDEMANN -- 10/3/07

1   A.   **Either the same day or the following day, I**
2   **don't recall.**
3   Q.   Okay.  And what did you speak to
4   Mr. Albright about?
5   A.   **I asked him specifically about the incident**
6   **of -- with this particular individual.**
7   Q.   Okay.  And, you know, specifically -- and I
8   want to, kind of, hasten this, but, you
9   know, you need to be -- try to be as
10   specific as you can.  Did you specifically
11   ask Mr. Albright, first, did he put his arm
12   around Ms. Riviera?
13   A.   **Yes.**
14   Q.   Okay.
15   A.   **Not -- not first.  I mean, there was an**
16   **issue of where he had take -- they had went**
17   **to another facility or HMMA.**
18   Q.   Who had went to another facility?
19   A.   **Ms. Riviera and Mr. Albright, and I asked**
20   **him about that and then I asked him about**
21   **complaints of putting his arm around her.**
22   Q.   Okay.  I want to try to keep this in proper
23   context.  When you -- you said that

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

**160**

ELIZABETH LINDEMANN -- 10/3/07

1   Mr. Albright and Ms. Riviera went to
2   another facility?
3   A.   **Yes.**
4   Q.   Okay.  They went to HM -- you're talking
5   about Hyundai Motor Company of Alabama;
6   right?
7   A.   **Yes.**
8   Q.   Well, were they -- what, were they working
9   there, I mean, when you say they went to
10   another facility, I'm trying to -- what did
11   they go to the facility for?
12   A.   **That I don't know.**
13   Q.   Okay.  Did they go -- was it upon
14   somebody's request, or did they just go on
15   their own volition?
16   A.   **Mr. Albright went on his own.**
17   Q.   With Ms. Riviera?
18   A.   **Yes.**
19   Q.   Did they go together?
20   A.   **Yes.**
21   Q.   In the same automobile?
22   A.   **Yes.**
23   Q.   Okay.  And when did you first learn that

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

161

ELIZABETH LINDEMANN -- 10/3/07

1      Mr. Albright and Ms. Riviera went to the

2      Hyundai Motor facility in the same vehicle?

3  A.  **That next day. I don't -- again, I can't**

4      **tell you the date.**

5  Q.  Okay. Do you know when this excursion to

6      Hyundai occurred with Mr. Albright and

7      Ms. Riviera?

8  A.  **Such as -- a date or --**

9  Q.  I mean, yeah, the date. In other words,

10     let me ask you this: Did Mr. Albright and

11     Ms. Riviera, did they go to the Hyundai

12     facility before you had been informed by

13     Mr. Diego of the complaint or after?

14  A.  **Before.**

15  Q.  Before. Okay. And you learned that

16     Mr. Albright and Ms. Riviera went to the

17     Hyundai Motor Plant after Mr. Diego

18     informed you about Ms. Riviera's

19     complaints? Let me ask you -- let me

20     strike -- you learned that Mr. Albright and

21     Ms. Riviera went together to the Hyundai

22     Motor facility after Mr. Diego informed you

23     about Ms. Riviera's sexual complaints

162

ELIZABETH LINDEMANN -- 10/3/07

1      against Mr. Albright?

2  A.  **Let me make sure I'm not confusing your**

3      **question, I learned about it after they**

4      **went, yes.**

5  Q.  After they went, but my specific question

6     is, is we know that this complaint was made

7     by Ms. Riviera to Diego in February of 2006

8     and then subsequently Mr. Diego -- not

9     Mr. Diego, Diego notified you of

10     Ms. Riviera's complaint; is that the

11     correct chronology?

12  A.  **Yes, that they went --**

13  Q.  Right.

14  A.  **Yes.**

15  Q.  Right. So what I'm trying to do is I'm

16     trying to get a point of reference as to

17     whether this excursion to the Hyundai Motor

18     Plant with Mr. Albright and Ms. Riviera

19     occurred before you were notified of

20     Ms. Riviera's complaint or after?

21  A.  **Before.**

22  Q.  Okay. It occurred before?

23  A.  **Uh-huh.**

163

ELIZABETH LINDEMANN -- 10/3/07

1  Q.  Okay. And you didn't know anything about

2     this until a day or two after Mr. Diego

3     told you about Ms. Riviera's complaint?

4        MR. ENLOE: Object to form.

5  A.  **I heard about it the next day.**

6  Q.  Okay. Who did you -- who told you about

7     that?

8  A.  **Mister -- Diego had come to me.**

9  Q.  Okay. Did Diego tell you this at the same

10     time he told you about Ms. Riviera's

11     complaint, did all this happen on the same

12     day?

13  A.  **Diego told me about the complaint, and the**

14     **rest of the information I found out during**

15     **the course of the investigation.**

16  Q.  Okay. How did you come to find out that

17     Albright and Ms. Riviera went to the

18     Hyundai facility?

19  A.  **Mr. Albright told me.**

20  Q.  Okay. And was that the following day after

21     you -- after Diego spoke with you that you

22     talked with Mr. Albright?

23  A.  **Again, I don't -- I can't remember**

164

ELIZABETH LINDEMANN -- 10/3/07

1      **exactly.**

2  Q.  It was a day or two --

3  A.  **-- the specific day --**

4  Q.  Yeah.

5  A.  **-- that I talked to Mr. Albright after.**

6  Q.  Okay. But Mr. Albright told you that he

7     and Ms. Riviera went to the Hyundai plant;

8     right?

9  A.  **Yes.**

10  Q.  And was this during work hours?

11  A.  **Yes.**

12  Q.  Okay. Now, Mr. Albright along with

13     Mr. Wells, they were -- for the lack of a

14     better term -- co-team leaders; right?

15  A.  **Yes.**

16  Q.  Do you know if Mr. Albright had anybody's

17     permission to leave his area and go to the

18     Hyundai plant?

19  A.  **I don't -- I don't know.**

20  Q.  You didn't give him permission, did you?

21  A.  **No.**

22  Q.  Did you check to see if Dave had given him

23     permission?

165

ELIZABETH LINDEMANN -- 10/3/07

1    A.    **I don't recall. I mean, I don't know. I**
2           **don't remember.**
3    Q.    Okay. Well, let me ask you this: Do you
4           know of any reason why he would have had a
5           legitimate reason to leave his work area
6           and go to Hyundai during working hours?
7    A.    **No.**
8    Q.    Okay. And even though he was a team
9           leader, if he was to leave the facility to
10          go to Hyundai, wasn't he supposed to get
11          permission to do that?
12    A.    **Yes.**
13    Q.    Okay. So you would deem his action to be a
14          violation of a work-place rule; is that
15          correct?
16    A.    **Yes.**
17    Q.    Okay. And when Mr. Albright told you that
18          he had gone to Hyundai plant with
19          Ms. Riviera, did you make a decision at
20          that time to terminate him?
21    A.    **At that time, no, I continued my**
22           **investigation?**
23           THE REPORTER: I'm sorry. Can you

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

166

ELIZABETH LINDEMANN -- 10/3/07

1           speak up?
2           THE WITNESS: Okay.
3    A.    **At that time, I continued my investigation.**
4    Q.    Okay. Did Mr. Albright tell you what, if
5          anything, happened between him and
6          Ms. Riviera at the Hyundai plant?
7    A.    **He told me nothing happened.**
8    Q.    Did he tell you why they went there?
9    A.    **He may have. That part, I don't remember.**
10    Q.    Okay. And we'll -- and we'll, kind of, get
11          the notes in your computer, information on
12          that, but you can't remember as you sit
13          here today?
14    A.    **No.**
15    Q.    Okay. Now, did Mr. Albright tell you about
16          this trip to the Hyundai plant in response
17          to your questions about the allegations
18          that he had touched Ms. Riviera in an
19          unwelcome manner?
20    A.    **Yes.**
21    Q.    Okay. And did he tell you that he felt
22          that it was of a consensual nature, this
23          touching?

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

167

ELIZABETH LINDEMANN -- 10/3/07

1    A.    **He told me nothing happened.**
2    Q.    Okay. So he denied that he had ever
3          touched Ms. Riviera; right?
4    A.    **Yes.**
5    Q.    He denied that he asked her out on a date?
6    A.    **Yes.**
7    Q.    Okay.
8           (Off-the-record discussion.)
9    Q.    Now, after you -- let me ask this: The
10          conversation that you had with
11          Mr. Albright, it was just yourself and him
12          present?
13    A.    **Yes.**
14    Q.    Mr. Harris was not present?
15    A.    **Yes.**
16    Q.    And did this conversation take place in
17          your office?
18    A.    **Yes.**
19    Q.    Okay. And about how long did it last?
20    A.    **I don't remember.**
21    Q.    Okay. Did you ask Mr. Albright for a
22          written statement?
23    A.    **I believe so.**

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

168

ELIZABETH LINDEMANN -- 10/3/07

1    Q.    Okay. And did he provide a written
2          statement about his version?
3    A.    **Probably. I don't remember right off**
4           **without looking.**
5    Q.    I understand. That would be something that
6          you would have?
7    A.    **If it was provided, yes.**
8    Q.    Okay. And did you take any notes of this
9          meeting with Mr. Albright?
10    A.    **Yes.**
11    Q.    Okay. Be written notes?
12    A.    **Yes.**
13    Q.    Okay. And did you reduce them to an
14          electronic fashion?
15    A.    **Yes.**
16    Q.    Okay. So that information as well should
17          be on your computer?
18    A.    **Yes.**
19    Q.    And can you recall, other than what you've
20          testified about, anything else that you
21          talked with Mr. Albright about on that
22          particular occasion?
23    A.    **No.**

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

169

ELIZABETH LINDEMANN -- 10/3/07

1   Q.   Okay.  So just -- just so we're clear, you
2        were communicated -- well, strike that.
3        Mr. Diego communicated to you back in
4        February of '06 about Ms. Riviera's sexual
5        complaints against Mr. Albright's.  A day or
6        two later, you can't remember specifically
7        when, but it was soon after Mr. Diego told
8        you about these sexual complaints that you
9        spoke with Mr. Albright; is that correct?
10  A.   Yes.
11  Q.   And you took some notes and reduced them to
12       electronic form; correct?
13  A.   Yes.
14  Q.   And you don't know how long that you spoke
15       with Mr. Albright?
16  A.   No.
17  Q.   It was in your office?
18  A.   Yes.
19  Q.   And you guys were the only one that was
20       present?
21  A.   Yes.
22  Q.   Okay.  And after the conversation, was
23       Mr. Albright placed on any type of leave,

171

ELIZABETH LINDEMANN -- 10/3/07

1   Q.   Okay.  And she was an employee of Quality
2        Logistics Services; right?
3   A.   Yes.
4   Q.   Do you know if she's still there?
5   A.   I don't know.
6   Q.   Have you seen her recently?
7   A.   No.
8   Q.   Okay.  Who else did you talk to in the
9        recycling department?
10  A.   Other than Diego and EC --
11  Q.   All right.
12  A.   -- that was it.
13  Q.   All right.
14  A.   No one else wanted to become involved.
15  Q.   I understand.  What did Ms. McKinnon tell
16       you when you spoke with her?
17            MR. ENLOE:  And standing
18            objection.
19            MR. BROWN:  That's fine.
20            Objection noted.
21  A.   I believe she mirrored what Ms. Riviera had
22       said --
23  Q.   Okay.  Now, I don't --

170

ELIZABETH LINDEMANN -- 10/3/07

1        or was he allowed to go back to work?
2   A.   He was allowed to go back to work at that
3        time.
4   Q.   Okay.  And what was the next step that you
5        took in your investigation?
6   A.   I started talking to people that worked in
7        the area to see if there were any
8        witnesses.
9   Q.   Okay.  Now, and I just want to get the
10       department's right.  I know you said
11       Ms. Riviera was in a recycling department.
12       Did you talk to anybody in that department?
13  A.   Yes.
14  Q.   Who did you talk to in the recycling
15       department?
16  A.   McKinnon, Ms. McKinnon.
17  Q.   Ms. McKinnon, okay.  And what was
18       Ms. McKinnon's position if you know?
19  A.   I know she worked in the recycling
20       department?
21  Q.   What was her race, Hispanic, African
22       American, Caucasian?
23  A.   I believe she was African American.

172

ELIZABETH LINDEMANN -- 10/3/07

1   A.   -- about he's put his arm around her and
2        touched her leg, but I don't recall
3        exactly.
4   Q.   Did she say she witnessed this or that was
5        something that she heard about?
6   A.   That was something she was told by
7        Ms. Riviera.
8   Q.   Okay.  So she was not a personal witness,
9        it was just something that Ms. Riviera
10       allegedly told Ms. McKinnon?
11  A.   Correct.
12  Q.   Did she say anything else?
13  A.   Not that I remember.
14  Q.   Okay.  Now, did you speak with anyone in
15       the breakdown department which would have
16       been the department that Mr. Albright was a
17       co-team leader?
18  A.   Yes.
19  Q.   Okay.  Who did you talk to in that
20       department?
21  A.   There was a bunch of --
22  Q.   Okay.  Just tell me who you remember.  I
23       mean, that's what we're entitled to, and

173

ELIZABETH LINDEMANN -- 10/3/07

1    that's what we're asking.  We're not asking
2    you to speculate, just what you can
3    remember now.  We want to know about it.
4  A.  **Terri Corbett was one.**
5        THE REPORTER:  I'm sorry.  Can you
6            speak up?
7  A.  **Terri Corbett.  Lekethia Henderson.**
8  Q.  Lekethia?
9  A.  **Uh-huh.**
10 Q.  Henderson.  Who else?
11 A.  **Terrance Wilson.**
12 Q.  Anyone else you can remember?
13 A.  **Not without looking at my notes.**
14 Q.  I understand, and you don't have your notes
15     here today, do you?
16 A.  **No.**
17 Q.  Okay.  That's back in your office at
18     Glovis?
19 A.  **Yes.**
20 Q.  Okay.  Do you -- again, were these notes
21     reduced to electronic form?
22 A.  **Yes.**
23 Q.  Okay.  Now, did you speak with

174

ELIZABETH LINDEMANN -- 10/3/07

1    Mr. Corbett, Ms. Henderson, and Mr. Wilson,
2    did all of this occur in February of '06?
3  A.  **Yes.**
4  Q.  Okay.  Let's start with Mr. Corbett first.
5    What did you discuss with him?
6  A.  **It's Ms. Corbett.**
7  Q.  Ms. Corbett, I'm sorry.
8  A.  **What we discussed was if she had observed**
9      **any behavior that she would consider**
10     **inappropriate with Mr. Albright versus**
11     **Ms. Riviera or --**
12 Q.  What did she say?
13 A.  **She said she did not witness anything.**
14 Q.  Did she --
15 A.  **I believe that's what she said.  Again, I'm**
16     **acting on memory.**
17 Q.  I understand.  Did she say that she heard
18     anything about inappropriate conduct
19     between Mr. Albright and Ms. Riviera?
20 A.  **I don't remember what she said.**
21 Q.  Okay.  All right.  What about
22     Ms. Henderson?
23 A.  **I asked her the same question, and she said**

175

ELIZABETH LINDEMANN -- 10/3/07

1    **she did not see anything.**
2  Q.  That she had not heard of anything either?
3  A.  **Correct.**
4  Q.  What about Terrance Wilson?
5  A.  **He said he heard rumors, but he'd never**
6      **seen anything that he could confirm.**
7  Q.  Did he say who he heard the rumors from or
8      the source of the rumor?
9  A.  **No.**
10 Q.  Okay.  Now, Ms. Corbett, Ms. Henderson, and
11     Mr. Wilson, did you talk with all of them
12     on the same day, or was it during the
13     course of a week or so or two weeks or?
14 A.  **I believe it was within a day or two of all**
15     **of it.**
16 Q.  And did you talk with them separately, or
17     did you talk with them as a group?
18 A.  **Separately.**
19 Q.  Okay.  And during this time, Mr. Albright
20     was still working at Glovis as a co-team
21     leader?
22 A.  **Yes.**
23 Q.  Okay.  Okay.  Did you take any additional

176

ELIZABETH LINDEMANN -- 10/3/07

1    steps in your investigation, other than
2    what you've testified about?
3        MR. ENLOE:  Same objection as
4            earlier.  You can answer.
5  A.  **Okay.  After the investigation, we took**
6      **steps, but nothing.**
7  Q.  No, okay, well, let me ask this:  Again,
8      trying to keep everything chronological.
9  A.  **Uh-huh.**
10 Q.  After you were informed by Diego of
11     Ms. Riviera's sexual complaint, you spoke
12     with Mr. Albright a day or two after.
13     After speaking with Mr. Albright, you spoke
14     with Ms. Corbett, Ms. Henderson, and
15     Mr. Wilson?
16 A.  **Correct.**
17 Q.  Okay.  And did you do anything else
18     pursuant to your investigation to determine
19     if Ms. Riviera's complaint had any merit?
20     MR. ENLOE:  Object to form.
21 A.  **I know I spoke to other people.  I don't**
22     **remember their names.**
23 Q.  Did you speak with -- because you told me

SUKENIA MARSHALL V. GLOVIS ALABAMA -- 10/3/07

177

ELIZABETH LINDEMANN -- 10/3/07

1    you spoke with people in the recycling

2    department?

3  A.  **Un-huh.**

4  Q.  And also in the breakdown department?

5  A.  **Yes.**

6  Q.  And we know that the employees who worked

7    in the recycling department worked for

8    Quality Logistics Services?

9  A.  **Yes.**

10  Q.  Okay.  Now, did you -- you say you spoke

11    with some other people, I think you just

12    said that, who else did you speak with?

13  A.  **I said I don't recall their name.  I know I**

14    **did, but I don't recall their name.**

15  Q.  Okay.  Do you have that -- is that in

16    writing in your office in terms of who else

17    you would have spoke with?

18  A.  **Yes.**

19  Q.  Okay.  And that's also been reduced to

20    electronic form?

21  A.  **Yes.**

22  Q.  Okay.  Is there anything else that you can

23    remember other than who you testified about

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

178

ELIZABETH LINDEMANN -- 10/3/07

1    that you may have spoken about in

2    accordance with your investigation?

3        (Brief interruption.)

4  Q.  Do you remember my question, Liz, I'm

5    sorry?

6  A.  **Yes.**

7  Q.  Okay.

8  A.  **I spoke to the operations manager after the**

9    **investigation -- after my investigation.**

10  Q.  And that was Dave?

11  A.  **No.**

12  Q.  Okay.  Dave --

13  A.  **Dave had resigned previously.**

14  Q.  Okay.  So Dave is no longer at Glovis?

15  A.  **Correct.**

16  Q.  When did Dave resign?

17  A.  **I don't remember the date.**

18  Q.  Okay.  All right.  But it was before

19    February of 2006; right?

20  A.  **Yes.**

21  Q.  Okay.  Was Dave terminated?

22  A.  **No.**

23  Q.  Okay.  He voluntarily resigned?

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

179

ELIZABETH LINDEMANN -- 10/3/07

1  A.  **Yes.**

2  Q.  Dave was never the source of any

3    investigation; right, at Glovis?

4  A.  **Correct.**

5  Q.  Okay.  Do you know what, if any company,

6    Dave transferred to?

7  A.  **No, I do not.**

8  Q.  Okay.  When's the last time you spoke with

9    Dave?

10  A.  **Shortly after he left the company.**

11  Q.  You haven't spoke with him about this

12    lawsuit?

13  A.  **No.**

14  Q.  Okay.  Do you know where Dave is?

15        MR. ENLOE:  You can contact me.

16        It's our position that Mr. Harris

17        would have been a managerial

18        level employee and so any contact

19        with him should come through

20        counsel for the defense.  He had

21        the authority to hire and fire.

22        MR. BROWN:  Yeah, but I'm just --

23        I'm not asking -- I hadn't gotten

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

180

ELIZABETH LINDEMANN -- 10/3/07

1    into the content of any

2    discussions.  I think I have a

3    right to know if she's spoken

4    with him.

5        MR. ENLOE:  I'll agree.  I'm just

6        pointing out --

7        MR. BROWN:  Yeah, yeah.  Oh, no, I

8        understand.  I think when I go

9        there, I think it's appropriate

10        for you to object on that basis,

11        but at this point, I'm not asking

12        about the content of any

13        discussion.

14        MR. ENLOE:  Yeah, no.  I wasn't

15        objecting to any of your

16        questions.

17        MR. BROWN:  Oh, no.  Yeah.

18        MR. ENLOE:  I'm just setting --

19        noting for the record that our

20        position will be that he's at

21        management level employee.

22        MR. BROWN:  I understand.

23  Q.  Have you spoken with him about this

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

181

ELIZABETH LINDEMANN -- 10/3/07

1    lawsuit?
2    A.   No.
3    Q.   Okay.  Now, you say you also spoke with the
4         operations manager, who was the operations
5         manager back in February of '06?
6    A.   Robert Winter.
7              THE REPORTER:  Robert -- I'm
8              sorry, I didn't hear.
9              THE WITNESS:  Robert Winter.
10   Q.   Is he still operations manager?
11   A.   No.  He resigned.
12   Q.   Okay.  How long was Mr. Winter the
13        operations manager at Glovis?
14   A.   Two years.
15   Q.   Okay.  So he just resigned this year?
16   A.   Correct.
17   Q.   Do you know when he resigned?
18   A.   It was July of '07.
19   Q.   Okay.  And was he terminated or suspended,
20        or did he just resign on his own volition?
21   A.   He voluntarily resigned.
22   Q.   Okay.  Was he the subject of any
23        investigation?

182

ELIZABETH LINDEMANN -- 10/3/07

1    A.   No.
2    Q.   Okay.  Have you talked with Mr. Winter
3         about this lawsuit?
4    A.   No.
5    Q.   Have you not spoken with him since his
6         resignation in July of '07?
7    A.   I spoke to him in August about insurance.
8    Q.   Was it dealing with the Cobra plan?
9    A.   Yes.
10   Q.   Okay.  Do you know if Mr. Winter is -- if
11        he's gainfully employed at another company?
12   A.   As far as I know, yes.
13   Q.   What company is he with?
14   A.   That I don't know.
15   Q.   Okay.  But you -- how did you come to
16        understand that he had gotten another
17        position?
18   A.   When I spoke to him in August, he mentioned
19        his job, but I don't recall the name of the
20        company.
21   Q.   Did his job not provide insurance?
22   A.   I don't know the details or --
23   Q.   Yeah, I'm just trying --

183

ELIZABETH LINDEMANN -- 10/3/07

1    A.   -- the benefits for that, I don't know.
2    Q.   Yeah, okay.  I'm just trying to figure out
3         if he was employed with another company
4         when he talked with you in August of '07,
5         why would he need Cobra benefits?
6    A.   Again, I don't know what -- when his
7         insurance with the new company would start.
8    Q.   I understand.
9              MR. ENLOE:  We take the same
10             position on Mr. Winter.  As a
11             management level employee,
12             contact should be made through
13             counsel for defendant.
14             MR. BROWN:  That's fine.  We'll
15             hammer that out with the Court.
16   Q.   What, if anything, did you discuss with
17        Mr. Winter about your investigation
18        involving Mr. Albright and Ms. Riviera?
19             MR. ENLOE:  Again, the standing
20             objection, but subject to that.
21             MR. BROWN:  Okay.
22   Q.   You -- go ahead.
23   A.   Basically what we discussed is, based on

184

ELIZABETH LINDEMANN -- 10/3/07

1         the investigation, I recommended
2         termination.
3    Q.   You recommended termination?
4    A.   Uh-huh.
5    Q.   And did Mr. Winter concur in that
6         recommendation?
7    A.   Yes.
8    Q.   Okay.  Did Mr. Winter assist you in your
9         investigation?
10   A.   No.
11   Q.   Okay.  Were you the sole one that
12        investigated it?
13   A.   Yes.
14   Q.   Okay.  And other than Mr. Winter concurring
15        in your termination request, was there
16        anybody else who had to come on board in
17        order for Mr. Albright to be terminated?
18   A.   No.
19   Q.   Okay.  Now, tell me the reason or reasons
20        why you decided that Mr. Albright should be
21        terminated from Glovis.
22   A.   He was terminated for what we classify as
23        unwanted behavior, harassment.

185

ELIZABETH LINDEMANN -- 10/3/07

1    Q.   You mean sexual harassment or harassment?
2    A.   **Harassment.**
3    Q.   Okay.  Harassment was not of a sexual
4         nature?
5              MR. ENLOE:  Object to form.  It
6              calls for a legal conclusion.  I
7              don't know that --
8    Q.   Well, well, let me ask you this:  You have
9         quite a bit of experience in
10        human-resource-related issues, do you not?
11   A.   **Uh-huh.**
12   Q.   Do you not?
13   A.   **Yes.**
14   Q.   Okay.  And do you understand what sexual
15        harassment is?
16   A.   **I do.**
17   Q.   Okay.  And isn't it true sexual harassment
18        is comments -- unwelcome comments that are
19        of a sexual nature?
20             MR. ENLOE:  Object to form.
21             That's really asking her to give
22             an opinion as to the law.
23             MR. BROWN:  Okay.  Well, let me

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

186

ELIZABETH LINDEMANN -- 10/3/07

1              ask you this, objection noted.
2    Q.   Because I think we are, kind of, getting in
3         to some ridiculous issues here, but anyway,
4         did you understand that one of the reasons
5         that Mr. Albright was being terminated was
6         because of harassment of a non-sexual
7         nature?
8              MR. ENLOE:  Object to form.
9    Q.   You can answer.
10   A.   **Can you repeat that?  I'm sorry, could you**
11        **repeat the question?**
12   Q.   Did you understand, because you recommended
13        that he be terminated, you had the
14        authority to terminate Mr. Albright, you
15        hired him obviously as the human resource
16        specialist so my question was, could you
17        give me the reason or reasons why he was
18        terminated, and in response to that, you
19        said, because -- and I want to be very
20        clear -- because of harassment; is that
21        true?
22   A.   **Correct.**
23   Q.   And my follow-up question to that is, was

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

187

ELIZABETH LINDEMANN -- 10/3/07

1         this harassment of a sexual nature or a
2         non-sexual nature?
3              MR. ENLOE:  Object to form.  You
4              can answer.
5    A.   **Okay.  I lost track.  Potential, yes.**
6    Q.   Potential sexual nature?
7    A.   **Correct.**
8    Q.   Okay.  Is it your position that the
9         allegations that Ms. Riviera made against
10        Mr. Albright were not established to your
11        satisfaction?
12   A.   **The allegations she made, I believed the**
13        **allegations.**
14   Q.   Why did you believe them?
15   A.   **Based on the detail.**
16   Q.   Okay.
17   A.   **And the detail of what she said what had**
18        **happened.**
19   Q.   Okay.  Did you get any corroborating
20        information from any of the witnesses that
21        you interviewed to verify the accuracy of
22        Ms. Riviera's complaint?
23             MR. ENLOE:  Object to form.  It's

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

188

ELIZABETH LINDEMANN -- 10/3/07

1         a foundation objection.
2              MR. BROWN:  You can answer.
3    A.   **There were -- there were things said during**
4         **the course of the investigation that would**
5         **lead me to believe it, yes.**
6    Q.   Okay.
7              THE REPORTER:  I'm sorry.  Can you
8              say --
9    A.   **There were things said during the course of**
10        **the investigation that would lead me to**
11        **believe it.**
12   Q.   Okay.  Anything else other than what we've
13        talked about that was said during the
14        course of the investigation that made you
15        believe that Ms. Riviera's complaint was
16        true?
17   A.   **No.**
18   Q.   Okay.  I'm looking for a particular
19        document.  Now, other than -- and I want to
20        use your term, other than harassment, okay,
21        any other reason for Mr. Albright's
22        termination?
23   A.   **No.**

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

189

ELIZABETH LINDEMANN -- 10/3/07

1  Q.  Now, you were present during the entire
2      deposition of Ms. Marshall, were you not?
3  A.  Yes.
4  Q.  Okay.  And do you recall Ms. Marshall
5      testifying that Mr. Albright also asked her
6      on a date?
7  A.  Yes.
8  Q.  Do you recall that?
9  A.  Yes.
10 Q.  Okay.  And Ms. Marshall -- that was more
11     than one time that Mr. Albright allegedly
12     asked Ms. Marshall out on a date, do you
13     recall that testimony?
14     MR. ENLOE:  Object to form.  The
15       record will speak for itself.
16     MR. BROWN:  You can answer.
17 A.  I believe that's what she said.
18 Q.  Okay.  And do you recall her denying his
19     request?
20 A.  Yes.
21 Q.  Okay.  Now, about how long would you say
22     your investigation occurred?
23 A.  Over the course of a couple of days.  I

190

ELIZABETH LINDEMANN -- 10/3/07

1      don't remember exactly.
2  Q.  Okay.  Let me do something that may job
3      your memory, if you can identify that
4      document for me, please.  I'm going to mark
5      this as Plaintiff's Exhibit 3.
6      (The referred-to document was
7        marked for identification as
8        Plaintiff's Exhibit No. 3.)
9  Q.  If you can identify that for me once you
10     get a chance to review it.
11 A.  A notice of separation that was given to
12     Mr. Albright.
13 Q.  Okay.  Is this a true and accurate copy of
14     the notice of separation that would have
15     been given to Mr. Albright?
16 A.  Yes.
17 Q.  And I understand this is not the exact
18     document, but all the information contained
19     on this document would have been given to
20     Mr. Albright?
21 A.  Correct.
22 Q.  Okay.  And this is notice to Mr. Albright
23     indicating that his employment with Glovis

191

ELIZABETH LINDEMANN -- 10/3/07

1      was terminated; is that correct?
2  A.  Yes.
3  Q.  And I believe this document gives a
4      termination date of February 15th?
5  A.  Correct.
6  Q.  Okay.  And it's -- it gives a reason for
7      his discharge; is that correct?
8  A.  Yes.
9  Q.  And it talks about gross misconduct,
10     harassment of employees; correct?
11 A.  Yes.
12 Q.  Now, other than Ms. Riviera, was there any
13     additional employee that he harassed?
14 A.  No.
15 Q.  Okay.  Now, one thing we know is that
16     Ms. Riviera was not an employee of Glovis,
17     you know that, right?
18 A.  That's correct.
19 Q.  Okay.  Now, you can -- it has -- is this
20     Mr. Albright's signature on the bottom
21     showing that he, in fact, did get it?
22 A.  Yes.
23 Q.  Okay.  Now, the C column, it says on --

192

ELIZABETH LINDEMANN -- 10/3/07

1      after the investigation, that it was
2      concluded that Ellis demonstrated
3      inappropriate behavior in the workplace,
4      and is that what you refer to as the
5      harassment that we talked about?
6  A.  Yes.
7  Q.  Okay.  Will you set that aside for a
8      second?
9      (Off-the-record discussion.)
10 Q.  If you can identify -- take your time and
11     review it and let me know when you're
12     ready, please.
13     (The referred-to document was
14       marked for identification as
15       Plaintiff's Exhibit No. 4.)
16 A.  Okay.
17 Q.  You had a chance to review it in it's
18     entirety?
19 A.  Yes.
20 Q.  Can you identify this document for me,
21     please?
22 A.  The notice I received from unemployment
23     compensation.

193

ELIZABETH LINDEMANN -- 10/3/07

1  Q.  Okay. And before today, have you seen this
2      document?
3  A.  **Yes.**
4  Q.  Okay. And at the bottom of this document
5      it appears your name and your title and
6      your telephone number, would that have
7      been -- what is that 387-4203?
8  A.  **Correct.**
9  Q.  Okay. And is this -- did you fill out the
10     information that's on this sheet?
11  A.  **Yes.**
12  Q.  Okay. And it does show consistent with
13     Plaintiff's Exhibit 3, No. 9, that his last
14     date of employment was February 15th of
15     2006?
16  A.  **Yes.**
17  Q.  Then it has No. 11, the final date
18     of the incident that caused the discharge,
19     and that was February 8th of '06, do you
20     see that?
21  A.  **Yes.**
22  Q.  Okay. Does that help to refresh your
23     recollection regarding when the complaint

194

ELIZABETH LINDEMANN -- 10/3/07

1     was made to you by Diego regarding
2     Ms. Riviera?
3  A.  **It had to be around that time.**
4  Q.  Okay.
5  A.  **I would get the information from his files**
6     **so.**
7  Q.  From whose file, from Diego?
8  A.  **From Mr. Albright.**
9  Q.  From Mr. Albright?
10  A.  **When I complete these forms.**
11  Q.  Okay. And, again, what I'm trying to do,
12     because, you know, obviously dates are very
13     important so I'm trying to get some
14     understanding of when this alleged incident
15     occurred between Mr. Albright and
16     Ms. Riviera. Am I correct that this
17     document that we have marked as Plaintiff's
18     Exhibit 4 seems to indicate that the final
19     incident that caused his discharge occurred
20     on February 8th of 2006?
21  A.  **Yes.**
22  Q.  Okay. So basically your investigation
23     would have been over the course of eight

195

ELIZABETH LINDEMANN -- 10/3/07

1     days including the weekend?
2       MR. ENLOE: Object to form.
3  A.  **He was discharged on the 15th.**
4  Q.  Okay. But my question is --
5  A.  **Uh-huh.**
6  Q.  -- if I -- I mean, I know your counsel's
7     objected, but you still got to answer the
8     question. My question is to -- I'm trying
9     to figure out the length of your
10     investigation, okay? And it gives a date
11     of February 8th as being the final incident
12     that caused his discharge, and he last
13     worked on February 15th of 2006?
14  A.  **Yes.**
15  Q.  That's a span of seven days; right?
16  A.  **Yes.**
17  Q.  Okay. My question is, is that a fair
18     representation of how long your
19     investigation took regarding the
20     Ms. Riviera situation?
21  A.  **I would say so, yeah.**
22  Q.  Okay. Now, help me with this on No. 10,
23     and I don't know, that's why I'm asking.

196

ELIZABETH LINDEMANN -- 10/3/07

1     Okay. LDW would have been "last day
2     worked"; right?
3  A.  **Yes.**
4  Q.  Okay. All right. All right.
5       MR. BROWN: I'm sorry. I'm just
6       making sure that I've asked all
7       my questions on this document.
8       All right.
9       MR. ENLOE: When you get to a
10       stopping point, can we take a
11       little break?
12       MR. BROWN: Oh, yeah. I
13       apologize. I'm just -- if I ask
14       a couple of quick questions --
15       I'm really trying, I know you got
16       a long drive, and I'm trying
17       to --
18       MR. ENLOE: Take your time.
19  Q.  (Mr. Brown) Have you seen this document
20     before?
21       (The referred-to document was
22       marked for identification as
23       Plaintiff's Exhibit No. 5.)

197

ELIZABETH LINDEMANN -- 10/3/07

1    A.    Yes.
2    Q.    Okay.  You might -- do you need a minute to
3          review it?
4    A.    No.
5    Q.    Okay.  If you can, identify it for me,
6          please.
7    A.    **It's the notice from unemployment about**
8          **their determination of his benefits,**
9          **unemployment benefits.**
10   Q.    Okay.  And did this come directly to you
11         or --
12   A.    **Yes, it came to --**
13   Q.    Okay.  And it says that it was mailed on
14         February 20th of '06, do you know when you
15         received it?
16         MR. ENLOE:  March 20th.
17   Q.    March, I'm sorry.  March 20th, I'm sorry,
18         of '06, do you know when you received it?
19   A.    **Not -- no.**
20   Q.    Okay.  And do you know what, if anything,
21         specifically Mr. Albright may have told the
22         unemployment compensation agency about the
23         nature of his discharge?

198

ELIZABETH LINDEMANN -- 10/3/07

1    A.    **No.**
2    Q.    Okay.  So am I correct in that his weekly
3          benefit amount would have been $220?
4    A.    **I guess, that's their determination.**
5    Q.    And that would have been paid by Glovis?
6    A.    **Out of the unemployment insurance funds,**
7          **yeah.**
8    Q.    Right.  Okay.  Do you know the total amount
9          of benefits that was paid to Mr. Albright?
10   A.    **Not off the top of my head, no.**
11   Q.    Okay.  Do you know how long he received
12         unemployment benefits?
13   A.    **Not off the top of my head, no.**
14   Q.    Okay.  Let me ask you one question and then
15         we can break for a little while.  Do you
16         have any personal objection to someone that
17         you believe committed harassment receiving
18         unemployment benefits?
19   A.    **Personal doesn't -- I mean, I have to**
20         **address the company, not personally.**
21   Q.    Well, I understand, but what I'm asking,
22         personally, do you have any objection to
23         that?

199

ELIZABETH LINDEMANN -- 10/3/07

1    A.    **Personally, yes.**
2    Q.    Okay.  Did you as the HR specialist, did
3          you communicate your personal position on
4          Mr. Albright receiving unemployment
5          benefits to the company?
6    A.    **No.**
7          MR. BROWN:  All right.  This may
8               be a good stop, and I think I
9               just may go over some things, and
10              I'm very close to being finished.
11              I might be finished so.
12         (Brief recess taken.)
13   Q.    (By Mr. Brown)  We're back on the record.
14         I should have asked you this earlier, Liz,
15         and I apologize for this, but Glovis's
16         position that Ms. Marshall abandoned her
17         job, is that similar in your mind to a
18         resignation?
19   A.    **Yes.**
20   Q.    Okay.  So it's just basically the
21         abandonment is just Glovis' position she
22         just quit?
23   A.    **Yes.**

200

ELIZABETH LINDEMANN -- 10/3/07

1    Q.    Okay.  And generally when an employee
2          resigns, are they given any sort of exit
3          interview or anything like that?
4    A.    **Depends on the circumstances, if they walk**
5          **out the door.**
6    Q.    Okay.
7    A.    **I mean.**
8    Q.    All right.  And in this case, consequently,
9          Marshall was -- Sukenia Marshall was not
10         given any kind of exit interview or
11         anything like that?
12   A.    **Correct.**
13   Q.    Okay.  Now -- and we talked about some of
14         the core team values, and I don't want to
15         mark the exhibit.  That's what I'm trying
16         to shortcut it.  We talked a little bit
17         about how teamwork is encouraged at Glovis?
18   A.    **Correct.**
19   Q.    And when appropriate, you know, that other
20         employees should help people in their
21         particular line, remember us talking about
22         that earlier?
23   A.    **Yes.**

201

ELIZABETH LINDEMANN -- 10/3/07

1   Q.   Okay. And after Ms. Marshall made these
2        complaints, and I understand Glovis'
3        position that she complained that only that
4        Mr. Albright was picking on her, and that
5        was basically not giving her the help that
6        she felt she deserved?
7   A.   That's correct.
8   Q.   Okay. Based on those complaints at any
9        time, and I know the answer to this, but I
10       just need to get it on the record, at any
11       time was Mr. Albright temporarily assigned
12       until Glovis looked into these allegations,
13       anything like that happen?
14  A.   Which allegations?
15  Q.   The allegations regarding that Mr. Albright
16       was picking on her?
17  A.   No.
18  Q.   Okay. And at that point, Ms. Marshall was
19       not reassigned to any areas; is that
20       correct?
21  A.   That's correct.
22  Q.   Okay. Now, the -- and this is getting back
23       to Plaintiff's Exhibit 2 which is the

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

202

ELIZABETH LINDEMANN -- 10/3/07

1        e-mail, the initial e-mail that you sent,
2        and I neglected to ask you this earlier,
3        but the two pages of e-mails that we've
4        marked as Plaintiff's Exhibit 2 --
5   A.   Okay.
6   Q.   -- and the first page of the e-mail --
7        second page, I'm sorry, is Bates stamped
8        GLOVIS 3, you follow me?
9   A.   Yes.
10  Q.   Okay. And, you know, we've talked about
11       that the e-mail indicating that Sukenia was
12       having problems in her area and so forth,
13       we talked about that; right?
14  A.   Okay.
15  Q.   Do you know who, if anyone, may have
16       reported that to Mr. Harris?
17  A.   Reported?
18  Q.   Reported these alleged problems that
19       Ms. Marshall was having in her work area,
20       would that probably have been Mr. Albright?
21            MR. ENLOE: Object to form.
22            MR. BROWN: Well, that's a good
23            objection.

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

203

ELIZABETH LINDEMANN -- 10/3/07

1   Q.   Do you know who, if anyone, may have told
2        Dave about these alleged problems
3        Ms. Marshall was having in her work area?
4   A.   The only issue I brought to him was the one
5        she came to me with. The other ones, I
6        don't know.
7   Q.   Okay. So to answer my question, you don't
8        know who, if anyone, may have told Dave
9        about these alleged problems Ms. Marshall
10       was having in her work area?
11  A.   No.
12  Q.   Okay.
13            MR. BROWN: I think that's about
14            it, Liz, all I have, and your
15            attorney may have some follow-up
16            questions for you. If you need a
17            few minutes --
18            MR. ENLOE: If you don't mind.
19            MR. BROWN: Do you want to take a
20            little break?
21            MR. ENLOE: Yeah.
22       (Brief recess taken.)
23            MR. ENLOE: No questions.

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

204

ELIZABETH LINDEMANN -- 10/3/07

1        (The deposition of ELIZABETH
2        LINDEMANN concluded at
3        approximately 3:35 p.m., on
4        October 3, 2007.)

VILA DAVENPORT, CCR -- FREELANCE JUDICIAL REPORTER -- 334.324.1127

205

ELIZABETH LINDEMANN -- 10/3/07

1              * * * * * * * * * * *

2          REPORTER'S  CERTIFICATE

3              * * * * * * * * * * *

4

5    STATE OF ALABAMA

6    COUNTY OF MONTGOMERY

7

8              I, Vila Davenport, Judicial

9    Reporter and Notary Public in and for the

10   State of Alabama at Large, do hereby

11   certify that on Wednesday, October 3, 2007,

12   pursuant to notice and stipulation on

13   behalf of the Plaintiff, I reported the

14   deposition of **ELIZABETH LINDEMANN**, who was

15   first duly sworn by me to speak the truth,

16   the whole truth, and nothing but the truth,

17   in the matter of SUKENIA MARSHALL,

18   Plaintiff, versus GLOVIS ALABAMA, LLC,

19   Defendant, Civil Action No.: 2:06CV973, now

20   pending in The United States District

21   Court, In the Middle District of Alabama,

22   Montgomery Division, that the foregoing 204

23   typewritten pages contain a true and

206

ELIZABETH LINDEMANN -- 10/3/07

1    accurate transcription of the examination

2    of said witness by counsel for the parties

3    set out herein; that the reading and

4    signing of said deposition was waived by

5    witness and counsel for the parties.

6              I further certify that I am

7    neither of kin nor of counsel to the

8    parties to said cause, nor in any manner

9    interested in the results thereof.

10             This 24th day of October, 2007.

11

12

13             _____
               Vila Davenport, CCR
               Reporter and Notary Public

14             State of Alabama at Large

15   My Commission Expires
     September 6, 2009

16

17

18

19

20

21

22

23

PLAINTIFF'S
EXHIBIT
2

PENGAD 800-631-6989

Page 1 of 1

**Elizabeth Lindemann**

| | |
|---|---|
| From: | Davis Harris |
| To: | Elizabeth Lindemann |
| Cc: | Gino@Glovis.net |
| Subject: | Re: Sukenia Marshall |
| Attachments: | |

Sent:Thu 7/21/2005 9:12 AM

Liz
Just to confirm the situation with Sukenia Marshall

- July 20  approx 10:00am, HR notified me that Sukenia had issues with employee Ellis
  _____. She was referred to manager for counsel
- Manager spoke with Sukenia and understood her complaint, regarding Ellis, was due to him
  constantly giving instructions and always " picking her out for work assignments. She also
  complained that no one was helping her. Manager committed to have  a discussion with both
  present and listen to each side of the issue to resolve. Sukenia was satisfied with the action
  and communicated to HR her satisfaction with a "Thank You"
- July 20 approx 11:00am . Manager was reviewing staffing records and noted that Sukenia was
  to hired for second shift, but was still on first.
- Manager informed Sukenia that the situation may change when she goes to second shift, and
  monday start time was 5:00 pm.
- Sukenia becam very adgitated with her instruction from the manager regarding second shift
  and stated that she was not going to report to second shift.
- Manager informed her that there is not an option on this issue and no authorization has been
  given ot her for permanent first shift.
- Sukenia proceeded to HR office with Manager to discuss further.
- Discussion with HR resulted in confirmation that she was hired for second shift and she was
  to report as instructed.
- Sukenia became very irritated and wakled off the job without authorization stating that she
  must leave.
- Manager was informed by HR that she left the job without authorization after discussion.
- Manager informed HR that this behavior will not be accepted and action would be taken,
  based on her abandoning her jwalking off the job.
- July 21st 9:30am, Manager was notified that Sukenia was at work today. Manager met with
  employee and notifed her of her discharge due to her actions of walking off the job without
  authorization.
- Sukenia stated that she thought HR gave her permission, but stated that being discharged was
  fine and she really did not need this " stuff"
-

Turn  89

GLOVIS 0002

**Elizabeth Lindemann**

| | | |
|---|---|---|
| **From:** | Davis Harris | **Sent:** Wed 7/20/2005 7:19 AM |
| **To:** | Elizabeth Lindemann | |
| **Cc:** | | |
| **Subject:** | RE: Breakdown | |
| **Attachments:** | | |

Thanks Liz,
This employee has been reported to have been having problems staying in her area as instructed. She has had problems working with others and actually just does what she pleases. Ellis is really trying to work with her but this is a case where she just does not think she has a boss.
Tim is out today with his foot and has been out the past weeks, so there has been some playing the people games from her.
I will speak with her today, and basically I am sure she will not be pleased with what I have to say based on what I have been told.
Thanks Dave

-----Original Message-----
From: Elizabeth Lindemann
Sent: Wed 05/07/20 9:03 AM
To: Davis Harris
Cc:
Subject: Breakdown

Dave,

Good morning. Something I wanted to bring to your attention. Sukenia Marshall came to me this morning about 8:45 a.m. asking to go home. I asked her why and she indicated that she just needed to get away from the area back there.

I asked her what was going on, here is the issue she says that Ellis is on her all of the time, telling people not to help her, telling people just to let her do it (lifting boxes) if she is going to have that type of attitude like she does.

This morning she said that Ron came back and Ellis kept telling him to go to the cardboard area. She says this is just to pick at her. She did say she talked to Tim yesterday, not sure what the outcome is.

I told her that I would talk to you about it and she would like to sit down and discuss further.

I also told her to go back to work. Please let me know the outcome.

Liz

GLOVIS 0003

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA

SUKENIA MARSHALL,                          )
                                           )
                    Plaintiff,             )
                                           )        Civil Action No. 2:06CV973-ID
          v.                               )
                                           )
GLOVIS ALABAMA, LLC,                       )
                                           )
                    Defendant.             )
                                           )

DECLARATION OF ELIZABETH LINDEMANN

I, Elizabeth Lindemann, a resident of Autauga County, Alabama, hereby declare as follows:

1.    I am over the age of 21, am not suffering from any legal disabilities and am competent to testify to the matters set forth in this Declaration.

2.    The facts and circumstances set forth below are based upon my personal knowledge, and are true.

3.    Glovis operates a consolidation center at 300 Hyundai Blvd, Montgomery Alabama.

4.    This warehouse receives and stores automotive parts that eventually are sent to customers for use in making automobiles.

5.    I worked for Glovis Alabama LLC as a human resources specialist in July 2005; I am currently employed by Glovis as its assistant human resources manager.

6.    In July 2005, Glovis had roughly 170 employees; employee ranks ranged between 15 and 174 over the course of that year, and averaged over 101 employees for the balance of the year.

7.    Currently Glovis has 180 employees.

8.    In my time with the company, Glovis has ended the employment of a number of employees for job abandonment / leaving work before the end of a designated shift.

9.    For example, in 2005 the company discharged three employees in addition to Ms. Marshall for this reason.

I declare under penalty of perjury under the law of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this _11th_ day of February, 2008.

Elizabeth Lindemann